**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ROBERT M. MILLER,<br><br>                              *Plaintiff,*<br><br>        v.<br><br>MERRICK B. GARLAND, U.S. Attorney General,<br>U.S. DEPARTMENT OF JUSTICE; STEVEN<br>DETTELBACH, Director, Bureau of Alcohol<br>Tobacco, Firearms, and Explosives; BUREAU<br>OF ALCOHOL, TOBACCO, FIREARMS AND<br>EXPLOSIVES,<br><br>                              *Defendants.* | Civ. Act. No: 1:22-cv-02579-CKK<br><br><br><br><br><br><br><br>JURY TRIAL WAIVED |

**FIRST AMENDED COMPLAINT**

COMES NOW Plaintiff Robert M. Miller, *pro se*, pursuant to Federal Rules of Civil Procedure and for his claims seeking declaratory and injunctive relief and damages as follows:

**INCORPORATION AND RELATION BACK**

1.      This *First Amended Complaint* incorporates herein by reference and relates back to the pleadings of the *Verified Complaint*, ECF 1, Exhibits 1—5 of that complaint, and any other pleadings, motions, or exhibits submitted to this Court subsequent to that complaint.

**PARTIES**

2.      Plaintiff is a natural person and a citizen of the United States and the Commonwealth of Virginia, residing in Loudoun County, Virginia.

3.      Defendant Merrick B. Garland is the United States Attorney General and head of the U.S. Department of Justice, a federal government agency.

4.    Defendant Steven Dettelbach is the Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives, a federal bureau under the authority of the U.S. Department of Justice, ("Agency" or "ATF").

## JURISDICTION AND VENUE

5.    This Court has jurisdiction for this action under 28 U.S.C. §1331 and 5 U.S.C. §702.

6.    Declaratory judgment and relief are authorized under 28 U.S.C. §2201-2202.

7.    This Court has inherent powers of injunctive relief under U.S. Const. Art. III, Sec. 2.

8.    Venue is proper under 5 U.S.C. §703; 28 U.S.C. §1391(e)(1) because a substantial part of the events giving rise to the claims occurred in Washington, D.C., and all Defendants and Plaintiff reside in or near Washington, D.C.

## STANDING

9.    On April 26, 2022, Defendants issued a final rule *Definition of 'Frame or Receiver' and Identification of Firearms*, RIN 1140-AA54, amending the Code of Federal Regulations, Title 27, Parts 447, 478, and 479. ("Rule")

10.   The Rule is a final rule made reviewable by the Administrative Procedure Act for which there is no other adequate remedy in a court. 5 U.S.C. §704.

11.   Plaintiff has standing and states a claim upon which relief may be granted to oppose Defendants' Rule because, as described in the facts below, he is directly and concretely injured by the Rule causing loss of his private property, unwarranted regulation of his actions and private property, exposure to potential felony criminal prosecution for non-harmful actions, and restricting his liberties, especially those protected by the United States Constitution, Articles of Amendment II, IV, V, IX and the Common Law, and setting aside the Rule and providing declaratory and injunctive relief and damages will cure such harm.

12.     Plaintiff has standing and states a claim upon which relief may be granted in opposing the

National Firearms Act of 1934, Pub. L. 73-474 ("NFA") because it causes injury in fact in

violation of the Second Amendment to the United States Constitution, such injury is caused

by the NFA, and overturning NFA and awarding damages redresses the harm in its entirety.

## STATEMENT OF FACTS

13.     Plaintiff has an M.A. and Ph.D. in Economics from the University of Illinois (1995, 2002),

and a B.S. in Mathematics and Economics from the University of Colorado at Denver

(1992).

14.     Plaintiff is a Senior Financial Economist for a Federal financial regulator, whose regular

duties involve conducting cost-benefit analysis for agency rulemaking, and analyzing rules

for compliance with, *inter alia*, the Administrative Procedure Act, Congressional Review

Act, Regulatory Flexibility Act, Small Business Regulatory Enforcement Fairness Act,

Executive Orders 12866 and 13563, and Office of Management and Budget Circular A-4.

15.     Plaintiff is a disabled veteran with a 60% compensatory disability rating from the Veterans

Administration including, *inter alia*, a 10% service connected disability for tinnitus, which

is the maximum evaluation for unilateral or bilateral tinnitus absent the development of

Meniere's syndrome, which has a rating of 30%.

16.     Tinnitus is the perception of a piercing or ringing sound by the ear when no corresponding

external sound is present.

17.     More than thirty million Americans over the age of twelve, about 13% of population, suffer

hearing loss. Sixteen million people seek medical attention for tinnitus annually.

18.     More than 1.25 million veterans suffer from hearing loss, with nearly two million suffering

from tinnitus, representing the top two most frequent service connected disabilities.

19.   Firearms, by statutory and functional definition, launch projectiles using expanding gases arising from an explosive charge.

20.   Plaintiff is the lawful owner of numerous firearms, including Glock-style pistols, Sig Sauer P320-style pistols, semi-automatic AR-15-style rifles, and firearm silencers.

21.   The AR-15 rifle ("AR") and its kind are the most popular rifles in the United States for personal and common defense, hunting, and sport shooting.

22.   An AR rifle has two receivers, commonly called "upper" and "lower" receivers. The upper receiver and all its parts are unregulated, except for certain rifles where the manufacturer and Defendants determined that the upper receiver is the "firearm," e.g., B&T APC 9, FN SCAR 17, and Sig Sauer 556.

23.   The AR upper receiver houses, *inter alia*, the bolt carrier, bolt, firing pin, and charging handle. The barrel and barrel extension are inserted into the front of the upper receiver.

24.   The lower receiver houses, *inter alia*, the trigger, hammer, and selector lever (safety), together commonly known as the "fire control group." A pistol grip attaches to the bottom of the lower receiver. The magazine containing ammunition is inserted into the lower receiver. A receiver extension, also known as a "buffer tube," is attached to the back of the lower receiver containing a buffer and buffer spring. The buffer and buffer spring return the bolt carrier group into battery to begin the next firing cycle. The butt stock usually attaches to the receiver extension.

25.   The lower AR receiver is the serialized and regulated "firearm."

26.   Purchasing a lower receiver generally requires a transaction conducted by a federal firearms licensed ("FFL") dealer with an accompanying National Instant Criminal

Background Check System ("NICS") background check, except for private party sales between citizens of the same state where not prohibited by state law.

27.   Upper receivers and their components could be purchased from gun stores and on the internet without any regulation or background check.

28.   While other semi-automatic rifles have somewhat different configurations, the description of the AR is generally applicable for purposes of the instant *First Amended Complaint*.

29.   Unfinished, non-functional AR lower receivers, commonly known as "80% receivers" representing the approximate level of completion toward a fully-functional lower receiver, are often sold to consumers to facilitate making their own lawful firearms.

30.   Upon information and belief, it has never been illegal in the United States for a law-abiding citizen to make rifles, pistols, or silencers for personal use.

31.   These unfinished receivers often come in a parts kit containing jigs, drill bits, and instructions on how to complete the receiver into a fully-functional receiver.

32.   Plaintiff attempted to make a fully-functional AR lower receiver using a parts kit with jig and drill bits, and he failed to do so despite using a $2,000 mini milling machine. Plaintiff's attempts took several days, including attempting to fit the fire control group into the receiver and to get it to function. This receiver remains unfunctional.

33.   Plaintiff had previously made numerous fully-functional firearms using commercially produced firearm receivers in under two hours.

34.   Until the Rule was promulgated, Defendants did not regulate 80% receivers.

35.   Defendants expressly stated in numerous prior communications with the public and regulated industry that such receivers were not "firearms" subject to regulation.

36.   Semi-automatic pistols typically consist of three major parts: frame, slide, and barrel.

37. The frame houses the trigger mechanism and is the regulated "firearm," the only part required to be serialized for most semiautomatic pistols.

38. Slides, barrels, and other internal semiautomatic pistol parts could be purchased from any store or from web sites without regulation or background checks. These parts are usually interchangeable with parts from other guns of the same or similar model.

39. To the extent slides, barrels, and internal parts bear serial numbers, U.S. law and regulations have never required those serial numbers to match the serialized frame.

40. For Glock-style or Striker-style pistols, the slide houses the striker (similar to a firing pin), safety mechanisms, and springs to power the pistol functions.

41. For Hammer-style pistols – the standard semiautomatic pistol style for more than a century until the striker innovation – the slide houses a firing pin, safety mechanisms, and springs to power the pistol functions, while the frame houses the hammer.

42. For the purposes of this *FAC*, there is no need to distinguish between Glock-style and Hammer-style pistols unless otherwise noted.

43. Plaintiff owns one 80% Glock-style frame with a jig and drill bits, but Plaintiff has never attempted to make a Glock-style pistol with this or any other kit.

44. Firearm silencers, also known as "silencers," "suppressors," and "mufflers," are devices that reduce the volume and moderate the tone of firearms. Silencers work on the same principles as an automobile muffler.

45. Firearm noise is mainly caused by the rapid expansion of gases that push the projectile down the barrel, past the muzzle, and toward the target.

46. These hot, supersonic gases upon reaching the muzzle produce a loud cracking sound – a small sonic boom – that can damage the hearing of people in the vicinity. These loud noises

can also frighten game animals while hunting and cause civil disturbances or fear.

47.   "Silencer" was a trademark and marketing name by Hiram Percy Maxim, who patented the first commercially successful silencer around 1902.

48.   Silencers pre-existed Maxim's design, but the history of silencers is uncertain.

49.   Silencers do not make guns completely silent; a firearm fitted with a silencer can still produce sound louder than a rock and roll concert, and comparable with jet airplanes, jackhammers, and ambulance sirens.

50.   The NFA regulates certain types of firearms including, silencers, short-barreled rifles, and short-barreled shotguns.

51.   In 2019, there were approximately 13,927 homicides with firearms. Of those, handguns accounted for 6,368 (45.7%); rifles 364 (2.6%), and shotguns 200 (1.4%).[1]   Obviously, short-barreled rifles and short-barreled shotguns accounted for less than the figures for all rifles and shotguns.

52.   There were more homicides in 2019 using hands, fists, or feet than rifles and shotguns combined.

53.   Because of their shorter barrels, short-barreled rifles and shotguns fire projectiles at a lower velocity and thus less energy than otherwise identical rifles and shotguns with longer barrels firing identical projectiles.

54.   Certain AR "pistols" with barrels under 16 inches and unregulated by the NFA are functionally identical to and just as concealable as AR short-barreled rifles.

---

[1] FBI: Uniform Crime Report, Expanded Homicide Data Table 8.
https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/tables/expanded-homicide-data-table-8.xls

55. Certain "firearms," e.g., the Mossberg Shockwave, with barrels under 18 inches, and unregulated by the NFA, are functionally identical to short-barreled shotguns.

56. Under 26 U.S.C. §5845, silencers are defined as "firearms" even though they do not expel projectiles by the action of an explosive as defined in 18 U.S.C. §921.

57. NFA did not ban silencers, short-barreled rifles, and short-barreled shotguns, but provided for a $200 tax for the making or transfer of such weapons, and submission of a photograph and fingerprints.

58. The $200 tax at the time NFA was enacted would be about $4,420 in today's dollars.

59. Plaintiff currently owns twenty-four short-barreled rifles, and he has paid $4,800 in NFA taxes to own these weapons.

60. Plaintiff currently owns two short-barreled shotguns, and he has paid $400 in NFA taxes to own these weapons.

61. Plaintiff currently owns a Mossberg Shockwave and "pistols" that are otherwise identical to NFA regulated firearms except for the absence of a butt stock.

62. Silencers generally range in price from $225 to $2,000, meaning that the $200 tax represents between 10% and 89% of the price of the silencer.

63. The SilencerCo Omega 9K – one of the most popular 9mm silencers on the market – costs about $637. The tax stamp adds 31% to the cost of the silencer.

64. Plaintiff currently owns twenty-three silencers, and he paid total taxes of $4,600. Many of these silencers are dedicated to particular guns Plaintiff regularly uses, including his everyday carry (EDC) gun.

65. Silencers generally consist of the following parts: a tubular outer housing, internal baffles allowing hot gases to cool and expand, a front end cap, a rear mount, pistons for mounting

on pistol barrels, and a Nielsen device which assists the operation of a pistol equipped with a silencer. Some silencers have no outer tube but are assembled section by section with a series of baffles, each having their own integral external housing.

66. Silencers can also employ wipes – small disks of plastic or rubber-type material – that further reduce the noise from firearms; however, the effects of wipes diminish as the user punches holes through them by firing bullets.

67. People can buy rubber washers from local hardware stores that can be used as wipes.

68. Defendants consider wipes to be regulated silencer parts, and they must be replaced by the manufacturer at relatively high expense for such an inexpensive item.

69. Plaintiff owned a "solvent trap" with the intent of making of a legal silencer.

70. The solvent trap consisted of an outer tube, internal cones that could be drilled into baffles, a spacer, an end cap that needed to be drilled, and a threaded tail cap for mounting to a firearm. The end cap and cones had a divot indicating the center of the parts for a drill bit. Each component was made of solid aluminum.

71. Agency recently began to consider, without rulemaking, the mere possession of a solvent trap to violate the law, holding they are regulated silencer parts.

72. Plaintiff has never attempted to complete an operational silencer from solvent traps out of fear of Agency's regulations, legal opinions, and prosecutions. Plaintiff destroyed and discarded his solvent trap because of the Rule and Defendants' determinations.

73. Plaintiff is aware of complaints by other persons who filed ATF Form 1 to make a silencer from solvent traps, and those forms were rejected by Defendants and the taxes refunded.

74.   May 21, 2021, Defendants issued a notice of proposed rulemaking ("NPRM"), *Definition of 'Frame or Receiver' and Identification of Firearms* ("Receiver Rule"), RIN 1140-AA54, 87 FR 27720. Exhibit 1.

75.   NPRM proposed to "provide new regulatory definitions of 'firearm frame or receiver' and 'frame or receiver' because the current regulations fail to capture the full meaning of those terms," to amend the definitions of 'firearm' and 'gunsmith,' and to "provide definitions of terms such as 'complete weapon,' 'complete muffler or silencer device,' 'privately made firearm,' and 'readily' for purposes of clarity given advancements in firearm technology." 86 FR 27720.

76.   NPRM cited the Gun Control Act of 1968 ("GCA"), Pub. L. 90-618, as amended, and the National Firearms Act of 1934 ("NFA") as amended, as providing Defendants' authority for its rulemaking. 86 FR 27720.

77.   NPRM claims the intent of promulgating definitions of a frame or receiver "was to provide guidance as to which portion of a firearm was the frame or receiver for purposes of licensing, serialization, and recordkeeping, thereby ensuring that a necessary component of the weapon could be traced if later involved in a crime." 86 FR 27721.

78.   NPRM refers to AR-style and Glock-style receivers and frames as "split/multi-piece receivers." 86 FR 27721.

79.   NPRM cites several criminal cases Agency lost based on the courts' or juries' views that persons prohibited from owning firearms can only be convicted for possessing a complete firearm or receiver with all their attendant parts identified in the statute. 86 FR 27722.

80.  NRPM says these court decisions are a "narrow interpretation" that, if broadly followed, would mean that "as many as 90 percent of all firearms now in the United States would not have any frame or receiver subject to regulation." 87 FR 27722.

81.  NPRM says, "If no portion of split/multi-piece frames or receivers were subject to any existing regulations, such as marking, recordkeeping, or background checks, law enforcement's ability to trace semiautomatic firearms later used in crime would be severely impeded." 87 FR 27722.

82.  NPRM defines privately made firearms ("PMF") or "ghost guns" as those firearms "people can make themselves, often with the assistance of standalone parts or weapon parts kits, using 3D printers or personally owned or leased equipment, without any records or a background check." 87 FR 27722.

83.  The term "ghost guns" is an emotionally-charged term invented and used by gun control advocates to frighten the public into supporting regulation of such guns or gun parts.

84.  The overwhelming majority – nearly 100% – of unmarked PMFs are used by law-abiding citizens for lawful purposes.

85.  NPRM and Rule showed no evidence persons owning unmarked PMFs are more likely than those not owning unmarked PMFs to commit crimes using firearms.

86.  NRPM argues "the number of PMFs recovered from crime scenes throughout the country has increased," with almost 24,000 suspected PMFs recovered by law enforcement from 2016 to 2020, including 325 homicides or attempted homicides. 87 FR 27722.

87.  From 2016 to 2020, there were approximately 56,000 firearm homicides. Thus, PMFs recovered by law enforcement accounted for approximately 0.6% of firearm homicides during this period.

88.   According to the 2021 National Firearms Survey, more than 81.4 million Americans own guns, with between 41% and 44% of households having guns. Other estimates claim that more than 100 million Americans own guns.[2]

89.   Citizens of the United States own between 350 and 500 million guns.

90.   Using the low estimate of gun ownership to favor Defendants, PMFs recovered by law enforcement during this period account for only 0.007% of all guns owned.

91.   NPRM provided no data on the number of unmarked firearm silencers recovered by law enforcement or used in crimes.

92.   Defendants reported that as of May 2021, there are about 2.66 million registered silencers.

93.   On February 17, 2017, the Washington Free Beacon reported that Defendants released statistics showing that the nearly 1.3 million registered silencers at that time were rarely used in crimes – only 44 silencer-related crimes per year over the past decade, which is only 0.003% of silencers used in crimes. Of those 44 crimes per year, only 6 involved defendants with prior felony convictions.[3]

94.   Data in the Free Beacon article does not reveal whether the silencer-related crimes involved violent crime or mere unlawful possession.

95.   Agency's National Tracing Center reports firearms recovered and traced as: 2016: 205,201; 2017: 234,018; 2018: 249,675; 2019: 264,099; 2020: 300,851. This is a total of 1,253,844 successful traces from 2016 to 2020.

---

[2] English, William; *2021 National Firearms Survey*, Georgetown McDonough School of Business, Res. Paper. No. 3887145, July 14, 2021.
[3] https://freebeacon.com/issues/atf-despite-nearly-1-3-million-silencers-united-states-rarely-used-crimes/

96.    Defendants consider a trace "successful" if it discovers the last known firearms dealer who transferred the firearm.

97.    After a successful trace, Defendants must then investigate the chain of ownership of that firearm.

98.    Defendants have never reported the percentage of successful traces that lead to arrests, charges, and convictions of firearm crimes investigated by the trace.

99.    Most guns used in crimes are stolen (6%), found at crime scenes (7%), or bought on streets or from the underground market (43%).[4]

100.   Agency's National Tracing Center reports it conducted 490,800 trace requests in fiscal year 2020 for a success rate of 61 percent.[5]

101.   Thus, the 24,000 PMFs recovered by law enforcement from 2016 to 2020 are equivalent to (but do not comprise) about 1.91% of all firearms successfully traced during this period and approximately 1.17% of all guns attempted to be traced.

102.   A 1995 study by the Bureau of Justice Statistics found that 72% of guns traced involved weapon law violations, while only 6% involved homicide, 5% assaults, 2% burglaries, and 2% robberies.[6]

103.   Data from 2019 show homicide arrests are only 7% of those for weapon law violations.[7]

---

[4] *Source and Use of Firearms Involved in Crimes: Survey of Prison Inmates, 2016*, Bureau of Justice Statistics, January 2019. https://bjs.ojp.gov/content/pub/pdf/suficspi16_sum.pdf
[5] https://www.atf.gov/resource-center/fact-sheet/fact-sheet-national-tracing-center

[6] https://bjs.ojp.gov/content/pub/pdf/GUIC.PDF

[7] 2019 Crime in the United States, Table 43.

104. Defendants held a notice and comment period from May 21 to August 19, 2021 for the Rule.

105. Plaintiff submitted a public comment to the proposed rule. *Comment*, Exhibit 2.

106. *Comment* argued Agency's proposal to regulate PMFs is an *ultra vires* usurpation of Congressional authorization, undertaken because of the unwillingness of Congress to pass legislation regulating "ghost guns." *Comment* at 2.

107. *Comment* argued Agency's use of the term "readily" to describe completion, assembly, conversion or restoration to a functional state is vague, ambiguous, arbitrary, and capricious. *Id*.

108. *Comment* argued that the terms "difficulty," "expertise," "availability," "ease," "expense," "feasibility," and "operable," used to define "readily" are all vague and subjective. *Id.* at 3.

109. *Comment* argued Agency's terms "critical stage" and "critical line" were vague, subjective, ambiguous, arbitrary, and capricious. *Id.* at 4.

110. *Comment* argued these arbitrary and capricious definitions leave reasonably intelligent people in complete doubt as to whether materials they possess violate the law. *Id*. at 4.

111. *Comment* argued the former "80%" standard relied upon by the Agency was clear, specific, objective, and actionable. *Id.* at 3. This standard was part of the *status quo ante* alternative.

112. *Comment* argued Agency wrongfully relied on "marketing materials" in this and other regulations to determine the legal status of firearms, parts, or raw materials. Weapons are classified by law and regulated based on what they actually are, not what manufacturers or sellers purport them to be. *Id*. at 4.

113.   *Comment* argued the rule would violate the Tenth Amendment by requiring gunsmiths in a State to mark unmarked firearms owned by persons from the same State when taken in for repairs. *Id.* at 4—5.

114.   *Comment* argued Agency's electronic storage provision of requiring the surrender of electronic records when an FFL goes out of business unlawfully violates the prohibition against Agency creating, maintaining, or administering a database of firearms owners or their firearms. *Consolidated and Further Continuing Appropriations Act*, Pub.L. 112-55 (Nov. 8, 2011), 125 Stat. 609. *Id*. at 5.

115.   *Comment* argued Agency was attempting to side-step that law by having private FFLs create these electronic databases for it. *Id*.

116.   *Comment* argued Agency was attempting to enact provisions of bills sponsored by Democrat members of Congress that failed to become law, e.g., *Crime Gun Tracing Modernization Act*, S.2974 (115th Congress), S.3348 (116th Congress). *Id*.

117.   *Comment* argued serious deficiencies in NPRM's cost-benefit analysis for their failure to monetize or quantify the benefits of the rule, and without stating why such monetization and quantification was not possible. *Id.* at 6.

118.   To demonstrate the lack of any benefits or at least the capability of Defendants to calculate benefits, *Comment* showed calculations that "ghost guns" are virtually nonexistent among the population of all firearms in the United States, and they are used in a minuscule proportion of homicides; thus, the rule provides almost no benefits for its substantial costs and burdens. *Id.*

119.   *Comment* argued Agency failed to consider how noncompliance by criminals would diminish the benefits of the rule, if any. *Id.* at 7.

120.    NPRM asserted the existence of a *negative externality* for the possession of unmarked firearms without proving such externality, theoretically modelling it, or quantifying it. 86 FR 27738.

121.    Generally, a *negative externality* is a "market failure" whereby the unregulated market would fail to achieve the socially optimal quantity of a good.

122.    This type of market failure arises because there is a cost or negative benefit imposed on third parties from the consumption or production of a good without that third party being compensated through the price system. Put another way, the producer of the good and the consumer of the good do not take into account the damages to third parties from their transaction. Thus, the unregulated market overproduces the good, causing economic inefficiency.

123.    Notably, unless the negative externality is enormous, the socially optimal level of the good is not zero.

124.    In the instant case, the "good" is unmarked firearms. Agency's assertion of a negative externality implies that it believes the unregulated market produces too many unmarked firearms, creating economic inefficiency.

125.    *Comment* argued the agency's presumption that "technological advances in firearms…impose costs on investigating and prosecuting firearm related criminal cases" does not meet the definition of an externality. *Comment* at 7.

126.    Assuming without conceding that failing to mark guns does create an externality, *Comment* argued the Agency's marking requirement would destroy more social welfare than it preserves, i.e., the rule would have negative net benefits, because the optimal quantity of

unmarked firearms is not zero. This form of overregulation is called *government failure*. *Id.* at 8.

127.   *Comment* argued the effects of marking requirements on manufacturers of 80% receivers would be large, and Agency never calculated these costs. *Id.* at 11.

128.   The vast majority of manufacturers of 80% receivers and frames are small businesses as defined by the Small Business Administration.

129.   The failure to analyze rule effects on small businesses violates the Small Business Regulatory Enforcement Fairness Act ("SBREFA"), 5 U.S.C. §601 et seq.

130.   *Comment* argued Agency failed to consider that many private citizens prefer to own firearms the U.S. government does not know about – a perfectly legitimate and legal motive to avoid future confiscation of firearms. *Id.* at 11.

131.   Indeed, the appropriations bill prohibiting Agency from having a searchable database of firearm ownership was intended by Congress to prevent the federal government from someday using such a database to confiscate firearms.

132.   Agency failed to consider and monetize the economic impact of preventing citizens from choosing to have unmarked firearms.

133.   *Comment* argued the marking requirement would impose massive costs by doubling marking costs on every firearm produced. *Id*. at 12.

134.   *Comment* argued Agency failed to estimate the capital costs for retooling for the marking requirements. *Id.*

135.   Agency assumed without any supporting evidence "that the majority of the industry currently complies with these [marking] requirements, so the cost would be minimal." 86 FR 27736.

136.    Making some reasonable assumptions weighing in Agency's favor, Plaintiff estimated Agency undercounted $92.4 million in costs, and actual costs would be much higher. *Id*. at 13.

137.    Had Agency made this and other appropriate estimations, this would have made the Rule a *major rule* for purposes of the Congressional Review Act ("CRA"), Pub. L. 104-121, codified in 5 U.S.C. §801 et seq., and Congress could enact a joint resolution of disapproval.

138.    Had Agency made this and other appropriate estimations, this would require expenditures by the private sector of $100 million or more, triggering requirements of the Unfunded Mandates Reform Act, Pub. L. 104—4, 109 Stat. 48.

139.    Defendants' hand-waving assumptions in its own favor are commonplace in Agency rulemaking and throughout the instant Rule.

140.    Agency's definition of a frame or receiver for firearm mufflers or silencers includes "a part of the firearm, that, when the complete device is assembled, is visible from the exterior and provides housing or a structure, such as an outer tube or modular piece, designed to hold or integrate one or more essential components of the device, including any of the following: baffles, baffling material, or expansion chamber." 86 FR 27728.

141.    *Comment* argued that this expansive definition would include among the parts required to be marked the end caps, muzzle brakes, mounts, and even pistons which would all be serialized and regulated. *Comment* at 13—14.

142.    Notwithstanding the availability of variances, every silencer manufacturer would have to apply for variances because of the Rule, and Agency had not calculated these costs. *Id*.

143.  *Comment* argued this "would completely eliminate the entire industry for home-made silencer parts, none of which currently meet the definition of a silencer or regulated part." *Id.* at 14.

144.  Defendants never attempted to monetize, quantify, or qualitatively describe the adverse economics effects on the market for home-made silencer parts.

145.  *Comment* argued the new gunsmithing requirements were unnecessary because one need not be "professional" or "licensed" to comply with the statutory and regulatory marking requirements, adding enormous costs of licensing and restricting supply of persons qualified to engrave. *Id.* at 14. Engravers of bowling trophies can meet the requirements.

146.  Restricting the supply of persons able to mark firearms will have the economic effect of increasing marking costs

147.  Restricting the supply of persons able to mark firearms will cause an increase in FFL inventory of firearms for marking after Rule enactment.

148.  The unadmitted purpose of this requirement was to bring all firearm marking under the auspices of firms regulated by the Agency to unlawfully extend their purported powers under the Interstate Commerce Clause, violating the Tenth Amendment.

149.  Agency assumed the effects on non-FFL manufacturers would be small by anticipating these would either become FFLs to sell regulated frames, receivers, or complete weapons, or would take a loss in revenue to sell unregulated items or parts kits. Agency undertook no analysis to reach these presumptions.

150.  Non-FFL manufacturers of 80% parts and kits already revealed their preference to not become licensed when they had they always had the option to do so.

151. Licensing would impose substantial costs and compliance requirements under firearm laws and regulations. Agency never monetized or quantified these additional costs and burdens.

152. *Comment* argued Agency underestimated the costs of contract gunsmithing by deliberately low-balling the costs of tools for marking with consumer-grade tools for "jewelry" and "leather craft printing." *Comment* at 16.

153. *Comment* argued that while Agency required "professional" gunsmithing to engrave markings, they estimated labor costs with wages of "salesclerks" and "cashiers." *Id.*

154. Agency assumed PMF inventory at FFLs is low, and that they may have only "1 or 2 PMFs in their inventory." *Regulatory Impact Analysis* ("*RIA*"), Exhibit 5, p. 42. Agency never provided an evidentiary basis for this assumption nor change this assumption to see how it affected their cost analysis.

155. While Agency came up with a reasonable estimated cost of $692.00 to turn in or destroy partially complete firearm kits, Agency failed to estimate the number of such kits and thus failed to monetize or quantify the costs.

156. Agency attributes to its Rule purported benefits allowing FFLs to "track their inventories, reconcile any missing inventory, respond to trace requests, process warranty claims and report lost of stolen PMFs to police and insurance companies." 86 FR 27724.

157. Agency abused its discretion by presuming benefits for regulated parties who had revealed by their own free choices that not marking guns was preferred to receiving these so-called benefits.

158. Agency assumed 90% of FFLs retain their records indefinitely, which reduced the cost estimate of the record retention requirement. Agency relied on their own subject matter experts for this assumption.

159.   Agency did not ask the public for information about record retention in an Advance Notice of Proposed Rulemaking.

160.   Agency did not vary the record retention assumption to see how rule costs would change.

161.   Even given its unsupported assumptions, Agency undercounted by about 50 percent the number of FFLs not storing records more than twenty years.

162.   Agency erred presuming that just because FFLs had stored records more than 20 years in the past, that they would continue to do so after this rule is enacted.

163.   Agency was required to estimate the costs of the regulatory structure it was imposing, not what it believes actually takes place, because the rule itself will change incentives for the public. That is, an agency is not allowed to presume regulations will be non-binding when calculating costs and benefits.

164.   *Comment* pointed out that the rule would pose additional costs on all those FFLs currently choosing to retain records beyond 20 years, and the rule would encourage those FFLs to stop doing this altogether as the number of documents they must maintain will rise exponentially under the Rule. *Comment* at 19.

165.   Agency did not attempt to calculate the costs of longer record retention.

166.   On average, the National Tracing Center receives about five million out-of-business records per month.[8]

167.   *Comment* estimated FFLs would amass an additional 433 million records over the next 20 years with *six trillion* pages. *Id.*

168.   Agency claimed industry costs for overflow records would be minimal because dealers could drop records off to ATF. 86 FR 27737.

---

[8] https://www.atf.gov/resource-center/docs/undefined/ntc-fact-sheet-june-2020/download

169.   Agency did not calculate its own increased costs if FFLs surrender overflow records.

170.   Agency claimed the record retention requirement would have "benefits in investigating criminal activities," because "there are a number of traces that are unsuccessful due to the age of the firearm and the fact that records do not have to be maintained after 20 years." *RIA* at 47.

171.   Agency's assessment of benefits of increased record retention failed to recognize that the marginal benefit of longer-retained records declines and the marginal cost rises.

172.   Agency did not consider alternative regulatory approaches of the length of record retention, e.g., for 15, 25, or 30 years instead of perpetually.

173.   *Comment* demonstrated with calculations that given Agency's estimates of traces lost, the record retention rule has virtually no benefits.

174.   *Comment* argued that even successful traces to the seller of the firearm would often fail to identify the current possessor of the firearm, especially for guns first sold 20 years ago.

175.   NPRM asserted benefits from making consistent marking requirements. 86 FR 27736.

176.   Agency did not monetize or quantify these benefits of consistent marking requirements or say why they could not do so. Agency did not state to whom these benefits would accrue.

177.   Agency claimed, without monetization or quantification, that easing certain marking requirements is a rule benefit. 86 FR 27736.

178.   *Comment* argued Agency may ease marking requirements without implementing any of the other Rule provisions, and Agency was attempting to reduce Rule costs with some offsetting reductions in requirements to avoid statutory thresholds such as the CRA.

179.   Agency asserted benefits of increased tracing of guns from crime scenes for criminal prosecution without evidentiary support. 86 FR 27736.

180.     NPRM did not define what a "successful" trace means, nor did it estimate the likelihood of identifying a perpetrator from a trace, the probability traces result in arrests and prosecutions, or the expected benefits of a successful prosecution.

181.     Without such calculations, Agency has not demonstrated any benefits of tracing at all, much less those that exceed costs.

182.     Agency did not monetize or quantify any benefits of electronic storage of information.

183.     Agency failed to properly analyze alternative regulatory approaches. For the *status quo ante* alternative, Agency claims the rule provides "clarity" such that it could succeed in prosecutions that had failed in the past. Agency begs the question by asserting all the people it formerly prosecuted were criminals who should have been convicted of crimes; Agency is rulemaking its way into post-hoc victory in failed legal cases.

184.     NPRM did not consider deferring action to Congress or State legislatures, and it did not explain why it could not do so.

185.     NPRM did not explain why regulation at the Federal level was necessary.

186.     NPRM did not analyze whether existing sales taxes, criminal liability, or tort liability already reduced the number of unmarked guns to their socially optimal levels.

187.     In rejecting Alternative 3 – grandfathering all existing firearm receivers – Agency presumed that "manufacturers could continue to produce non-compliant firearm frames or receivers and falsely market them as grandfathered items." 86 FR 27737—38.

188.     Agency rejected a valid alternative by presuming law-abiding manufacturers would risk their freedom, property, and livelihoods by committing felony crimes.

189.     Agency considered no reduction in benefits from non-compliance by criminals.

190.     Agency did not monetize or quantify the benefits of Alternative 3.

191.  Notwithstanding its claim there was a negative externality, Agency failed to consider the two most obvious economic policy responses to eliminate the inefficiency of externalities: a *Pigouvian* tax or a quota, both of which could reduce the number of unmarked firearms to the socially optimal level.

192.  While Agency could not implement a *Pigouvian* tax or quota, Congress could.

193.  Agency failed to consider allowing anyone with the technical expertise and equipment to mark firearms to do so, with or without a license.

194.  Despite a rule of expansive and ambitious scope, NPRM failed to consider alternative regulatory approaches for each and every part of the proposed rule.

195.  April 26, 2022, Defendants issued a final rule, *Definition of 'Frame or Receiver' and Identification of Firearms* ("Rule"), RIN 1140-AA54, 87 FR 24652, effective on August 24, 2022, amending 27 C.F.R. §447, 478, 479. Exhibit 3.

196.  Rule maintained the NPRM's bases for rulemaking on statutory authority, legal decisions, PMF recoveries, anecdotes of criminal acts with PMFs, and proclamations by other agencies regarding PMFs.

197.  Rule made no attempt to monetize or quantify the benefits of the rule, explicitly saying, "Not estimated." 87 FR 24731.

198.  Rule did not explain **why** Defendants could not monetize or quantify benefits.

199.  Defendants clearly could have monetized benefits by estimating the additional number of traces made possible by the Rule, the probability such traces would be successful, the probability the perpetrator of a crime could be identified, the probability such traces would be decisive in achieving a conviction, and the expected benefits to the public from a successful conviction.

200.    Rule qualitatively describes benefits of: (1) Provides clarity to courts on what constitutes a firearm frame or receiver; (2) Adapts to new technology/terminology; (3) Makes consistent marking requirements; (4) Eases certain marking restrictions; (5) Increases tracing of crime scene firearms to prosecute criminals; (6) Restricts felons and other prohibited persons from acquiring PMFs. 87 FR 24731.

201.    Defendants' first claimed Rule "benefit" does not actually provide any clarity to courts. Rather, Defendants are attempting to change definitions to retroactively make themselves winners in cases where courts determined people Defendants prosecuted had not violated the law. Defendants determined in their own minds these defendants were guilty of crimes, and Defendants lament that these persons were acquitted. This implies Agency will seek prosecutions of people who had previously not committed unlawful acts under the statute.

202.    Defendants' second claimed "benefit" of adapting to new technology is the province of Congress to consider and weigh competing policy interests, not the agency's duty to rewrite the law to include devices Congress had not considered at the time of enacting statutes.

203.    Defendants' third claimed "benefit" of "consistent" marking is already part of the *status quo ante*.

204.    Defendants' fourth claimed "benefit" of easing marking requirements could be done without enacting the other provisions of this Rule, and Defendants' inclusion of these benefits is a cynical attempt to reduce the total costs of the Rule.

205.    Defendants' fifth claimed "benefit" of increasing tracing to prosecute criminals is a bald assertion without any proof.

206.    Defendants' sixth claimed "benefit" of restricting felons from obtaining PMFs is simply a restatement of the first "benefit."

207.   The Rule updated the estimated number of PMFs reported recovered by police and reported to ATF between 2016 and 2021 to 45,240. This included weapons used in 692 homicides or attempted homicides.

208.   This updated data does not change the fact that unmarked PMFs represent a minuscule proportion of crimes with guns, and that homicides with such guns are an infinitesimal share of total firearm homicides. Thus, Defendants have failed to demonstrate the need for rulemaking, the significance of the issue under consideration, or net benefits of the Rule.

209.   Rule also failed to consider that in the absence of unmarked PMFs, criminals can simply obliterate serial numbers on firearms. That is, Defendants cannot claim the total Rule benefits of marking firearms, but only the *difference* in benefits between a world with PMF marking and that of criminals undertaking their next-best alternative means of making guns untraceable.

210.   Rule required FFLs and gunsmiths taking unmarked firearms into inventory to mark and document the firearms, even if the FFL and firearm owner are citizens of the same State.

211.   FFLs and gunsmiths do not actually take firearms into inventory for adjustments or repairs, but rather maintain only temporary custody of such firearms to perform work.

212.   While the Rule allows for same-day work to be performed without marking, the vast majority of firearms brought for work to FFL's and gunsmiths remain one or more nights while awaiting their turn in line, and the Rule requires FFLs to take those into inventory and comply with the marking requirement.

213.   Rule claims "submission of PMFs reported for tracing by law enforcement is increasing at an exponential rate." 87 FR 24714.

214. Defendants have insufficient data over a mere six years to determine the nature of the growth function.

215. Even if submissions for tracing are rising at an exponential rate, Defendants did nothing more than assert this claim rather than prove it.

216. Defendants committed one of the most basic fallacies in statistics – overstating the significance of large percentage increases from an extremely low base.

217. Defendants' claim regarding the growth in PMF's use in crimes failed to control for other factors causing increases in crime rates generally. This causes inferential errors from *omitted variable bias*.

218. For example, from 2019 to 2020, the growth rate in PMFs recovered by law enforcement dropped from nearly 90% to 34.5%. This drop coincides with the COVID-19 pandemic.

219. Responding directly to Plaintiff's comments concerning externalities, the Rule states, "ATF concurs that this rule would not address externalities due to market inefficiencies; therefore, to avoid any confusion, the language in the NPRM that suggested that this rule would address a market inefficiency has been removed in the final rule. Regardless of this change, publication of this rule remains necessary to enforce the GCA and NFA." 87 FR 24715. That is, Defendants withdrew the entire economic basis for this Rule.

220. In response to comments suggesting non-perpetual record keeping requirements, Agency said, "ATF determined that this alternative was not the best course of action. Because firearms are durable items that can be in circulation for many decades even beyond 100 years, an alternative specifying a specific time frame for record retention requirements would not align with the shelf life of most firearms. Thus, without the indefinite retention requirement imposed by this rule, ATF would continue to encounter the problem of not

being able to successfully trace older firearms that are used in the commission of a crime." 87 FR 24725.

221.  Agency's response is a rookie error in economic analysis of relying on rising *total* benefits rather than falling *marginal* benefits; all good economic analysis is done at the margin. For example, if a well-educated person obtains an additional year of education, they undoubtedly enjoy benefits of more education, but the marginal benefits would be small and unlikely to cover the marginal costs.

222.  Commenters said words to the effect of, "regardless of whether an FFL ships records to ATF voluntarily, all FFLs should be accounted for, not only the ones that currently destroy their records that are over 20 years old." Agency's response was simply to disagree "the agency underestimated the cost per FFL and that it should have taken into account the costs borne by all FFLs."

223.  Agency claims OMB holds that the baseline for measuring a rule's costs should be "what the world will be like if the proposed rule is not adopted." 87 FR 24721.

224.  Agency may not credit its rule for voluntary compliance when the Rule itself unfavorably alters incentives to do so.

225.  Agency failed, in response to comments, to explain its continued reliance on an assumption only 10% of FFLs "were estimated to be destroying their records that were more than 20 years old." 87 FR 24721. This low estimate reduces the estimated costs of the rule.

226.  Agency conducted no sensitivity analysis on any of its assumptions to determine changes in estimated costs if those assumptions changed.

227. Agency responded to comments faulting its failure to quantify or monetize benefits of record retention by simply contradicting the comments without any meaningful responses. 87 FR 24722.

228. Agency argued "Tracing a firearm that was involved in a criminal activity is an existing requirement and not a new requirement attributable to this rule." *Id*.

229. This response fails to explain how the benefits of increased tracing of guns more than twenty years old will exceed the costs of the additional record retention.

230. Agency asserted benefits that increased tracing "provides useful investigative leads to law enforcement," without supporting that claim with evidence or detail, nor attempting to monetize or quantify such benefits and compare them to additional costs.

231. Agency repeatedly eschewed the use of crime data demonstrating that the "problem" with "ghost guns" is insignificant.

232. The Rule failed to conduct any analysis of whether certain localities were more likely than others to experience crimes committed with unmarked PMFs, thereby concluding that regulation was best left up to those particular localities or States.

233. In response to comments saying Agency failed to address the effects of the rule on innovation, Agency simply disagreed without further explanation.

234. Defendants failed to consider economic growth, innovation, competition, and job creation in their Rule.

235. Concerning public comments about non-regulatory alternatives such as tort liability and public advocacy, Agency claimed "these alternatives are out of ATF's purview and beyond the scope of this regulation; therefore, these alternatives were not considered." 87 FR 24725.

236.   OMB Circular A-4 expressly required Defendants to consider alternative regulatory approaches outside their authority to act. Moreover, the existence or potential enactment of these alternatives militate against Federal rulemaking.

237.   Agency published corrections to the Rule on August 22, 2022. Exhibit 4.

238.   The military forces of the United States have used short-barreled rifles, short-barreled shotguns, and silencers in national defense since before the passage of the National Firearms Act, and they still do to this day.

239.   Generally, Agency's lack of responsiveness to comments and mere assertion of benefits demonstrates its unalterably closed mind.

240.   Courts invalidate agency determinations failing to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection' between the facts found and the choice made." *Motor Veh. Manu. Assoc. v. State Farm Auto Mut. Ins. Co.*, 463 U.S. 29, 43 (1983) ("*State Farm*"), quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962).

241.   Courts "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *State Farm* at 30—31, 43.

242.   Agency decisions are arbitrary "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm* at 43.

243.   That costs or benefits are difficult to measure "does not excuse [an agency] from its statutory obligation to determine as best it can the economic implications of the rule it has

proposed." *Chamber of Commerce v. Sec. and Exch. Com'n*, 412 F.3d 133, 143 (D.C. Cir. 2005); *Public Citizen v. Fed. Motor Carrier Safety*, 374 F.3d 1209, 1221 (D.C. Cir. 2004)

244. Courts invalidate rules if agencies fail to consider policy effects. *Ctr. for Bio. Diversity v. U.S. Bur. of Land Mgmt.*, 698 F.3d 1101, 1124 (9th Cir. 2012).

245. Policy effects an agency must analyze include costs, benefits, transfers, and the impact of the rule on economic growth, innovation, competition, and job creation.

246. Agencies must demonstrate they used reasoned decision making. *State Farm* at 52.

247. An agency's failure to provide adequate explanations for its decision is grounds for remand or invalidation. See e.g., *Williams Gas Processing-Gulf Coast Co., L.P. v. FERC*, 475 F.3d 319, 329 (D.C. Cir. 2006) ("*Williams Gas*").

248. Courts may not sustain an action on a basis not mentioned by an agency if an agency's stated rationale for its decision is erroneous. *Id.*

249. Failure to reasonably respond to comments raised during notice-and-comment rulemaking is arbitrary and capricious. *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 449 (D.C. Cir. 2012); *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 626 F.3d 84, 94 (D.C. Cir. 2010).

250. Courts invalidate rules for failure to consider regulatory alternatives also achieving rule objectives. *Off. Comm. of United Church of Christ v. FCC*, 779 F.2d 702, 714 (D.C. Cir. 1985); *Wilderness Watch, Inc. v. U.S. Fish & Wildlife Serv.*, 629 F.3d 1024, 1039 (9th Cir. 2010); *Chamber of Commerce v. SEC*, 412 F.3d 133, 144 (D.C. Cir. 2005).

251. Where a party raises facially reasonable alternatives, the agency must either consider those alternatives or give some reason for declining to do so. *Laclede Gas Co. v. F.E.R.C.*, 873 F.2d 1494, 1498 (D.C. Cir. 1989).

252. "It is not adequate simply to report a comparison of the agency's preferred option to the chosen baseline." OMB Cir. A 4, p. 16.

## CLAIM ONE

**Violations of the Administrative Procedure Act, 5 U.S.C. §701 et seq.**

253. Plaintiff incorporates herein by reference the facts in the preceding paragraphs and all exhibits to this *First Amended Complaint*.

254. On April 26, 2022, Defendants issued a final rule *Definition of 'Frame or Receiver' and Identification of Firearms*, RIN 1140-AA54, amending the Code of Federal Regulations, Title 27, Parts 447, 478, and 479. ("Rule")

255. The Rule became effective on August 24, 2022.

256. The Rule violates the Tenth Amendment to the United States Constitution by regulating commerce arising wholly within a State by citizens of the same State, to wit: marking of firearms.

257. The Rule violates the Fourth Amendment to the United States Constitution by causing FFLs and gunsmiths to mark and record privately made firearms only in their temporary custody, and such records can and will be provided to Defendants without a warrant or probable cause of a crime being committed with such firearms.

258. The Rule's record retention requirement, if acted upon, violates the *Consolidated and Further Continuing Appropriations Act*, Pub.L. 112-55 (Nov. 8, 2011), 125 Stat. 609; in that it uses appropriated funds toward salaries and administrative expenses to require FFLs going out of business to surrender electronic records of firearm transactions, which Defendants are expressly prohibited from consolidating or centralizing.

259.  The Rule violates the Small Business Regulatory Enforcement Fairness Act, 5 U.S.C. §601 et seq., by failing to adequately analyze rule costs and benefits and other rule effects on small businesses.

260.  The Rule violates the Unfunded Mandates Reform Act, Pub. L. 104-4, in that the economic effects of the Rule on the private sector exceed $100 million, but Defendants' insufficient economic analysis found economic effects to be less than that amount.

261.  The Rule is void for vagueness because numerous terms in the Rule cannot be understood by reasonably intelligent people to know what the law requires or forbids.

262.  The Rule failed to adequately identify a significant problem requiring regulation.

263.  The Rule failed to explain why regulation at the Federal level is necessary.

264.  The Rule failed to monetize or quantify costs and benefits or otherwise explain why those could not be monetized, even though doing so is a straightforward economic exercise.

265.  The Rule failed to provide meaningful responses to public comments.

266.  The Rule failed to adequately address alternative regulatory approaches in its NPRM.

267.  The Rule failed to adequately consider and respond to alternatives proffered in the public comments.

268.  The Rule failed to completely analyze the *status quo ante* and explain why existing laws, rules, regulations, criminal and tort liability were inadequate for preventing the harm and economic inefficiency the Rule identified.

269.  The Rule failed to consider deferring action to Congress, States, Tribes, or localities, and the Rule did not explain why doing so was not possible.

270.  The Rule failed to examine the economic effects on economic growth, innovation, competition, and job creation.

271.   The Rule made unsupported assumptions greatly in its own favor and without seeking more reliable information from the public through an Advance Notice of Proposed Rulemaking.

272.   The Rule failed to show the results of sensitivity analyses from changing rule assumptions.

273.   The Rule's deficient analysis deprived Congress the ability to disapprove of the Rule. 5 U.S.C. §801 et seq.

274.   Defendants exceeded their statutory authority by regulating potential gun and silencer parts that are not "firearms."

275.   The Rule's definitions are not permissible constructions of the statutes.

276.   Defendants took action on a policy issue of great economic and political significance providing a reason to hesitate before concluding that Congress meant to confer such authority.

277.   Defendants implemented policy provisions that had been expressly considered and rejected by Congress, strongly counseling hesitation of action by the Executive branch.

278.   Defendants exceeded their statutory authority in promulgating the Rule.

279.   Thus, the rule must be set aside under 5 U.S.C. §706 because it is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law; contrary to constitutional right, power, privilege, and immunity; in excess of statutory jurisdiction, authority, or limitations, and short of statutory right; without observance of procedure required by law; and unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

## CLAIM TWO

**Violations of the United States Constitution, Second Article of Amendment**

280.  Plaintiff incorporates herein by reference the facts in the preceding paragraphs and all exhibits to this *First Amended Complaint.*

281.  Defendants enforce provisions of the National Firearms Act regulating, taxing, possessing, making, and transferring short-barreled rifles, short-barreled shotguns, firearm silencers and silencer parts.

282.  Defendants' Rule unlawfully regulates unfinished silencer components with which persons could, with payment of the $200.00 excise tax, and completion of other administrative requirements, build a functional silencer complying with law.

283.  The regulation and taxation of short-barreled rifles, short-barreled shotguns, and silencers are inconsistent with the Second Amendment's text and historical understanding.

284.  The Second Amendment's historically fixed meaning applies to new firearms and devices, such as silencers.

285.  Short-barreled rifles, short-barreled shotguns, and silencers are neither dangerous nor unusual, and they are almost never used in crimes.

286.  Short-barreled rifles, short-barreled shotguns, and silencers are part of the ordinary military equipment, they have a reasonable, rational relationship to the preservation or efficiency of a well-regulated militia, and their use could contribute to the common defense.

287.  Short-barreled rifles and short-barreled shotguns have legitimate, non-dangerous purposes of wielding such firearms in confined spaces, such as inside one's home or in a wartime trench.

288.   Silencers have legitimate, non-dangerous purposes of protecting the hearing of persons who use firearms, to avoid frightening game animals on hunts, and to avoid public disturbances and fear.

289.   Firearms equipped with silencers are not truly silent, and they are still sufficiently loud to militate against a finding that silenced weapons can contribute to crime.

290.   To the extent the historical understanding of the Second Amendment permits regulation of silencers, such laws are not shown to advance an important or compelling government interest by means that are substantially related to that interest, are narrowly tailored, and solve the problem with the least burden on the public.

291.   The National Firearms Act of 1934 was intended to impose taxes on silencers so onerous that it became a *de facto* prohibition for moderate to low income persons, but without offending the Second Amendment through an absolute ban. Despite erosion of the prohibitive nature of the tax over time, the $200.00 tax still has substantial preclusive effects on those who would exercise their rights.

292.   For these reasons, this Court should declare that the Rule violates the Second Amendment of the United States Constitution.

293.   For these reasons, this Court should declare that the National Firearms Act's regulation and taxation of short-barreled rifles, short-barreled shotguns, and firearm silencers violate the Second Amendment of the United States Constitution.

## CLAIM THREE

### Violation of the Ninth Amendment and Common Law Rights

294.   Plaintiff incorporates herein by reference the facts in the preceding paragraphs and all exhibits to this *First Amended Complaint.*

295.   The Ninth Amendment to the United States Constitution provides that the enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people.

296.   Plaintiff suffers from military service-connected tinnitus.

297.   Tens of millions of Americans suffer from tinnitus or hearing loss.

298.   Firearm silencers reduce the harm and risk of hearing loss while using firearms.

299.   The people have an unalienable, unenumerated right to prevent hearing loss in themselves and others while enjoying other rights guaranteed in Second Amendment to the U.S. Constitution.

300.   Defendants' enforcement of the National Firearms Act as it relates to firearm silencers violates the Ninth Amendment to the United States Constitution.

301.   Plaintiff seeks to reverse, extend, or modify existing law concerning the Ninth Amendment.

302.   The right to protect one's hearing is an essential component of life in our free society under the Common Law, and the National Firearms Act and the Rule violate that right.

### RELIEF REQUESTED

WHEREFORE, Plaintiff requests that judgment be entered in his favor and against Defendants as follows:

303. Enter a declaratory judgment that Defendants' final rule *Definition of 'Frame or Receiver' and Identification of Firearms*, RIN 1140-AA54, issued on April 26, 2022 is held unlawful and set aside.

304. Enter an order preliminarily and permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction from enforcing this final rule.

305. Enter a declaratory judgment that Defendants' regulation and taxation of silencers and silencer parts violates the Second Amendment to the United States Constitution.

306. Enter a declaratory judgment that Defendants' regulation and taxation of silencers and silencer parts violates the Ninth Amendment to the United States Constitution.

307. Enter a declaratory judgment that the National Firearms Act's regulation and taxation of silencers and silencer parts violates the Common Law right of protecting one's hearing while exercising rights protected by the Second Amendment.

308. Enter an order preliminarily and permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction from enforcing the National Firearms Act as it relates to the regulation and taxation of firearm silencers and silencer parts.

309. Enter a declaratory judgment that the National Firearms Act's regulation and taxation of short-barreled rifles, short-barreled shotguns, silencers and silencer parts violates the Second Amendment of the United States Constitution.

310. Enter an order preliminarily and permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction from enforcing the National Firearms Act as it relates to the

regulation and taxation of short-barreled rifles, short-barreled shotguns, firearm silencers and silencer parts.

311.   Enter an order awarding Plaintiff a refund of all taxes he paid for the ownership of short-barreled rifles, short-barreled shotguns, and firearm silencers, currently in the amount of $9,800 plus ancillary costs of registration.

312.   Enter an order awarding Plaintiff damages for the destruction of his private property to comply with this Rule.

313.   Enter an order awarding Plaintiff his costs of this suit, including any attorney fees and costs pursuant to 42 U.S.C. §1988 and damages.

314.   Enter an order providing any other and further relief that the court deems just and appropriate.

I hereby verify under penalty of perjury under the laws of the United States that the foregoing is true and correct. 28 U.S.C. §1746.

EXECUTED ON September 16, 2022.

-s- *Robert M. Miller*

Robert M. Miller, Ph.D.
4094 Majestic Ln., #278
Fairfax, VA 22033
(415) 596-2444
RobMiller44@hotmail.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on September 16, 2022, a copy of the

foregoing **<u>FIRST AMENDED COMPLAINT</u>** was filed to dcd_intake@dcd.uscourts.gov.

I caused a copy of this filing to be served by U.S. Mail to:

U.S. Attorney for the District of Columbia
ATTN: Civil Process Clerk
555 Fourth Street, NW
Washington, DC 20530

Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Ave, NW
Washington, DC  20530-0001

Steven Dettelbach, Director
Bureau of Alcohol, Tobacco, Firearms, and Explosives
99 New York Ave, NE
Washington, DC  20226

<u>/s/ Robert M. Miller</u>
Pro Se