## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ROBERT M. MILLER,<br><br>*Plaintiff,*<br><br>v.<br><br>MERRICK B. GARLAND, U.S. Attorney General,<br>U.S. DEPARTMENT OF JUSTICE; STEVEN<br>DETTELBACH, Director, Bureau of Alcohol<br>Tobacco, Firearms, and Explosives; BUREAU<br>OF ALCOHOL, TOBACCO, FIREARMS AND<br>EXPLOSIVES,<br><br>*Defendants.* | Civ. Act. No: 1:22-cv-02579-CKK<br><br><br><br>JURY TRIAL WAIVED |

## SECOND AMENDED COMPLAINT

COMES NOW Plaintiff Robert M. Miller, *pro se*, pursuant to Federal Rules of Civil Procedure and for his claims seeking declaratory and injunctive relief and damages as follows:

## INCORPORATION AND RELATION BACK

1.     This *Second Amended Complaint* incorporates herein by reference and relates back to the pleadings of the *Verified Complaint*, ECF 1, Exhibits 1—5 of that complaint, the *First Amended Complaint*, ECF 7, and any other pleadings, motions, or exhibits submitted to this Court subsequent to those complaints.

## PARTIES

2.     Plaintiff is a natural person and a citizen of the United States and the Commonwealth of Virginia, residing in Loudoun County, Virginia.

3.     Defendant Merrick B. Garland is the United States Attorney General and head of the U.S. Department of Justice, a federal government agency.

4.      Defendant Steven Dettelbach is the Director of the Bureau of Alcohol, Tobacco, Firearms,

and Explosives, a federal bureau under the authority of the U.S. Department of Justice,

("Agency" or "ATF").

## JURISDICTION AND VENUE

5.      This Court has jurisdiction for this action under 28 U.S.C. §1331 and 5 U.S.C. §702.

6.      Declaratory judgment and relief are authorized under 28 U.S.C. §2201-2202.

7.      This Court has inherent powers of injunctive relief under U.S. Const. Art. III, Sec. 2.

8.      Venue is proper under 5 U.S.C. §703; 28 U.S.C. §1391(e)(1) because a substantial part of

the events giving rise to the claims occurred in Washington, D.C., and all Defendants and

Plaintiff reside in or near Washington, D.C.

## STANDING

9.      On April 26, 2022, Defendants issued a final rule *Definition of 'Frame or Receiver' and

Identification of Firearms*, RIN 1140-AA54, amending the Code of Federal Regulations,

Title 27, Parts 447, 478, and 479. ("Rule")

10.     The Rule is a final rule made reviewable by the Administrative Procedure Act for which

there is no other adequate remedy in a court. 5 U.S.C. §704.

11.     Plaintiff has standing and states a claim upon which relief may be granted to oppose

Defendants' Rule because, as described in the facts below, he is directly and concretely

injured by the Rule causing loss of his private property, unwarranted regulation of his

actions and private property, exposure to potential felony criminal prosecution for non-

harmful actions, and restricting his liberties, especially those protected by the United States

Constitution, Articles of Amendment II, IV, V, IX and the Common Law, and setting aside

the Rule and providing declaratory and injunctive relief and damages will cure such harms in their entirety.

12.    Plaintiff has standing and states a claim upon which relief may be granted in opposing the National Firearms Act of 1934 ("NFA")("Title II"), Pub. L. 73-474, the Gun Control Act of 1968 ("GCA")("Title I"), Pub. L. 90-618, the Firearms Owners Protection Act ("FOPA"), Pub. L. 99-308, and other pertinent statutory provisions because they cause injury in fact in violation of the Second Amendment to the United States Constitution and the common law rights of self-defense and prevention of hearing loss, such injuries are caused by those statutes, and overturning those statutes and awarding damages redresses the harms in their entirety.

13.    As an owner and prospective owner of regulated firearms and firearm parts and accessories under the Rule, the NFA, the GCA, FOPA, and other pertinent firearms statutes, Plaintiff's claims fall within the zone of interest of these statutes, the Second Amendment, and common law rights.

**<u>STATEMENT OF FACTS</u>**

Plaintiff proffers the following facts supported by law or evidence, from evidence he expects to be produced after a reasonable opportunity for further investigation or discovery, and from his personal knowledge as verified below, as if by affidavit. Plaintiff's legal conclusions supported by factual allegations may form the framework of his complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 664 (2009).

A.   <u>**Congressional Powers and Limitations, and the Second Amendment**</u>

14.   The Second Article of Amendment to the United States Constitution states, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed."

15.   Like every other amendment in the Bill of Rights, the Second Amendment was an explicit restriction on the powers of Congress.

16.   The Second Amendment, in tandem with the two-year limitation against large, standing armies in times of peace, was intended to prevent disarmament "of the citizens' militia and enabling a politicized standing army or a select militia to rule." *District of Columbia et al. v. Heller*, 554 U.S. 570 (2008) (hereinafter "*Heller*").

17.   While the right to bear arms certainly includes common law rights of personal defense, common defense, hunting, and sport shooting, the main purpose of the Second Amendment was to prevent and deter an oppressive federal government.

18.   The Second Amendment guarantees the People of the United States a fundamental, individual right to keep and carry arms for self-defense and defense of others in the event of a violent confrontation. *New York State Rifle and Pistol Association v. Bruen*, __ U.S. __, Case No. 20-843, slip op. (June 23, 2022) (hereinafter "*Bruen*"); *Heller*; *McDonald v. Chicago*, 561 U.S. 742 (2010) (hereinafter "*McDonald*"); *Caetano v. Massachusetts*, 577 U.S. 411 (2016) (hereinafter "*Caetano*"); *Wrenn v. District of Columbia*, 864 F.3d 650 (D.C. Cir. 2017) (hereinafter "*Wrenn*"); *Palmer v. District of Columbia*, 59 F.Supp.3d 173 (D.D.C 2014) (hereinafter "*Palmer*").

19.   Arms are "'weapons of offence, or armour of defence.' 1 Dictionary of the English Language 107 (4th ed.). They are anything that a man [or woman] wears for his defense, or

takes into his hands, or uses in wrath to cast at or strike another.' 1 A New and Complete Law Dictionary (1771)." *Heller*, 554 U.S. at 581.

20. The Second Amendment extends, *prima facie*, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding. *Heller*, 554 U.S. at 582; *Caetano*, slip op. at 1 (per curiam).

21. Given the decisions in *Bruen* and *Heller*, Defendants may not infringe the keeping and bearing of arms that are not unusually dangerous; deprive individuals of the right to keep or carry arms in an arbitrary and capricious manner; or impose regulations on the right to keep and carry arms that are inconsistent with the Second Amendment and the historical tradition of firearms regulation in the United States. *Bruen*, slip op. at 13. See also *Caetano*, *Heller*, *Wrenn*, *Palmer*.

22. The NFA, GCA, FOPA, and other federal statutes and rules regulating short-barreled rifles, short-barreled shotguns, "any other weapons," and firearm silencers run afoul of the Second Amendment because the plain text of the Second Amendment covers these bearable arms; they are and always have been in common use for lawful purposes, the common defense, and part of the ordinary military equipment; laws and regulations governing these firearms are arbitrary and capricious; and there are few to no historical analogues of regulating these guns before, during, and long after the ratification of the Second Amendment.

23. "The Constitution creates a Federal Government of enumerated powers." *United States v. Lopez*, 514 U.S. 549, 552, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (hereinafter "*Lopez*") ; see U.S. Const., Art. I, § 8; *Marbury v. Madison*, 1 Cranch 137, 176, 2 L.Ed. 60 (1803) (Marshall, C.J.) ("The powers of the legislature are defined, and limited; and that those

limits may not be mistaken, or forgotten, the constitution is written"). As with its powers generally, Congress has only limited authority over crime. *Taylor v. United States*, 136 S. Ct. 2074, 2082 (2016) (hereinafter "*Taylor*").

24. The Tenth Article of Amendment to the United States Constitution provides that "The powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people."

25. Congress has no plenary police powers to regulate concealed carry or concealable weapons, except within its power to make rules for the government and regulation of the land and naval forces, and to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States. U.S. Const., Art. I, § 8, cl. 14, 17; Art. IV, § 3; See *Taylor* at 2083. (""The Constitution," in short, "withhold[s] from Congress a plenary police power." *Lopez* at 566, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995); see Art. I, § 8; U.S. Const. amend. X).

26. In the NFA, Congress has unconstitutionally used its taxation powers to achieve ends beyond the scope of its specified powers and expressly prohibited by the Second Amendment. NFA taxes are and were intended to make certain firearms too expensive for most ordinary citizens to own or want to own.

27. Notwithstanding the erosion of the disincentivizing effects of this fixed dollar tax by inflation, these taxes continue to substantially deter law abiding citizens from owning these bearable arms by raising prices and thus reducing quantity demanded.

28. To the extent existing law sustains the use of taxation powers to achieve *ultra vires* results, this suit seeks to distinguish the instant case because of the taxation of a fundamental right; to extend, modify, or reverse existing law; or to establish new law.

29.    Even if Congress has the power to tax firearms regulated by the NFA, Congress has no plenary power to require the registration of firearms, or the fingerprinting and photographing of firearm owners who make Title I and Title II firearms for their lawful personal use and not traded in interstate commerce.

**B.    Facts Concerning Plaintiff and Similarly Situated Third Parties**

30.    Plaintiff is a twenty-one year veteran of the U.S. Army, the Army National Guard, and the U.S. Army Reserve, serving in Special Forces and Infantry units, trained and experienced in firing and maintaining pistols, rifles, shotguns, short-barreled rifles, short-barreled shotguns, machineguns, silencers, and destructive devices such as explosives, mines, grenades, grenade launchers, rockets, missiles, and mortars.

31.    Plaintiff has thirty years of knowledge and experience in shooting a wide variety of commercial firearms, making and repairing guns, gun rights, and gun laws.

32.    Plaintiff has an M.A. and Ph.D. in Economics from the University of Illinois (1995, 2002), and a B.S. in Mathematics and Economics from the University of Colorado at Denver (1992).

33.    Plaintiff is a Senior Financial Economist for a Federal financial regulator, whose regular duties involve conducting cost-benefit analysis for agency rulemaking, and analyzing rules for compliance with, *inter alia*, the Administrative Procedure Act, Congressional Review Act, Regulatory Flexibility Act, Small Business Regulatory Enforcement Fairness Act, Executive Orders 12866 and 13563, and Office of Management and Budget Circular A-4.

34.    Plaintiff is a disabled veteran with a 60% compensatory disability rating from the Veterans Administration including, *inter alia*, a 10% service connected disability for tinnitus, which

is the maximum evaluation for unilateral or bilateral tinnitus absent the development of Meniere's syndrome, which has a rating of 30%.

35.   Tinnitus is the perception of a piercing or ringing sound by the ear when no corresponding external sound is present.

36.   Hearing loss affects an estimated 30 million people in the United States.[1]

37.   Sixteen million people seek medical attention for tinnitus annually, and tinnitus affects up to 50 million people.[2]

38.   As of fiscal year 2020, more than 1.3 million veterans were receiving disability compensation for hearing loss, and more than 2.3 million received compensation for tinnitus.[3]

39.   Among veterans, tinnitus and hearing loss are the most prevalent service connected disabilities of all Veterans Administration compensation recipients.[4]

40.   Plaintiff has owned more than one hundred firearms.

41.   Plaintiff currently owns twenty-four short-barreled rifles, and he has paid $4,800 in NFA taxes to own these weapons.

42.   Plaintiff currently owns two short-barreled shotguns, and he has paid $400 in NFA taxes to own these weapons.

43.   Plaintiff currently owns a Mossberg Shockwave shotgun.

44.   Plaintiff currently owns at least one AR-style pistol with a barrel less than 16".

---

[1] *Medical Devices; Ear, Nose, and Throat Devices; Establishing Over-the-Counter Hearing Aids*, RIN 0910-AI21, Food and Drug Administration, Dep't of Health and Human Services, 87 FR 50698.
[2] https://www.tinnitusretrain.com/causes-of-ringing-in-ears-and-what-does-tinnitus-sound-like/.
[3] https://www.benefits.va.gov/REPORTS/abr/docs/2020_compensation.pdf, p. 71.
[4] *Ibid.*

45.     Plaintiff currently owns twenty-three silencers, and he paid total taxes of $4,600.

46.     Many of Plaintiff's silencers are dedicated to particular guns Plaintiff regularly uses, including his main defensive firearms for his person, home, and car, for the purpose of protecting his hearing and eyesight if he needs to use them for defense.

47.     The time from purchasing a silencer until Plaintiff received an approved tax stamp has been a minimum of 152 days, an average of 271 days, and a maximum of 449 days.

48.     But for Defendants' regulation and taxation of short-barreled rifles, short-barreled shotguns, "any other weapons," and firearm suppressors, Plaintiff would own more of them or better ones.

49.     But for Defendants' regulation and taxation of these weapons, Plaintiff would not mark his firearms, submit his photographs or fingerprints, nor notify his local law enforcement agency of his possession of these weapons.

50.     Plaintiff owns two uncoated 80% AR-style receivers he bought with the intention to make into functional, unmarked, AR-style lower receivers. See, e.g., *Appx.*, Figure 4.

51.      Plaintiff owns jigs and drill bits provided in a kit to assist in finishing these 80% receivers. *Id.,* Figure 5.

52.     After completing these unfinished receivers, Plaintiff will take these privately made firearms ("PMFs") to a federal firearms licensed dealer ("FFL") to have them "cerakoted." The cerakoting process will take more than one day.

53.     Cerakote is a ceramic-based thermoset composite coating that is applied to the surface of firearms as a protective and colored finish.

54.     Current firearm laws or regulations require the FFL doing the cerakoting to take Plaintiff's PMFs into inventory.

55. The Rule requires the FFL to mark and record a serial number on the PMF when it keeps Plaintiff's PMF for more than one day.

56. Plaintiff does not wish to have his PMFs marked with a serial number.

57. Plaintiff attempted to make a fully-functional AR lower receiver using a parts kit with jig and drill bits, and he failed to do so despite using a $2,000 mini milling machine. Plaintiff's attempts took several days, including attempting to fit the fire control group into the receiver and to get it to function. This receiver remains unfunctional and will require gunsmith repairs.

58. Under the Rule, a gunsmith performing repairs on this PMF must mark and record it with a serial number, against Plaintiff's wishes.

59. Plaintiff had previously made numerous fully-functional firearms using commercially produced firearm receivers in under two hours.

60. Plaintiff owns one 80% Glock-style frame with a jig and drill bits, which he bought with the intention to make into a functional, unmarked, Glock-style pistol. See, e.g., *Appx.*, Figure 6.

**C.     Facts Concerning Firearms, Frames, and Receivers**

61. Firearms, by statutory and functional definition, launch projectiles using expanding gases arising from an explosive charge.

62. The AR-15 rifle ("AR") and its kind are the most popular rifles in the United States for personal and common defense, hunting, and sport shooting.

63. The AR-15 rifle is the semiautomatic equivalent of the U.S. military's automatic M16 rifles and M4 carbines (both, machineguns), and many AR-15, M16, and M4 parts are interchangeable.

64. An AR rifle has two receivers, commonly called "upper" and "lower" receivers. *Appx.* Figure 1. The upper receiver and all its parts are unregulated, except for certain rifles where the manufacturer and Defendants determined that the upper receiver is the "firearm," e.g., B&T APC 9, FN SCAR 17, and Sig Sauer 556.

65. The AR upper receiver houses, *inter alia*, the bolt carrier, bolt, firing pin, and charging handle. The barrel, barrel extension, and hand guard are attached to the front of the upper receiver. *Id.*, Figure 2.

66. The lower receiver houses, *inter alia*, the trigger, hammer, and selector lever (safety), together commonly known as the "fire control group." A pistol grip attaches to the bottom of the lower receiver. The magazine containing ammunition is inserted into the lower receiver. A receiver extension, also known as a "buffer tube," is attached to the back of the lower receiver containing a buffer and buffer spring. The buffer and buffer spring return the bolt carrier group into battery to begin the next firing cycle. The butt stock usually attaches to the receiver extension. *Id.*, Figure 3.

67. The lower AR receiver is the serialized and regulated "firearm."

68. Purchasing a lower receiver generally requires a transaction conducted by a FFL with an accompanying National Instant Criminal Background Check System ("NICS") background check, except for private party sales between citizens of the same state where not prohibited by state law.

69. Upper receivers and their components can generally be purchased from gun stores and on the internet without any regulation or background check.

70. While other semi-automatic rifles have somewhat different configurations, the description of the AR is generally applicable for purposes of the instant complaint.

71.   Unfinished, non-functional AR lower receivers are commonly known as "80% receivers" representing the approximate level of completion toward a fully-functional lower receiver. These 80% receivers are often sold to consumers to facilitate making their own lawful firearms. *Id.,* Figure 4.

72.   Upon information and belief, it has never been illegal in the United States for a law-abiding citizen to make rifles, pistols, or silencers for personal use.

73.   In NFA hearings, long before the emergence of firearm kits, Mr. Karl Frederick, President of the National Rifle Association of America, testified, "I may say that a gun is a very easy thing to make, that a third-class automobile mechanic can make a pistol which will do deadly work, and can do it in an afternoon with the materials he can find in any automobile shop. And I can say that it has been done time and time and time again…the actual manufacture of pistols is an easy thing." *NFA Hearings* at 51.

74.   These 80% receivers often come in a parts kit containing jigs, drill bits, and instructions on how to complete the receiver into a fully-functional receiver. *Appx,* Figure 4.

75.   These 80% receivers can be completed into functional receivers using an electric hand drill, drill stand, drill press, lathe, router, or milling machine.

76.   Semi-automatic pistols typically consist of three major parts: frame, slide, and barrel.

77.   The frame houses the trigger mechanism and is the regulated "firearm," the only part required to be serialized for most semiautomatic pistols. *Appx.,* Figure 7.

78.   Slides, barrels, and other internal semiautomatic pistol parts can be purchased from gun stores or web sites without regulation or background checks. These parts are usually interchangeable with parts from other guns of the same or similar model.

79.   To the extent slides, barrels, and internal parts bear serial numbers, U.S. law and regulations have never required those serial numbers to match the serialized frame.

80.   For Glock-style or Striker-style pistols, the slide houses the striker (similar to a firing pin), safety mechanisms, and springs to power the pistol functions. *Appx.*, Figure 8.

81.   Glock and Glock-style pistols, Sig Sauer P320 pistols, and other similar polymer-framed, striker fired pistols are among the most popular handguns purchased and owned in the United States today.

82.   For Hammer-style pistols – the standard semiautomatic pistol style for more than a century until the striker innovation – the slide houses a firing pin, safety mechanisms, and springs to power the pistol functions, while the frame houses the hammer.

83.   Defendants expressly stated in numerous prior communications with the public and regulated industry that 80% receivers and frames were not "firearms" subject to regulation.

84.   Until the Rule was promulgated, Defendants did not regulate 80% receivers or frames.

**D.   Facts Concerning Homicides and the NFA, GCA, and FOPA**

85.   The NFA regulates certain types of firearms including, silencers, short-barreled rifles (SBR), short-barreled shotguns (SBS), and any other weapons (AOW).

86.   The NFA was motivated by gangster violence during the Prohibition Era, including the crimes of John Dillinger, Al Capone, and the St. Valentine's Day Massacre.

87.   Immediately after the repeal of the 18th Amendment and the Volstead Act, Pub. L. 66-66, the U.S. homicide rate fell by half from 9.7 per 100,000 population in 1933 to about 5.0 in 1944.[5]

---

[5] https://www.druglibrary.org/schaffer/Library/homrate1.htm; See also Statistical Abstracts of the United States, 1934, 1946.

88.     The initial text of the NFA drafted by the Department of Justice sought to impose taxes and regulations on pistols, revolvers, short-barreled shotguns, machineguns, any other weapons, firearm silencers, and destructive devices. *See* Hearings Before the Committee on Ways and Means, House of Representatives, Seventy-Third Congress, Second Session on H.R. 9066, Apr. 16, 18, and May 14, 16, 1934 ("*NFA Hearings*") at 1.

89.     The bill proceeded under two powers – "one, the taxing power, and the other, the power to regulate interstate commerce." *Id.* at 6, 23.

90.     After amending the bill, Assistant Attorney General Joseph B. Keenan said, "As you will recall, the bill as originally drafted exercised two powers, one under the taxation clause and the other under the commerce clause. Under the bill as now submitted, it follows the theory of taxation all the way through,…" *Id*. at 86.

91.     Congressman Woodruff said, "As a matter of fact, the purpose of taxing is for control only. That is the primary purpose; that is the medium through which we hope, constitutionally, to take charge of this situation, is it not?…I say again, that the primary purpose of putting the tax item in this bill is constitutionally to take charge of the situation?" *Id*. at 91.

92.     Asst. AG Keenan testified, "The amount of the tax is not important except from this standpoint; it would be desirable to have the sale of guns in the hands of as few people as possible as a matter of efficiency to keep track of these weapons and see whether they are sold to the wrong people." *Id*. at 91.

93.     NFA's tax of $200 in 1934 was equivalent to $4,215.33 in 2022 dollars, inflated by the Consumer Price Index.[6]

---

[6]https://www.calculator.net/inflation-calculator.html?cstartingamount1=200&cinyear1=1934&coutyear1=2022&calctype=1&x=82&y=16

94.     Average wage earning income reported to the 16th decennial census in 1940 was $1,368, making the $200 NFA tax about 15% of annual income.[7] This would be equivalent to $5,628 for the 2021 median personal income of $37,522.[8]

95.     Thus, the $200 tax at the time the NFA was enacted made these regulated firearms prohibitively expensive for most people.

96.     Despite erosion of the prohibitive nature of the fixed-dollar tax over time from wage increases, the $200.00 tax still has substantial preclusive effects on those who would exercise their rights to keep and bear the regulated weapons.

97.     Today, commercial silencers generally range in price from $225 to $2,000, meaning that the $200 tax represents between 10% and 89% of the price of the silencer.

98.     The SilencerCo Omega 9K – one of the most popular 9mm silencers on the market – retails for about $637.[9] The tax stamp is 31% the price of the Omega 9K.

99.     A machinegun cost about $200 in 1934, and the $200 tax on machineguns amounted to a 100% tax. *NFA Hearings* at 12.

100.    Silencers cost between $5 and $7 in 1934, and the $200 NFA tax rate was between 2,857% and 4,000%.

101.    Much of hearing testimony concerning the NFA was its provision regulating licensing and taxation of pistols or revolvers, which was dropped prior to passage of the Act. *NFA*

---

[7] https://www.archives.gov/publications/prologue/2012/spring/1940.html; See also War and Postwar Wages, Prices, and Hours, 1914-23 and 1939-44 : Bulletin of the United States Bureau of Labor Statistics, No. 852, showing average weekly earnings in 1939 ranging from $23.86 to $30.71 for workers in manufacturing, coal mining, and steam railroads, or $1,240.72 and $1,596.92 per fifty-two week year. https://fraser.stlouisfed.org/title/war-postwar-wages-prices-hours-1914-23-1939-44-4318.

[8] https://fred.stlouisfed.org/series/MEPAINUSA646N

[9] https://www.silencershop.com/silencerco-omega-9k.html

*Hearings*.

102.   Attorney General Homer Stille Cummings admitted, "we have no inherent police powers to go into certain localities and deal with local crime." *Id.,* at 8.

103.   AG Cummings described the intent of the NFA: "it deals with the requirement of licensing if a person is to take any weapon across State lines. And I am assuming in all this, of course, that the criminal elements are not going to obtain permits and they are not going to obtain licenses, and they are not going to be able to bring themselves within those protective requirements. Therefore, when we capture one of those people, we have simply a plain question to propound to him – where is your license; where is your permit? If he cannot show it, we have got him and his weapons and we do not have to go through an elaborate trial, with all kinds of complicated questions arising. That is the theory of the bill." *Id.,* at 10.

104.   NFA hearing testimony presented no facts establishing that short-barreled rifles, short-barreled shotguns, or silencers were dangerous or unusual except a conclusory assertion by AG Cummings that, "A sawed-off shotgun is one of the most dangerous and deadly weapons." *Id.* at 6.

105.   Responding to a question from Congressman James McClintic, AG Cummings testified he was afraid that a provision requiring registration of these weapons already in private hands would be unconstitutional. *Id.* at 13.

106.   AG Cummings confirmed to Congressman Claude Fuller that the bill did "not contemplate that private individuals will have to register or have stamped their pistols that they now own…unless they sell them, or give them away, or otherwise dispose of them," *Id.* at 15.

107.   Congressman James Frear argued that "Those coats and those vests, that are for armament

and purely a matter of criminal use," and "It seems to me that there are very few people who are innocent wearing [vests and other protective armament] of that kind, even for their own protection." *Id.,* at 7.

108.    Congressman David Lewis said he had "never quite understood how the [gun control] laws of the various States have been reconciled with the provision in our Constitution denying the privilege to the legislature to take away the right to carry arms. Concealed-weapon laws, of course, are familiar in the various states." *Id.* at 19.

109.    AG Cummings responded, "Of course, we deal purely with concealable weapons." *Id.*

110.    Congressman Lewis said, "I hope the courts will find no doubt on a subject like this, General; but I was curious to know how we escaped that provision in the Constitution." *Id.*

111.    AG Cummings responded, "Oh, we do not attempt to escape it. We are dealing with another power, namely, the power of taxation and of regulation under the interstate commerce clause. You see, if we made a statute absolutely forbidding any human being to have a machine gun, you might say there is some constitutional question involved. But when you say, 'We will tax the machine gun' and when you say that 'the absence of a license showing payment of the tax has been made indicates that a crime has been perpetrated', you are easily within the law." *Id.*

112.    Congressman Lewis responded, "In other words, it does not amount to prohibition, but allows of regulation," to which AG Cummings replied, "That's the idea." *Id.*

113.    Congressman Samuel B. Hill acknowledged, "Now, of course, this is a pretty drastic measure. Nobody will question that for a moment. And it may arouse some resentment among certain of our perfectly good law-abiding people." *Id.* at 24.

114.    AG Cummings said, "Well, I said at the outset, Mr. Chairman, and Mr. Congressman, that

this was a drastic law, and the law-abiding people of this country have got to be prepared to go to some inconvenience in dealing with these deadly weapons. The thing is not an irrational request to make of the honest citizen who wants the criminal class stamped out." *Id.* at 25.

115. In NFA testimony, Congressman Claude Fuller asserted the mere possession of a sawed-off shotgun, a machinegun, or a silencer was evidence a person "ought to be taken into custody anyway, because we know that he is carrying it for an unlawful purpose." *Id.* at 111.

116. No documents in the Congressional record at the time explain why silencers were included in the NFA.

117. The only Congressional testimony related to short-barreled rifles was from a question by Minnesota Congressman Harold Knutson who asked, "General, would there any objection, on page 1, line 4. After the word 'shotgun' to add the words 'or rifle' having a barrel less than 18 inches? The reason I ask that is I happen to come from a section of the State where deer hunting is a very popular pastime in the fall of the year and, of course, I would not like to pass any legislation to forbid or make it impossible for our people to keep arms that would permit them to hunt deer." *Id.,* at 13.

118. Attorney General Cummings responded to Congressman Knutson, "Well, as long as it is not mentioned at all, it would not interfere at all." *Id.*

119. Congressman Knutson continued, "It seems to me that an 18-inch barrel would make this provision stronger than 16 inches, knowing what I do about firearms." *Id.*

120. When Congressman Knutson asked Attorney General Cummings why Congress should permit the sale of machineguns to anyone outside of the federal government, sheriff's

officers, and State constabularies, the Attorney General responded "Well, there are other conceivable uses. For instance, in banking institutions, we want to protect the banks." *Id.*

121. Congressman Hatton Sumners, Chairman of the Judiciary Committee, reminded Congressman Knutson that "this is a revenue measure and you have to make it possible at least in theory for these things to move in order to get internal revenue," to which AG Cummings said, "That is the answer exactly." *Id.,* at 14.

122. AG Cummings admitted, "Now, you say that it is easy for criminals to get weapons. I know it; but I want to make it easy to convict them when they have the weapons. That is the point of it. I do not expect criminals to comply with this law; I do not expect the underworld to be going around giving their fingerprints and getting permits to carry these weapons, but I want to be in a position, when I find such a person, to convict him because he has not complied." *Id.* at 22.

123. When asked by Chairman Robert L. Doughton, "Do you believe that the criminal classes will comply with that [registration] provision," Asst. AG Keenan responded, "We do not…We have recognized that from the beginning. We do not believe that this bill will disarm the hardened gangster, nor do we believe that it will prevent him from obtaining firearms." *Id.* at 92.

124. Asst. AG Keenan testified the law was not intended to be enforced on law-abiding citizens: "Really, what we are after is the crook who has not registered, and we do not believe he is going to register…If the law-abiding citizen does not register, and does not get into any kind of difficulty that would cause him to come to the notice of the police, and there are not going to be snooping squads going around from house to house to see who does and who does not possess arms; this is a practical piece of legislation…The presumption is

applied to the gangster." *Id.,* at 136.

125.   The Gun Control Act of 1968 added regulation of silencer parts.

126.   In enacting the Firearm Owners Protection Act, Congress considered "expert evidence…establishing that approximately 75 percent of BATF gun prosecutions were aimed at ordinary citizens who had neither criminal intent nor knowledge, but were enticed by agents into unknowing technical violations." The Right to Keep and Bear Arms, Report of the Subcommittee on the Constitution of the Committee on the Judiciary, United States Senate, Ninety-Seventh Congress, Second Session, February 1982, at 23.

127.   That subcommittee noted, "BATF stated that 55 percent of its gun law prosecutions overall involve persons with no record of felony conviction, and a third involve citizens with no prior police contact at all." *Id.* at 21.

## E.   Facts Concerning Short-Barreled Rifles and Shotguns

128.   The term "rifle" is defined as "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger, and shall include any such weapon which may be readily restored to fire a fixed cartridge." 26 U.S.C. §5845(c). See also 18 U.S.C. §921(a)(7).

129.   The term "shotgun" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed shotgun shell to fire through a smooth bore either a number of projectiles (ball shot) or a single projectile for each pull of the trigger, and

shall include any such weapon which may be readily restored to fire a fixed shotgun shell. 26 U.S.C. §5845(d). 18 U.S.C. §921(a)(5).

130.   The term "short-barreled rifle" means a rifle having one or more barrels less than sixteen inches in length and any weapon made from a rifle (whether by alteration, modification, or otherwise) if such weapon, as modified, has an overall length of less than twenty-six inches. 18 U.S.C. §921(a)(5).

131.   A short-barreled shotgun is defined as a shotgun having one or more barrels less than eighteen inches in length and any weapon made from a shotgun (whether by alteration, modification, or otherwise) if such a weapon as modified has an overall length of less than twenty-six inches. 18 U.S.C. §921(a)(6).

132.   Short-barreled rifles and shotguns have been in common use since before ratification of the Second Amendment and long thereafter.

133.   Short-barreled rifles are legal to own in 45 states without substantial restrictions.[10]

134.   Short-barreled shotguns are legal to own in 41 states without substantial restrictions.[11]

135.   In 2021, Defendants reported there are currently more than 532,000 registered short-barreled rifles and 162,000 registered short-barreled shotguns under the NFA.[12]

136.   Defendants report there were 923,137 applications to make short-barreled rifles from 2010 to 2020.[13]

---

[10] Maryland requires SBRs to have an overall length greater than 29 inches, and it disallows "copycats" of weapons prohibited by its "assault weapons ban." An additional state, California, allows SBRs only if they are curios or relics.
[11] Additional states California and Maryland allow SBSs only if they are curios or relics.
[12] ATF - Firearms Commerce in the United States – Annual Statistical Update 2021, p. 16.
[13] National Firearms Commerce and Trafficking Assessment, p. 157.

137.   Defendants have proposed a rule *Factoring Criteria for Firearms with Attached Stabilizing Braces*, RIN 2021R-08, that could result in hundreds of thousands to millions of pistols outfitted with stabilizing arm braces being reclassified as short-barreled rifles.

138.   Defendants report a large increase in the number of manufactured pistols in calibers between .22 and .25 from 2018 to 2020, which they conclude is an indication manufacturers are rapidly increasing production of AR pistols (.223 caliber and 5.56mm) equipped with stabilizing arm braces.[14] Approximately 250,000 of these firearms were manufactured in 2019 and 2020.

139.   At the time of the American Revolution, most firearms had very long barrels to increase projectile velocity because of slower-burning powders and poor fit of musket balls to their barrels allowing gases to pass by the ball. These long guns also extended the reach of the weapon with a fixed bayonet, which was usually unnecessary outside of warfare.

140.   As better gunpowder and rifled barrels evolved, average firearm barrel length decreased.

141.   From before the time of the Founding to the present, short-barreled firearms have always had a disadvantage of lower muzzle velocity than their similar longer-barreled comparators, which implies less terminal energy at the target, i.e. they are less deadly.

142.   Longer barreled weapons also had an advantage of having a longer sight axis with iron sights, making them more accurate. This advantage is largely obviated with the use of modern electronic red dot, holographic, or laser sights.

143.   Other than concealment, short-barreled weapons have advantages of being lighter, less front-heavy, easier to carry, easier to store, and easier to wield indoors or in close quarters.

---

[14] *Id.*, p. 158.

144.   Since before the Second Amendment to the present, short-barreled weapons were purpose-built for or modified for use on/in, horseback, coaches, bicycles, ships, trenches, cars, and indoors.

145.   The "carbine" rifle with its short barrel, was developed in the 17th century for cavalry forces.

146.   Currently, the United States Army fields the M4 Carbine with a barrel length of 14.5 inches. *Appx.*, Figure 9.

147.   The Giovanni Beretta Folding Stock Snaphaunce Pistol, produced around 1683, could be concealed under a cloak. *Appx.*, Figure 10.

148.   Colt's New Model Revolving Rifle was produced from 1855 to 1863 with a barrel length as low as fifteen inches. *Appx.*, Figure 11. These were notably used by the Pony Express, a private company.

149.   The Springfield Model 1855 musket was produced in a pistol-carbine version with barrel lengths of ten and twelve inches. *Appx.*, Figure 12.

150.   The Smith & Wesson New Model No. 3 Single Action Revolver, produced between 1870 and 1915 with a 6.5 inch barrel, was sometimes made with a detachable shoulder stock.

151.   Winchester Model 1892 rifles were customized into a "mare's leg" model with a shortened barrel of about thirteen inches and a shortened stock. *Appx.*, Figure 13.

152.   Marble's Game Getter, produced from 1908 to the present, is a double-barrel gun with a rifle barrel over a smooth-bore shotgun barrel, with a folding stock. The gun was produced in barrel lengths as low as twelve and fifteen inches. *Appx.*, Figure 14.

153.  In the 18th and 19th century, fur traders and other persons modified muskets for personal defense into "blanket guns," so called because they were easy to conceal under blankets or robes. *Appx.*, Figure 15.

154.  The British Sea Service Blunderbuss, produced around 1750, was a smoothbore shotgun with a fourteen inch barrel. *Appx.*, Figure 16.

155.  The Wilson Flintlock Blunderbuss with its eleven inch barrel first appeared in the 16th century and were famously associated with the Pilgrims who landed on Plymouth Rock. *Appx.*, Figure 17.

156.  "Coach guns" or "messenger guns" were double-barreled shotguns with shortened barrels used by stagecoach drivers and messengers in the 1860s for personal protection. *Appx.*, Figure 18. These guns led to the phrase "riding shotgun" which today means sitting in the passenger seat of an automobile, but in their time this meant keeping guard while someone else drove the coach.

157.  Many modern gun manufacturers make AR-15 "pistols" which are functionally identical to a short-barreled AR-15 rifle, the latter differing only by the addition of a butt stock. *Appx.*, Figure 19, 37.

158.  AR-15 pistols are Title I weapons not regulated by the NFA, and they are just as concealable, if not more so, than a short-barreled rifle version of the same gun.

159.  Compared to an AR-15 with a longer barrel, an AR-15 pistol is arguably less deadly because the projectiles have a lower velocity, all else equal.

160.  Under the NFA, simply adding a shoulder stock to a handgun transforms it into a short-barreled rifle without altering its function or deadliness.

161.   Mossberg Shockwave (14.4" barrel, 26.2" overall length, with a "bird's head" grip) is not regulated by the NFA, but it is functionally identical to and equally deadly as a Mossberg 590 Short-Barreled Shotgun and the Mossberg 590 shotgun. *Appx.*, Figure 20.

162.   Mossberg Shockwave was the best selling pump-action shotgun in 2020.[15]

163.   Remington TAC-14 is a pump-action shotgun with a 14" inch barrel that is not regulated by the NFA, but it is shorter than, functionally identical to, and equally deadly as a Remington 870 short-barreled shotgun and a Remington 870 shotgun. *Appx.*, Figure 21.

164.   Remington V3 TAC-13 is a semiautomatic shotgun with a 13" barrel, that is shorter than, functionally identical to, and equally deadly as the Remington V3 Competition Shotgun with a 22" barrel. *Appx.*, Figure 22.

165.   Civilians defending their own homes use short-barreled rifles and short-barreled shotguns because longer barreled weapons are harder to wield in a home with narrow doorways, hallways, and stairways.

166.   Short-barreled weapons can also mount a silencer to have the same overall length of a standard rifle or shotgun, but with hearing protection. *Appx.*, Figures 23, 24.

**F.    Facts Concerning Firearm Silencers**

167.   All firearms create muzzle blast – an explosive, supersonic shockwave created when hot gases contained by the firearm barrel are suddenly released when the projectile exits the muzzle (the end of the barrel).

168.   Muzzle blast has four main effects: flash, recoil, report, and infrasonic compression waves.

---

[15] Sagi, Guy. "Mossberg 590 Shockwave: Top-Selling Pump Shotgun in 2020". American Rifleman; https://www.americanrifleman.org/articles/2021/2/20/mossberg-590-shockwave-top-selling-pump-shotgun-in-2020

169. Flash refers to the bright light emitted from the firearm muzzle while shooting. It results from exothermic combustion of the propellant and any remaining unburned powder reacting with ambient air. *Appx.*, Figure 25.

170. Flash from a firearm causes momentary blindness, especially in low light when the observers' pupils are dilated.

171. Recoil is the rearward thrust generated when a gun is fired, according to Newton's Third Law of Motion. Recoil results from the forward momentum of the projectile and the gas ejected from the muzzle (jet thrust).

172. Recoil also causes muzzle rise (a.k.a. muzzle flip), which is the tendency of a firearm's muzzle to rise after firing, throwing off a shooter's aim for subsequent shots, and possibly causing the shooter to miss the target.

173. Report is the loudest part of firearm noise – a sonic boom – caused by the supersonic or transonic projectile and the rapid expansion of supersonic gases that push the projectile down the barrel, out of the muzzle, and toward the target.

174. According to the Occupational Safety and Health Administration (OSHA), sounds louder than 85 decibels can damage human hearing. *Appx.*, Figure 27.

175. While firearm report varies widely based on caliber and barrel length, unsuppressed gunshots generally range between 140 and 185 decibels, which can rupture eardrums and cause permanent sensorineural hearing loss for even brief and infrequent exposures. *Appx.*, Figure 28.

176. The decibel scale is logarithmic, meaning that each successive unit of decibels represents an increasing amount of power generated by the sound wave. That is, the increase in power from 130 dB to 140 dB is an order of magnitude larger than from 120 dB to 130 dB.

177. Infrasonic compression waves are inaudible, high-energy waves emanating from the muzzle blast. Infrasonic compression waves can cause tinnitus, restlessness, and nausea.

178. Few, if any, firearms have ever been designed with the intention of having flash, recoil, muzzle rise, report, or infrasonic compression waves as desirable features; these are inherent disadvantageous effects of firearms that manufacturers routinely attempt to diminish.

179. For example, flash suppressors (not to be confused with silencers), diminish muzzle flash. Recoil compensators and muzzle brakes are designed to reduce recoil and muzzle rise. Some manufacturers reduce muzzle rise by designing the bore axis (longitudinal centerline of the barrel) closer to the gun's center of gravity. Smokeless powders were developed from the mid- to late- 19th century to reduce the smoke emitted by firearms that obscured targets.

180. Firearm silencers, a.k.a. suppressors or mufflers, are devices that allow hot gases to expand and cool, reducing flash, recoil, muzzle rise, report, and infrasonic compression waves. *Appx.*, Figure 26. Silencers work on the same principles as an automobile muffler.

181. Silencers do not make guns completely silent; a firearm fitted with a silencer can still produce ear-damaging sound louder than a rock and roll concert, and comparable with jet airplanes, jackhammers, and ambulance sirens. *Appx.*, Figure 27.

182. Silencers generally have a noise reduction rating (NRR) of about 30-35 decibels. *Id.*

183. Earmuffs designed for shooting have an average NRR of about 30 decibels.

184. Shooting with earmuffs alone can still damage human hearing.

185. The term "silencer" was a trademark and marketing name by Hiram Percy Maxim, who patented the first commercially successful silencer around 1902.

186.  Silencers pre-existed Maxim's design, but the history of silencers is uncertain.

187.  Robert A. Moore patented a silencer in 1909, #US956717A.

188.  The United States Army tested both Maxim's and Moore's silencers for use on combat rifles from 1909 to 1916.[16]

189.  The United States Marine Corps recently began fielding 30,000 silencers to its combat units to reduce the "din of battle," to aid communication, to reduce muzzle flash, and to protect soldier hearing.[17]

190.  Silencers generally consist of the following parts: a tubular outer housing, internal baffles allowing hot gases to cool and expand, a front end cap, a rear mount, pistons for mounting on pistol barrels, and a Nielsen device which assists the operation of a pistol equipped with a silencer. Some silencers have no outer tube but are assembled section by section with a series of baffles, each having their own integral external housing. *Appx.*, Figure 29.

191.  Silencers can also employ wipes – small disks of plastic or rubber-type material – that further reduce the noise from firearms; however, the effects of wipes diminish as the user punches holes through them by firing bullets. *Appx.*, Figure 30.

192.  People can buy rubber washers from local hardware stores that can be used as wipes.

193.  Defendants consider wipes to be regulated silencer parts, and they must be replaced by the manufacturer at relatively high expense for such an inexpensive item.

194.  Firearm silencers are legal in forty-two states.

195.  Under federal statutes, the terms "firearm silencer" and "firearm muffler" mean any device

---

[16] https://www.thefirearmblog.com/blog/2018/11/28/us-army-world-war-onesilencers/
[17] https://www.military.com/daily-news/2020/12/29/marine-corps-has-started-fielding-30000-rifle-suppressors-combat-units.html; https://armourersbench.com/2022/05/06/ngsw-the-us-armys-first-suppressed-service-rifle-some-history/

for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication. 18 U.S.C. §921(a)(25).

196. Silencers are rarely used in crimes.

197. Plaintiff owned a "solvent trap" with the intention of making of a legal silencer.

198. The solvent trap consisted of an outer tube, internal cones that could be drilled into baffles, a spacer, an end cap that needed to be drilled, and a threaded tail cap for mounting to a firearm. The end cap and cones had a divot indicating the center of the parts for a drill bit. Each component was made of solid aluminum. See, e.g., *Appx*. Figure 31.

199. Defendants recently began to consider, without rulemaking, the mere possession of a solvent trap to violate the law, holding they are regulated silencer parts.

200. Plaintiff has never attempted to complete an operational silencer from solvent traps out of fear of Agency's regulations, legal opinions, and prosecutions. Plaintiff destroyed and discarded his solvent trap because of the proposed Rule and Defendants' determinations.

201. Defendants' current practice is to deny applications to make silencers using solvent traps.

202. Defendants reported that as of May 2021, there are about 2.66 million registered silencers.[18]

203. More than 80% of suppressors registered since 1934 have been registered in the past twelve years.

204. On February 17, 2017, the Washington Free Beacon reported that Defendants released statistics showing that the nearly 1.3 million registered silencers at that time were rarely

---

[18] ATF - Firearms Commerce in the United States – Annual Statistical Update 2021, p. 16.

used in crimes – only 44 silencer-related crimes per year over the past decade, which is only 0.003% of silencers used in crimes. Of those 44 crimes per year, only 6 involved defendants with prior felony convictions.[19]

205.    Data in the Free Beacon article does not reveal whether the silencer-related crimes involved violent crime or mere unlawful possession.

206.    ShotSpotter, the leading manufacturer of gunshot detection systems in the U.S., responded to a Frequently Asked Question, "Does ShotSpotter detect gunshots from gun silencers?" by saying, "Yes, it does. "Silencers" are more accurately called suppressors as they suppress the impulsive sound of gunfire, but do not wholly eliminate it. The ShotSpotter sensors are designed to pick up the sound of gunfire from suppressors, but it does make it more challenging."[20]

## G.    Facts Concerning "Any Other Weapons"

207.    As defined in relevant statutes, the term "any other weapon" means any weapon or device capable of being concealed on the person from which a shot can be discharged through the energy of an explosive, a pistol or revolver having a barrel with a smooth bore designed or redesigned to fire a fixed shotgun shell, weapons with combination shotgun and rifle barrels 12 inches or more, less than 18 inches in length, from which only a single discharge can be made from either barrel without manual reloading, and shall include any such weapon which may be readily restored to fire. Such term shall not include a pistol or a

---

[19]    https://freebeacon.com/issues/atf-despite-nearly-1-3-million-silencers-united-states-rarely-used-crimes/

[20] https://www.shotspotter.com/wp-content/uploads/2019/05/FAQ-June-2019.pdf

revolver having a rifled bore, or rifled bores, or weapons designed, made, or intended to be fired from the shoulder and not capable of firing fixed ammunition. 26 U.S.C. §5845(e).

208.   The AOW category can fairly be described as a catch-all category in the NFA for any firearm that does not fall into the categories of pistol, revolver, machinegun, destructive device, rifle, or shotgun.

209.   "Any other weapons" are legal to own in 48 states without substantial restrictions.[21]

210.   The NFA tax for the transfer of an AOW is $5, while the NFA tax for making an AOW is $200.

211.   There are approximately 67,000 any other weapons registered under the NFA.[22]

212.   AOWs include disguised weapons such as cane guns and guns concealed in wallets, pocket watches, rings, umbrellas, lipstick, pens, gloves, briefcases, and cigarette packs. *Appx.*, Figures 32—36.

213.   While not firearms, sword canes (a.k.a. sword sticks) date to antiquity and were popular among wealthy people for self-defense during the 18th and 19th centuries.

214.   Cane guns were first patented in 1823.[23]

215.   In 1858, John F. Thomas patented (#19,328) a percussion fired single-shot cane rifle, which was produced by Remington Arms the following year.

216.   In the 1860s, Briggs of London produced a four-shot .22 rimfire cane gun.

---

[21] New York generally allows AOWs, but not disguised weapons.
[22] ATF - Firearms Commerce in the United States – Annual Statistical Update 2021, p. 16.
[23] Wills, Chuck, *The Illustrated Encyclopedia of Weaponry*. Thunder Bay Press (July 19, 2016). ISBN 978-1626866164

217.   In 1876, gunsmith Joseph-Celestin Dumonthier patented a smoothbore cane gun of about .410 caliber, similar in design to the Remington cane gun, which was produced from 1880 to 1900.[24]

218.   In 1885, Edward Bean patented the Bean's Breech-Loading Gun Cane.

219.   Combination guns with a rifle and shotgun barrel between twelve and eighteen inches are AOWs.

220.   A small derringer pistol concealed inside a wallet would be an AOW even though the gun by itself and the wallet by itself are not NFA regulated items.

221.   These types of disguised weapons were popular during the 19th and 20th centuries for the discreet carry of weapons for self-defense.

222.   Demonstrating the arbitrariness of the NFA's and Defendants' classifications, four functionally identical weapons with slightly different configurations have very different treatments under the law. *Appx.* Figure 37.

223.   Defendants consider a pistol or handgun outfitted with a vertical forward grip (VFG) to be an AOW because, they contend, this redesigns the gun to be fired with two hands. *Id.* (third)

224.   Defendants do not consider a pistol or handgun outfitted with an angled foregrip to be an AOW, even though these grips enable the use of a second hand. *Id.*, (top).

225.   Contemporary police, military, and civilian handgun training overwhelmingly teaches students to shoot a pistol or handgun with two hands. *Appx.*, Figure 38.

---

[24]   Gabriel, Ronald (2011). *American & British 410 Shotguns*. Gun Digest Books. p. 136. ISBN 9781440223976.

Many pistol and handgun owners legally add thumb rest, sometimes called a "gas pedal," to their guns, which makes it easier for the non-firing hand to control muzzle rise. *Appx.* Figure 39.

## H.    Facts Concerning Firearm Ownership and Crimes

226.    In 2019, there were approximately 13,927 homicides with firearms. Of those, handguns accounted for 6,368 (45.7%); rifles 364 (2.6%), and shotguns 200 (1.4%).[25]  Obviously, short-barreled rifles and short-barreled shotguns accounted for less than the figures for all rifles and shotguns.

227.    There were more homicides in 2019 using hands, fists, or feet than rifles and shotguns combined.

228.    Because of their shorter barrels, short-barreled rifles and shotguns fire projectiles at a lower velocity and thus less energy than otherwise identical rifles and shotguns with longer barrels firing identical projectiles.

229.    Certain AR "pistols" with barrels under 16 inches and unregulated by the NFA are functionally identical to and just as concealable as AR short-barreled rifles.

230.    Certain "firearms," e.g., the Mossberg Shockwave, with barrels under 18 inches, and unregulated by the NFA, are functionally identical to short-barreled shotguns.

231.    Under 26 U.S.C. §5845, silencers are defined as "firearms" even though they do not expel projectiles by the action of an explosive as defined in 18 U.S.C. §921.

232.    NFA did not ban silencers, short-barreled rifles, and short-barreled shotguns, but provided

---

[25] FBI: Uniform Crime Report, Expanded Homicide Data Table 8.
https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/tables/expanded-homicide-data-table-8.xls

for a $200 tax for the making or transfer of such weapons, and submission of a photograph and fingerprints.

## I.     Facts Concerning the Notice of Proposed Rulemaking and Plaintiff's Comments

233.   May 21, 2021, Defendants issued a notice of proposed rulemaking ("NPRM"), *Definition of 'Frame or Receiver' and Identification of Firearms* ("Receiver Rule"), RIN 1140-AA54, ECF 1-1, 87 FR 27720.

234.   NPRM proposed to "provide new regulatory definitions of 'firearm frame or receiver' and 'frame or receiver' because the current regulations fail to capture the full meaning of those terms," to amend the definitions of 'firearm' and 'gunsmith,' and to "provide definitions of terms such as 'complete weapon,' 'complete muffler or silencer device,' 'privately made firearm,' and 'readily' for purposes of clarity given advancements in firearm technology." *Id*., 86 FR 27720.

235.   NPRM cited the Gun Control Act of 1968 ("GCA"), Pub. L. 90-618, as amended, and the National Firearms Act of 1934 ("NFA") as amended, as providing Defendants' authority for its rulemaking. *Id*., 86 FR 27720.

236.   NPRM claims the intent of promulgating definitions of a frame or receiver "was to provide guidance as to which portion of a firearm was the frame or receiver for purposes of licensing, serialization, and recordkeeping, thereby ensuring that a necessary component of the weapon could be traced if later involved in a crime." *Id*., 86 FR 27721.

237.   NPRM refers to AR-style and Glock-style receivers and frames as "split/multi-piece receivers." *Id*., 86 FR 27721.

238. NPRM cites several criminal cases Agency lost based on the courts' or juries' views that persons prohibited from owning firearms can only be convicted for possessing a complete firearm or receiver with all their attendant parts identified in the statute. *Id.*, 86 FR 27722.

239. NRPM says these court decisions are a "narrow interpretation" that, if broadly followed, would mean that "as many as 90 percent of all firearms now in the United States would not have any frame or receiver subject to regulation." *Id.*, 87 FR 27722.

240. NPRM says, "If no portion of split/multi-piece frames or receivers were subject to any existing regulations, such as marking, recordkeeping, or background checks, law enforcement's ability to trace semiautomatic firearms later used in crime would be severely impeded." *Id.*, 87 FR 27722.

241. NPRM defines privately made firearms ("PMF") or "ghost guns" as those firearms "people can make themselves, often with the assistance of standalone parts or weapon parts kits, using 3D printers or personally owned or leased equipment, without any records or a background check." *Id.*, 87 FR 27722.

242. The term "ghost guns" is an emotionally-charged term invented and used by gun control advocates to frighten the public into supporting regulation of such guns or gun parts.

243. The overwhelming majority – nearly 100% – of unmarked PMFs are used by law-abiding citizens for lawful purposes.

244. NPRM and Rule showed no evidence persons owning unmarked PMFs are more likely than those not owning unmarked PMFs to commit crimes using firearms.

245. NRPM argues "the number of PMFs recovered from crime scenes throughout the country has increased," with almost 24,000 suspected PMFs recovered by law enforcement from 2016 to 2020, including 325 homicides or attempted homicides. *Id.*, 87 FR 27722.

246.    From 2016 to 2020, there were approximately 56,000 firearm homicides. Thus, PMFs recovered by law enforcement accounted for approximately 0.6% of firearm homicides during this period.

247.    According to the 2021 National Firearms Survey, more than 81.4 million Americans own guns, with between 41% and 44% of households having guns. Other estimates claim that more than 100 million Americans own guns.[26]

248.    Citizens of the United States own between 350 and 500 million guns.

249.    Using the low estimate of gun ownership to favor Defendants, PMFs recovered by law enforcement during this period account for only 0.007% of all guns owned.

250.    NPRM provided no data on the number of unmarked firearm silencers recovered by law enforcement or used in crimes.

**J.    Facts Concerning Firearm Traces**

251.    Agency's National Tracing Center reports firearms recovered and traced as: 2016: 205,201; 2017: 234,018; 2018: 249,675; 2019: 264,099; 2020: 300,851. This is a total of 1,253,844 successful traces from 2016 to 2020.

252.    Defendants consider a trace "successful" if it discovers the last known firearms dealer who transferred the firearm.

253.    After a successful trace, Defendants must then investigate the chain of ownership of that firearm.

254.    Defendants have never reported the percentage of successful traces that lead to arrests, charges, and convictions of firearm crimes investigated by the trace.

---

[26] English, William; *2021 National Firearms Survey*, Georgetown McDonough School of Business, Res. Paper. No. 3887145, July 14, 2021.

255. Most guns used in crimes are stolen (6%), found at crime scenes (7%), or bought on streets or from the underground market (43%).[28]

256. Agency's National Tracing Center reports it conducted 490,800 trace requests in fiscal year 2020 for a success rate of 61 percent.[29]

257. Thus, the 24,000 PMFs recovered by law enforcement from 2016 to 2020 are equivalent to (but do not comprise) about 1.91% of all firearms successfully traced during this period and approximately 1.17% of all guns attempted to be traced.

258. A 1995 study by the Bureau of Justice Statistics found that 72% of guns traced involved weapon law violations, while only 6% involved homicide, 5% assaults, 2% burglaries, and 2% robberies.[30]

259. Data from 2019 show homicide arrests are only 7% of those for weapon law violations.[31]

260. Defendants held a notice and comment period from May 21 to August 19, 2021 for the Rule.

261. Plaintiff submitted a public comment to the proposed rule. *Comment*, Exhibit 2.

262. *Comment* argued Agency's proposal to regulate PMFs is an *ultra vires* usurpation of Congressional authorization, undertaken because of the unwillingness of Congress to pass legislation regulating "ghost guns." *Comment* at 2.

---

[28] *Source and Use of Firearms Involved in Crimes: Survey of Prison Inmates, 2016*, Bureau of Justice Statistics, January 2019. https://bjs.ojp.gov/content/pub/pdf/suficspi16_sum.pdf
[29] https://www.atf.gov/resource-center/fact-sheet/fact-sheet-national-tracing-center

[30] https://bjs.ojp.gov/content/pub/pdf/GUIC.PDF

[31] 2019 Crime in the United States, Table 43.

263.  *Comment* argued Agency's use of the term "readily" to describe completion, assembly, conversion or restoration to a functional state is vague, ambiguous, arbitrary, and capricious. *Id*.

264.  *Comment* argued that the terms "difficulty," "expertise," "availability," "ease," "expense," "feasibility," and "operable," used to define "readily" are all vague and subjective. *Id.* at 3.

265.  *Comment* argued Agency's terms "critical stage" and "critical line" were vague, subjective, ambiguous, arbitrary, and capricious. *Id.* at 4.

266.  *Comment* argued these arbitrary and capricious definitions leave reasonably intelligent people in complete doubt as to whether materials they possess violate the law. *Id*. at 4.

267.  *Comment* argued the former "80%" standard relied upon by the Agency was clear, specific, objective, and actionable. *Id.* at 3. This standard was part of the *status quo ante* alternative.

268.  *Comment* argued Agency wrongfully relied on "marketing materials" in this and other regulations to determine the legal status of firearms, parts, or raw materials. Weapons are classified by law and regulated based on what they actually are, not what manufacturers or sellers purport them to be. *Id*. at 4.

269.  *Comment* argued the rule would violate the Tenth Amendment by requiring gunsmiths in a State to mark unmarked firearms owned by persons from the same State when taken in for repairs. *Id.* at 4—5.

270.  *Comment* argued Agency's electronic storage provision of requiring the surrender of electronic records when an FFL goes out of business unlawfully violates the prohibition against Agency creating, maintaining, or administering a database of firearms owners or their firearms. *Consolidated and Further Continuing Appropriations Act*, Pub.L. 112-55 (Nov. 8, 2011), 125 Stat. 609. *Id*. at 5.

271.   *Comment* argued Agency was attempting to side-step that law by having private FFLs create these electronic databases for it. *Id.*

272.   *Comment* argued Agency was attempting to enact provisions of bills sponsored by Democrat members of Congress that failed to become law, e.g., *Crime Gun Tracing Modernization Act*, S.2974 (115th Congress), S.3348 (116th Congress). *Id.*

273.   *Comment* argued serious deficiencies in NPRM's cost-benefit analysis for their failure to monetize or quantify the benefits of the rule, and without stating why such monetization and quantification was not possible. *Id.* at 6.

274.   To demonstrate the lack of any benefits or at least the capability of Defendants to calculate benefits, *Comment* showed calculations that "ghost guns" are virtually nonexistent among the population of all firearms in the United States, and they are used in a minuscule proportion of homicides; thus, the rule provides almost no benefits for its substantial costs and burdens. *Id.*

275.   *Comment* argued Agency failed to consider how noncompliance by criminals would diminish the benefits of the rule, if any. *Id.* at 7.

276.   NPRM asserted the existence of a *negative externality* for the possession of unmarked firearms without proving such externality, theoretically modelling it, or quantifying it. *Id.*, 86 FR 27738.

277.   Generally, a *negative externality* is a "market failure" whereby the unregulated market would fail to achieve the socially optimal quantity of a good.

278.   This type of market failure arises because there is a cost or negative benefit imposed on third parties from the consumption or production of a good without that third party being compensated through the price system. Put another way, the producer of the good and the

consumer of the good do not take into account the damages to third parties from their transaction. Thus, the unregulated market overproduces the good, causing economic inefficiency.

279. Notably, unless the negative externality is enormous, the socially optimal level of the good is not zero.

280. In the instant case, the "good" is unmarked firearms. Agency's assertion of a negative externality implies that it believes the unregulated market produces too many unmarked firearms, creating economic inefficiency.

281. *Comment* argued the agency's presumption that "technological advances in firearms…impose costs on investigating and prosecuting firearm related criminal cases" does not meet the definition of an externality. *Comment* at 7.

282. Assuming without conceding that failing to mark guns does create an externality, *Comment* argued the Agency's marking requirement would destroy more social welfare than it preserves, i.e., the rule would have negative net benefits, because the optimal quantity of unmarked firearms is not zero. This form of overregulation is called *government failure. Id.* at 8.

283. *Comment* argued the effects of marking requirements on manufacturers of 80% receivers would be large, and Agency never calculated these costs. *Id.* at 11.

284. The vast majority of manufacturers of 80% receivers and frames are small businesses as defined by the Small Business Administration.

285. The failure to analyze rule effects on small businesses violates the Small Business Regulatory Enforcement Fairness Act ("SBREFA"), 5 U.S.C. §601 et seq.

286. *Comment* argued Agency failed to consider that many private citizens prefer to own firearms the U.S. government does not know about – a perfectly legitimate and legal motive to avoid future confiscation of firearms. *Id.* at 11.

287. Indeed, the appropriations bill prohibiting Agency from having a searchable database of firearm ownership was intended by Congress to prevent the federal government from someday using such a database to confiscate firearms.

288. Agency failed to consider and monetize the economic impact of preventing citizens from choosing to have unmarked firearms.

289. *Comment* argued the marking requirement would impose massive costs by doubling marking costs on every firearm produced. *Id*. at 12.

290. *Comment* argued Agency failed to estimate the capital costs for retooling for the marking requirements. *Id.*

291. Agency assumed without any supporting evidence "that the majority of the industry currently complies with these [marking] requirements, so the cost would be minimal." *Id*., 86 FR 27736.

292. Making some reasonable assumptions weighing in Agency's favor, Plaintiff estimated Agency undercounted $92.4 million in costs, and actual costs would be much higher. ECF 1-2 at 13.

293. Had Agency made this and other appropriate estimations, this would have made the Rule a *major rule* for purposes of the Congressional Review Act ("CRA"), Pub. L. 104-121, codified in 5 U.S.C. §801 et seq., and Congress could enact a joint resolution of disapproval.

294. Had Agency made this and other appropriate estimations, this would require expenditures by the private sector of $100 million or more, triggering requirements of the Unfunded Mandates Reform Act, Pub. L. 104—4, 109 Stat. 48.

295. Defendants' hand-waving assumptions in its own favor are commonplace in Agency rulemaking and throughout the instant Rule.

296. Agency's definition of a frame or receiver for firearm mufflers or silencers includes "a part of the firearm, that, when the complete device is assembled, is visible from the exterior and provides housing or a structure, such as an outer tube or modular piece, designed to hold or integrate one or more essential components of the device, including any of the following: baffles, baffling material, or expansion chamber." 86 FR 27728.

297. *Comment* argued that this expansive definition would include among the parts required to be marked the end caps, muzzle brakes, mounts, and even pistons which would all be serialized and regulated. *Comment* at 13—14.

298. Notwithstanding the availability of variances, every silencer manufacturer would have to apply for variances because of the Rule, and Agency had not calculated these costs. *Id*.

299. *Comment* argued this "would completely eliminate the entire industry for home-made silencer parts, none of which currently meet the definition of a silencer or regulated part." *Id.* at 14.

300. NPRM did not monetize, quantify, or qualitatively describe the adverse economics effects on the market for home-made silencer parts.

301. *Comment* argued the new gunsmithing requirements were unnecessary because one need not be "professional" or "licensed" to comply with the statutory and regulatory marking

requirements, adding enormous costs of licensing and restricting supply of persons qualified to engrave. *Id*. at 14. Engravers of bowling trophies can meet the requirements.

302. Restricting the supply of persons permitted to mark firearms will have the economic effect of increasing marking costs, all else equal.

303. Restricting the supply of persons permitted to mark firearms will cause an increase in FFL inventory of firearms for marking after Rule enactment, all else equal.

304. The purpose of this requirement was to bring all firearm marking under the auspices of firms regulated by the Agency to unlawfully extend their purported powers under the Interstate Commerce Clause, violating the Tenth Amendment.

305. "The manufacture and sale of a product wholly within a state is not interstate commerce even though the product is destined by the buyer to be shipped out of the state in interstate commerce." *Jersey Central Co. v. Power Comm'n*, 319 U.S. 61, 83 (1943).

306. "Today, the only recognized limitations are that (1) Congress may not regulate non-economic behavior based solely on an attenuated link to interstate commerce, and (2) Congress may not regulate intrastate economic behavior if its aggregate impact on interstate commerce is negligible." See *United States v. Morrison*, 529 U.S. 598, 610, 615-19 (2000); *United States v. Lopez*, 514 U.S. 549, 558-61, 566-67 (1995). *Seven-Sky v. Holder*, 661 F.3d 1, 29-30 (D.C. Cir. 2011).

307. Firearm possession "has nothing to do with 'commerce' or any sort of economic enterprise, however broadly those terms are defined." *United States v. Lopez*, 514 U.S. 549 (1995)

308. Agency assumed the effects on non-FFL manufacturers would be small by anticipating these would either become FFLs to sell regulated frames, receivers, or complete weapons,

or would take a loss in revenue to sell unregulated items or parts kits. Agency undertook no analysis to reach these presumptions.

309.    Non-FFL manufacturers of 80% parts and kits already revealed their preference to not become licensed when they had they always had the option to do so.

310.    Licensing would impose substantial costs and compliance requirements under firearm laws and regulations. Agency never monetized or quantified these additional costs and burdens.

311.    *Comment* argued Agency underestimated the costs of contract gunsmithing by deliberately low-balling the costs of tools for marking with consumer-grade tools for "jewelry" and "leather craft printing." *Comment* at 16.

312.    *Comment* argued that while Agency required "professional" gunsmithing to engrave markings, they estimated labor costs with wages of "salesclerks" and "cashiers." *Id.*

313.    Agency assumed PMF inventory at FFLs is low, and that they may have only "1 or 2 PMFs in their inventory." *Regulatory Impact Analysis* ("*RIA*"), Exhibit 5, p. 42. Agency never provided an evidentiary basis for this assumption nor change this assumption to see how it affected their cost analysis.

314.    While Agency came up with a reasonable estimated cost of $692.00 to turn in or destroy partially complete firearm kits, Agency failed to estimate the number of such kits and thus failed to monetize or quantify the costs.

315.    Agency attributes to its Rule purported benefits allowing FFLs to "track their inventories, reconcile any missing inventory, respond to trace requests, process warranty claims and report lost of stolen PMFs to police and insurance companies." 86 FR 27724.

316.   Agency abused its discretion by presuming benefits for regulated parties who had revealed by their own free choices that not marking guns was preferred to receiving these so-called benefits.

317.   Agency assumed 90% of FFLs retain their records indefinitely, which reduced the cost estimate of the record retention requirement. Agency relied on their own subject matter experts for this assumption.

318.   Agency did not ask the public for information about record retention in an Advance Notice of Proposed Rulemaking.

319.   Agency did not vary the record retention assumption to see how rule costs would change.

320.   Even given its unsupported assumptions, Agency undercounted by about 50 percent the number of FFLs not storing records more than twenty years.

321.   Agency erred presuming that just because FFLs had stored records more than 20 years in the past, that they would continue to do so after this rule is enacted.

322.   Agency was required to estimate the costs of the regulatory structure it was imposing, not what it believes actually takes place, because the rule itself will change incentives for the public. That is, an agency is not allowed to presume regulations will be non-binding when calculating costs and benefits.

323.   *Comment* pointed out that the rule would pose additional costs on all those FFLs currently choosing to retain records beyond 20 years, and the rule would encourage those FFLs to stop doing this altogether as the number of documents they must maintain will rise exponentially under the Rule. *Comment* at 19.

324.   Agency did not attempt to calculate the costs of longer record retention.

325.    On average, the National Tracing Center receives about five million out-of-business records per month.[32]

326.    *Comment* estimated FFLs would amass an additional 433 million records over the next 20 years with *six trillion* pages. *Id.*

327.    Agency claimed industry costs for overflow records would be minimal because dealers could drop records off to ATF. 86 FR 27737.

328.    Agency did not calculate its own increased costs if FFLs surrender overflow records.

329.    Agency claimed the record retention requirement would have "benefits in investigating criminal activities," because "there are a number of traces that are unsuccessful due to the age of the firearm and the fact that records do not have to be maintained after 20 years." *RIA* at 47.

330.    Agency's assessment of benefits of increased record retention failed to recognize that the marginal benefit of longer-retained records declines and the marginal cost rises.

331.    Agency did not consider alternative regulatory approaches of the length of record retention, e.g.,  for 15, 25, or 30 years instead of perpetually.

332.    *Comment* demonstrated with calculations that given Agency's estimates of traces lost, the record retention rule has virtually no benefits.

333.    *Comment* argued that even successful traces to the seller of the firearm would often fail to identify the current possessor of the firearm, especially for guns first sold 20 years ago.

334.    Agency asserted benefits from making consistent marking requirements. 86 FR 27736.

---

[32] https://www.atf.gov/resource-center/docs/undefined/ntc-fact-sheet-june-2020/download

335.   Agency did not monetize or quantify these benefits of consistent marking requirements or say why they could not do so. Agency did not state to whom these benefits would accrue.

336.   Agency claimed, without monetization or quantification, that easing certain marking requirements is a rule benefit. 86 FR 27736.

337.   *Comment* argued Agency may ease marking requirements without implementing any of the other Rule provisions, and Agency was attempting to reduce Rule costs with some offsetting reductions in requirements to avoid statutory thresholds such as the CRA.

338.   Agency asserted benefits of increased tracing of guns from crime scenes for criminal prosecution without evidentiary support. 86 FR 27736.

339.   NPRM did not define what a "successful" trace means, nor did it estimate the likelihood of identifying a perpetrator from a trace, the probability traces result in arrests and prosecutions, or the expected benefits of a successful prosecution.

340.   Without such calculations, Agency has not demonstrated any benefits of tracing at all, much less those that exceed costs.

341.   Agency did not monetize or quantify any benefits of electronic storage of information.

342.   NPRM did not analyze whether existing sales taxes, criminal liability, or tort liability already reduced the number of unmarked guns to their socially optimal levels.

## K.   Facts Concerning Alternative Regulatory Approaches Considered

343.   Agency failed to properly analyze alternative regulatory approaches. For the *status quo ante* alternative, Agency claims the rule provides "clarity" such that it could succeed in prosecutions that had failed in the past. Agency begs the question by asserting all the people it formerly prosecuted were criminals who should have been convicted of crimes; Agency is rulemaking its way into post-hoc victory in failed legal cases.

344. NPRM did not consider deferring action to Congress or State legislatures, and it did not explain why it could not do so.

345. NPRM did not explain why regulation at the Federal level was necessary.

346. In rejecting Alternative 3 – grandfathering all existing firearm receivers – Agency presumed that "manufacturers could continue to produce non-compliant firearm frames or receivers and falsely market them as grandfathered items." 86 FR 27737—38.

347. That is, Agency rejected a valid alternative by presuming law-abiding manufacturers would risk their freedom, property, and livelihoods by committing felony crimes.

348. Agency considered no reduction in benefits from non-compliance by criminals.

349. Agency did not monetize or quantify the benefits of Alternative 3.

350. Notwithstanding its claim there was a negative externality, Agency failed to consider the two most obvious economic policy responses to eliminate the inefficiency of externalities: a *Pigouvian* tax or a quota, both of which could reduce the number of unmarked firearms to the socially optimal level.

351. While Agency could not implement a *Pigouvian* tax or quota, Congress could.

352. Agency failed to consider allowing anyone with the technical expertise and equipment to mark firearms to do so, with or without a license.

353. Despite a rule of expansive and ambitious scope, NPRM failed to consider alternative regulatory approaches for each and every part of the proposed rule.

354. April 26, 2022, Defendants issued a final rule, *Definition of 'Frame or Receiver' and Identification of Firearms* ("Rule"), RIN 1140-AA54, 87 FR 24652, effective on August 24, 2022, amending 27 C.F.R. §447, 478, 479. Exhibit 3.

355.   Rule maintained the NPRM's bases for rulemaking on statutory authority, legal decisions, PMF recoveries, anecdotes of criminal acts with PMFs, and proclamations by other agencies regarding PMFs.

356.   Rule made no attempt to monetize or quantify the benefits of the rule, explicitly saying, "Not estimated." 87 FR 24731.

357.   Rule did not explain *why* Defendants could not monetize or quantify benefits.

358.   Defendants clearly could have monetized benefits by estimating the additional number of traces made possible by the Rule, the probability such traces would be successful, the probability the perpetrator of a crime could be identified, the probability such traces would be decisive in achieving a conviction, and the expected benefits to the public from a successful conviction.

359.   Rule qualitatively describes benefits of: (1) Provides clarity to courts on what constitutes a firearm frame or receiver; (2) Adapts to new technology/terminology; (3) Makes consistent marking requirements; (4) Eases certain marking restrictions; (5) Increases tracing of crime scene firearms to prosecute criminals; (6) Restricts felons and other prohibited persons from acquiring PMFs. 87 FR 24731.

360.   Defendants' first claimed Rule "benefit" does not actually provide any clarity to courts. Rather, Defendants are attempting to change definitions to retroactively make themselves winners in cases where courts determined people Defendants prosecuted had not violated the law. Defendants determined in their own minds these defendants were guilty of crimes, and Defendants lament that these persons were acquitted. This implies Agency will seek prosecutions of people who had previously not committed unlawful acts under the statute.

361.     Defendants' second claimed "benefit" of adapting to new technology is the province of
Congress to consider and weigh competing policy interests, not the agency's duty to rewrite
the law to include devices Congress had not considered at the time of enacting statutes.

362.     Defendants' third claimed "benefit" of "consistent" marking is already part of the *status
quo ante*.

363.     Defendants' fourth claimed "benefit" of easing marking requirements could be done
without enacting the other provisions of this Rule, and Defendants' inclusion of these
benefits is a cynical attempt to reduce the total costs of the Rule.

364.     Defendants' fifth claimed "benefit" of increasing tracing to prosecute criminals is a bald
assertion without any proof.

365.     Defendants' sixth claimed "benefit" of restricting felons from obtaining PMFs is simply a
restatement of the first "benefit."

366.     The Rule updated the estimated number of PMFs reported recovered by police and reported
to ATF between 2016 and 2021 to 45,240. This included weapons used in 692 homicides
or attempted homicides.

367.     This updated data does not change the fact that unmarked PMFs represent a minuscule
proportion of crimes with guns, and that homicides with such guns are an infinitesimal
share of total firearm homicides. Thus, Defendants have failed to demonstrate the need for
rulemaking, the significance of the issue under consideration, or net benefits of the Rule.

368.     Rule also failed to consider that in the absence of unmarked PMFs, criminals can simply
obliterate serial numbers on firearms. That is, Defendants cannot claim the total Rule
benefits of marking firearms, but only the *difference* in benefits between a world with PMF

marking and that of criminals undertaking their next-best alternative means of making guns untraceable.

369.    Rule required FFLs and gunsmiths taking unmarked firearms into inventory to mark and document the firearms, even if the FFL and firearm owner are citizens of the same State.

370.    FFLs and gunsmiths do not actually take firearms into inventory for adjustments or repairs, but rather maintain only temporary custody of such firearms to perform work.

371.    While the Rule allows for same-day work to be performed without marking, the vast majority of firearms brought for work to FFL's and gunsmiths remain one or more nights while awaiting their turn in line, and the Rule requires FFLs to take those into inventory and comply with the marking requirement.

372.    Rule claims "submission of PMFs reported for tracing by law enforcement is increasing at an exponential rate." 87 FR 24714.

373.    Defendants have insufficient data over a mere six years to determine the nature of the growth function.

374.    Even if submissions for tracing are rising at an exponential rate, Defendants did nothing more than assert this claim rather than prove it.

375.    Defendants committed one of the most basic fallacies in statistics – overstating the significance of large percentage increases from an extremely low base.

376.    Defendants' claim regarding the growth in PMF's use in crimes failed to control for other factors causing increases in crime rates generally. This causes inferential errors from *omitted variable bias*.

377.    For example, from 2019 to 2020, the growth rate in PMFs recovered by law enforcement dropped from nearly 90% to 34.5%. This drop coincides with the COVID-19 pandemic.

378.   Responding directly to Plaintiff's comments concerning externalities, the Rule states, "ATF concurs that this rule would not address externalities due to market inefficiencies; therefore, to avoid any confusion, the language in the NPRM that suggested that this rule would address a market inefficiency has been removed in the final rule. Regardless of this change, publication of this rule remains necessary to enforce the GCA and NFA." 87 FR 24715. That is, Defendants withdrew the entire economic basis for this Rule.

379.   In response to comments suggesting non-perpetual record keeping requirements, Agency said, "ATF determined that this alternative was not the best course of action. Because firearms are durable items that can be in circulation for many decades even beyond 100 years, an alternative specifying a specific time frame for record retention requirements would not align with the shelf life of most firearms. Thus, without the indefinite retention requirement imposed by this rule, ATF would continue to encounter the problem of not being able to successfully trace older firearms that are used in the commission of a crime." 87 FR 24725.

380.   Agency's response is a rookie error in economic analysis of relying on rising *total* benefits rather than falling *marginal* benefits; all good economic analysis is done at the margin. For example, if a well-educated person obtains an additional year of education, they undoubtedly enjoy benefits of more education, but the marginal benefits would be small and unlikely to cover the marginal costs.

381.   Commenters said words to the effect of, "regardless of whether an FFL ships records to ATF voluntarily, all FFLs should be accounted for, not only the ones that currently destroy their records that are over 20 years old." Agency's response was simply to disagree "the

agency underestimated the cost per FFL and that it should have taken into account the costs borne by all FFLs."

382.    Agency claims OMB holds that the baseline for measuring a rule's costs should be "what the world will be like if the proposed rule is not adopted." 87 FR 24721.

383.    Agency may not credit its rule for voluntary compliance when the Rule itself unfavorably alters incentives to do so.

384.    Agency failed, in response to comments, to explain its continued reliance on an assumption only 10% of FFLs "were estimated to be destroying their records that were more than 20 years old." 87 FR 24721. This low estimate reduces the estimated costs of the rule.

385.    Agency conducted no sensitivity analysis on any of its assumptions to determine changes in estimated costs if those assumptions changed.

386.    Agency responded to comments faulting its failure to quantify or monetize benefits of record retention by simply contradicting the comments without any meaningful responses. 87 FR 24722.

387.    Agency argued "Tracing a firearm that was involved in a criminal activity is an existing requirement and not a new requirement attributable to this rule." *Id*.

388.    This response fails to explain how the benefits of increased tracing of guns more than twenty years old will exceed the costs of the additional record retention.

389.    Agency asserted benefits that increased tracing "provides useful investigative leads to law enforcement," without supporting that claim with evidence or detail, nor attempting to monetize or quantify such benefits and compare them to additional costs.

390.    Agency repeatedly eschewed the use of crime data demonstrating that the "problem" with "ghost guns" is insignificant.

391. The Rule failed to conduct any analysis of whether certain localities were more likely than others to experience crimes committed with unmarked PMFs, thereby concluding that regulation was best left up to those particular localities or States.

392. In response to comments saying Agency failed to address the effects of the rule on innovation, Agency simply disagreed without further explanation.

393. Defendants failed to consider economic growth, innovation, competition, and job creation in their Rule.

394. Concerning public comments about non-regulatory alternatives such as tort liability and public advocacy, Agency claimed "these alternatives are out of ATF's purview and beyond the scope of this regulation; therefore, these alternatives were not considered." ECF 1-3, 87 FR 24725.

395. The final Rule claims to have performed and refers to a Final Regulatory Flexibility Analysis ("FRFA"), but it did not publish a FRFA and cites the Initial Regulatory Flexibility Analysis ("IRFA"). ECF 1-3, pp. 87 FR 24726, 24732, 24733, 24725—24726.

396. Despite finding the Rule will have a significant economic impact on a substantial number of small entities, Defendants have not published a small business compliance guide.

397. OMB Circular A-4 expressly required Defendants to consider alternative regulatory approaches outside their authority to act. Moreover, the existence or potential enactment of these alternatives militate against Federal rulemaking.

398. Agency published corrections to the Rule on August 22, 2022. Exhibit 4.

399. Generally, Agency's lack of responsiveness to comments and mere assertion of benefits demonstrates its unalterably closed mind.

**L.**   **Governing Law, Orders, Rules, Guidance Concerning Agency Analysis for Rulemaking**

400.   Courts invalidate agency determinations failing to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection' between the facts found and the choice made." *Motor Veh. Manu.  Assoc. v. State Farm Auto Mut. Ins. Co.*, 463 U.S. 29, 43 (1983) ("*State Farm*"), quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962).

401.   Courts "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *State Farm* at 30—31, 43.

402.   Agency decisions are arbitrary "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm* at 43.

403.   That costs or benefits are difficult to measure "does not excuse [an agency] from its statutory obligation to determine as best it can the economic implications of the rule it has proposed." *Chamber of Commerce v. Sec. and Exch. Com'n*, 412 F.3d 133, 143 (D.C. Cir. 2005); *Public Citizen v. Fed. Motor Carrier Safety*, 374 F.3d 1209, 1221 (D.C. Cir. 2004)

404.   Courts invalidate rules if agencies fail to consider policy effects. *Ctr. for Bio. Diversity v. U.S. Bur. of Land Mgmt.*, 698 F.3d 1101, 1124 (9th Cir. 2012).

405.   Policy effects an agency must analyze include costs, benefits, transfers, and the impact of the rule on economic growth, innovation, competition, and job creation.

406.   Agencies must demonstrate they used reasoned decision making. *State Farm* at 52.

407.   An agency's failure to provide adequate explanations for its decision is grounds for remand or invalidation. See e.g., *Williams Gas Processing-Gulf Coast Co., L.P. v. FERC*, 475 F.3d 319, 329 (D.C. Cir. 2006) ("*Williams Gas*").

408.   Courts may not sustain an action on a basis not mentioned by an agency if an agency's stated rationale for its decision is erroneous. *Id*.

409.   Failure to reasonably respond to comments raised during notice-and-comment rulemaking is arbitrary and capricious. *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 449 (D.C. Cir. 2012); *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 626 F.3d 84, 94 (D.C. Cir. 2010).

410.   Courts invalidate rules for failure to consider regulatory alternatives also achieving rule objectives. *Off. Comm. of United Church of Christ v. FCC*, 779 F.3d 702, 714 (D.C. Cir. 1985); *Wilderness Watch, Inc. v. U.S. Fish & Wildlife Serv.*, 629 F.3d 1024, 1039 (9th Cir. 2010); *Chamber of Commerce v. SEC*, 412 F.3d 133, 144 (D.C. Cir. 2005).

411.   Where a party raises facially reasonable alternatives, the agency must either consider those alternatives or give some reason for declining to do so. *Laclede Gas Co. v. F.E.R.C.*, 873 F.2d 1494, 1498 (D.C. Cir. 1989).

412.   "It is not adequate simply to report a comparison of the agency's preferred option to the chosen baseline." OMB Cir. A 4, p. 16.

## **CLAIM ONE**

### **Violations of the Administrative Procedure Act, 5 U.S.C. §701 et seq.**

413.   Plaintiff incorporates herein by reference the facts in the preceding paragraphs and all exhibits to this *First Amended Complaint*.

414.   On April 26, 2022, Defendants issued a final rule *Definition of 'Frame or Receiver' and Identification of Firearms*, RIN 1140-AA54, amending the Code of Federal Regulations, Title 27, Parts 447, 478, and 479. ("Rule")

415.   The Rule became effective on August 24, 2022.

416.   Plaintiff and other citizens of the United States have a right to make their own firearms for personal use.

417.   No law has ever required citizens making their own firearms for personal use to mark their firearms with a serial number or any other identification.

418.   The Rule imminently injures Plaintiff by forcing him to have his privately made firearms marked when he takes them to a federal firearms licensed dealer for cerakoting or repairs, diminishing their purpose and value as unmarked firearms.

419.   The Rule restricts Plaintiff and others from having their firearms marked by non-licensed engravers not covered under the Interstate Commerce Clause.

420.   The Rule failed to adequately identify a significant problem requiring regulation.

421.   The Rule failed to explain why regulation at the Federal level is necessary.

422.   The Rule failed to monetize or quantify costs and benefits or otherwise explain why those could not be monetized, even though doing so is a straightforward economic exercise.

423.   The Rule failed to provide meaningful responses to public comments.

424.   The Rule failed to adequately address several obvious alternative regulatory approaches in its NPRM.

425.   The Rule failed to adequately consider and respond to alternatives proffered in the public comments.

426.    The Rule failed to completely analyze the *status quo ante*, explaining why existing laws, rules, regulations, criminal and tort liability were inadequate for preventing the harm and economic inefficiency the Rule identified.

427.    The Rule failed to consider deferring action to Congress, States, Tribes, or localities, and the Rule did not explain why doing so was not possible.

428.    The Rule failed to examine the economic effects on economic growth, innovation, competition, and job creation.

429.    The Rule made unsupported assumptions greatly in its own favor and without seeking more reliable information from the public through an Advance Notice of Proposed Rulemaking.

430.    The Rule failed to show the results of sensitivity analyses from changing rule assumptions.

431.    The Rule's deficient analysis deprived Congress the ability to disapprove of the Rule. 5 U.S.C. §801 et seq.

432.    The Rule violates the Tenth Amendment to the United States Constitution by regulating commerce arising wholly within a State by citizens of the same State, to wit: marking of firearms.

433.    The Rule violates the Fourth Amendment to the United States Constitution by causing FFLs and gunsmiths to mark and record privately made firearms only in their temporary custody, and such records can and will be provided to Defendants without a warrant or probable cause of a crime being committed with such firearms.

434.    The Rule's record retention requirement, if acted upon, violates the *Consolidated and Further Continuing Appropriations Act*, Pub.L. 112-55 (Nov. 8, 2011), 125 Stat. 609; in that it uses appropriated funds toward salaries and administrative expenses to require FFLs

going out of business to surrender electronic records of firearm transactions, which Defendants are expressly prohibited from consolidating or centralizing.

435.   The Rule violates the Small Business Regulatory Enforcement Fairness Act, 5 U.S.C. §601 et seq., by failing to adequately analyze rule costs and benefits and other rule effects on small businesses.

436.   The Rule violates the Unfunded Mandates Reform Act, Pub. L. 104-4, in that the economic effects of the Rule on the private sector exceed $100 million, but Defendants' insufficient economic analysis found economic effects to be less than that amount.

437.   Defendants exceeded their statutory authority by regulating potential gun and silencer parts that are not "firearms."

438.   The Rule is void for vagueness because numerous terms in the Rule cannot be understood by reasonably intelligent people to know what the law requires or forbids, such as the word "readily" as it applies to unfinished firearm parts, and words used to define "readily" such as "difficulty," "expertise," "availability," "ease," "expense," "feasibility," and "operable," "critical stage," and "critical line."

439.   The Rule's definitions are not permissible constructions of the statutes.

440.   Defendants took action on a policy issue of great economic and political significance providing a reason to hesitate before concluding that Congress meant to confer such authority.

441.   Defendants implemented policy provisions that had been expressly considered and rejected by Congress, strongly counseling hesitation of action by the Executive branch.

442.   Defendants exceeded their statutory authority in promulgating the Rule.

443.   Thus, the rule must be set aside under 5 U.S.C. §706 because it is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law; contrary to constitutional right, power, privilege, and immunity; in excess of statutory jurisdiction, authority, or limitations, and short of statutory right; without observance of procedure required by law; and unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

## CLAIM TWO

**Violations of the United States Constitution, Second Article of Amendment**

### Count 1
### Agency's Rule Violates the Second Amendment

444.   Plaintiff incorporates herein by reference the facts in the preceding paragraphs and all exhibits to the *Complaint* and *First Amended Complaint.*

445.   Defendants enforce provisions of the National Firearms Act of 1934, the Gun Control Act of 1968, and the Firearm Owners Protection Act, regulating, taxing, possessing, making, and transferring pistols, revolvers, rifles, shotguns, short-barreled rifles, short-barreled shotguns, any other weapons, firearm silencers, and silencer parts.

446.   Defendants' Rule unlawfully regulates unfinished pieces of plastic, aluminum, and other metals with which persons could, with payment of the $200.00 excise tax, and completion of other administrative requirements, build a functional pistol frame, rifle receiver, or silencer complying with law.

447.   For these reasons, this Court should declare that the Rule violates the Second Amendment of the United States Constitution.

**Count 2**
**Regulation and Taxation of Short-Barreled Weapons Violate the Second Amendment**

448. Plaintiff incorporates herein by reference the facts in the preceding paragraphs and all exhibits to the *First and Second Amended Complaints.*

449. The Constitution withholds from Congress any plenary police powers that would authorize enactment of laws prohibiting or infringing the peaceful possession and carriage of weapons capable of being concealed.

450. Congress may not use its powers of taxation to achieve the same effect as undelegated police powers, to wit: making short-barreled rifles and shotguns prohibitively expensive.

451. The NFA was explicitly designed to skirt Second Amendment protections by using Congressional powers of taxation and regulation under the Interstate Commerce Clause.

452. The plain text of the Second Amendment, which does not mention restrictions on barrel length, covers short-barreled rifles and short-barreled shotguns as bearable arms.

453. Before, during, and long after the ratification of the Second Amendment, short-barreled rifles and short-barreled shotguns were in common use for all lawful purposes, including common defense and personal defense.

454. There is little to no historical record of restricting the right to keep and bear short-barreled rifles and shotguns before, during, and long after the ratification of the Second Amendment until the National Firearms Act was enacted.

455. Congress has no plenary police powers to restrict concealed carry of weapons outside of its exclusive federal jurisdictions.

456. Laws prohibiting concealed carry of firearms are independent from laws prohibiting weapons that are relatively more concealable than others.

457.   The regulation and taxation of short-barreled rifles and shotguns are inconsistent with the Second Amendment's text and historical understanding.

458.   The transportation of short-barreled rifles and shotguns across state lines for personal use, whether registered under the NFA or not, does not implicate Congressional authority for regulation under the Interstate Commerce Clause.

459.   Short-barreled rifles and shotguns are neither dangerous nor unusual, and they are less dangerous than rifles and shotguns with longer barrels.

460.   The NFA regulation of short-barreled rifles arose solely because a Congressman on the House Ways and Means Committee did not understand adding the words "or rifle" would impose regulation he expressly stated he did not want.

461.   Short-barreled rifles and shotguns are rarely used in crimes.

462.   There exists Title I firearms that are just as concealable, if not more so, than short-barreled rifles and shotguns but are otherwise functionally identical, making the regulation and taxation of short-barreled weapons arbitrary and capricious.

463.   Short-barreled rifles and shotguns are part of the ordinary military equipment, they have a reasonable, rational relationship to the preservation or efficiency of a well-regulated militia, and their use could contribute to the common defense.

464.   Short-barreled rifles and shotguns have legitimate purposes of wielding such firearms in confined spaces, such as inside one's home, in a vehicle, or in other close quarters.

465.   Regulation and taxation of short-barreled rifles and shotguns have little to no effect in deterring criminals from obtaining and using short-barreled rifles and shotguns.

466.    For these reasons, this Court should declare that all laws, regulations, and taxation of short-barreled rifles and shotguns violate the Second Amendment of the United States Constitution, or otherwise exceed Congressional authority.

## Count 3
## Regulation and Taxation of Any Other Weapons Violates the Second Amendment

467.    Plaintiff incorporates herein by reference the facts in the preceding paragraphs and all exhibits to the *First and Second Amended Complaints.*

468.    The Constitution withholds from Congress any plenary police powers that would authorize enactment of laws prohibiting or infringing the peaceful possession and carriage of "any other weapons" as defined by federal statutes.

469.    Congress may not use its powers of taxation to achieve the same effect as undelegated police powers, to wit: making "any other weapons" prohibitively expensive.

470.    The NFA was explicitly designed to skirt Second Amendment protections by using Congressional powers of taxation and regulation under the Interstate Commerce Clause.

471.    The plain text of the Second Amendment covers "any other weapons," as defined by federal law, as bearable arms.

472.    At the time the Second Amendment was ratified and long thereafter, weapons now considered "any other weapons" were in common use for all lawful purposes, including common defense and personal defense.

473.    Disguised firearms, such as guns hidden within canes, umbrellas, wallets, pens, gloves, etc., existed at the time of ratification of the Second Amendment and were in common use long thereafter.

474.    Simply adding a vertical forward grip to a Title I handgun or pistol does not design or redesign the firearm to be used with more than one hand any more than forearms, angled

foregrips, frame or slide serrations, "gas pedals," etc., and these additions do not make such pistols or handguns any more dangerous or unusual; thus, the regulation and taxation of pistols with vertical forward grips is arbitrary and capricious.

475. There is little to no historical record of restricting the right to keep and bear "any other weapons" before, during, and long after the ratification of the Second Amendment until the National Firearms Act was enacted.

476. The regulation and taxation of "any other weapons" are inconsistent with the Second Amendment's text and historical understanding.

477. "Any other weapons" are rarely used in crimes.

478. "Any other weapons" are part of the ordinary military equipment, they have a reasonable, rational relationship to the preservation or efficiency of a well-regulated militia, and their use could contribute to the common defense.

479. "Any other weapons" have legitimate purposes for self-defense such as carrying disguised weapons for self-defense without causing public alarm or alerting potential criminals, or to better control a pistol with the addition of a vertical forward grip.

480. Laws prohibiting concealed carry of firearms are independent from laws prohibiting weapons that are relatively more concealable, such as disguised weapons.

481. Restrictions on "any other weapons" have little to no effect in deterring criminals from using "any other weapons."

482. For these reasons, this Court should declare that all laws, regulations, and taxation of "any other weapons" violate the Second Amendment of the United States Constitution, or otherwise exceed Congressional authority.

**Count 4**
**Regulation and Taxation of Firearm Silencers Violates the Second Amendment**

483.  Plaintiff incorporates herein by reference the facts in the preceding paragraphs and all exhibits to the *First and Second Amended Complaints.*

484.  The Constitution withholds from Congress any plenary police powers that would authorize enactment of laws prohibiting or infringing the peaceful possession and carriage of silencers.

485.  Congress may not use its powers of taxation to achieve the same effect as undelegated police powers, to wit: making silencers prohibitively expensive.

486.  The NFA was explicitly designed to skirt Second Amendment protections by using Congressional powers of taxation and regulation under the Interstate Commerce Clause.

487.  The plain text of the Second Amendment covers silencers as the arms of offense and the armor of defense, and federal law defines silencers as bearable arms.

488.  The ear-splitting noise from firearms is an unintended and harmful byproduct of early firearm technology, not a deliberate and desirable design feature.

489.  The entire history of firearm technology has relentlessly sought to reduce the undesirable qualities and effects of using firearms, including reducing weight, smoke, flash, recoil, report, infrasonic waves, and making them more comfortable, accurate, and safe.

490.  Silencers were in common use to suppress or muffle the sound of firearms before the enactment of the NFA, GCA, and FOPA.

491.  There are no historical analogues before, during, and long after the ratification of the Second Amendment until enactment of the NFA of government prohibiting devices or accessories that made firearms more comfortable or safe for use, including devices for protecting hearing.

492.  Firearm silencers are neither dangerous nor unusual.

493.  Firearm silencers are part of the ordinary military equipment, they have a reasonable, rational relationship to the preservation or efficiency of a well-regulated militia, and their use could contribute to the common defense.

494.  Firearm silencers have lawful purposes such as protecting the hearing of persons nearby the shooter, hunting without frightening game animals, and firing weapons without undue public annoyance or alarm.

495.  Firearm silencers are rarely used in crimes.

496.  Restrictions on silencers have little to no effect in deterring criminals from using silencers.

497.  For these reasons, this Court should declare that all laws, regulations, and taxation of silencers violate the Second Amendment of the United States Constitution, or otherwise exceed Congressional authority.

## CLAIM THREE

### Regulation of Silencers Violates the Ninth Amendment and Common Law Rights

498.  Plaintiff incorporates herein by reference the facts in the preceding paragraphs and all exhibits to the *First and Second Amended Complaints.*

499.  The Ninth Amendment to the United States Constitution provides that the enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people.

500.  Plaintiff suffers from military service-connected tinnitus.

501.  Tens of millions of Americans suffer from tinnitus or hearing loss.

502.  Firearm silencers reduce the harm and risk of hearing loss while using firearms.

503.   The people have an unalienable, unenumerated right to prevent hearing loss in themselves and others while enjoying other rights guaranteed in Second Amendment to the U.S. Constitution.

504.   Defendants' enforcement of laws and regulations that restrict or prohibitively tax the use of firearm silencers violates the Ninth Amendment to the United States Constitution.

505.   Plaintiff seeks to reverse, extend, or modify existing law concerning the Ninth Amendment.

506.   The right to protect one's hearing is an essential component of life in our free society under the Common Law, and the regulation and prohibitive taxation of firearm silencers violates that right.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff requests that judgment be entered in his favor and against Defendants as follows:

507.   Enter a declaratory judgment that Defendants' final rule *Definition of 'Frame or Receiver' and Identification of Firearms*, RIN 1140-AA54, issued on April 26, 2022, is held unlawful and set aside.

508.   Enter an order preliminarily and permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction from enforcing this final rule.

509.   Enter a declaratory judgment that Defendants' regulation and taxation of silencers and silencer parts violates the Second Amendment to the United States Constitution.

510.   Enter a declaratory judgment that Defendants' regulation and taxation of silencers and silencer parts violates the Ninth Amendment to the United States Constitution.

511. Enter a declaratory judgment that the National Firearms Act's regulation and taxation of silencers and silencer parts violates the Common Law right of protecting one's hearing while exercising rights protected by the Second Amendment.

512. Enter an order preliminarily and permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction from enforcing the National Firearms Act as it relates to the regulation and taxation of firearm silencers and silencer parts.

513. Enter a declaratory judgment that the National Firearms Act's regulation and taxation of short-barreled rifles, short-barreled shotguns, any other weapons, silencers, and silencer parts violates the Second Amendment of the United States Constitution.

514. Enter a declaratory judgment that the manufacture or addition of a vertical forward grip or any other aid to handling a pistol or revolver with the non-firing hand does not make the pistol or revolver into an "any other weapon."

515. Enter a declaratory judgment that solvent traps and wipes are not silencer parts subject to regulation under the NFA, GCA, FOPA, or other federal statutes.

516. Enter an order preliminarily and permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction from enforcing the NFA, GCA, FOPA, or other federal statutes as they relate to solvent traps and wipes as silencer parts.

517. Enter an order preliminarily and permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction from enforcing the National Firearms Act as it relates to the

regulation and taxation of short-barreled rifles, short-barreled shotguns, any other weapons, firearm silencers, and silencer parts.

518. Enter an order awarding Plaintiff a refund of all taxes he paid for the ownership of short-barreled rifles, short-barreled shotguns, and firearm silencers, currently in the amount of $9,800 plus ancillary costs of registration.

519. Enter an order awarding Plaintiff damages for the destruction of his private property to comply with this Rule.

520. Enter an order declaring the use of Congress's taxation powers to achieve the same or similar effects as laws outside the scope of its specified powers to be unconstitutional.

521. Enter an order preliminarily and permanently enjoining Congress and Defendants from enacting or enforcing any law, rule, or regulation providing for the taxation of goods, services, actions, or inactions having the same or similar effect of laws, rules, or regulations outside the specified powers of Congress or the powers delegated by Congress to Executive branch agencies.

522. Enter an order awarding Plaintiff his costs of this suit, including any attorney fees and costs pursuant to 42 U.S.C. §1988 and damages.

523. Enter an order providing any other and further relief that the court deems just and appropriate.

I hereby verify under penalty of perjury under the laws of the United States that the foregoing is true and correct. 28 U.S.C. §1746.

EXECUTED ON October 28, 2022.

-s- _____

Robert M. Miller, Ph.D.
4094 Majestic Ln., #278
Fairfax, VA 22033
(415) 596-2444
RobMiller44@hotmail.com