# NATIONAL FIREARMS ACT

## HEARINGS

BEFORE THE

## COMMITTEE ON WAYS AND MEANS
## HOUSE OF REPRESENTATIVES

SEVENTY-THIRD CONGRESS
SECOND SESSION

ON

# H.R. 9066

APRIL 16, 18, AND MAY 14, 15, AND 16, 1934



UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON: 1934

58278

## COMMITTEE ON WAYS AND MEANS

### HOUSE OF REPRESENTATIVES

ROBERT L. DOUGHTON, North Carolina, *Chairman*

SAMUEL B. HILL, Washington
THOMAS H. CULLEN, New York
CHRISTOPHER D. SULLIVAN, New York
MORGAN G. SANDERS, Texas
JOHN W. McCORMACK, Massachusetts
CLEMENT C. DICKINSON, Missouri
DAVID J. LEWIS, Maryland
FRED M. VINSON, Kentucky
JERE COOPER, Tennessee
ASHTON C. SHALLENBERGER, Nebraska
CHARLES WEST, Ohio
JOHN W. BOEHNE, JR., Indiana
JAMES V. McCLINTIC, Oklahoma
CLAUDE A. FULLER, Arkansas

ALLEN T. TREADWAY, Massachusetts
ISAAC BACHARACH, New Jersey
FRANK CROWTHER, New York
JAMES A. FREAR, Wisconsin
HAROLD KNUTSON, Minnesota
DANIEL R. REED, New York
ROY O. WOODRUFF, Michigan
THOMAS A. JENKINS, Ohio
WILLIAM E. EVANS, California
THOMAS C. COCHRAN, Pennsylvania

E. W. G. HUFFMAN, *Clerk*

# CONTENTS

Statements of—                                                                        Page

Allen, J. Weston, chairman National Anti-Crime Commission, New-
ton, Mass_____ 102, 127
Cummings, Hon. Homer S., Attorney General of the United States__ 4
Frederick, Karl T., president National Rifle Association of America_ 38
Gordon, Seth, president American Game Association_____ 81, 161
Imlay, Charles V., representing the National Conference on Uniform
Law_____ 67, 137
Keenan, Hon. Joseph B., Assistant Attorney General, Department of
Justice_____ 26, 64, 82, 86, 133, 161
Nichols, Frank C., vice president Colt Patent Firearms Manufactur-
ing Co_____ 151
Reckord, Hon. Milton A., adjutant general of the State of Maryland_ 33, 107
Ryan, W. B., president Auto Ordnance Co_____ 66
Taylor, John Thomas, representing the American Legion_____ 80

III

# NATIONAL FIREARMS ACT

## MONDAY, APRIL 16, 1934

HOUSE OF REPRESENTATIVES,
COMMITTEE ON WAYS AND MEANS,
*Washington, D.C.*

The committee met at 10 a.m., Hon. Robert L. Doughton (chairman) presiding.

The CHAIRMAN. We have met this morning to consider several matters, one of which is H.R. 9066, to provide for the taxation of manufacturers, importers, and dealers in small arms and machine guns, and other weapons.

The Attorney General of the United States is here and I understand sponsors and is very much interested in this or in some similar legislation. We will be glad to have him proceed to explain the bill and make any statement with reference to it that he may deem proper.

[H.R. 9066, 73d Cong. 2d sess.]

A BILL To provide for the taxation of manufacturers, importers, and dealers in small firearms and machine guns, to tax the sale or other disposal of such weapons, and to restrict importation and regulate interstate transportation thereof

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That for the purposes of this act the term "firearm" means a pistol, revolver, shotgun having a barrel less than sixteen inches in length, or any other firearm capable of being concealed on the person, a muffler or silencer therefor, or a machine gun.

The term "machine gun" means any weapon designed to shoot automatically or semiautomatically twelve or more shots without reloading.

The term "person" includes a partnership, company, association, or corporation, as well as a natural person.

The term "continental United States" means the States of the United States and the District of Columbia.

The term "importer" means any person who imports or brings firearms into he continental United States, for sale.

The term "manufacturer" means any person who is engaged within the continental United States in the manufacture of firearms, or who otherwise produces therein any fircarm for sale or disposition.

The term "dealer" means any person not a manufacturer or importer engaged within the continental United States in the business of selling firearms. The term "dealer" shall include pawnbrokers and dealers in used firearms.

The term "interstate commerce" means transportation from any State or Territory or District, or any insular possession of the United States (including the Philippine Islands), to any other State or Territory or District, or any insular possession of the United States (including the Philippine Islands).

SEC. 2. (a) Within fifteen days after the effective date of this act, or upon first engaging in business, and thereafter on or before the 1st day of July of each year, every importer, manufacturer, and dealer in firearms shall register with the collector of internal revenue for each district in which such business is to be carried on his name or style, principal place of business, and places of business in such district, and pay a special tax at the following rates: Importers or manufacturers, $        a year; dealers, $        a year. Where the tax is payable on the 1st day of July in any year it shall be computed for one year; where the tax is

payable on any other day it shall be computed proportionately from the 1st day of the month in which the liability to the tax accrued to the 1st day of July following.

(b) It shall be unlawful for any person required to register under the provisions of this section to import, manufacture, or deal in firearms without having registered and paid the tax imposed by this section.

(c) All laws (including penalties) relating to the assessment, collection, remission, and refund of special taxes, so far as applicable to and not inconsistent with the provisions of this act, are extended and made applicable to the taxes imposed by this section.

SEC. 3. (a) There shall be levied, collected, and paid upon firearms sold, assigned, transferred, given away, or otherwise disposed of in the continental United States a tax at the rate of $     per machine gun and $     per other firearm, such tax to be paid by the person so disposing thereof, and to be represented by appropriate stamps to be provided by the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury; and the stamps herein provided shall be affixed to the order for such firearm, hereinafter provided for. The tax imposed by this section shall be in addition to any import duty imposed on such firearm.

(b) All provisions of law (including penalties) applicable with respect to the taxes imposed by section 800 of the Revenue Act of 1926 (U.S.C., Supp. VII, title 26, sec. 900) shall, insofar as not inconsistent with the provisions of this act, be applicable with respect to the taxes imposed by this section.

SEC. 4. (a) It shall be unlawful for any person to sell, assign, transfer, give away, or otherwise dispose of any firearm except in pursuance of a written order from the person seeking to obtain such article, on an application form issued in blank for that purpose by the Commissioner of Internal Revenue. Such order shall identify the applicant by his name, address, fingerprints, photograph, and such other means of identification as may be prescribed by regulations under this act. If the applicant is other than an individual, such application shall be made by an executive officer thereof.

(b) Every person disposing of any firearm shall set forth in each copy of such order the manufacturer's number or other mark identifying such firearm, and shall forward a copy of such order to the Commissioner of Internal Revenue. The original thereof, with stamps affixed, shall be returned to the applicant.

(c) No person shall sell, assign, transfer, give away, or otherwise dispose of a firearm which has previously been so disposed of (on or after the effective date of this act) unless such person, in addition to complying with subsection (b), transfers therewith the stamp-affixed order provided for in this section, for each such prior disposal, and complies with such other rules and regulations as may be imposed by the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, for proof of payment of all taxes on such firearm.

SEC. 5. It shall be unlawful for any person to receive or possess any firearm which has at any time been disposed of in violation of section 3 or 4 of this act.

SEC. 6. Any firearm which has at any time been disposed of in violation of the provisions of this act shall be subject to seizure and forfeiture, and all the provisions of internal-revenue laws relating to searches, seizures, and forfeiture of unstamped articles are extended to and made to apply to the articles taxed under this act, and the persons upon whom these taxes are imposed.

SEC. 7. Each manufacturer and importer of a firearm shall identify it with a number or other identification mark approved by the Commissioner of Internal Revenue, such number or mark to be stamped or otherwise placed thereon in a manner approved by such Commissioner.

SEC. 8. Importers, manufacturers, and dealers shall keep such books and records and render such returns in relation to the transactions in firearms specified in this act as the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, may by regulations require.

SEC. 9. (a) No firearms shall be imported or brought into the United States or any territory under its control or jurisdiction (including the Philippine Islands), except that, under regulations prescribed by the Secretary of the Treasury, any firearm may be so imported or brought in when (1) the purpose thereof is shown to be lawful and (2) such firearm is unique or of a type which cannot be obtained within the United States or such territory.

(b) It shall be unlawful (1) fraudulently or knowingly to import or bring any firearms into the United States or any territory under its control or jurisdiction

in violation of the provisions of this act; or (2) knowingly to assist in so doing; or (3) to receive, conceal, buy, sell, or in any manner facilitate the transportation, concealment, or sale of any such firearm after being imported or brought in, knowing the same to have been imported contrary to law. Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of such imported firearm, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains such possession to the satisfaction of the jury.

SEC. 10. (a) It shall be unlawful for any person who has not first obtained a permit as hereinafter provided, to send, ship, carry, or deliver any firearm in interstate commerce. Nothing contained in this section shall apply—

(1) To any manufacturer, importer, or dealer who has complied with the provisions of section 2;

(2) To any person who has complied with the provisions of sections 3 and 4 in respect to the firearm so sent, shipped, carried, or delivered by him;

(3) To a common carrier in the ordinary course of its business as a common carrier;

(4) To an employee, acting within the scope of his employment, of any person not violating this section;

(5) To a person who has lawfully obtained a license for such firearm from the State, Territory, District, or possession to which such firearm is to be sent, shipped, carried, or delivered;

(6) To any United States, State, county, municipal, District, Territorial, or insular officer or official acting within the scope of his official duties.

(b) Application for such permit may be made to the Commissioner of Internal Revenue at Washington or to such officers at such places as he may designate by regulations to be prescribed by him, with the approval of the Secretary of the Treasury, for the issuance of such permit. Such regulations shall provide for a written application containing the photograph and fingerprints of the applicant, or employee, the serial number and description of the firearm to be transported, and other information requested by the Commissioner of Internal Revenue or his agent.

(c) Such permits shall be issued upon payment of a fee of $        , provided the Commissioner of Internal Revenue is satisfied that the proposed transaction is lawful.

(d) Any person found in possession of a firearm shall be presumed to have transported such firearm in interstate commerce contrary to the provisions hereof, unless such person has been a bona fide resident for a period of not less than sixty days of the State wherein he is found in possession of such firearm, or unless such person has in his possession a stamp-affixed order therefor required by this act. This presumption may be rebutted by competent evidence.

SEC. 11. The Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, shall make all needful rules and regulations for carrying the provisions of this act into effect.

SEC. 12. This act shall not apply to the sale, assignment. transfer, gift, or other disposal of firearms (1) to the United States Government, any State, Territory, or possession of the United States, or to any political subdivision thereof, or to the District of Columbia; (2) to any peace officer or any Federal officer designated by regulations of the Commissioner of Internal Revenue.

SEC. 13. Any person who violates or fails to comply with any of the requirements of this act shall, upon conviction, be fined not more than $        or be imprisoned for not more than        years, or both, in the discretion of the court.

SEC. 14. The taxes imposed by paragraph (2) of section 600 of the Revenue Act of 1926 (U.S.C., Supp. VII, title 26, sec. 1120) and by action 610 of the Revenue Act of 1932 (47 Stat. 169, 264), shall not apply to any firearm on which the tax provided by section 3 of this act has been paid.

SEC. 15. If any provision of this act, or the application thereof to any person or circumstance, is held invalid, the remainder of the act, and the application of such provision to other persons or circumstances, shall not be affected thereby.

SEC. 16. This act shall take effect on the sixtieth day after the date of its enactment.

SEC. 17. This act may be cited as the "National Firearms Act."

## STATEMENT OF HON. HOMER S. CUMMINGS, ATTORNEY GENERAL OF THE UNITED STATES

Attorney General CUMMINGS. Mr. Chairman and members of the committee, I do not think it is necessary to make any very elaborate statement, at least at the beginning.

This bill is a part of a program that has been formulated by the Department of Justice, following our experiences with the crime situation. I think it is a very essential part of it. There are pending before other committees, as of course you are aware, quite a number of bills which are designed to enable the Department of Justice to deal with what I think is generally recognized as a very serious national emergency.

All of these bills, as well as this bill, are predicated upon the proposition that there has developed in this country a situation which is far beyond the power of control of merely local authorities. All these bills have been drafted with an eye to constitutional limitations, and have been kept within a scope which indicates that there is no desire upon the part of the Department of Justice, or of anyone else, so far as I know, to take over any powers, or exert any administrative functions beyond those absolutely necessary to deal with this situation.

The development of late years of the predatory criminal who passes rapidly from State to State, has created a situation which is giving concern to all who are interested in law and order. We have gangs organized, as of course you all know, upon a Nation-wide basis and, on account of the shadowy area or twilight zone between State and Federal power, many of these very well instructed, very skillful, and highly intelligent criminals have found a certain refuge and safety in that zone, and there lies the heart of our problem—the roaming groups of predatory criminals who know, by experience, or because they have been instructed and advised, that they are safer if they pass quickly across a State line, leaving the scene of their crime in a high-powered car or by other means of quick transportation.

Now this situation, gentlemen, has become exceedingly serious. I stated in a moment of zeal on this question that there were more people in the underworld armed than there are in the Navy and the Army of the United States. I afterward sought to check up on the accuracy of my own statement. This proposition is, of course, somewhat difficult to calculate. Yet, on the basis of the records of crimes of violence which have been perpetrated, taken with our statistics of the number of persons in prisons for crimes of violence, and such other collateral data as it is possible to secure, I am prepared to say that the statement which I made was exceedingly conservative. It would be much fairer to say that there are more people in the underworld today armed with deadly weapons, in fact, twice as many, as there are in the Army and the Navy of the United States combined. In other words, roughly speaking, there are at least 500,000 of these people who are warring against society and who are carrying about with them or have available at hand, weapons of the most deadly character.

Mr. COOPER. Pardon me, General, but what was the number you estimated?

Attorney General CUMMINGS. A half a million. Now to deal with that situation, of course, requires thought and study and a serious, concerted program. Early last year the Department of Justice began

an earnest study of this problem. We have been at it for more than a year, with some degree of success in our actual operations, and we have, in addition to that, collected a lot of data and information of one kind or another. Into the Department of Justice have flowed thousands and thousands of letters offering suggestions as to how to deal with this problem. The amount of public interest in this effort to suppress crime is astounding. Unless you have been in contact with it, perhaps you have not fully realized that, but we do; because we are at the storm center of this activity.

Now, we have established in our Department an organization to segregate this material, to separate out the worthless suggestions, the extreme suggestions, the untenable propositions, and then gradually to concentrate on a program that is constitutional, that is reasonable, that does not invite local communities to relate their problems to the Federal Government and burden the Federal Government unnecessarily with expenses, personnel, and all the things that go with widened authority. At the same time, we have endeavored to provide the means for meeting this very real problem.

I have not the slightest pride of opinion in any of these bills—not the least. I am interested only in the problem and how best to meet it. If you gentlemen can improve these bills, or make them more workable, or more useful, I am very happy to have you do that. All that we have sought to do in this particular is to formulate these bills and submit them to the Congress for its consideration.

Amongst the bills is, of course, the one that is before the committee here today. This bill deals, I think it is fair to say, with one of the most serious aspects of the crime situation, namely, the armed underworld. How to deal with that was and is a difficult proposition. I do not know that this bill meets it entirely to our satisfaction; I do not know how it will work out. All I can say is that it is the result of our best thought on the subject.

Now this bill is drastic in some respects—

The CHAIRMAN. General, would you care to complete your main statement without interruption, or is it all right for members to ask questions as you go along?

Attorney General CUMMINGS. Suppose I go along for a little while. I do not mind interruptions, of course——

Mr. LEWIS. I would like to hear the general's statement first.

The CHAIRMAN. Suppose you complete your main statement and then yield to questions.

Attorney General CUMMINGS. All right, Mr. Chairman. As I was saying, I do not know exactly how this bill will work out. Nobody can tell. We must feel our way through these big problems. But, after all, it represents a lot of thought, and a lot of study.

Frankness compels me to say right at the outset that it is a drastic bill, but we have eliminated a good many suggestions that were made by people who are a little more enthusiastic about this than we are—I mean enthusiastic about the possibility of curing everything by legislation.

For instance, this bill does not touch in any way the owner, or possessor, or dealer in the ordinary shotgun or rifle. There would manifestly be a good deal of objection to any attempt to deal with weapons of that kind. The sportsman who desires to go out and shoot ducks, or the marksman who desires to go out and practice,

perhaps wishing to pass from one State to another, would not like to be embarrassed, or troubled, or delayed by too much detail. While there are arguments for including weapons of that kind, we do not advance that suggestion.

This bill deals, as the very first part of it indicates, with firearms, but defines "firearms" to mean a pistol, a revolver, a shotgun having a barrel less than 16 inches in length, or any other firearm capable of being concealed on the person, a muffler or silencer therefor, or a machine gun. In the next paragraph it defines a machine gun as any weapon designed to shoot automatically, or semiautomatically, 12 or more shots without reloading. The inquiries we have made of experts on the subject of the length of the barrel of sawed-off shot-guns indicates the general belief amongst such people that 18 or even 20 inches would be a better maximum length than the 16 inches suggested in our bill.

A sawed-off shotgun is one of the most dangerous and deadly weapons. A machine gun, of course, ought never to be in the hands of any private individual. There is not the slightest excuse for it, not the least in the world, and we must, if we are going to be success-ful in this effort to suppress crime in America, take these machine guns out of the hands of the criminal class.

Now we proceed in this bill generally under two powers—one, the taxing power, and the other, the power to regulate interstate com-merce. The advantages of using the taxing power with respect to the identification of the weapons and the sale, and so forth, are quite manifest. In the first place, there is already in existence a certain machinery for dealing with the collection of taxes of this kind, and these powers are being preserved in this particular act. In addition to that, it is revenue-producing. I presume that is the reason this bill is before this particular committee. I suspect there ought to be enough revenue produced to cover at least the cost of administration and as much more as is necessary in the opinion of the committee to constitute an effective regulatory arrangement.

I am informed that, under existing law, there is an ad valorem 10-percent tax on pistols and revolvers and that this law produced $35,388 in the fiscal year 1933. This existing law, if the pending bill should pass, will become inoperative so far as it imposes a tax on fire-arms included in the proposed legislation. So we shall have to take into account the fact that with the passage of this bill there will dis-appear most if not all of that $35,000, but it will reappear in a larger measure under the taxing provisions and the licensing provisions that we would have in this act.

I do not think, gentlemen, that I can help very much in the details of this bill. We have followed, where we could, the language of existing laws as to revenue terminology; and we have followed the Harrison Anti-Narcotic-Act in language so as to get the benefit of any possible interpretation that the courts may have made of that act. We have given this bill the best study that we could, and we want your help. We are very anxious to obtain its passage and, if there are any things that ought to be changed, or any features of it which ought to be improved, as I said before, we are only too happy to have it done.

Now that is really all I have to say, Mr. Chairman, unless there are some questions which some of the members desire to ask.

Mr. FREAR. General, I think every member of this committee who has been a prosecuting officer at any time appreciates the work that your Department has been doing, particularly on kidnaping and matters of that kind, and I speak of that because I had for years a near relation to police officials in St. Paul, and the difficulty of getting prisoners over State lines has been emphasized in the past. It was helpful, whether they were responsive or not. You have great difficulty, of course, between Federal and State laws.

Attorney General CUMMINGS. Yes, sir.

Mr. FREAR. I notice in all of the work that has been done you have been very helpful to the State authorities.

Attorney General CUMMINGS. Yes, sir.

Mr. FREAR. And I think we appreciate that. I was just wondering—you have not put a provision in here by means of which a man like Dillinger who goes into police headquarters and gets vests and arms—you have not provided anything in this bill that covers a situation like that, and there is this suggestion: Those coats and those vests, that are for armament and purely a matter of criminal use, if this bill could be broadened in any way to cover those things—whether your office had considered that.

Attorney General CUMMINGS. Let me answer your interrogatory, Mr. Congressman, in two sections. First, with regard to reaching a man like Dillinger: There is nothing specific in this act that deals with that situation. There is pending, however, before the Judiciary Committee of the House a bill making it an offense, a Federal offense, to flee across a State line to escape prosecution for a felony and, if that bill should be enacted, we would be able to reach criminals who are passing rapidly from one State to another. The mere fact of going across a State line for such a purpose would in itself be an offense.

Now in regard to vests and other protective armament, the reason we did not go into that, to be perfectly frank with you, sir, is because we were not confident that the committees would go along with us. There is a great deal of hesitancy in expanding the Federal powers too much and these things that you mention were merely left out as a matter of judgment. Now if the committee wants them in, it is all right with me.

Mr. FREAR. I was wondering if it had been considered.

Attorney General CUMMINGS. It has been considered and left out merely because I did not want to go before any committee and ask for too much. I wanted to ask for all that I thought should be granted to us. If they want to give us more in the way of power, we shall try to discharge the duties which may be imposed upon us. It was merely a matter of judgment whether we should ask for it.

Mr. FREAR. With an officer of the law trying to get a man who is a desperate criminal, who is clothed with protective clothing, of course the officer is at a disadvantage. It seems to me that there are very few people who are innocent wearing clothes of that kind, even for their own protection.

Attorney General CUMMINGS. That is true. The things that the underworld do to camouflage their activities and protect their persons are astounding. I do not know whether we have it here today, but we have a photograph taken of a gangster's arsenal that would make your blood run cold to ook at. Amongst other equipment found were

uniforms of police officers; uniforms of the Western Union Telegraph
Co.'s delivery boys; and automobile license plates, manufactured by
the gangsters themselves, which they use on their cars to divert
suspicion. We are confronted, gentlemen, with a very serious problem,
and if the committee, as our distinguished friend suggests, could devise
a way of dealing with these armaments, these bullet-proof vests—
there are various types of them—if that could be made a matter of
prohibition under some theory that permits the Federal Government
to handle it, this would be of great assistance. But there is some
difficulty there, you see.

Mr. FREAR. I quite agree.

Attorney General CUMMINGS. It would be quite all right with me;
but, of course, we have no inherent police powers to go into certain
localities and deal with local crime. It is only when we can reach
those things under the interstate commerce provision, or under the use
of the mails, or by the power of taxation, that we can act.

Now, for instance, we are asking for amendments to the Lindbergh
Kidnaping Act so as to make communication not only by letter, but
also by radio, or telephone, or other means, by criminals demanding
rewards—making that a Federal offense; we are trying to strengthen
the law so as to plug up as many of those loopholes as possible.

Mr. FREAR. We all follow your work and I believe every member of
the committee congratulates you on what you have been able to do.

Attorney General CUMMINGS. It is very gracious of you to say so,
sir. I must say we are very much in earnest about it, working very
hard with it, and there is a fine morale in the Department.

Mr. COOPER. Mr. Attorney General, I am thoroughly in sympathy
with the purpose sought to be accomplished. I feel that the situa-
tion presented by you here is really a challenge to governmental
authority and organized society and that we have to meet and solve
this problem. Having such a profound respect for your views, I want
to ask one or two questions in connection with this bill. I invite
your attention to the language appearing at the top of page 7, begin-
ning in line 3—

* * *  Whenever on trial for a violation of this section the defendant is
shown to have or to have had possession of such imported firearm, such posses-
sion shall be deemed sufficient evidence to authorize conviction unless the de-
fendant explains such possession to the satisfaction of the jury.

I would appreciate your legal opinion on that provision, as to
whether the burden of proof is placed upon the defendant in the trial
of the case, or whether it in any way affects his presumption of
innocence, that we all recognize as being thrown around him as a
protection.

Attorney General CUMMINGS. No, it does not shift the essential
burden of proof on the trial, but it does, when once established, require
an explanation by the defendant. And in formulating that particular
language, we followed precisely the language of a similar provision
of the Narcotic Drug Act of February 9, 1909, chapter 100, as amended
relating to the importation of narcotic drugs. That provision was
upheld in the case of *Yee Hem* v. *United States*, 268 U.S., 178. We
thought that if we followed the language of that act, inasmuch as the
Supreme Court had passed on the language, it was safer for us so to
do than to attempt to formulate language of our own.

Mr. COOPER. It was my mpression this provision was similar to the narcotic provision referred to by you, and that had been upheld.

Attorney General CUMMINGS. That is it exactly.

Mr. COOPER. I thought, for the benefit of the record, that should appear specifically at this point.

Attorney General CUMMINGS. That is quite true.

Mr. COOPER. Now just one or two other questions. I would be interested to get your opinion about meeting the problem with reference to arms already in the possession of the criminal element of the country. As you stated, it is your estimate there are some 500,000 of these firearms in the hands of the criminal element of the country now. Is it your thought that this bill would afford some effective means of meeting and dealing with that problem, where the arms are already in the possession of those criminals?

The CHAIRMAN. Mr. Cooper, I understood the General to state there were 500,000 of these underworld criminals who were armed; not 500,000 firearms.

Attorney General CUMMINGS. Five hundred thousand individuals.

Mr. COOPER. I am glad to have that cleared up.

Attorney General CUMMINGS. One individual might have a dozen different types of armament.

Mr. COOPER. Yes. I realize that, of course; but I was wondering what your opinion would be as to the effectiveness of this measure in meeting the problem that is presented by this large number of weapons now being in possession of these criminals.

Attorney General CUMMINGS. Well the only answer I can give to you, Mr. Cooper, is that I racked my brain to try to find some simple and effective manner of dealing with those already armed. This bill is in two parts. The first part, under the internal revenue measure, deals with weapons as they now are coming out of the factories, and it seemed to us that the establishment of a system for the tracing of the weapons from owner to owner by a certificate of title might also be attempted with reference to arms already in existence. If we can once make a start and begin with the manufacture and disposal so that each person hereafter obtaining a weapon of the prescribed type would have to show his title to it and the propriety of its possession, that is about all we can do with that part of the problem.

The other part of the problem is dealt with under the Interstate Commerce provision, which makes it an offense to carry in interstate commerce any of the weapons which are under the ban of the law, with certain exceptions. So if, for instance, Dillinger, or any other of those roving criminals, not having proper credentials, should carry a revolver, a pistol, a sawed-off shotgun, or machine gun, across a State line and we could demonstrate that fact, that of itself would be an offense, and the weapons would be forfeited. And that is the only way I can think of to handle this where the weapons are already in existence.

Mr. COOPER. I realize, of course, the difficulty involved and I had this thought in mind—which, of course, you will readily appreciate—that whatever legislation is reported will have to be sustained to a very great extent by the members of this committee in the debate in the House.

Attorney General CUMMINGS. Yes, sir.

Mr. COOPER. And I am just trying to anticipate a few questions that I apprehend will be asked during that time. And it occurred to me that was one very important thing to bear in mind, that is. the large number of these weapons that are already in the hands of the criminal element of the country, and whether or not it is your opinion that this bill affords an effective means of meeting that problem.

Attorney General CUMMINGS. I think it is as far as I would be warranted in asking a committee to go at the present time.

Mr. COOPER. I see.

Attorney General CUMMINGS. I think that it does two crucial things. It deals with the tracing of these weapons if traded or transferred after this act goes into effect; it deals with the requirement of licensing if a person is to take any weapon across State lines. And I am assuming in all this, of course, that the criminal elements are not going to obtain permits and they are not going to obtain licenses, and they are not going to be able to bring themselves within those protective requirements. Therefore, when we capture one of those people, we have simply a plain question to propound to him—where is your license; where is your permit? If he cannot show it, we have got him and his weapons and we do not have to go through an elaborate trial, with all kinds of complicated questions arising. That is the theory of the bill.

Mr. COOPER. Then it is your thought that this bill presents the best method that the Department of Justice has been able to work out, in view of its long experience and intensive efforts along that line that have been made?

Attorney General CUMMINGS. Bearing in mind our limitations of the constitutional character, bearing in mind our limitations to extend our power beyond the immediate requirements of the problem, this is our best thought on the subject.

Mr. COOPER. And this, as indicated by your opening remarks, is a very important part of your whole program?

Attorney General CUMMINGS. Absolutely.

Mr. COOPER. For meeting the criminal situation now existing in the country.

Attorney General CUMMINGS. Yes, Mr. Cooper.

Mr. COOPER. And is an important administrative measure?

Attorney General CUMMINGS. Yes, sir. I might add that the President has authorized me to say he was strongly in favor not only of this measure, but of all the other pending measures the Department of Justice has suggested.

Mr. COOPER. Now, then, one other phase of the matter if I may, please, and that is with reference to the taxes and penalties imposed by the bill. Would you feel disposed to give us some idea as to what you think those taxes should be? You have observed, of course, that the amounts are left blank in the bill. I invite your attention to page 3, where there are some 4 blanks appearing on that page; page 8, where there is a blank with reference to the fine and the imprisonment to be imposed; page 9, where there is a blank. Would you feel disposed to give us your views as to what would be the proper amounts to insert in those places?

Attorney General CUMMINGS. Yes, sir.

Mr. HILL. Would you supplement that by asking for an estimate of the revenue which would be produced?

Mr. Cooper. Yes; I would be glad to have any estimate made of the amount to be yielded by this legislation.

Attorney General Cummings. Answering for the moment your question, Mr. Cooper. On page 3, line 5 of the bill, there is a special tax of blank dollars a year fixed upon importers or manufacturers, and an unnamed annual tax upon dealers. We hesitated to make any specific suggestions as to amount, because they are mere matters of opinion. But, for what it is worth, we would suggest that a tax on importers or manufacturers of $5,000 a year would be proper. There are only four basic manufacturers in the country, large manufacturers. I see no reason why it should not be $5,000 a year, and dealers $200 a year.

The Chairman. General, would you not include for the record the names of those four large manufacturers you referred to?

Attorney General Cummings. Yes; I will supply that.

Mr. Cooper. Then, on the bottom of page 3, General?

Attorney General Cummings. On the bottom of page 3, in line 23, there is the tax on firearms sold, and so forth. For machine guns, $200 and, any other firearms, $1.

Mr. Cooper. That is $200 in the first blank in line 23, and $1 in the second blank?

Attorney General Cummings. Yes. It rather penalizes the machine gun. Now in the next blank——

Mr. Woodruff. Mr. Attorney General, you suggest a tax of $200 on the sale of a machine gun. I understood a moment ago you said that those machine guns were manufactured almost exclusively by four different concerns.

Attorney General Cummings. Yes.

Mr. Woodruff. Now it seems to me that possibly it would have a somewhat wholesome effect upon these particular manufacturers to increase that substantially. They can not have much to say; they would not have much reason to complain if the tax were made much larger than that; because, as we know, machine guns are in the possession of practically all of the criminals in the country who desire them; the fact that they have them must be due, to some small extent at least, to either carelessness or worse on the part of the people who manufacture those guns. Is that a reasonable deduction?

Attorney General Cummings. Well let me say a few words on that if you will, sir.

Mr. Woodruff. I would be glad to hear you, General.

Attorney General Cummings. In the past, that has been true—the presence of machine guns in the hands of the criminal classes has been a reflection upon the manufacturers of those weapons.

Mr. Woodruff. It certainly has.

Attorney General Cummings. Now there is only one, really, the Colt Co., of Hartford, Conn.—my own State—I think that is the only manufacturer now of the type of machine gun used by gangsters and they have entered into a gentleman's agreement with the Department of Justice by which far greater care is now being taken in connection with the distribution of machine guns. Therefore I did not want to have it thought that they were entirely responsible.

Mr. Woodruff. I do not say "entirely".

Attorney General Cummings. They have been quite cooperative of late, sir, and I think it is because they have realized what a dreadful

thing it has been for those deadly and dangerous weapons to be in the hands of those criminals.

Mr. WOODRUFF. General, I do not charge them with the entire responsibility.

Attorney General CUMMINGS. No, sir.

Mr. WOODRUFF. But I did feel and do now feel they have been to a great extent responsible.

Attorney General CUMMINGS. You are quite right. Now you could put that higher if you wanted to, as far as I am concerned.

Mr. WOODRUFF. I would like to ask about the provision in the last paragraph on page 1——

Mr. COOPER. Mr. Chairman, I only yielded for a question.

Mr. WOODRUFF. Just before he leaves this, then I am through.

Mr. COOPER. My point is this, that I only yielded for one question and I would like to have in the record, in one place, about these taxes, and then we can go back and pick up these other matters. If the gentleman will pardon me, I prefer to keep this matter together in the record.

Now just one question, if I may, in reference to the suggestion offered by you as to the tax provided in line 23, on page 3: That is $200 per machine gun?

Attorney General CUMMINGS. Yes.

Mr. COOPER. In that connection, would you be prepared to give us some information as to the average cost of one of these machine guns?

Attorney General CUMMINGS. The cost now is about $200.

Mr. COOPER. That is, delivered to the purchaser?

Attorney General CUMMINGS. Yes, sir.

Mr. COOPER. Then the proposed tax of $200——

Attorney General CUMMINGS. Would be about a 100-percent tax.

Mr. COOPER. About a 100-percent tax?

Attorney General CUMMINGS. Yes, sir.

Mr. COOPER. Then pass on if you will, please, sir, to page 8 and give us your idea as to the amount of fee that should be imposed in the provision in line 15.

Attorney General CUMMINGS. In line 15, on page 8, I think a dollar for each permit is reasonable.

Mr. COOPER. Then on page 9, General, the amount of the fine and the length of the imprisonment.

Attorney General CUMMINGS. In line 14, the amount of fine, page 9, is suggested at $2,000, and the imprisonment, in line 15, not more than 5 years. I will supplement that by saying that that is the penalty that is prescribed in the Harrison Anti-narcotic Act and we were following that suggestion. The committee may think it is not sufficiently drastic.

Mr. COOPER. I thank you, General, and Mr. Chairman, I will be glad to yield the General back to the gentleman.

Mr. HILL. Did you want to ask him for an estimate of the revenue?

Mr. COOPER. I would be glad if you could give us your estimate of the revenue to be yielded from these various items suggested by you.

Attorney General CUMMINGS. Well it probably would approach $100,000.

Mr. COOPER. All of them together would approach, in your opinion, about $100,000 a year?

Case 1:22-cv-02579-CKK   Document 10-1   Filed 10/28/22   Page 16 of 168

Attorney General CUMMINGS. Yes, sir.

Mr. McCLINTIC. Will you yield for a question in connection with that?

Mr. COOPER. Yes.

Mr. McCLINTIC. I would like to ask just one question. I am very much interested in this subject. What in your opinion would be the constitutionality of a provision added to this bill which would require registration, on the part of those who now own the type or class of weapons that are included in this bill?

Attorney General CUMMINGS. We were afraid of that, sir.

Mr. McCLINTIC. Afraid it would conflict with State laws?

Attorney General CUMMINGS. I am afraid it would be unconstitutional.

Mr. McCLINTIC. That is what I want to know.

Mr. COOPER. Now then, Mr. Chairman, I will be glad to yield back the gentleman to Mr. Woodruff.

The CHAIRMAN. I understand you are through now?

Mr. COOPER. Yes.

Mr. CULLEN. Pardon my suggestion, but my colleague Mr. Cooper understood, as he was collecting this data to have it assembled in one place in the record, that the $35,000 being collected now by the Government would be eliminated?

Mr. COOPER. Yes; I understood from the Attorney General it was his estimate—and I am having those figures checked now—that the present yield from the tax on revolvers, and so forth, is about $35,000 a year. And of course, as he suggested here, that would be eliminated if this new tax were imposed.

Mr. HILL. Will the gentleman yield for a question?

Mr. COOPER. Yes, sir.

Mr. HILL. Where is there in this bill a provision for the repeal of those taxes?

Attorney General CUMMINGS. Section 14, page 9, appears to be the place.

Mr. KNUTSON. General, would there be any objection, on page 1, line 4, after the word "shotgun" to add the words "or rifle" having a barrel less than 18 inches? The reason I ask that is I happen to come from a section of the State where deer hunting is a very popular pastime in the fall of the year and, of course, I would not like to pass any legislation to forbid or make it impossible for our people to keep arms that would permit them to hunt deer.

Attorney General CUMMINGS. Well, as long as it is not mentioned at all, it would not interfere at all.

Mr. KNUTSON. It seems to me that an 18-inch barrel would make this provision stronger than 16 inches, knowing what I do about firearms.

Attorney General CUMMINGS. Well, there is no objection as far as we are concerned to including rifles after the word "shotguns" if you desire.

Mr. KNUTSON. Why should we permit the manufacture, that is, permit the sale of the machine guns to any one outside of the several branches of the Government—for instance, the Federal Government, the sheriff's officers, and State constabularies?

Attorney General CUMMINGS. Well, there are other conceivable uses. For instance, in banking institutions, we want to protect the banks.

Mr. KNUTSON. They could swear their guards at the banks in as deputy sheriffs, which would allow them to use machine guns.

Mr. SUMNERS of Texas. Pardon a suggestion, but is not this the answer, that this is a revenue measure and you have to make it possible at least in theory for these things to move in order to get internal revenue?

Attorney General CUMMINGS. That is the answer exactly.

Mr. SUMNERS of Texas. Mr. Attorney General, with the permission of the Chair, may I ask this one question: I notice you put in as the description of a machine gun a gun that will shoot automatically 12 or more shots without reloading. Would you anticipate the possibility, if this bill should be passed, of some unscrupulous manufacturer of these machine guns cutting it down to 11?

Attorney General CUMMINGS. No, sir; I do not think so.

Mr. SUMNERS of Texas. I do not know enough about it, but that possibility occurs to my mind.

Attorney General CUMMINGS. They are only made by the Colt people and the Colt people have been very cooperative of late and I would not believe for a moment that they would try to evade the law by any such device.

Mr. WOODRUFF. I will say, General, that the question raised by my friend from Texas, Mr. Sumners, is exactly the question that I wished to propound to you a moment ago. You say that the Colt Co. is the only one that manufactures machine guns?

Attorney General CUMMINGS. Yes, sir.

Mr. WOODRUFF. Are you sure about that?

Attorney General CUMMINGS. That is the submachine gun, the small kind—that is correct.

Mr. WOODRUFF. Well there are other machine guns, however, that are used?

Attorney General CUMMINGS. There are machine guns that sometimes get in by importation.

Mr. WOODRUFF. Is the Browning machine gun manufactured in this country?

Attorney General CUMMINGS. The same company, if I recall correctly, the Colt Co., manufactures the Browning gun. But the Browning gun is not easily transportable; it is a large, cumbersome weapon that would probably not be used by the criminal class. So that it is not absolutely necessary to bother with it.

Mr. WOODRUFF. I see. Will you indulge me, Mr. Chairman, if I make a short statement?

The CHAIRMAN. Go ahead.

Mr. WOODRUFF. I wish to say, General, that for the last 5 or 6 years I have had before the House a bill to do exactly what you are now proposing to do. I want to congratulate you on that. You can imagine the pleasure it gives me to know that at last the Department of Justice is recommending to the Congress legislation that will give the Federal Government authority over interstate crime.

Now I have addressed letters to every Attorney General for the last 5 or 6 years enclosing a copy of my bill, asking departmental approval of that bill. I think my friend from Texas, the Chairman of the Judiciary Committee, who is present, will bear me out when I say my bill has been before his committee during this period of time, and I recall I even addressed a communication to you, sir,

when you first became Attorney General of the United States, and enclosed a copy of my bill. And that last bill that I introduced at the beginning of this Congress provided a penalty for any man fleeing across State lines who was accused of crime. I am happy to know you have such a bill as that before the Judiciary Committee. I hope you will have much greater influence, though, with the very honorable chairman of that committee than I have had in the past; I hope you have more influence with the committee and that the legislation gets out of that committee and before the Congress and becomes a law in this session.

I believe we are engaged in a war against crime and I believe we ought to bring up every element of strength we have to win that war. Again, I congratulate you.

Attorney General CUMMINGS. I thank you most sincerely, Mr. Congressman.

Mr. FULLER. General, as I understand from your statement, this bill does not contemplate that private individuals will have to register or have stamped their pistols that they now own.

Attorney General CUMMINGS. Not unless they sell them, or give them away, or otherwise dispose of them.

Mr. FULLER. If they dispose of them, then they have to transfer them with a bill of sale, or something of that kind?

Attorney General CUMMINGS. That is it.

Mr. FULLER. For instance, if a Member of Congress driving to Washington would put a pistol in his car, he would have to have that registered before he started, would he, and have it stamped?

Attorney General CUMMINGS. No, sir; in section 10, sir, subsection 5, page 7, prohibiting certain acts without a permit, it indicates that it does not apply to a person who has legally obtained a license for such firearm from the State, territory, district, or possession to which such firearm is to be sent, shipped, carried, or delivered. In other words, if he has thus complied with the State law he is exempt under the Federal law.

Mr. FULLER. But he would have to have some instrument to show it and in most of the States, I imagine, they have no law to require an owner of a pistol to show he is the owner of it. There is no registration, for instance, in the State of Arkansas. We had a law requiring the registration of pistols and 1 year we did do that; but it was so unpopular that at last the legislature repealed it.

Now, I have a pistol, say, in my home where I live and I interpretate under this bill I cannot give that away, I cannot sell it, I cannot dispose of it, without registering it or giving a bill of sale.

Attorney General CUMMINGS. That is correct.

Mr. FULLER. Nor can I carry it across a State line.

Mr. VINSON. Will the gentleman yield right at that point?

Mr. FULLER. Let him answer the question, first.

Attorney General CUMMINGS. You would not be required to have a license or go through any other formalities except in the disposition of the weapon to some one else. And to go across a State line, you would find yourself subject to no inconvenience whatsoever, if you complied with the law of the place you were going to.

Mr. VINSON. Now, General, in that connection, the gentleman from Arkansas (Mr. Fuller) referred to the State of Arkansas having

no law granting permits to carry pistols. This subsection 5 of section 10, to which you refer, makes it necessary for you to have obtained a license from the State, Territory, District, or possession to which such firearm is to be sent, shipped, carried, or delivered. That does not apply to the State from which the firearm is carried, as I read it.

Mr. HILL. That would apply to half a dozen different States.

Mr. VINSON. Yes; that applies to States into which the pistol or revolver is to be carried.

Mr. HILL. Including the District of Columbia.

Mr. VINSON. And I do not think it is confined merely to sales; because the language in section 10 refers to the sending, shipping, carrying, or delivering of any firearms in interstate commerce.

Attorney General CUMMINGS. To what section are you referring now?

Mr. VINSON. I am referring to the one you quoted, subsection 5 of section 10 on page 7 of the bill, at the bottom of the page.

Attorney General CUMMINGS. And what is the difficulty with it, sir?

Mr. VINSON. Well it does not refer to the granting of a permit in the State where the person lives and has his revolver legally. That language refers to the securing of a permit from the State, Territory, District, or possession in which the firearm is to be sent, shipped, carried, or delivered.

Attorney General CUMMINGS. Yes, sir.

Mr. VINSON. Then you would have to get a permit, if you were in Arkansas and coming to Washington, you would have to get a permit in every State between Arkansas and the District of Columbia, and in the District of Columbia; or you would be violating the law. I would like for you to refer to subsection 5 of that section and say if that is not true?

Attorney General CUMMINGS. If you are going from your home, we will say, in some remote State, to Washington, D.C., it is not contemplated you would have to have a permit from every intermediate State.

Mr. VINSON. It is not a question of what is in contemplation; it is a question of the language, General.

Attorney General CUMMINGS. If there is any doubt about it, you may, of course, clear it up; I have no objection. That certainly was not the purpose. It was the purpose not to compel a permit so long as you complied with the law of the State to which you were going.

Mr. VINSON. That is right. The State to which you are going.

Attorney General CUMMINGS. I think it very clearly states that; but if you have any doubt about it, clear it up.

Mr. VINSON. No; it does that. It states the State to which you are going; but you, in answer to the query of the gentleman from Arkansas, said it was a question of securing a permit in the State where the party lives—in Arkansas, for instance, as he asks.

Attorney General CUMMINGS. Oh, well, you would not be expected to obtain a permit from a State that does not issue them.

Mr. FULLER. But if you were going into a State that did require a permit—for instance, I have to come through Missouri and Illinois, and I would have to secure a permit from each one of those States.

Attorney General CUMMINGS. Oh, no. I do not think that would be the fair interpretation.

Mr. FULLER. You do not mean that that is the intention of the law?

Attorney General CUMMINGS. Oh, no; and neither is it the language.

Mr. FULLER. And if the language of the law is such that it does require it, you would not have any objection to correcting it?

Attorney General CUMMINGS. Absolutely not.

Mr. FULLER. Would you have any objection to an officer of the law who has a warrant or is in pursuit of a criminal, carrying a weapon into another State?  He has no time to stop and hesitate about getting a permit.

Attorney General CUMMINGS. That is included in the act.

Mr. FULLER. Where?

Attorney General CUMMINGS. Page 8, line 1——

Mr. FULLER. That keeps him from registering, but does not keep him from transporting.

Attorney General CUMMINGS. If you will look at page 8, line 1, section 6, you will find the act requiring a permit in interstate commerce does not apply to any United States, State, county, municipal, district, territorial or insular officer, or official acting within the scope of his official duties.

Mr. FULLER. Now is that for transportation, or is that for having a permit?

Attorney General CUMMINGS. Transportation.

Mr. VINSON. Now, General Cummings, let us assume you have a State officer and he goes out of his State, across the line, into another State: As soon as he crosses the line, he becomes a private citizen. Now would he be violating the provisions of this act if he had a pistol on him?

Attorney General CUMMINGS. I see the point you make—as to whether the language "within the scope of his duties" would be sufficient to protect him.  Well it might be you could improve that language.

Mr. FULLER. Now you would have no exemption, as I understand—I have just hurriedly looked at this bill—for a sheriff, a man in the Department of Justice, one of your men, buying a machine gun and, as long as you have to combat those people, when the criminal has one, do you think they ought to be penalized by paying this exorbitant sum of $200 if a man is going out just to combat criminals?

Attorney General CUMMINGS. The answer is found on page 9, line 5, section 12, which exempts such officials.  —

Mr. FULLER. The question was asked you about the conclusive evidence of his guilt if a man did not have this permit, as provided by the narcotic law.  As I understand, that is nothing more than the prevailing law in practically every State in the Union, and the old common law, that the possession of stolen goods is prima facie evidence of guilt; by the burden of proof in the entire case does not shift by reason of that law.

Attorney General CUMMINGS. That was the substance of the answer I thought I had given you; yes, sir.

Now some one asked me for the names of the manufacturers of weapons.  The four concerns that are chiefly concerned in this matter are the Colt Manufacturing Co., of Hartford, Conn., Smith & Wesson,

of Springfied, Mass., Harrington & Richardson, Gloucester, Mass., and Iver-Johnson, of Boston.

Mr. LEWIS. General, doubtless you have compared the homicidal statistics of this country with other countries like Great Britain.

Attorney General CUMMINGS. Yes.

Mr. LEWIS. Will you put them in the record, in connection with your statement?

Attorney General CUMMINGS. Would you like those statistics put in the record?

Mr. LEWIS. Yes.

Attorney General CUMMINGS. Then, with the permission of the chairman of the committee, I shall file a memorandum.

Mr. LEWIS. Do you recall what the comparison is, say, between Great Britain and the United States, in a general way?

Attorney General CUMMINGS. I could not speak off-hand on that, sir.

Mr. LEWIS. I have seen comparisons in which it was said that one city in the United States, not the largest, had more murders each year than the whole of Great Britain.

Attorney General CUMMINGS. I can submit the accurate figures on that; but I prefer to submit them after consultation of the records.

Mr. LEWIS. Now, in the study of this subject doubtless you have had under consideration the method of dealing with these deadly weapons in other countries—say Great Britain, France, Germany?

Attorney General CUMMINGS. Yes.

Mr. LEWIS. Would it be a matter of great difficulty to give the committee the benefit of a comparison of such methods of treatment?

Attorney General CUMMINGS. I suppose I could supply data on that subject; but from my own experience, my judgment is that we are apt to be mislead by statistics that have been compiled under different theories in an entirely different country, having very different problems. If you will permit me to recur to one of my favorite illustrations, take this situation, for instance: Take the Urschell kidnaping case. Urschell was kidnaped in Oklahoma; he was carried into a remote section of Texas; the demand for the ransom money came from Missouri, and there was already prepared a gang of confederates in Minnesota to make disposition of the ransom money. There were other groups in 3 different additional States and our representatives had to travel in 16 States in rounding up those criminals. But calculating only the 7 original States; exclusive of the additional States in which our representatives traveled, those 7 States have an area of about 683,000 square miles, and that 683,000 square miles superimposed upon the map of Europe would cover Germany, France, Italy, Austria, Denmark, Holland, Switzerland, England, Scotland, and Wales.

Now, that is our crime problem, gentlemen. There is not anything comparable to it anywhere on the face of the globe.

Mr. LEWIS. What I have in mind mostly, General, is this: The theory of individual rights that is involved. There is a disposition among certain persons to overstate their rights. There is a provision in the Constitution, for example, about the right to carry firearms, and it would be helpful to me in reaching a judgment in supporting this bill to find just what restrictions a law-abiding citizen of Great

Britain and these other countries is willing to accept in the way of his duty to society.

Attorney General CUMMINGS. I will be very glad to supply all the information I can on that subject.

Mr. LEWIS. Now a very brief statement on this subject: Lawyer though I am, I have never quite understood how the laws of the various States have been reconciled with the provision in our Constitution denying the privilege to the legislature to take away the right to carry arms. Concealed-weapon laws, of course, are familiar in the various States; there is a legal theory upon which we prohibit the carrying of weapons—the smaller weapons.

Attorney General CUMMINGS. Of course we deal purely with concealable weapons. Machine guns, however, are not of that class. Do you have any doubt as to the power of the Government to deal with machine guns as they are transported in interstate commerce?

Mr. LEWIS. I hope the courts will find no doubt on a subject like this, General; but I was curious to know how we escaped that provision in the Constitution.

Attorney General CUMMINGS. Oh, we do not attempt to escape it. We are dealing with another power, namely, the power of taxation, and of regulation under the interstate commerce clause. You see, if we made a statute absolutely forbidding any human being to have a machine gun, you might say there is some constitutional question involved. But when you say "We will tax the machine gun" and when you say that "the absence of a license showing payment of the tax has been made indicates that a crime has been perpetrated", you are easily within the law.

Mr. LEWIS. In other words, it does not amount to prohibition, but allows of regulation.

Attorney General CUMMINGS. That is the idea. We have studied that very carefully.

Mr. LEWIS. Just one other question: If the bill were to require of a person now holding one of these weapons that in order to travel in another State with that pistol in his possession he should first have to get a Federal permit, would you not then have reached, in a very substantial way, those who now, hundreds of thousands, carry these small firearms?

Attorney General CUMMINGS. Why, there is a question of policy and there are a lot of people who think that would be too drastic; that it would reach too many innocent people who desire to carry weapons for what they think are proper purposes. Now I do not think it would be proper for me to go into it very deeply, but we have gone as far as we thought we could and yet find support for our propositions as a matter of policy.

There is one matter, Mr. Chairman, if you will pardon me, that I neglected to mention——

Mr. SUMNERS of Texas. General, with the permission of the Chairman, something has occurred to me.

The CHAIRMAN. Proceed.

Mr. SUMNERS of Texas. What do you think about the bullet-proof vests that are part of the equipment of these persons?

Attorney General CUMMINGS. That subject, Mr. Sumners, was brought up by one of the members of the committee.

Mr. SUMNERS of Texas. Then please excuse me. Please dismiss it, and please do not cover it.

Attorney General CUMMINGS. There is one other matter that I would like to draw to your attention, that I think you will approve of. The bill ought, in my judgment, at some appropriate spot, for instance as section 7 (b) on page 6—I would suggest that on page 6, line 1, section 7 be changed so that after section 7 the letter "a" be inserted and the present language be considered as paragraph (a), and then that a subsection (b) be added containing the following language:

(b) It shall be unlawful for anyone to obliterate, remove, change or alter such number or other identification mark. Whenever on trial for a violation of this subsection the defendant is shown to have or to have had possession of such firearm, upon which such number or mark shall have been obliterated, removed, changed or altered, such possession shall be deemed sufficient evidence to authorize conviction, unless the defendant explains such possession to the satisfaction of the jury.

That, of course, speaks for itself. We deal with criminals who will file off the numbers of the weapons so as to make it impossible to trace them, much as they do with automobiles now.

Mr. McCLINTIC. The distinguished Attorney General has referred to the so-called "Urschel case", which was tried in the State of Oklahoma. I want to say to the members of the committee it was my privilege to attend that trial. The closing argument for the Government was made by the distinguished Assistant Attorney General who is here, Mr. Keenan. It was handled in such an efficient manner that all of the citizens of my State deeply appreciate the able presentation and the fine results obtained in that particular instance.

Attorney General CUMMINGS. On behalf of my associate, I extend thanks to you, Mr. Congressman.

Mr. VINSON. General Cummings, I want to read paragraph (d) of subsection 6, section 10:

Any person found in possession of a firearm shall be presumed to have transported such firearm in interstate commerce contrary to the provisions hereof, unless that person has been a bona fide resident for a period of not less than sixty days of the State wherein he is found in possession of such firearm, or unless such person has in his possession a stamp-affixed order therefor required by this Act. This presumption may be rebutted by competent evidence.

Now is there any provision in any Federal or State statute similar to that?

Attorney General CUMMINGS. The case of *Mobile Railroad Co.* v. *Turnip Seed* (219 U.S. 35) discusses such a provision. If you will glance at that case, you will find that it sustains the proposition that there may be a legislative presumption based on one fact followed by another fact.

Mr. VINSON. What sort of crime had been committed in the case to which you refer?

Attorney General CUMMINGS. Suppose I send for the case, sir.

Mr. VINSON. I will say I am familiar in a general way with the rule of presumption that obtains relative to stolen goods and possession of narcotics, and possession of distilled spirits, and particularly with reference to State laws in regard to liquors. But I never came in contact with anything that even looked like a presumption such as written here in this bill in that paragraph.

Attorney General CUMMINGS. The answer is confession and avoidance. There is not anything that specifically I can point to which is

similar to this particular provision.   This question arose in connection with a provision in another bill that we have pending, dealing with kidnaping, in which we raised a presumption that the person was transported in interstate commerce if not returned within 3 days. And when that was before the Senate committee, Senator Borah, who was very much interested in the matter, raised the same question that you have raised, sir, as to this general power to create such presumptions.   And at that time we sent for this case and read it over together and both reached the conclusion that it was a constitutional provision.   So, personally, I have no doubt that upon test it would be sustained.

Mr. VINSON. Of course I may reach that same conclusion; but, at the present time, I am just as far distant from such a conclusion as a person could be.

Attorney General CUMMINGS. Well the test is this, that it is only essential that there shall be some rational connection between the fact proved and the fact presumed, and that the inference of one fact from proof of another shall not be so unreasonable as to be a purely arbitrary mandate.

Mr. VINSON. That provision there puts a citizen of the United States on trial, innocent, however, as he may be, and compels him to rebut by competent evidence something that is not part and parcel of the crime; that is, a 60 days' bona fide residence.

Attorney General CUMMINGS. Mr. Congressman, it is perfectly natural to look at this crime problem from two angles; one, the angle of the defendant who may get into trouble——

Mr. VINSON. I am looking at it from the angle of a law-abiding citizen.

Attorney General CUMMINGS. That is what I say, and I have no fear of the law-abiding citizen getting into trouble.   The other angle is that of the prosecuting agency who desires to stamp out criminal practices.

Now we are dealing with armed people, criminals, who have hide-outs in various spots.   They will stay in one place a little while and in another place a little while, and move about——always with arms; always with arms.   We have recently broken into places where criminals had recently left and found regular arsenals of machine guns, revolvers, pistols, clips, vests, and the Lord knows what.   Now this particular provision was calculated to enable us to have a case against people of that kind.   Your fear is that it might be used as an engine of oppression against some innocent citizen.

Mr. VINSON. Let me say to you, General, I have been on the prosecution end of the law myself and can view it from the prosecutor's side of the case and, so far as the purpose in the prevention or restraint of this crime wave is concerned, of course we are in complete accord. But we have had some recent experiences in regard to splendid purposes that have been written into the law.   I could refer you to the 5-and-10-year provision of the Jones Act.   Nobody questioned the purpose of those of us who voted for that legislation; but, when we got off in the coolness and calmness of retrospect, we had something there that I do not think any English speaking people had ever seen prior to that time, and I know have not seen since.

Attorney General CUMMINGS. I will leave that to the committee.

Mr. FULLER. As I understand from this bill, if I had a pistol of my own and I wanted to sell it, or give it away, I would have to have a picture taken.

Attorney General CUMMINGS. Yes.

Mr. FULLER. And have to give my fingerprints?

Attorney General CUMMINGS. Yes, you would.

Mr. FULLER. Do not you think that will cause an awful revolt all over the United States amongst private citizens, that the Federal Government is taking too much authority?

Attorney General CUMMINGS. Just a moment. I misspoke myself. You would not have to give your fingerprints, or your picture. It would be the person who got the weapon.

Mr. FULLER. The man who got the weapon?

Attorney General CUMMINGS. The man who received the weapon.

Mr. FULLER. Well is he the one who would have to get the permit?

Attorney General CUMMINGS. Yes, he would have to get the permit.

Mr. FULLER. What about transporting? If I had to get a permit to transport, would not I have to have my fingerprints made and a photograph taken, in order to get that permit to transport?

Attorney General CUMMINGS. Yes, I believe you would.

Mr. FULLER. Now, another question: You know that naturally, outside in your private life, as a practitioner, there is more or less resentment on behalf of all law-abiding people to be regulated too much, especially about pistols. Would it in your opinion seriously injure the object and purpose of this bill if you would eliminate pistols and let us get as strong a law as possible for sawed-off shotguns and machine guns—the very thing you are trying to reach? That sentiment is reflected in Congress here. And it is no trouble for a criminal to get a pistol any time he wants it, even if you pass this law; but it would have a wholesome effect to stop him on these machine guns and sawed-off shotguns.

Attorney General CUMMINGS. Of course, the committee and the Congress will do as they please about this matter. I can only say what I think and I think it would be a terrible mistake to adopt any half-way measures about this. I think the sooner we get to the point where we are prepared to recognize the fact that the possession of deadly weapons must be regulated and checked, the better off we are going to be as a people.

Now, you say that it is easy for criminals to get weapons. I know it; but I want to make it easy to convict them when they have the weapons. That is the point of it. I do not expect criminals to comply with this law; I do not expect the underworld to be going around giving their fingerprints and getting permits to carry these weapons, but I want to be in a position, when I find such a person, to convict him because he has not complied.

Mr. FULLER. Of carrying the pistol or weapon, instead of the offense with which he is charged?

Mr. LEWIS. General, you were compelled, in the case of one outlaw, which the Department has convicted, to resort to prosecution under the income-tax law?

Attorney General CUMMINGS. That is Capone.

Mr. LEWIS. You were compelled to do that by utter lack of power to deal with a national outlaw.

Attorney General CUMMINGS. Yes.

Mr. VINSON. General, I have been handed the case of the *Mobile, Jackson & Kansas City Railroad* v. *Turnipseed*, 235 U.S., to which you refer. That case, briefly, is a civil case for tort, and in it I find the following language in regard to presumption. I quote from it:

To enact legislation providing that proof of one fact shall constitute prima facie evidence of the main fact in issue, is to enact a rule of evidence and keep within the general powers of government. Statutes, National and State, dealing with such methods of proof in both civil and criminal cases, are found and decisions upholding them are numerous.

Now that is with respect to some part and parcel of the crime; for instance, the possession of stolen goods. There may be a proper legal presumption that goods that have been stolen, that are in the hands of the party charged with the crime, have come there illegally, and the State or Federal Government may make that possession a crime. But this presumption that is referred to in paragraph (d) of subsection 6 of section 10 deals with a man's residence—the question of whether a man has resided for 60 days within a State: There is no violation of law there; there is nothing that even squints of crime in a man's living in a State for 60 days, 6 months, or 6 years. And it just occurs to me that this particular decision might not be very strong authority for that contention.

Attorney General CUMMINGS. We have a memorandum on that subject that I would be glad to submit.

Mr. VINSON. I would be very happy to see it.

Mr. HILL. General Cummings, the question has been asked as to how you are going to check up on or deal with these prohibited arms now in possession of the people. Now there is not any provision in this bill that I have found that deals with clips, for instance, for a machine gun. It occurs to me that probably to some extent you might check up on the possessors of machine guns by requiring some identification in the purchase of the clips to furnish the ammunition for those guns.

Attorney General CUMMINGS. That is a very good suggestion, sir—very good.

Mr. HILL. I doubt whether it would be a very popular thing to carry that on to the matter of ammunition for pistols.

Attorney General CUMMINGS. No.

Mr. HILL. And sawed-off shotguns, and things of that kind; but, as to machine guns, it might be a very desirable supplement to this bill.

Attorney General CUMMINGS. I think that is a very good suggestion.

Mr. LEWIS. Do they have a different type of cartridge?

Attorney General CUMMINGS. They have special equipment to go into these machine guns. It is a highly specialized implement and ought not to be in the hands of any innocent person—I mean ought not to be in the hands of any person who is not properly entitled to have possession of it.

Mr. HILL. Now you are proceeding under two provisions of the Constitution as a basis for this legislation. One is the taxing power and the other is the regulation of interstate commerce.

Attorney General CUMMINGS. Yes.

Mr. HILL. How far does the character of interstate commerce follow a firearm? For instance, with a gun that is imported, of course

that would be international commerce and would come under this provision; but take a domestic product. A manufacturer ships a gun into another State from that in which it is manufactured. It is in interstate commerce. Now if the person receiving that gun, purchasing that gun, sells it to some other person within the same State as he is, does the interstate commerce character still obtain?

Attorney General CUMMINGS. Well we would get that person, if he is a criminal, under the taxing provision.

Mr. HILL. Under the excise tax?

Attorney General CUMMINGS. Yes, sir.

Mr. HILL. You would require the person selling the weapon to pay the tax?

Attorney General CUMMINGS. Yes.

Mr. HILL. And in all these cases, I take it, where arms are imported, they will pay the import duty?

Attorney General CUMMINGS. Yes.

Mr. HILL. And, in addition to that, would pay the excise or internal revenue tax?

Attorney General CUMMINGS. I think it is so provided specifically.

Mr. HILL. Under the internal revenue tax feature, you would reach the sale of a weapon sold in the State in which it is manufactured?

Attorney General CUMMINGS. Yes. There you are under the taxing power.

Mr. HILL. Yes; I say, under the taxing power.

Attorney General CUMMINGS. You see, we have to use both of those powers to solve this problem.

Mr. HILL. Now, of course, this is a pretty drastic measure. Nobody will question that for a moment. And it may arouse some resentment among certain of our perfectly good law-abiding people. For instance, it requires, as has been suggested here, every person; regardless of whether he be a criminal or law-abiding, if he wants to transport one of these prohibited arms in interstate commerce, that he must first secure a permit. And, to get that permit, he must furnish a photograph and fingerprints and other marks of identification.

Attorney General CUMMINGS. That is unless he complies with the law of the State to which he is going.

Mr. HILL. Yes. Well, if that State does not have any requirements as to licenses or permits, then he would have to get the permit from the Commissioner of Internal Revenue?

Attorney General CUMMINGS. If you wish, sir, to meet that situation, on page 7, section 10, line 21, where we exempt persons who have lawfully obtained a license for such firearm from the State, Territory, District, or possession to which such firearm is to be sent— if you are raising the question that that State may not require any license (there is no doubt as to what it means) you might say:

Who has complied with the laws respecting firearms in the State, Territory, District, or possession to which he is going.

It is fair enough when you come to analyze it, because every State has a right, I should think, to be protected against people going into the State in contravention of the laws thereof.

Mr. HILL. There is no question but that the State has the power to impose a restriction and require certain regulations to be complied with; but if that State has not done that and the person, a per-

Case 1:22-cv-02579-CKK Document 10-1 Filed 10/28/22 Page 28 of 168

fectly good citizen, should carry a firearm into that State, he would of course have nothing to show he is there legally in possession of it, because the State law will not require a permit.

Attorney General CUMMINGS. He would never be convicted or arrested in the world.

Mr. HILL. But he would have nothing to show specifically to the Federal officer who arrested him for having a firearm.

Attorney General CUMMINGS. The law would not contemplate for a moment requiring a person to have something that does not exist. So I should say if you were in the State of Arkansas, for instance, or going there, if it requires no permit, you would not have even to attempt to get one.

Mr. HILL. But section 10, on page 7, reads—

It shall be unlawful for any person who has not first obtained a permit as hereinafter provided, to send, ship, carry, or deliver any firearm in interstate commerce.

Then it goes on to say—

* * * nothing contained in this section shall apply—

to the number of different provisions which follow.

Attorney General CUMMINGS. You can change that so that, instead of requiring a license, it would read, "complied with the law?"

Mr. HILL. Well there is no law to be complied with. He has absolutely nothing to show; that is the point I am making. He has to get a permit from the Commissioner and has nothing to show from the State, and what is there to keep him from being arrested by a Federal official as having violated this law?

Attorney General CUMMINGS. If he wants to get a permit, that would protect him. He does not have to get it.

Mr. HILL. He has to comply with regulations prescribed by the Secretary of the Treasury, which might include fingerprints, photographs, and other marks of identification. I am just simply calling attention, to get it in the record, to what this bill does, because we are going to be asked a lot of questions about it.

Attorney General CUMMINGS. Well, I said at the outset, Mr. Chairman, and Mr. Congressman, that this was a drastic law, and the law-abiding people of this country have got to be prepared to go to some inconvenience in dealing with these deadly weapons. The thing is not an irrational request to make of the honest citizen who wants the criminal class stamped out.

Mr. DICKINSON. Just one question, General. On page 4, section 4, the first line, where it says, "It shall be unlawfor for any person", does the word "person" include a dealer? Is it intended to include a dealer; is it broad enough to cover a dealer?"

Attorney General CUMMINGS. Yes, sir. On page 2, line 1, it says "The term 'person' includes a partnership, company, association, or corporation, as well as a natural person."

Mr. DICKINSON. You think that includes a dealer?

Attorney General CUMMINGS. Well, if the dealer is a partnership, or company, or association, or corporation, undoubtedly.

Mr. DICKINSON. That definition, then, must be taken into consideration with the other?

importer" and so on, and "The term 'dealer' shall include pawn-brokers and dealers in used firearms". I would like to put those people out of business, if I could.

Mr. DICKINSON. It is the dealer that I have been thinking about for years.

Attorney General CUMMINGS. Will you permit me to express my appreciation, Mr. Chairman, to yourself and these very courteous and attentive gentlemen who have been so patient with me? I thank you.

The CHAIRMAN. General, we appreciate your attendance and the information you have given the committee. I am sure the committee is very deeply interested in this proposed legislation, and we perhaps will want to confer with you later. We thank you very much, General.

(Thereupon an adjournment was taken until Wednesday, Apr. 18, 1934, at 10 a.m.)

(The following data was subsequently submitted for the record by Hon. Joseph B. Keenan, Assistant Attorney General, Department of Justice:)

MEMORANDUM FOR THE ATTORNEY GENERAL CONCERNING LEGALITY OF PRE-SUMPTIONS IN CRIMINAL STATUTES WHICH PLACE THE BURDEN OF PROOF UPON THE ACCUSED; PRESUMPTION, IN H.R. 9066, CONCERNING INTERSTATE TRANSPORTATION OF FIREARMS

Numerous decisions of Federal courts have established the rule that a presumption in a Federal criminal statute is not unconstitutional if (1) the defendant is given a fair chance to make a defense to it; (2) there is some rational connection between the fact proved and the fact presumed by reason of the statute.

The rule now followed has been set forth by the United States Supreme Court—

"That a legislative presumption of one fact from evidence of another may not constitute a denial of due process of law or a denial of the equal protection of the law, it is only essential that there shall be some rational connection between the fact proved and the fact presumed, and that the inference of one fact from proof of another shall not be so unreasonable as to be a purely arbitrary mandate."

*Mobile, etc. R.R. Co.* v. *Turnipseed*, 219 U.S. 35; see also *Hawes* v. *Ga.*, 258 U.S. 1; *Brighton* v. *U.S.*, 7 F. (2d) 532; 43 Harvard Law Rev. 100; 38 Yale Law Rev. 1145; 27 Mich. Law Rev. 951.

Legislative presumptions which, in effect, place the burden of proof on the defendant, are attacked on two grounds; first, that they are a denial of due process, in that they deprive the accused of the presumption of innocence; second, that they are a violation of the constitutional provision against self-incrimination. The case of *Yee Hem* v. *United States*, 268 U.S. 178 (1924) embodies the answer of the Supreme Court of the United States to all these objections.

That case arose over the arrest of one Yee Hem who was found to be in possession of and concealing a quantity of smoking opium. He was convicted of the offense of concealing a quantity of smoking opium after importation, with knowledge that it had been imported in violation of the act of February 9, 1909, c. 100, as amended. Section 1 of that act "prohibits the importation into the United States of opium in any form after April 1, 1909, except that opium and preparations and derivatives thereof, other than smoking opium or opium prepared for smoking, may be imported for medicinal purposes only, under regulations prescribed by the Secretary of the Treasury. Section 2 provides, among other things, that if any person shall conceal or facilitate the concealment of such opium, etc., after importation, knowing the same to have been imported contrary to law, the offender shall be subject to fine or imprisonment or both. It further provides that whenever the defendant on trial is shown to have or to have had possession of such opium, etc., 'such possession shall be deemed sufficient evidence to authorize conviction unless the defendant shall explain the possession to the satisfaction of the jury.' Section 3 provides that on and after July 1, 1913, 'all smoking opium or opium prepared for smoking found within the United States shall be presumed to have been imported after the 1st day of April, 1909, and

the burden of proof shall be on the claimant or the accused to rebut such presumption' " (268 U.S. 178, 181).

The question was raised whether Congress had power to enact the provisions in respect to the presumptions arising from the unexplained possession of such opium and from its presence in this country after the time fixed by the statute. The case was appealed to the Supreme Court which, by unanimous opinion delivered by Justice Sutherland, upheld the validity of this presumption. The court quoted from the opinion of the Supreme Court, by Justice Lurton, in *Mobile, etc., R.R.* v. *Turnipseed* (219 U.S. 35, 42):

"The law of evidence is full of presumptions either of fact or law. The former are, of course, disputable, and the strength of any inference of one fact from proof of another depends upon the generality of the experience upon which it is founded.

\* \* \*

"Legislation providing that proof of one fact shall constitute prima facie evidence of the main fact in issue is but to enact a rule of evidence, and quite within the general power of Government. Statutes, National and State, dealing with such methods of proof in both civil and criminal cases abound, and the decisions upholding them are numerous. \* \* \*

"That a legislative presumption of one fact from evidence of another may not constitute a denial of due process of law or a denial of the equal protection of the law it is only essential that there shall be some rational connection between the fact proved and the ultimate fact presumed, and that the inference of one fact from proof of another shall not be so unreasonable as to be a purely arbitrary mandate. So, also, it must not, under guise of regulating the presentation of evidence, operate to preclude the party from the right to present his defense to the main fact thus presumed."

Justice Sutherland said that the legislative provisions assailed in this case satisfied the above requirements set forth in the *Turnipseed case* in respect to due process.

"They have been upheld against similar attacks, without exception so far as we are advised, by the lower Federal courts. (*Charley Toy* v. *United States*, 266 Fed. 326, 239; *Gee Woe* v. *United States*, 250 Fed. 428; *Ng Choy Fong* v. *United States*, 245 Fed. 305; *United States* v. *Yee Fing*, 222 Fed. 154; *United States* v. *Ah Hung*, 243 Fed. 762, 764.) We think it is not an illogical inference that opium, found in this country more than 4 years (in the present case, more than 14 years) after its importation had been prohibited, was unlawfully imported. Nor do we think the further provision, that possession of such opium in the absence of a satisfactory explanation shall create a presumption of guilt, is 'so unreasonable as to be a purely arbitrary mandate.' By universal sentiment, and settled policy as evidenced by State and local legislation for more than half a century, opium is an illegitimate commodity, the use of which, except as a medicinal agent, is rigidly condemned. Legitimate possession, unless for medicinal use, is so highly improbable that to say to any person who obtains the outlawed commodity, 'since you are bound to know that it cannot be brought into this country at all, except under regulation for medicinal use, you must at your peril ascertain and be prepared to show the facts and circumstances which rebut, or tend to rebut, the natural inference of unlawful importation, or your knowledge of it,' is not such an unreasonable requirement as to cause it to fall outside the constitutional power of Congress" (p. 184).

With respect to the argument that this legislative presumption deprives the accused of the presumption of innocence, the court said:

"Every accused person, of course, enters upon his trial clothed with the presumption of innocence. But that presumption may be overcome, not only by direct proof, but, in many cases, when the facts standing alone are not enough, by the additional weight of a countervailing legislative presumption. If the effect of the legislative act is to give to the facts from which the presumption is drawn an artificial value to some extent, it is no more than happens in respect of a great variety of presumptions not resting upon statute. (See *Dunlop* v. *United States*, 165 U.S. 486, 502–503; *Wilson* v. *United States*, 162 U.S. 613, 619.)"

Finally, the court denied the validity of defendant's argument that the presumption contravened the compulsory self-incrimination clause of the fifth amendment.

"The point that the practical effect of the statute creating the presumption is to compel the accused person to be a witness against himself may be put aside with slight discussion. The statute compels nothing. It does no more than to make possession of the prohibited article *prima facie* evidence of guilt. It leaves the accused entirely free to testify or not as he chooses. If the accused happens

to be the only repository of the facts necessary to negative the presumption arising from his possession, that is a misfortune which the statute under review does not create but which is inherent in the case. The same situation might present itself if there were no statutory presumption and a *prima facie* case of concealment with knowledge of unlawful importation were made by the evidence. The necessity of an explanation by the accused would be quite as compelling in that case as in this; but the constraint upon him to give testimony would arise there, as it arises here, simply from the force of circumstances and not from any form of compulsion forbidden by the Constitution" (p. 185).

In the bill H.R. 9066, which provides for the taxation and registration of manufacturers, importers, and dealers in small firearms and machine guns, and for the taxation and regulation of the sale or other disposal of such weapons a presumption is created that—

"Any person found in possession of a firearm shall be presumed to have transported such firearm in interstate commerce contrary to the provisions hereof, unless such person has been a bona fide resident for a period of not less than 60 days of the State wherein he is found in possession of such firearm, or unless such person has in his possession a stamp-affixed order therefor required by this act."

It is believed that this presumption is reasonable in view of the provisions of this act. If the firearm has been obtained since the accused entered the State, he should have a stamped-affixed order. Therefore, if he has not been a bona fide resident of the State for a period of more than 60 days, it is reasonable to presume that he came into the State within that period and transported such firearm with him.

JOHN W. BRABNER SMITH.

APRIL 17, 1934.

---

## FIREARM LEGISLATION IN GREAT BRITAIN

The British Firearm Act (act of 10 and 11 Geo. 5, c. 43, Aug. 16, 1920), not only is more rigorous and burdensome upon the inhabitants of Great Britain than the proposed National Firearms Act, H.R. 9066, would be upon the American people, but, considering all its provisions, it is more drastic than any present state legislation, including New York's "Sullivan law."

The British Act is based on regulating the sale, as well as the use and possession, of every kind of firearm, and of the ammunition therefor. Only those individuals can obtain a firearm certificate who are approved by the local chief of police, with certain exceptions such as law enforcement officials. The certificate fee is approximately $25, it is good for but three years, and is revocable. There is an additional hunting license fee.

Dealers are rigidly supervised and must make reports of all sales of weapons or ammunition within forty-eight hours. Such sales can only be made to identified certificate holders and must be pursuant to instructions in the certificates. Pawnbrokers cannot deal in firearms, and all manufacturers and repairmen are supervised.

A more extended review of this Act follows. It is unnecessary to discuss the infrequency of crimes committed with firearms in England, for repeated comparisons between such conditions there and in this country are becoming much too unpleasant for the law-abiding American citizen.

### OUTLINE OF THE BRITISH FIREARM ACT

[Act of 10 and 11 Geo. 5 ch. 43, Aug. 16, 1920]

#### FIREARM CERTIFICATE

In England every person, with certain exceptions, must have a firearm certificate to purchase, possess, use or carry any firearm or ammunition. Firearms include "any lethal firearm or other weapon of any description from which any shot, bullet or other missile can be discharged, or any part thereof". It does not include antiques or firearms possessed as trophies of any war, although no ammunition may be purchased therefor.

Ammunition is defined to be ammunition for such firearms, and also includes grenades, bombs and similar missiles, whether capable of use with a firearm or not, and ingredients and components thereof.

The firearm certificate is granted by the chief of police of the district in which the applicant resides, if the police officer is satisfied that the applicant has good

reason for acquiring the certificate and that he can be permitted to have the firearm without danger to the public safety, and on payment of a prescribed fee, which is 5 pounds for the first period of 3 years and is renewable every 3 years for a fee of 2 pounds 6 shillings.

The certificate must also specify the nature and number of the firearm to which it relates, and the quantity of ammunition authorized to be purchased and to be held at any one time thereunder.

### QUALIFICATIONS TO CARRY ARMS AND OBTAIN CERTIFICATE

(1) A certificate shall not be granted to a person of intemperate habits or unsound mind, or who is for any other reason unfit to be intrusted with firearms.

(2) A single certificate may be issued to a rifle club or cadet corps, if approved by a Secretary of State, for firearms to be used solely for target practice or drill, and no fee is charged.

(3) Certain groups of officers and individuals need not obtain a certificate: Law enforcement officers in the performance of duty; gunsmiths or firearm dealers; firearm and ammunition testers; warehousemen, post-office officials on duty; persons accompanied by a certificate holder; butchers or others who use firearms only to kill animals; and rifle ranges which use rifles not over 23 caliber.

(4) Persons under 14 years of age shall not purchase, possess, use or carry firearms or ammunition.

(5) A person who has been sentenced for a term of 3 months or more for any crime shall not, during a period of 5 years from the date of his release, have in his possession, use or carry a firearm or ammunition.

### LIMITATIONS ON DEALERS

Pawnbrokers shall not take in pawn a firearm or ammunition, although where they have done so before the act, redemption thereof may be made if the redeemer holds a firearm certificate or is a registered dealer, and in such case a sale also may be made to authorized persons.

Dealers are to register with the chief of police of the district in which their business is.

Manufacture, sale, repair, test, proof, exposure for sale, or possession for sale, repair, etc., is forbidden without registration.

No sale shall be made to other than a registered dealer unless the purchaser produces a certificate authorizing him to purchase firearms or ammunition, nor shall a person repair, test or prove firearms or ammunition for other than dealers or certificate holders. All vendors must, within 48 hours after a sale, notify the chief of police who issued the certificate, of the sale, must keep a record of all transactions within 24 hours after they take place, and must demand sufficient particulars to identify the purchaser. Such dealers must allow an inspection by the chief of police and other officers, of all stock on hand.

### APPEAL FROM REFUSAL TO ISSUE LICENSES, ETC.

Appeal from the refusal of a chief of police to issue a firearm certificate or to vary it or to register a firearm dealer, and other appeals from administrative acts hereunder, may be taken to a court of summary jurisdiction.

### PENALTIES

(1) For not having a certificate, or purchasing ammunition in excess quantities etc., the British Firearms Act provides a penalty up to 3 months imprisonment with or without hard labor, and £50.

(2) Dealers failing to comply with provisions of the act, as by making false entries, refusing to allow police inspection of books, etc., may be penalized up to 3 months and £20. Also the registration privilege may be withdrawn and the stock of firearms and ammunition sold by court order.

### MISCELLANEOUS

(1) All hunters must also have a gun license which costs 10 shillings.

(2) The manufacture, possession, sale, purchase, transportation of weapons, designed to contain or to discharge noxious liquid, gas, etc., may be punished by imprisonment for not more than 2 years.

58278—34——3

(3) Possessing a firearm or ammunition with intent to endanger or injure any person or property is a misdemeanor.

(4) Any secretary of state can by order prohibit the removal of firearms to places within or without the United Kingdom unless authorized by the chief of police under instructions contained in the order.

(5) Any constable is empowered to demand production of the firearm certificate by anyone whom he believes to be in possession of a firearm or ammunition. Upon failure to produce it, the firearm or ammunition may be seized and detained, and for failure to comply with officer's request for true name and address of the possessor, the latter is liable to arrest without warrant and to a penalty of £20.

(6) Any justice of the peace, on information on oath that there is reasonable grounds for suspecting an offense is being committed, may grant a search warrant to enter at any time, and by force if necessary, the premises named therein, and the searching officer may seize and detain all firearms and ammunition found therein and arrest without warrant any person reasonably suspected of having committed an offense under this act.

## COMPARISON OF STATISTICS CONCERNING MURDER AND MANSLAUGHTER IN THE UNITED STATES AND CERTAIN FOREIGN COUNTRIES, 1920-31

The following tables indicate that far more crimes of murder and manslaughter, in proportion to the population, are committed annually in the United States than in the leading European countries. In the year 1930, which is the last year for which comparative statistics are available, there was approximately one such crime per 11,000 of population in the United States, as compared with approximately one in 72,500 of population in France, approximately one in 46,000 of population in Germany, approximately one in 165,000 of population in Great Britain, and for the year 1928 (which is the last available record we have) approximately one in 40,000 of population in Italy.

Moreover, murder, for the period from 1929 to 1931, has been increasing in this country more rapidly than has the growth of population, whereas in all the leading European nations there has been a constant decrease in this form of crime. In the year 1931 there were 569 known cases of murder or manslaughter in the city of New York, as compared with 287 in the entire country of Great Britain. In the Borough of Manhattan, New York City, which is one of the 5 boroughs constituting the city, there were 333 homicides in the year 1931 as compared with 287 homicides in all of Great Britain for the same year. The entire population of the city of New York is approximately 7,000,000.

*Homicide statistics for the United States and certain foreign countries*

[Latest comparative figures available]

| | |
|---|---:|
| I. United States, 1931: Murder and manslaughter | 11, 160 |
| United States.   Division of Vital Statistics, Census Bureau of the United States Government. | |
| II. France, 1930: Murder and manslaughter | 562 |
| France.   Bureau de la statistique generale.   Annuaire statistique, 1932, p. 92. | |
| III. Germany, 1931: Murder and manslaughter | 1, 336 |
| Germany.   Statistisches reichsamt.   Statistisches Jahrbuch für das Deutsche Reich.   Berlin 1933, p. 45. | |
| IV. Great Britain, 1931: Murder and manslaughter | 287 |
| Great Britain.   Home department.   Criminal statistics, England and Wales, 1931.   London, 1933, p. 15. | |
| V. Italy, 1928: Homicide and infanticide | 988 |
| Italy.   Direzione generale della statistics.   Annuario statistico Italiano.   1930, p. 58. | |

*Homicide statistics for the United States, and some foreign countries, 1920–31*

NOTE.—Crime statistics are not compiled under uniform categories in all countries: consequently comparisons should be made advisedly.
Time limitation and lack of official reports prevent inclusion of later figures in this tabulation.

| Year | United States [1] | France [2] | Germany [3] | Great Britain [4] | Italy [5] | New York City [6] |
|---|---|---|---|---|---|---|
| 1920 | 6,205 | 781 | 1,868 | 313 | 2,661 | 344 |
| 1921 | 7,545 | 759 | 1,641 | 251 | 2,750 | 307 |
| 1922 | 7,788 | 595 | 1,538 | 243 | 2,459 | 350 |
| 1923 | 7,878 | 439 | 1,604 | 259 | 1,851 | 303 |
| 1924 | 8,420 | (7) | 1,373 | 274 | 1,786 | 390 |
| 1925 | 8,893 | 479 | 1,429 | 318 | 1,758 | 356 |
| 1926 | 9,210 | 627 | 1,442 | 297 | 1,252 | 344 |
| 1927 | 9,470 | 581 | 1,300 | 293 | 1,141 | 372 |
| 1928 | 10,050 | 520 | 1,264 | 284 | 988 | 369 |
| 1929 | 9,909 | (7) | 1,176 | 311 | (8) | 426 |
| 1930 | 10,617 | 562 | 1,233 | 300 | (7) | 498 |
| 1931 | 11,160 | ........ | 1,336 | 287 | (7) | 569 |
| Total | 107,145 | 5,343 | 17,204 | 3,430 | 16,646 | 4,658 |
| Years missing | 0 | 3 | 0 | 0 | 3 | 0 |

[1] Homicidal statistics of the Statistical Division, United States Government Census Bureau.
[2] France. Bureau de la statistique générale.   Annuaire statistique, 1924, p. 39—figures for 1920–22, inc.; 1927, p. 107—figures for 1923; 1928, p. 70—figures for 1925; 1929, p. 78—figures for 1926; 1930, p. 86—figures for 1927; 1931, p. 88—figures for 1928; 1932, p. 92—figures for 1930.
[3] Germany. Statistisches reichsamt.   Statistisches Jahrbuch für das Deutsche Reich, 1926, p. 33–34—figures for 1920; 1927, p. 37—figures for 1921–25, inc.; 1928, p. 55,—figures for 1926; 1929, p. 53—figures for 1927; 1930, p. 49—figures for 1928; 1931, p. 43—figures for 1929; 1932, p. 43—figures for 1930; 1933, p. 45—figures for 1931.
[4] Great Britain. Home department.   Criminal statistics, England and Wales, 1927, p. 27—figures for 1920–27, inc.; 1930, p. 15—figures for 1928–30, inc.; 1931, p. 15—figures for 1931.
[5] Italy. Direzione generale della statistica.   Annuario statistico Italiano, 1922–25, p. 35—figures for 1920–24, inc.; 1930, p. 58—figures for 1925–28, inc.
[6] World Almanac 1934 at page 476.
[7] Not found in subsequent yearbooks.
[8] Latest annual available in Library gave no figures later than 1928.

## Area of United States and European countries

[Figures taken from World Almanac, 1934]

*Square miles*

| | |
|---|---|
| United States (continental) | 3,026,789 |
| France | 212,000 |
| Germany | 180,000 |
| Great Britain, including England, Irish Free State, Northern Ireland, Scotland, and Wales | 124,284 |
| Italy | 119,744 |

## Population of United States and European countries

[Figures taken from World Almanac, 1934]

| | |
|---|---|
| United States (continent) (census 1930) | 122,775,046 |
| France (Census 1931) | 41,834,923 |
| Germany (Census 1933) | 65,300,000 |
| Great Britain, including England, Irish Free State, Northern Ireland, Scotland, and Wales (Census 1931) | 49,000,000 |
| Italy (Census 1931) | 41,176,671 |

# NATIONAL FIREARMS ACT

## WEDNESDAY, APRIL 18, 1934

House of Representatives,
Committee on Ways and Means.

The committee met at 10 a.m., Hon. Robert L. Doughton (chairman) presiding.

The CHAIRMAN. The committee will be in order.

We shall continue this morning the hearings on H.R. 9066. We have with us this morning the adjutant general of the State of Maryland, whom we shall be glad to hear at this time.

General, will you please come forward and for the purposes of the record give your name, address, and the capacity in which you appear?

## STATEMENT OF ADJT. GEN. MILTON A. RECKORD, ADJUTANT GENERAL OF THE STATE OF MARYLAND, EXECUTIVE VICE PRESIDENT OF THE NATIONAL RIFLE ASSOCIATION OF AMERICA, WASHINGTON, D.C.

General RECKORD. Mr. Chairman and gentlemen: My name is Gen. Milton A. Reckord. I am the adjutant general of Maryland and the executive officer of the National Rifle Association of America.

Mr. DICKINSON. Will you please give us your address?

General RECKORD. I have an address at the capitol in Annapolis, as the adjutant general of Maryland, and in the Barr Building, Washington, D.C., as the executive vice president of the National Rifle Association of America.

We have asked to be heard on H.R. 9066 because of the fact that for many years our association has been interested in legislation of this type.

The CHAIRMAN. What is your position with the National Rifle Association?

General RECKORD. I am the executive officer, the executive vice president, the active head of the National Rifle Association.

Mr. TREADWAY. May I ask, Mr. Adjutant General, whether you are appearing as an official of that association or as adjutant general of your State? You seem to hold two positions. How are you appearing here, in what capacity?

General RECKORD. I am appearing in both capacities.

Mr. TREADWAY. That is what I wanted to know. Thank you.

General RECKORD. Because I am the chairman of the legislative committee of the Adjutants General Association of the United States.

The CHAIRMAN. In that connection, are you appearing in opposition to or in favor of the bill?

33

General RECKORD. We are in opposition to many of the provisions of this bill.

Mr. HILL. You are representing the State of Maryland as well as the National Rifle Association in this hearing?

General RECKORD. I cannot say that I am representing the State of Maryland, because I have not been directed by the Governor to come here to present the views of the State. I am representing the Association of Adjutants General of all of the States, as I am the chairman of the legislative committee of that body.

Mr. HILL. Have you been directed by that organization to appear here?

General RECKORD. Yes, sir.

The CHAIRMAN. You say you appear in the capacity of adjutant general of the State of Maryland?

General RECKORD. I am the adjutant general of the State of Maryland and chairman of the Legislation Committee of the Adjutants General Association.

The CHAIRMAN. I do not see the necessity of bringing that out unless you appear here in that capacity. Exactly in what capacity do you appear? Will you please state that again for the record?

General RECKORD. I appear here as the executive vice president, or the active head, of the National Rifle Association of America.

The CHAIRMAN. Then I understand that you represent a private organization.

General RECKORD. That is true.

The CHAIRMAN. And you do not appear here in any official governmental capacity?

General RECKORD. No, sir; I am not here in any official Government capacity.

Mr. WOODRUFF. I understood you to say, General, that you are appearing both as a representative of the National Rifle Association and the National Association of Adjutants General.

General RECKORD. Yes, sir.

Mr. WOODRUFF. May I suggest that you confirm what I am about to say, if you will, and that is that the adjutant general of a State is the executive officer of the Militia or the National Guard of that State.

General RECKORD. Yes, sir; that is correct.

Mr. WOODRUFF. So you are here as a representative of the National Guard of all the States?

General RECKORD. That is correct. I am chairman of the legislative committee of the adjutants general of all the States. '

Mr. WOODRUFF. And you are appearing in a dual capacity, representing that organization and also representing the National Rifle Association, is that correct?

General RECKORD. That is correct.

Mr. FREAR. Did they take action recently authorizing you to appear in opposition to the bill?

General RECKORD. Only in an informal manner.

Mr. FREAR. In what manner?

General RECKORD. The president of the association told me that—that is General Immell——

Mr. FREAR. That is General Immell?

NATIONAL FIREARMS ACT    33

General RECKORD. That is General Immell, of Wisconsin, yes, sir.

The CHAIRMAN. But the organization has not met and considered this bill?

General RECKORD. No, sir.

The CHAIRMAN. Then this is your individual opposition rather than the opposition of your organization?

General RECKORD. No, sir.

Mr. WOODRUFF. General, I want to get this perfectly clear. I understood you to say a moment ago that you had been directed by the chief of your organization of adjutants general to appear here as the representative of that organization?

General RECKORD. That is correct.

Mr. WOODRUFF. To present the views of that organization as perhaps indicated to you by the president of the organization?

General RECKORD. Yes, sir; that is correct.

Mr. WOODRUFF. Then you are not speaking in your individual capacity; that is, if you are in opposition to any provision of this bill, it is not necessarily your individual opposition, but it is the opposition, as you understand it, of those organizations which you represent here?

General RECKORD. That is perfectly correct; yes, sir.

Mr. FREAR. General Immell is from my State and district I was just wondering whether he authorized you to appear for that organization, by letter or otherwise.

General RECKORD. Not by letter. But he was in town last week—— and he told me then to appear. I have been the legislative representative for a number of years. It was absolutely a verbal commitment.

Mr. FREAR. Let me ask you just one question, if I may. Would you prefer to have this bill rejected as it is now rather than passed?

General RECKORD. Yes, sir; very much prefer to have it rejected.

Mr. FREAR. I wanted to get your position, that was all.

Mr. TREADWAY. I do not want to interrupt your line of testimony, but in further answer to the question as to whether you had been asked officially to be here, or whether either one of your organizations had taken action on this bill, you rightly replied, no. Is not one reason for that the fact that this bill was introduced only April 11, which would not have given you time to communicate with the officials?

General RECKORD. That is the exact reason, because the Adjutants General met in convention here last week——

Mr. TREADWAY. And knew nothing about this?

General RECKORD. And knew nothing about this bill. Had they known about it I could easily have gotten a resolution directing me to come here in opposition to it.

Mr. TREADWAY. I think that explains it.

The CHAIRMAN. How do you know that, if they have not met?

General RECKORD. I beg your pardon?

The CHAIRMAN. How do you know that, if they have not expressed an opinion?

General RECKORD. Well, Mr. Chairman, I know it because I know those men, have known them for years. We all think more or less alike on the subject of firearms. There are so many provisions in

this bill that are not good, in my humble judgment, that I am confident—maybe that would be a better expression—I am confident that had this bill been before the convention last Monday or Tuesday, I could have had such a commitment.

Mr. REED. These provisions to which you are opposed, have they appeared in other forms in other legislation introduced heretofore, in piecemeal fashion?

General RECKORD. Many of them have not appeared, to my knowledge, until probably 2 or 3 weeks ago when an unnumbered bill was heard in the Senate. That bill was heard before the Senate Judiciary Committee.

Mr. REED. Containing provisions that are in this bill and to which you object?

General RECKORD. Yes, sir; that was the first time we had ever seen those provisions.

Mr. REED. Has your organization in the past considered any of the features of this bill; or features that are contained in provisions of this bill?

General RECKORD. You mean——

Mr. REED. That now appear in this bill; have you discussed those matters in your conventions?

General RECKORD. Not these particular features in convention, because these features just appeared within the last, I should say 2 or 3 weeks or a month.

Mr. REED. I did not know but that perhaps some of these provisions that appear here now have been discussed pro and con in years gone by.

General RECKORD. Many of these features are new and have not been presented before.

May I take this opportunity, Mr. Chairman, to say that the association I represent is absolutely favorable to reasonable legislation. We are responsible for the uniform firearms act being enacted into law by you gentlemen in the District of Columbia. It is on the books now. We are not obstructionists in any way. We want to help you. We offered to help; we carried that offer to the office of the Attorney General of the United States. We thought we were going to be called into conference to work with him. Instead of that, we stumbled upon an unknown bill in the Senate of the United States. We just have not been heard. That is the reason we are asking an opportunity to be heard now.

The CHAIRMAN. In that connection, you say you are favorable to reasonable legislation at this time.

General RECKORD. Yes, sir.

The CHAIRMAN. Therefore you must recognize its importance or necessity. Having recognized that, what steps have you taken yourself to bring such legislation as that to the attention of Congress, if any?

General RECKORD. We conferred with Mr. Keenan, of the Attorney General's office, and we left him believing that we were going to be invited to sit in with the Attorney General, and to work with them in shaping some legislation to bring before Congress. We were surprised, therefore, when we learned legislation had been presented without any reference to us whatever.

The CHAIRMAN. Your organization has presented none?

General RECKORD. The only legislation we have presented to the Congress is what is known as the uniform firearms act, which was passed, and which is now the law of the District of Columbia.

The CHAIRMAN. That does not have any effect outside of the District of Columbia?

General RECKORD. No, sir; that does not. I merely mention that to show you and your committee that we are not here to obstruct the enactment of proper legislation. We want to help. We are against the crook and the racketeer the same as anyone else.

The CHAIRMAN. Who do you think would be in the best position to deal with legislation on this subject? What organization, what official body do you think is in best position to judge what legislation is necessary to deal with the subject matter set forth in this bill? Do you think there is any organization in the United States in a better position to determine that matter than the Department of Justice? I ask that in order that we may understand each other to start with.

General RECKORD. Mr. Chairman, I may be prejudiced, but if this bill is an example, then I do not think they have approached the subject properly.

Mr. TREADWAY. General Reckord, you said that you had been in consultation or contact with a representative of the Attorney General's office?

General RECKORD. Yes, sir.

Mr. TREADWAY. And in what way were you led to believe that your organization would be consulted before legislation were proposed?

General RECKORD. Mr. Treadway, we at our annual meeting held in Washington early in February invited the Attorney General to be present with us to talk upon the subject of fire-arms legislation, so that he would meet us, know who we were and whom we represented.

Mr. TREADWAY. You volunteered that invitation; that is, you were not asked to call in the Attorney General's department?

General RECKORD. No, sir; we did that.

Mr. TREADWAY. You did that of your own free will?

General RECKORD. Yes, sir. Mr. Cummings wrote and said he was sorry but, because of engagements, he could not attend, but would try to arrange to have Mr. Keenan attend. Mr. Keenan did attend, made an after-dinner talk to our body. We enjoyed having him with us and we arranged that evening for Mr. Karl Frederick, of New York, who is here today and is the president of our association——

Mr. TREADWAY. Which association?

General RECKORD. The National Rifle Association of America.

Mr. TREADWAY. I would like to get these associations separated distinctly.

General RECKORD. And myself, to meet with Mr. Keenan the following afternoon.

Mr. TREADWAY. This was in February?

General RECKORD. Yes, sir. We spent about, I would say, at least 3 hours Saturday afternoon with Mr. Keenan in his office discussing this problem; because it is a problem. It is a hard problem. We realize that. We discussed it with Mr. Keenan for 3 hours, and it was at that time that Mr. Keenan made the remark that he would

prefer to go slowly and get proper legislation rather than to move rapidly and get something that was not just right.

He gave us every indication that he would confer with us and that we would be allowed to make suggestions and present the thought of our association. We were never given any further opportunity.

Mr. TREADWAY. This bill was introduced by Mr. Sumners, Chairman of the Committee on the Judiciary, marked "by request."

General RECKORD. Yes, sir.

Mr. TREADWAY. Do you know whether that request was Mr. Keenan's? Did Mr. Keenan prepare this bill, so far as you know, or are you not aware of that?

General RECKORD. If I may say so, may best knowledge is to the effect that it was prepared in the Attorney General's office; yes, sir.

Mr. TREADWAY. And if prepared in the Attorney General's office you feel confident that Mr. Keenan knew something about it?

General RECKORD. Well, Mr. Treadway, I know that it was prepared there and I know that Mr. Keenan knew all about it.

The CHAIRMAN. Will you now proceed to take up your objections one by one and explain them, with any suggestions that you have to offer?

General RECKORD. Mr. Doughton, if I may, I would like to present Mr. Karl Frederick, who is the President of the National Rifle Association of America. He is the vice president of the United States Revolver Association. He is a member of the Campfire Club. He is also a member of the New York Fish, Game, and Forest League and is vice president of the New York Conservation Council, Inc.; a former member of the Commission on Fire Arms Legislation of the National Crime Commission.

The CHAIRMAN. Mr. Frederick, will you please come forward and give your name and address to the reporter, for the record?

## STATEMENT OF KARL T. FREDERICK, PRESIDENT NATIONAL RIFLE ASSOCIATION OF AMERICA, 128 BROADWAY, NEW YORK CITY

Mr. FREDERICK. My name is Karl T. Frederick, 128 Broadway, New York.

I think the General has sufficiently indicated, unless some of you wish me to elaborate upon it, my representation and background.

I have been giving this subject of firearms regulation intense study and consideration over a period of 15 years, and the suggestions resulting from that study of mine and the people with whom I have been associated, such as the National Conference of Commissioners on Uniform Laws, have resulted in the adoption in many States of regulatory provisions suggested by us.

As General Reckord indicated, the national act for the District of Columbia is the uniform firearms act which was first drafted by me about 14 years ago, and which was, in that early time, brought to the attention of the National Conference of Commissioners of Uniform Laws, who appointed a subcommittee under the chairmanship of Mr. Imlay, who is here, and which gave about 7 years of study to the matter; which produced the most extensive and thoroughgoing investigation of the subject of firearms control that has ever been made by anybody in this country; and resulted, after successive

revisions, in the final form of the uniform act which has been, as I say, adopted by the Congress for the District of Columbia.

It is the law in Pennsylvania. It has been the law in California for many years. Portions of it are to be found in New York, New Jersey, Indiana, New Hampshire, and many other States.

This subject is a subject to which a large amount of careful and intensive thought has been given. I must, however, apologize to your committee if, as I anticipate, the remarks which I have to make with respect to this particular bill appear to be somewhat disconnected and not presented with the logical form with which I would otherwise desire to present them. The reason for that is that since I arrived this morning on the night train I have for the first time seen the bill. I have had earlier bills which were first presented in the Senate and I have had some typewritten notes with respect to some prospective contents of a bill which was supposed or expected shortly to appear in the House.

My consideration has, therefore, been almost wholly based upon that earlier and somewhat scrappy information which has come to me; because, as I say, this printed bill I have seen for the first time this morning.

As General Reckord said, we regret that we are forced to appear without having had an opportunity to completely formulate our views. We had expected that we would be, as he said, informed as to the proposals emanating concretely from the Attorney General's office. But, apart from the conference which I had with General Reckord and with Mr. Keenan about 2½ months ago, and apart from a courteous letter of acknowledgement of certain information which I sent to him about 6 weeks ago, I have had no information whatever with respect to their proposals from the Attorney General's office.

I will come immediately to certain concrete criticisms which I think should properly be made of this bill, and in the course of my remarks I shall be glad to attempt to answer any questions any of you desire to address to me, and I may from to time branch out a little bit into consideration of the more general features of such legislation which underlie the entire subject.

The first criticism that I have to make is on page 1, lines 8 to 10. The definition of the term "machine gun" I think is wholly inadequate and unsatisfactory. A gun which fires automatically or semiautomatically less than 12 shots is not under this definition a machine gun. And yet, in my opinion, it is in fact a machine gun and should be so classified.

The well-known Thompson submachine gun which has figured in the papers extensively; the so-called "Browning" automatic rifle or the Monitor rifle, which is a somewhat similar weapon designed for police use, are both in fact capable of being operated automatically and semiautomatically. The number of shots which they may discharge is dependent solely on the size or the content of the magazine and if you use those guns with magazines holding only 11 shots they would not be, within the terms of this bill, a machine gun.

Mr. WOODRUFF. Will you yield for a question there?

Mr. FREDERICK. Certainly.

Mr. WOODRUFF. As a matter of fact, the only thing that controls or limits the number of shots that an automatic rifle or shotgun can fire is the magazine itself, is it not?

Mr. FREDERICK. I think that is correct.

Mr. WOODRUFF. That is the only way in which you can limit the number of shots that can be fired. And it is a very simple matter, is it not, to change the magazine or the clip or whatever they use to hold these cartridges, to meet any restrictions, particularly restrictions such as are proposed in the paragraph at the bottom of the first page of this bill?

Mr. FREDERICK. In general, that is true. I propose, however, to suggest a definition of machine gun which I think obviates your objection.

Mr. WOODRUFF. I will say that my position is exactly the same as the gentleman's in regard to this paragraph. I am in perfect harmony with you on this.

Mr. FREDERICK. And which I venture to suggest will lay before you a more concrete definition of what is a machine gun.

Mr. FREAR. Will you please give it? That is what we are trying to get.

Mr. COOPER. Mr. Chairman, may I ask a question before the witness proceeds to do that?

The CHAIRMAN. Mr. Cooper.

Mr. COOPER. The guns to which you have referred, how many of those are now manufactured with the type of magazine mentioned by you, firing less than 12 shots?

Mr. FREDERICK. I cannot answer your question, I do not know. But I say that it would be a perfectly simple thing for smaller magazines to be prepared.

Mr. COOPER. I understand you say that it is possible for such type of weapon to be constructed, but I am asking you what the situation is now with reference to the manufacture and sale of the type of weapon to which you refer.

Mr. FREDERICK. I cannot answer that, because I do not know. The definition which I suggest is this:

A machine gun or submachine gun as used in this act means any firearm by whatever name known, loaded or unloaded, which shoots automatically more than one shot without manual reloading, by a single function of the trigger.

The distinguishing feature of a machine gun is that by a single pull of the trigger the gun continues to fire as long as there is any ammunition in the belt or in the magazine. Other guns require a separate pull of the trigger for every shot fired, and such guns are not properly designated as machine guns. A gun, however, which is capable of firing more than one shot by a single pull of the trigger, a single function of the trigger, is properly regarded, in my opinion, as a machine gun.

Mr. HILL. May I ask you a question there?

Mr. FREDERICK. Yes, sir.

Mr. HILL. Suppose your definition were adopted. Would it be practicable to manufacture a gun that would be classed either as an automatic or semiautomatically operated gun, even with more than one function of the trigger, and still answer the purpose, in a large way, of a machine gun which requires only one function of the trigger?

Mr. FREDERICK. I do not think so. For purposes of example, you may look at the automatic pistol which is the standard weapon of the United States Army. That has an automatic discharge of the empty cartridge and a reloading principle which is operated by the

force of the gas from the exploded cartridge. But with a single pull of the trigger only one shot is fired. You must release the trigger and pull it again for the second shot to be fired. You can keep firing that as fast as you can pull your trigger. But that is not properly a machine gun and in point of effectiveness any gun so operated will be very much less effective than one which pours out a stream of bullets with a single pull and as a perfect stream.

Mr. HILL. In one sense you are limiting the scope of this definition and in another you are broadening it. When you say that any weapon or any gun that will shoot more than once is a machine gun, you are broadening the definition. But when you say "one operation of the trigger" you may be limiting the definition as it is in this bill, as I see it, because this says nothing about what operation of the trigger is necessary to constitute the machine gun.

Mr. FREDERICK. If I understand your remark, Mr. Hill, I think that is quite true. I am including within the definition, however, everything that I think is a machine gun instead of including only those machine guns which fire 12 or more shots without reloading.

Mr. HILL. The point I am making is, why include in your definition the phrase, "with one function of the trigger"?

Mr. FREDERICK. Because that is the essence of a machine gun. Otherwise you have the ordinary repeating rifle. You have the ordinary shotgun which is in no sense and never has been thought of as a machine gun.

Mr. FREAR. You are attempting to cover more than is embodied in this bill?

Mr. FREDERICK. I am trying to bring within this everything that, in my opinion should be included under the term "machine gun."

Mr. FREAR. That would be desirable.

Mr. FREDERICK. I should not like, if there is to be legislation with respect to machine guns, to have machine guns capable of firing up to 12 shots exempted from the operations of this bill.

Mr. COCHRAN. Mr. Frederick, under your proposed definition, would the Colt automatic pistol be a machine gun?

Mr. FREDERICK. No, sir. I do not think that in the eyes of any ballistic engineer it would be so regarded. I do not think it should be so regarded.

Mr. COCHRAN. Does not the Colt automatic pistol continue to shoot as long as you exert pressure upon the trigger?

Mr. FREDERICK. No, sir. It requires a separate pull of the trigger for every shot fired.

Mr. HILL. If the Colt automatic pistol could fire 12 times, would it be a machine gun under this definition in the bill?

Mr. FREDERICK. Under the definition as printed in the bill?

Mr. HILL. Yes.

Mr. FREDERICK. I do not know what the language means, "automatically or semiautomatically." The language is not, as I read it, and from my limited knowledge of firearms and ballistics—which has some scope, but I do not pretend to be a finished master in that; I am a lawyer, I am not a firearms manufacturer—I do not know what "automatically or semiautomatically" means. There are automatic features about the Colt pistol in the sense that when a shot is fired the action of the gas not only expels the bullet from one

end of the barrel, but it expels the empty shell from the other end, and it is so devised that upon the return of the carriage through a spring, it puts another shell in place of the old one. That is in a sense automatic, and that principle is found in machine guns. But that is not the distinguishing features of a machine gun.

Mr. FREAR. The question in my mind and I think in the majority of the committee is what we can do to aid in suppressing violations by such men as Dillinger and others. Do you think that by your proposed amendment you have aided in that result?

Mr. FREDERICK. I believe so.

Mr. FREAR. Then what is the purpose of any longer discussing that? Why not go on to something else?

Mr. FREDERICK. If none of you gentlemen desires to discuss that particular feature——

Mr. FREAR. You are a lawyer, you are not a firearms manufacturer, as you have said. Let us assume that we accept your proposed suggestion. I suggest that we pass it and get to the other serious questions that are involved in the bill.

Mr. FREDERICK. Another objection which appears to me to be serious is that there appears to be no distinction—I do not know what figures it is intended to insert on page 3 in the matter of taxes or licenses, but it would seem that it was intended to insert a single figure.

Mr. HILL. What line?

Mr. FREDERICK. I am speaking of line 5, page 3.

Mr. HILL. It has been suggested that in the first blank you insert $5,000 and in the second blank $200. That is only a suggestion.

Mr. FREDERICK. There is, as I see it, no provision made in the act for the jobber, who is the general distributor to dealers of pistols. It seems to me that from the little I know of the manner in which the business is conducted, because I have not and never have had any connection with the business of firearms—as I understand it, the jobber plays an essential part in the firearms business. I understand that it would be quite impossible for the manufacturer to pass upon the credit questions and the other matters which arise, as between the ultimate dealer and his supplier. It has suggested itself to my mind that one of the purposes of this bill was to destroy the jobber and to eliminate all but the largest and the wealthiest and the strongest individual dealers.

The CHAIRMAN. Do you mean dealers or manufacturers?

Mr. FREDERICK. I mean dealers. I think an annual fee of $200 a year will eliminate 95 percent of the dealers in pistols.

Mr. LEWIS. What is your definition of dealer? What does it include? Does it include the village storekeeper who sells pistols?

Mr. FREDERICK. Yes, sir.

Mr. HILL. The definition is on page 2, beginning with line 11:

The term "dealer" means any person not a manufacturer or importer engaged within the continental United States in the business of selling firearms. The term "dealer" shall include pawn brokers and dealers in used firearms.

That would include jobbers, I take it.

Mr. FREDERICK. It is possible, but the jobber does not fit very logically into the picture that is here defined.

Mr. FREAR. If we insert that, would that be sufficient to meet your objection? That is, after the words "pawn brokers and dealers" add

Mr. FREDERICK. I would have to examine the bill in order to give a really intelligent answer to your question.

Mr. FREAR. Can you give us a constructive amendment?

Mr. FREDERICK. I must again refer you to the fact that this is the first morning I have seen this particular bill, and I am not prepared to give you that particular suggestion. But I think that provision ought to be made for the jobber and I think that provision ought to be made so that this will not destroy 95 percent of the small dealers throughout the country.

Mr. FREAR. On what do you base that statement?

Mr. FREDERICK. A tax, I say, of $200 per year will eliminate 95 percent of the dealers, in my opinion.

Mr. FREAR. On what is your opinion based?

Mr. FREDERICK. My general experience and practical contact with dealers, and observation of those who deal in firearms and such things, over a good many years.

Mr. HILL. What figure would you suggest?

Mr. FREDERICK. That takes me into the purposes of this bill. This bill, as I see it, is intended to be a bill for the suppression of crime and is proposed to the United States Congress which ordinarily has no power in such matters, under the guise of a revenue raising bill.

Mr. FREAR. May I ask a question? Are you interested at all in arms manufacturing or anything like that?

Mr. FREDERICK. Not at all, in any way.

Mr. FREAR. They why not offer some constructive criticism? You are complaining about the character of the bill, suggesting what is behind it, the motives behind it, and so forth. Why not offer something constructive that will be helpful to us anywhere along the line?

Mr. FREDERICK. I am try to do so, as rapidly as I can.

Mr. FREAR. If you will read your record, you will find, I understand, that you are attacking the motives generally.

Mr. FREDERICK. Not at all.

I am saying that this bill, practically speaking, destroys the business in firearms of 95 percent of the dealers.

Mr. FREAR. Then why not recommend something, as Mr. Hill has suggested?

Mr. FREDERICK. I shall be glad to submit a recommendation in that respect, as soon as I have had a chance to examine it.

Mr. FREAR. Yes; but do not attack the motives for its introduction. We are not interested in that at this time.

Mr. FREDERICK. I think that the result of this provision here will be to deprive the rural inhabitant, the inhabitant of the small town, the inhabitant of the farm, of any opportunity to secure a weapon which he perhaps more than anyone else needs for his self-defense and protection. I think that it would be distinctly harmful to destroy the opportunity for self-defense of the ordinary man in the small community, where police forces are not adequate.

Mr. HILL. Just tell us how this bill does that.

Mr. FREDERICK. It does it in two or three ways, as I see it. In the first place, it requires Federal documents to be filled out, procured from Federal officials, before a pistol can be purchased. It requires

that pistol to be purchased from a licensed dealer. Now, if the largest and most important and wealthiest dealers, those in the larger cities, are the only dealers to exist who can handle firearms, and if it is required to go to a Federal official who is not to be found readily in rural communities, in the country, in any except the larger communities—if they only are allowed to handle firearms, it seems to me that the practical result will be that the countryman absolutely will be unable, in a practical sense, to obtain any firearm.   There are so many impediments put in his way.   He will be unable to secure a weapon that he needs for his own defense and the defense of his home and family.

Mr. HILL. Do you have reference to the large license fee of $200 as suggested in line 5?

Mr. FREDERICK. I have at this moment, yes.

Mr. HILL. Suppose you made that fee $5, what would be the situation?

Mr. FREDERICK. I do not think that that would be as bad.   I think it would be somewhat serious, but I do not think it would be very serious.   I will tell you why I say that.   The uniform firearms act which we sponsored and which was adopted in Pennsylvania had a provision for $10 license fee for dealers in that State.   That law has been in effect in that State for 3 or 4 years.   I am told that the practical result is that most of the small dealers, country hardware merchants, and so forth, refuse to take out a license and pay $10, because they say it just is not worth it.   They sell maybe three or four guns a year and it is not worth $10 to get the privilege of selling three or four guns.   I think that any substantial license fee will destroy the small dealer in the small community.

Mr. HILL. That is, any appreciable license fee?

Mr. FREDERICK. Any appreciable license fee for dealers.

Mr. HILL. Would the requirement for a license itself do that?

Mr. FREDERICK. I do not think so.   I think if it were a negligible fee—and as I see it, inasmuch as I believe the main purpose behind this bill is a police purpose and not a revenue purpose, it seems to me that that charge should be made quite nominal; it should be made so small that you get actually the police result that you want, namely, the registration of the dealer and the issuance of a license to him, but that should not be made a burden to him in point of dollars and cents.

Mr. HILL. If that should be corrected—it is not really a correction, because there is no sum in there now; any amount that has been spoken of here is merely tentative.   There is no determination as to what that fee shall be.   But if we met the objection on that particular phase, you would be ready to pass on to something else, would you not?

Mr. FREDERICK. Yes.   I want to say one word with respect to the manufacturers.

Mr. COCHRAN. Mr. Chairman, before the witness gets to that, I desire to ask if he will at this point in his remarks insert a copy of the uniform firearms bill which his association has sponsored and which has been adopted in various States?

Mr. HILL. How voluminous is that document?

Mr. FREDERICK. It is about four pages. It is practically the law as it stands in the District of Columbia. I have a copy of it here. There are five pages.

The CHAIRMAN. Without objection, it will be inserted in the record.

Mr. FREDERICK. It is substantially the uniform act.

(The act referred to is as follows:)

[PUBLIC—No. 275—72D CONGRESS]

[H. R. 8754]

AN ACT To control the possession, sale, transfer, and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties, to prescribe rules of evidence, and for other purposes

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

### DEFINITIONS

SECTION 1. "Pistol," as used in this Act, means any firearm with a barrel less than twleve inches in length.

"Sawed-off shotgun," as used in this Act, means any shotgun with a barrel less than twenty inches in length.

"Machine gun," as used in this Act, means any firearm which shoots automatically or semiautomatically more than twelve shots without reloading.

"Person," as used in this Act, includes, individual, firm, association, or corporation.

"Sell" and "purchase" and the various derivatives of such words, as used in this Act, shall be construed to include letting on hire, giving, lending, borrowing, and otherwise transferring.

"Crime of violence" as used in this Act, means any of the following crimes, or an attempt to commit any of the same, namely: Murder, man slaughter, rape, mayhem, maliciously disfiguring another, abduction, kidnaping, burglary, housebreaking, larceny, any assault with intent to kill, commit rape, or robbery, assault with a dangerous weapon, or assault with intent to commit any offense punishable by imprisonment in the penitentiary.

### COMMITTING CRIME WHEN ARMED

SEC. 2. If any person shall commit a crime of violence in the District of Columbia when armed with or having readily available any pistol or other firearm, he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than five years; upon a second conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than ten years; upon a third conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than fifteen years; upon a forth or subsequent conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonement for an additional period of not more than thirty years.

### PERSONS FORBIDDEN TO POSSESS CERTAIN FIREARMS

SEC. 3. No person who has been convicted in the District of Columbia or elsewhere of a crime of violence shall own or have in his possession a pistol, within the District of Columbia.

### CARRYING CONCEALED WEAPONS

SEC. 4. No person shall within the District of Columbia carry concealed on or about his person, except in his dwelling house or place of business or on other land possessed by him, a pistol, without a license therefor issued as hereinafter provided, or any deadly or dangerous weapon.

### EXCEPTIONS

SEC. 5. The provisions of the preceding section shall not apply to marshals, sheriffs, prison or jail wardens, or their deputies, policemen or other duly appointed law-enforcement officers, or to members of the Army, Navy, or Marine Corps of

the United States or of the National Guard or Organized Reserves when on duty, or to the regularly enrolled members of any organization duly authorized to purchase or receive such weapons from the United States, provided such members are at or are going to or from their places of assembly or target practice, or to officers or employees of the United States duly authorized to carry a concealed pistol, or to any person engaged in the business of manufacturing, repairing, or dealing in firearms, or the agent or representative of any such person having in his possession, using, or carrying a pistol in the usual or ordinary course of such business or to any person while carrying a pistol unloaded and in a secure wrapper from the place of purchase to his home or place of business or to a place of repair or back to his home or place of business or in moving goods from one place of abode or business to another.

### ISSUE OF LICENSES TO CARRY

SEC. 6. The superintendent of police of the District of Columbia may, upon the application of any person having a bona fide residence or place of business within the District of Columbia or of any person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his person issued by the lawful authorities of any State or subdivision of the United States, issue a license to such person to carry a pistol within the District of Columbia for not more than one year from date of issue, if it appears that the applicant has good reason to fear injury to his person or property or has any other proper reason for carrying a pistol and that he is a suitable person to be so licensed. The license shall be in duplicate, in form to be prescribed by the Commissioners of the District of Columbia and shall bear the name, address, description, photograph, and signature of the licensee and the reason given for desiring a license. The original thereof shall be delivered to the licensee, and the duplicate shall be retained by the superintendent of police of the District of Columbia and preserved in his office for six years.

### SELLING TO MINORS AND OTHERS

SEC. 7. No person shall within the District of Columbia sell any pistol to a person who he has reasonable cause to believe is not of sound mind, or is a drug addict, or is a person who has been convicted in the District of Columbia or elsewhere of a crime of violence or, except when the relation of parent and child or guardian and ward exists, is under the age of eighteen years.

### TRANSFERS REGULATED

SEC. 8. No seller shall within the District of Columbia deliver a pistol to the purchaser thereof until forty-eight hours shall have elapsed from the time of the application for the purchase thereof, except in the case of sales to marshals, sheriffs, prison or jail wardens or their deputies, policemen, or other duly appointed law-enforcement officers, and, when delivered, said pistol shall be securely wrapped and shall be unloaded. At the time of applying for the purchase of a pistol the purchaser shall sign in duplicate and deliver to the seller a statement containing his full name, address, occupation, color, place of birth, the date and hour of application, the caliber, make, model, and manufacturer's number of the pistol to be purchased and a statement that he has never been convicted in the District of Columbia or elsewhere of a crime of violence. The seller shall, within six hours after such application, sign and attach his address and deliver one copy to such person or persons as the superintendent of police of the District of Columbia may designate, and shall retain the other copy for six years. No machingun, sawed-off shotgun, or blackjack shall be sold to any person other than the persons designated in section 14 hereof as entitled to possess the same, and then only after permission to make such sale has been obtained from the superintendent of police of the District of Columbia. This section shall not apply to sales at wholesale to licensed dealers.

### DEALERS TO BE LICENSED

SEC. 9. No retail dealer shall within the District of Columbia sell or expose for sale or have in his possession with intent to sell, any pistol, machine gun, sawed-off shotgun, or blackjack without being licensed as hereinafter provided. No wholesale dealer shall, within the District of Columbia, sell, or have in his possession with intent to sell, to any person other than a licensed dealer, any pistol, machine gun, sawed-off shotgun, or blackjack.

## DEALERS' LICENSES, BY WHOM GRANTED AND CONDITIONS THEREOF

SEC. 10. The Commissioners of the District of Columbia may, in their discretion, grant licenses and may prescribe the form thereof, effective for not more than one year from date of issue, permitting the licensee to sell pistols, machine guns, sawed-off shotguns, and blackjacks at retail within the District of Columbia subject to the following conditions in addition to those specified in section 9 hereof, for breach of any of which the license shall be subject to forfeiture and the licensee subject to punishment as provided in this Act.

1. The business shall be carried on only in the building designated in the license.

2. The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can be easily read.

3. No pistol shall be sold (a) if the seller has reasonable cause to believe that the purchaser is not of sound mind or is a drug addict or has been convicted in the District of Columbia or elsewhere of a crime of violence or is under the age of eighteen years, and (b) unless the purchaser is personally known to the seller or shall present clear evidence of his identity. No machine gun, sawed-off shotgun, or blackjack shall be sold to any person other than the persons designated in section 14 hereof as entitled to possess the same, and then only after permission to make such sale has been obtained from the superintendent of police of the District of Columbia.

4. A true record shall be made in a book kept for the purpose, the form of which may be prescribed by the Commissioners, of all pistols, machine guns, and sawed-off shotguns in the possession of the licensee, which said record shall contain the date of purchase, the caliber, make, model, and manufacturer's number of the weapon, to which shall be added, when sold, the date of sale.

5. A true record in duplicate shall be made of every pistol, machine gun, sawed-off shotgun, and blackjack sold, said record to be made in a book kept for the purpose, the form of which may be prescribed by the Commissioners of the District of Columbia and shall be personally signed by the purchaser and by the person effecting the sale, each in the presence of the other and shall contain the date of sale, the name, address, occupation, color, and place of birth of the purchaser, and, so far as applicable, the caliber, make, model, and manufacturer's number of the weapon, and a statement signed by the purchaser that he has never been convicted in the District of Columbia or elsewhere of a crime of violence. One copy of said record shall, within seven days, be forwarded by mail to the superintendent of police of the District of Columbia and the other copy retained by the seller for six years.

6. No pistol or imitation thereof or placard advertising the sale thereof shall be displayed in any part of said premises where it can readily be seen from the outside. No license to sell at retail shall be granted to anyone except as provided in this section.

### FALSE INFORMATION FORBIDDEN

SEC. 11. No person, shall, in purchasing a pistol or in applying for a license to carry the same, or in purchasing a machine gun, sawed-off shotgun, or blackjack within the District of Columbia, give false information or offer false evidence of his identify.

### ALTERATION OF IDENTIFYING MARKS PROHIBITED

SEC. 12. No person shall within the District of Columbia change, alter, remove, or obliterate the name of the maker, model, manufacturer's number, or other mark or identification on any pistol, machine gun, or sawed-off shotgun. Possession of any pistol, machine gun, or sawed-off shotgun upon which any such mark shall have been changed, altered, removed, or obliterated shall be prima facie evidence that the possessor has changed, altered, removed, or obliterated the same within the District of Columbia: *Provided, however,* That nothing contained in this section shall apply to any officer or agent of any of the departments of the United States or the District of Columbia engaged in experimental work.

### EXCEPTIONS

SEC. 13. This Act shall not apply to toy or antique pistols unsuitable for use as firearms.

### POSSESSION OF CERTAIN DANGEROUS WEAPONS

Sec. 14. No person shall within the District of Columbia possess any machine gun, sawed-off shotgun, or any instrument or weapon of the kind commonly known as a blackjack, slung shot, sand club, sandbag, or metal knuckles, nor any instrument, attachment, or appliance for causing the firing of any firearm to be silent or intended to lessen or muffle the noise of the firing of any firearms: *Provided, however,* That machine guns, or sawed-off shotguns, and blackjacks may be possessed by the members of the Army, Navy, or Marine Corps of the United States, the National Guard, or Organized Reserves when on duty, the Post Office Department or its employees when on duty, marshals, sheriffs, prison or jail wardens, or their deputies, policemen, or other duly appointed law-enforcement officers, officers or employees of the United States duly authorized to carry such weapons, banking institutions, public carriers who are engaged in the business of transporting mail, money, securities, or other valuables, wholesale dealers and retail dealers licensed under section 10 of this Act.

### PENALTIES

Sec. 15. Any violation of any provision of this Act for which no penalty is specifically provided shall be punished by a fine of not more than $1,000 or imprisonment for not more than one year, or both.

### CONSTITUTIONALITY

Sec. 16. If any part of this Act is for any reason declared void, such invalidity shall not affect the validity of the remaining portions of this Act.

### CERTAIN ACTS REPEALED

Sec. 17. The following sections of the Code of Law for the District of Columbia, 1919, namely, sections 835, 856, and 857, and all other Acts or parts of Acts inconsistent herewith, are hereby repealed.

Approved, July 8, 1932.

The CHAIRMAN. In what sense is the possession of a pistol essential to the self-defense of people who live in rural communities, as you have stated? Do you mean it is essential to the self-defense of an individual who is out on the highway, or in his home? In what sense is a pistol essential to the self-defense of an individual who lives in a rural community? Why is not a rifle or a shotgun, the possession of which would not be prohibited under this act, sufficient for the self-defense of an individual or an individual's home? In what sense did you mean that? You know, most of the States have laws against carrying concealed weapons.

Mr. FREDERICK. Exactly. I think those are quite proper laws and are the only effective laws.

The CHAIRMAN. Then it can be that you are referring only to the possession of a pistol in the home.

Mr. FREDERICK. No; because many people do find occasion to carry pistols, and do so under license.

The CHAIRMAN. That would not necessarily be a matter of self-defense, would it?

Mr. FREDERICK. Oh, yes, in many, many instances.

The CHAIRMAN. I never heard of it.

Mr. FREDERICK. I have heard of it in hundreds of instances.

Mr. FREAR. My experience is that the average person who carries a revolver is not one who lives in a rural district, but in New York or Chicago and such places that Dillinger and men of his type are found.

Mr. McCORMACK. All of those fellows are country-born boys. They do not come from the big cities. I understand that most of them are country boys originally.

Mr. FREAR. The man against whom we are trying to legislate is Dillinger and men of his type.

Mr. FREDERICK. If there is any feasible way of getting that type of man, I would like to know it.

Mr. FREAR. We are trying to. In all of your experience in these matters, have you drawn a bill which had for its purpose that end?

Mr. FREDERICK. I have spent 15 years studying the subject and I have worked with the National Crime Commission. One of the results of my work has been a contribution toward the uniform act which, in my opinion, has made——

Mr. FREAR. Have you put it in force in New York?

Mr. FREDERICK. I have tried to.

Mr. FREAR. We are trying to put some law into effect.

Mr. FREDERICK. Several of the provisions have been adopted in the law of New York. I have conducted campaigns for two successive years——

Mr. FREAR. You said your experience covered 15 years.

Mr. FREDERICK. I said that in New York State I have conducted campaigns in support of bills which I have caused to be introduced in the legislature.

Mr. FREAR. We do not want to have to wait 15 years more, do we?

Mr. FREDERICK. Mr. Chairman, in respect to the manufacturer, the manufacturer's license is $5,000 a year, and that must refer solely to the big manufacturers, of whom there are four or five in this country. There are smaller manufacturers who would be put out of business completely by any such tax as $5,000 a year and yet who perform an extremely useful function, when looked at from a certain standpoint.

Mr. FREAR. Could we not base that on the amount of sales?

Mr. FREDERICK. Yes, I think that could be quite easily done. I am referring to the makers of handmade pistol barrels, of whom there are a number in this country. They make the finest and highest type of target weapons that are to be found and they do it entirely by hand; I mean, with a hand lathe. Their guns have been used for 25 years in both the National and the International shooting competition. I have myself been a member of five or six international pistol teams and in every one of those I have used hand-made guns, hand-made barrels, because they were a little bit finer than any others that could be bought in my opinion.

Every one of those barrels was made by a man who is a past master of that field of ballistics, and who can, in my opinion, make a finer barrel than any manufacturer in the business.

The CHAIRMAN. Does he make the entire gun or just the barrel?

Mr. FREDERICK. He makes the barrel.

The CHAIRMAN. He would not come under the provisions of this bill, would he?

Mr. FREDERICK. I do not know. He is a manufacturer. He goes over the whole gun, revises the trigger pull, changes the hammer and does a lot of things to it.

The CHAIRMAN. But he is not a manufacturer of a gun. He assembles the parts and puts them together. He is not a manufacturer, is he?

Mr. FREDERICK. I suspect that he is.

The CHAIRMAN. I suspect that he is not. I do not see how he can be considered a manufacturer of a gun if he only makes the barrel.

Mr. FREDERICK. He might buy the action from one man. If he made the barrel and then put it together with the other parts, he would be a manufacturer of that gun, just as much as a man who bought automobile wheels from one place and a wiring system from another and a motor from another manufacturer and assembled them and sold them under his name—he would be a manufacturer.

The CHAIRMAN. If he bought all the parts and assembled them and sold the finished gun, I suppose he would be a manufacturer.

Mr. KNUTSON. This man to whom you refer, does he assemble the gun?

Mr. FREDERICK. He will take a gun, take off the old barrel and make a new barrel, put it on, make over the hammer, make over the trigger pull, make over the spring and do a variety of other things with it, so that the gun, you might say, was a reassembled gun after he was through with it.

Mr. KNUTSON. What we would call a rebuilt gun.

Mr. FREDERICK. It really is, I should say so.

Mr. KNUTSON. And you think he would be a manufacturer?

Mr. FREDERICK. I suspect that he would be a manufacturer within the terms of this act.

Mr. HILL. Assuming he is a manufacturer, of course in a small way so far as output is concerned, there has been a suggestion made here that the situation might be met by a graduated tax, depending upon the volume of the output.

Mr. FREDERICK. I think so.

Mr. HILL. If that can be done, the objection you make there does not go to the principle of the legislation, but simply to the particular provision as to license.

Mr. FREDERICK. That is quite true.

Mr. HILL. Your objection, then, is not to the principle, but simply to the prohibitive tax?

Mr. FREDERICK. It is to the prohibitive nature of the tax.

Mr. HILL. So that if we met that by a graduated tax on the manufacturer, your objection would be satisfied?

Mr. FREDERICK. I think so. I have no objection—to put it this way—to the principle of a Federal license designed not to destroy, but to secure a police registration of both manufacturers and dealers.

Mr. HILL. I think the committee would be very much interested in your directing our attention to the real objections to the bill. Of course, the suggestions you are making now are helpful.

The CHAIRMAN. May I ask, how long would it take you, if it were feasible, to prepare a bill better than you think the pending bill is, and one that would accomplish the purpose we have in mind, for the protection of society, to reach the end the Department of Justice has in mind, and submit it to the committee? That would be constructive, that would be practical, that would be helpful.

Mr. FREDERICK. In my opinion, the useful results which can be accomplished by firearms legislation are extremely limited.

The CHAIRMAN. That means that there is little ground left upon which to legislate or very little necessity for legislation, that there is little to be accomplished by it? Is that your view? I am not arguing with you, you understand. I just want to understand your viewpoint.

Mr. FREDERICK. In my opinion, there is a small area in which legislation which is useful in its results can be prepared.

The CHAIRMAN. Why not submit a bill to us that in your judgment would accomplish all that is possible to accomplish or practical to accomplish along that line?

Mr. FREDERICK. I should be very glad to submit a written memorandum containing some concrete suggestions.

Mr. KNUTSON. Let me ask you a question right at that point. Do you know of many illicit manufacturers of firearms? I think I read in the paper last evening a statement to the effect that the Department of Justice had seized an arsenal largely made up of guns manufactured illicitly, or unregistered, however they term them.

Mr. FREDERICK. I do not know of any illicit manufacturers.

Mr. LEWIS. Why should there be any illicit manufacturers in the absence of all law that now prevails in this field?

Mr. FREDERICK. I did not quite get your question.

Mr. LEWIS. I cannot fancy the motive for illicit manufacture of these things when we are almost without any laws on the subject whatever.

Mr. FREDERICK. I may say that a gun is a very easy thing to make, that a third-class automobile mechanic can make a pistol which will do deadly work, and can do it in an afternoon with the materials which he can find in any automobile shop. And I can say that it has been done time and time and time again.

Mr. LEWIS. What makes it illicit?

Mr. FREDERICK. I suppose what makes it illicit is the purpose for which such guns are made. If it is not against the law to make a gun, then there is nothing illicit in connection with it. But when such a gun is manufactured in a State prison and is used by an inmate for the purpose of perpetrating his escape from jail, I think that is illicit manufacture, and such guns have been made in prison, in prison machine shops.

Mr. FREAR. It turns on the motive?

Mr. FREDERICK. Yes; it turns on the motive.

Mr. FREAR. How are you going to determine that in advance?

Mr. FREDERICK. I do not know of any way in which you can get at that. I am simply saying that the actual manufacture of pistols is an easy thing. It is not the extraordinarily complicated trick which many people think. In the same way ammunition can be easily made or easily procured.

Mr. COOPER. Mr. Frederick, I understood you to say that you drafted the act which was passed for the District of Columbia?

Mr. FREDERICK. I drafted the original act about 1922 and worked with the National Conference of Commissioners on uniform laws in making successive revisions and improvements of that act up until the time of the final adoption of their redraft of it. This act in the District of Columbia has a few minor changes from that standard form and I participated in the preparation of those changes. I do not want to say that I personally did it, because I did not. I helped.

Mr. COOPER. The act passed for the District of Columbia was at least in part the product of your effort?

Mr. FREDERICK. I helped from the beginning.

Mr. COOPER. And had your complete approval?

Mr. FREDERICK. Yes, sir. And I helped from the very beginning.

Mr. COOPER. I understood you to criticize the definition of machine guns contained in the pending bill. I invite your attention to this provision of the District of Columbia Act, under the heading "definitions."

"Machine gun", as used in this act, means any firearm which shoots automatically or semi-automatically more than 12 shots without reloading.

Then I invite your attention to the provision of the pending bill as to the definition of a machine gun.

The term "machine gun" means any weapon designed to shoot automatically or semiautomatically 12 or more shots without reloading.

I will ask you to kindly point out to the committee the difference between those two definitions.

Mr. FREDERICK. I take it there is no essential difference. I may, however, answer what I take to be your suggested criticism, by saying that the uniform Firearms Act related exclusively to pistols and it had not any provisions whatever relating to machine guns which we regarded as proper subject for separate legislation; that this provision in the District of Columbia Act was added at the request of the police forces here in the District of Columbia. I had no part in the preparation of that definition or that part of the act, and I would not regard it as a proper definition of a machine gun.

Mr. COOPER. And yet that definition is contained in the act which you say had your approval.

Mr. FREDERICK. As a whole, it had my approval; certainly.

Mr. COOPER. And that was the definition that met your approval at the time the District of Columbia Act was passed by Congress, and it contains essentially the same definition as is contained in the pending bill?

Mr. FREDERICK. Quite true. My approval of that act was a general approval, of course, and I may very well have had one or two mental reservations as to minor portions of it. But as a whole I approved the act.

Mr. COOPER. Passing on to other phases of this bill, will you please point out the other objectionable features that you have, briefly, and without elaborating to such great extent? Just point out to us what you think the additional objectionable features are to the pending bill.

Mr. FREDERICK. The bill makes no provision whatever for an exception of antique or obsolete weapons. I happen, and there are thousands of other people who happen, to be the owner of obsolete weapons. They are pistols within the definition of this act. Theoretically, they might be used, but I have never heard of one being used in the perpetration of a crime. They are found in the museums and in the collections of private collectors. You cannot imagine a hold-up man using a flintlock, or a wheel-lock pistol.

Mr. LEWIS. How far back would you go in point of time to draw the line between antique and present-day weapons?

Mr. FREDERICK. I would say that we should except obsolete or antique pistols possessed as curiosities or ornaments.

I think there should be an exemption relating to such collections, and I may suggest that if I had, as I have, 300 or 400 or 500 such old weapons, and if I happened to move my residence to New Jersey, under this bill I would have to get a separate license for every one of those 300 or 400 or 500 weapons, in order to legally transport them to New Jersey.

The CHAIRMAN. If that were taken care of, would that remove your objection?

Mr. FREDERICK. I may remind you that the busines of numbering weapons is a modern device and it is not found in the older weapons. It is impossible in the case of many of the older weapons to comply with the terms of this bill by giving the descriptive numbers. I have dozens and hundreds of weapons and I cannot tell who made them. There are no distinguishing marks upon them. They were made by hand up until a little more than a hundred years ago.

Mr. DICKINSON. I will ask you whether or not this bill interferes in any way with the right of a person to keep and bear arms or his right to be secure in his person against unreasonable search; in other words, do you believe this bill is unconstitutional or that it violates any constitutional provision?

Mr. FREDERICK. I have not given it any study from that point of view. I will be glad to submit in writing my views on that subject, but I do think it is a subject which deserves serious thought.

Mr. DICKINSON. My mind is running along the lines that it is constitutional.

Mr. McCORMACK. You have been living with this legislation or following this type of legislation for quite a number of years.

Mr. FREDERICK. Yes; I have.

Mr. McCORMACK. The fact that you have not considered the constitutional aspect would be pretty powerful evidence, so far as I am concerned, that you did not think that question was involved.

Mr. FREDERICK. No; I would not say that, because my view has been that the United States has no jurisdiction to attack this problem directly. I think that under the Constitution the United States has no jurisdiction to legislate in a police sense with respect to firearms. I think that is exclusively a matter for State regulation, and I think that the only possible way in which the United States can legislate is through its taxing power, which is an indirect method of approach, through its control over interstate commerce, which was perfectly proper, and through control over importations. I have not considered the indirect method of approach as being one which was to be seriously considered until the bill began to be talked about.

Mr. McCORMACK. You would not seriously consider that there was any constitutional question involved in this bill, would you?

Mr. FREDERICK. I think this bill goes pretty far for a revenue bill in the direction of setting up what are essentially police regulations.

Mr. McCORMACK. Congress possesses the power, if it is required, to exercise the taxing power for the regulation of social purposes.

Mr. FREDERICK. I know, and it has been frequently exercised, and I suppose that Congress can pass, under its taxing power, what are in effect regulatory statutes, as it has in many instances, such as the acts relating to oleomargarine and other things.

Mr. McCORMACK. I quite agree with you. The thought in my mind was the fact you had not considered the constitutional phase, and

being the student you are, and following this particular type of legislation as closely as you have, it would be a powerful piece of evidence, and at least I would draw the inference, that you did not think the question was seriously involved.

Mr. FREDERICK. I may say that approached as a taxing proposition I am personally of the opinion, as a lawyer, that Congress may legislate in the way of taxing certain transactions with respect to firearms. That, I think, is clear.

Mr. LEWIS. Mr. Frederick, the automobile is a dangerous, even a deadly instrument, but never intentionally a deadly instrument, of course. States uniformly have taken notice of the danger to the innocent pedestrian and others involved in the use of the automobile. They have set up around the privilege of its ownership and operation a complete regulatory system consistent with reasonable rights to the use of the automobile. Approaching the subject of firearms, would you not consider that society is under the same duty to protect the innocent that it is with regard to the automobile and that with a view to the attainment of that result, the person who wishes the privilege of bearing firearms should submit to the same regulations as rigid as the automobile owner and driver is required to accept?

Mr. FREDERICK. You have raised a very interesting analogy, one which, to my mind, has a very decided bearing upon the practicability and the desirability of this type of legislation. Automobiles are a much more essential instrument of crime than pistols. Any police officer will tell you that. They are much more dangerous to ordinary life, because they kill approximately 30,000 people a year. The extent, so far as I know, to which the Government, or the Congress, has attempted to legislate is with respect to the transportation in interstate commerce of stolen vehicles, which apparently has accomplished very useful results. The rest of the legislation is left to the States, and in its effect and in its mode of enforcement, it is a wholly reasonable and suitable approach, because, if I want a license for my car I can get it in 20 minutes, by complying with certain definite and well-known regulations.

Mr. LEWIS. And qualifying.

Mr. FREDERICK. And qualifying, yes, sir. I do not have to prove I am a driver in order to get an automobile license. I do in order to get a personal driver's license, of course. Complying with the regulations, I get that automatically, as a matter of course. If I want a pistol license, and I have had one for a number of years in New York, it takes me 6 weeks to 4 months to get that license, and it costs me an enormous amount of personal bother and trouble. The difficulty in a sense is in the manner of administration and we know that that which is oppressive can be put into the administration much more effectively than into the law; it is the way the thing works. I have no objection, personally, to having my fingerprints taken, because my own fingerprints have been taken many times, but I do object to being singled out with the criminal element and having my fingerprints taken and put in the Bureau of Criminal Identification because I like to use a pistol or because I may need one for self-defense, whereas automobile owners are not fingerprinted and are, as a class, a much more criminal body, from the standpoint of percentage, than pistol licensees.

The CHAIRMAN. Do you make that statement seriously?

Mr. FREDERICK. Yes, sir.

The CHAIRMAN. That the ordinary man who owns and operates an automobile is more likely to be a criminal than the man who arms himself?

Mr. FREDERICK. You have not kept the sharp lines of distinction.

The CHAIRMAN. They are too sharp for me to grasp.

Mr. FREDERICK. I said pistol licensees, those who have gone to the trouble of securing a license to carry weapons, are a most law-abiding body, and the perpetration of a crime by such a licensee is almost unknown.

The CHAIRMAN. That has no analogy to your first statement.

Mr. FREDERICK. It is not by any means unknown for a person with an automobile license to commit a crime or to use that automobile in the perpetration of a crime.

The CHAIRMAN. But you say that the man who buys a pistol is much more likely to be a law-abiding citizen. On what do you base that statement? Have you any statistics upon which to base that, or is it a guess? My guess is as good as yours, but if you have any statistics we would like to have them.

Mr. FREDERICK. There are no statistics on these matters but I have tried my best to get such information as is available from the New York City police and from the records of other police authorities and from the State police, and my statement that automobiles are much more essential to crime than pistols is a statement that has been made to me by numbers of high police officials and I say that in licensing automobiles no such degree of care is taken as is exercised in giving licenses to carry pistols.

The CHAIRMAN. Then, if I understand you correctly, instead of further limiting or restricting the traffic in pistols, machine guns, and deadly weapons used by the criminals and racketeers, you object to the restrictions which now exist? I understood you to say that it is too difficult to secure a license to carry a pistol; that it takes 4 months to comply with the law, and I understand your position is that instead of having further restrictions and limitations, you think the restrictions are already too harsh?

Mr. FREDERICK. I think they are, so far as my experience goes in New York State, and I am referring to the New York statutes.

Mr. McCORMACK. You made an interesting remark in response to one of Mr. Lewis' questions when you said that weapons and automobiles are an interesting analogy. You recognize the clear line of distinction and demarcation between a weapon and an automobile, so far as its being inherently dangerous is concerned?

Mr. FREDERICK. I think the automobile is dangerous.

Mr. McCORMACK. I understand it is dangerous if it is negligibly operated. Would not the interesting analogy be more between a pistol and dope peddling? Would not that be a closer link than the link-up of a pistol with an automobile?

Mr. FREDERICK. I do not think so.

Mr. McCORMACK. The use of dope is recognized by mankind as inherently harmful to the human being.

Mr. FREDERICK. Except as prescribed by physicians.

Mr. McCORMACK. That is the exception but, as a general rule, it is recognized as inherently dangerous. The same applies to weapons; they are recognized as inherently dangerous.

Mr. FREDERICK. I do not think so.

Mr. McCORMACK. What do people buy weapons for?

Mr. FREDERICK. People buy weapons for several purposes; one is for the protection of the person or property.

Mr. McCORMACK. That class of people have no fear about reasonable license requirements.

Mr. FREDERICK. Not reasonable requirements.

Mr. McCORMACK. They have no fear of reasonable regulations as to licenses, if the weapons are necessary to meet a challenge to organized society.

Mr. FREDERICK. They buy pistols also to use for the purpose of training, in the event of military necessity.

Mr. McCORMACK. Those persons need not fear reasonable regulations.

Mr. FREDERICK. I beg your pardon?

Mr. McCORMACK. Those persons need have no fear of reasonable regulations.

Mr. FREDERICK. I think our difference may turn entirely upon what is reasonable.

Mr. McCORMACK. You are not opposed to regulation?

Mr. FREDERICK. Not at all; I have advocated it.

Mr. McCORMACK. You are not opposed to a Federal bill?

Mr. FREDERICK. Provided the bill will accomplish useful results in the suppression of crime, I am heartily in favor of it.

Mr. McCORMACK. You have given two groups who buy pistols.

Mr. FREDERICK. Another group is those who indulge in the use of pistols in connection with sports.

Mr. McCORMACK. That group need not fear any proper regulation.

Mr. FREDERICK. Any difference that we may have, and I do not know whether we have any, turns on the question of what is reasonable.

Mr. McCORMACK. I agree with you; you and I have a meeting of the minds on that. What other group is interested?

Mr. FREDERICK. At the moment I do not think of any.

Mr. McCORMACK. Then there is the criminal group.

Mr. FREDERICK. Yes; and that is the one group we are after.

Mr. McCORMACK. That is the only group who would object to regulations.

Mr. FREDERICK. Yes; and it is the only group that has never been touched.

Mr. LEWIS. In your study of the State regulatory systems have you found that they provide that men who have been convicted of crime shall not have licenses?

Mr. FREDERICK. They have, and that is a provision of the uniform bill.

Mr. FREAR. We have spent about an hour and a half on this matter and we have gotten only to page 3. We want your objections to the bill. All this discussion is very interesting, but why not point out the difficulties in the bill?

Mr. FREDERICK. I am afraid that merely running over a brief list of objections is not going to accomplish much.

Mr. FREAR. Do you not want to be heard by the committee?

Mr. FREDERICK. I am anxious to be heard.

Mr. FREAR. Can you point out, without interruption, the provisions to which you object?

Mr. FREDERICK. In my opinion, the provision for fingerprints will not accomplish what is desired.

Mr. FREAR. Suppose we strike that out.

Mr. FREDERICK. I would like to mention that the bill relates to the taking of fingerprints and refers to corporations, associations, and partnerships. I do not know how the fingerprint of any officer of such an association or corporation can have value.

Mr. FREAR. Admitting your answer is correct, that is not serious. What is your next objection?

Mr. FREDERICK. I am quite concerned about the amount which is suggested on page 8, line 15, for a permit to transport in interstate commerce.

Mr. FREAR. What would you recommend for that?

Mr. FREDERICK. I think, inasmuch as I deem the primary purpose of this bill to be purely regulatory that that ought not to be burdensome. I should make it as nominal as possible. It seems to me that 25 cents is ample.

Mr. FREAR. Or 15 cents.

Mr. FREDERICK. Fifteen cents or 10 cents, or anything which will not prevent compliance with it because of its burdensome nature.

Mr. FREAR. What is next?

Mr. FREDERICK. There is no provision in the act covering the situation of an owner of a weapon who loses this stamped order. As I see the operation of the bill, it will mean this: When a manufacturer sells a weapon to a jobber, he gives a stamped order; when the jobber sells the weapon to the retailer, assuming we still allow jobbers to exist, he gives a second order together with the first. When the dealer sells to the buyer, he gives the third order and the two previous ones, and the buyer gets the gun and three pieces of paper. It is essential to him, in order to keep out of jail, to keep those together.

Mr. FREAR. How would you suggest having but one piece of paper?

Mr. FREDERICK. I think the only piece useful is a piece of paper where the transfer takes place between two persons, one of whom is not a licensed dealer. In other words, if I, as a private individual, sell a gun to a friend, a piece of paper is necessary there. Where a dealer sells to me as a buyer, a piece of paper should be useful. I do not think a string of prior papers are of value, running from the manufacturer who may be required to keep records. In the second place, when, as a matter of human experience, the owner of a gun is going to lose papers, they are going to get mislaid, they are going to get burned up, if he cannot turn them up when required to do so he is liable to go to jail. I think there ought to be a simple method of obtaining a copy of that paper from the authorities with whom the original was filed.

Mr. FREAR. We might attach a number plate to the pistol like we do to the automobile, as small as is necessary, and have that be evidence of the privilege of transfer. You only want one?

Mr. FREDERICK. I think the owner ought to be able to get one if it is lost. I think that machinery ought to be made simple. If not, in the actual operation, you are going to create criminals.

Mr. FREAR. What is the next objection?

Mr. FREDERICK. On page 7 it says:

Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of such imported firearm, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains such possession to the satisfaction of the jury.

Mr. FREAR. That is taken from the other act.

Mr. FREDERICK. I do not understand why it should be necessary for such a person to go to trial.

Mr. FREAR. You think that language is too loose?

Mr. FREDERICK. Too loose and too drastic.

Mr. FREAR. You might write a substitute; we want your suggestions.

Mr. FREDERICK. I am skipping around somewhat, as I am sorry I have to do. On page 7, section 10, I do not know what that language "nothing contained in this section shall apply to any manufacturer, importer, or dealer who has complied with the provisions of section 2", means. I suppose that means that he has taken out a license.

Mr. FREAR. That is satisfactory as far as it goes?

Mr. FREDERICK. I should like very much to have the privilege of submitting some suggestions in writing, if I may.

The CHAIRMAN. Without objection, you may do so.

Mr. DICKINSON. Let me say that I have received numerous telegrams asking me to support legislation along the lines of the recommendations of the National Rifle Association. Your line of thought is in accord with the things advocated by the National Rifle Association?

Mr. FREDERICK. I am president of the National Rifle Association and I think I correctly voice its views.

Mr. DICKINSON. Your purpose is to submit to this committee recommendations desired by the National Rifle Association in connection with this bill?

Mr. FREDERICK. Among the other organizations whose views I voice.

The CHAIRMAN. When may we have your written suggestions?

Mr. FREDERICK. I will get at it this afternoon and try and let you have it as quickly as I can. As a lawyer, I know that the drafting of legislation is an extremely difficult job. You have to do a lot of checking, and it is a difficult piece of work.

Mr. HILL. When you do that, do not forget that we are after the gangster.

Mr. FREDERICK. You have put your finger on it. My general objections to most of the regulatory provisions are proposed with that in view. I am just as much against the gangster as any man. I am just as much interested in seeing him suppressed, but I do not believe that we should burn down the barn in order to destroy the rats. I am in favor of some more skillful method of getting the rats without destroying the barn. In my opinion, most of the proposals the regulation of firearms, although ostensibly and properly aimed at the crook, do not reach the crook at all, but they do reach the honest man. In my opinion, the forces which are opposed to crime consist of two general bodies; one is the organized police and the second is the unorganized victims, the great mass of unorganized law-abiding citizens, and if you destroy the effective opposition of either one of those, you are inevitably going to increase crime, because as you

destroy the forces of resistance in the human body to disease, you are
going to increase disease. So, by destroying the resistance of any
body which is opposed to crime, you are going to increase crime.
I think we should be careful in considering the actual operation of
regulatory measures to make sure that they do not hamstring the
law-abiding citizen in his opposition to the crook.

Mr. KNUTSON. There is no opposition on the part of the victims?

Mr. FREDERICK. It is not a 100 percent effective. Of course, the
right of self-defense is still a useful thing.

Mr. KNUTSON. It is a right, but an ineffective right under the
present situation.

Mr. FREDERICK. I would be interested to show you a collection
which I have made of newspaper clippings indicating the effective
use of firearms in self-defense, as a protection against the perpetration
of crime. Because of arguments which have been advanced by those
who are against the use of guns, I have made it my business to clip
from newspapers passing over my desk such cases as I run across of
effective self-defense with pistols, most of them pistols. I have a
scrap book two thirds full and I can show you dozens and hundred
of cases happening every year.

Mr. FREAR. How many in this room have pistols in their pockets
for self-defense?

Mr. FREDERICK. I doubt if any have.

Mr. FREAR. I doubt, unless a man anticipates danger, that he is
going to carry a pistol. You have looked after the clippings of the
man who has used a revolver in self-defense. How many men carry
revolvers? What percentage of men carry revolvers?

Mr. HILL. Quite a few traveling in automobiles.

Mr. FREDERICK. There are a good many.

Mr. FREAR. I am asking under present conditions.

Mr. FREDERICK. I have never believed in the general practice of
carrying weapons. I seldom carry one. I have when I felt it was
desirable to do so for my own protection. I know that applies in
most of the instances where guns are used effectively in self-defense
or in places of business and in the home. I do not believe in the
general promiscuous toting of guns. I think it should be sharply
restricted and only under licenses.

The CHAIRMAN. When did your association decide to call on Con-
gress for legislation dealing with this subject? Judge Dickinson refers
to telegrams urging him to support such legislation. When did you
determine to come before Congress and ask for such legislation as
you now have in mind?

Mr. FREDERICK. I do not understand that our association has
decided to urge any national legislation by Congress, and if the tele-
grams or messages which may have come to Judge Dickinson indicate
that the senders believe that we are sponsoring some particular bill
in Congress, or intend to do so, they are based on a misapprehension.

The CHAIRMAN. Your only interest in the matter is created by the
introduction and consideration of this bill? If it were not for this
bill you would not be here, nor would you be taking any interest in
the matter or bringing it to our attention; am I right?

Mr. FREDERICK. In our opinion, little of value can be accomplished
by Federal legislation on this point.

Mr. KNUTSON. Is it your thought to submit a substitute measure for H.R. 9066 and at the same time not infringe unnecessarily on the rights of law-abiding citizens?

Mr. FREDERICK. As I say, I have grave doubts as to the effectiveness of any such legislation.

Mr. HILL. You concede there is a necessity for something. In politics we have an old saying that you cannot beat somebody with nobody. You cannot hope to defeat or materially alter the legislation unless you submit to the committee something that is better or that will better attain the object that this legislation seeks to accomplish.

Mr. FREDERICK. I must differ with you in principle upon one point. I do not believe that Congress or the people back home want us to attempt miracles. In my opinion, based upon a rather extensive experience with this subject and study of it, very little of practical value can be accomplished by Federal legislation on the point.

Mr. HILL. I take it then that it is your opinion that the criminal is going to get firearms regardless of any laws.

Mr. FREDERICK. I think that is the opinion of any person who has knowledge of the subject. In most instances, the guns are stolen. They are not gotten through legitimate channels. Dillinger stole his guns. I have a half-dozen cases where guns have been used in prisons to effect a break; we have had that in New York, and all over the country. If you cannot keep guns out of the hands of criminals in jails, I do not see how you can keep them out of the hands of criminals walking about on the public highways.

The CHAIRMAN. If that be true, then the laws of the various States of the Union dealing with the subject, are not accomplishing a good purpose because they do not put them all out of business?

Mr. FREDERICK. I do not take that view of it at all. I believe in regulatory methods. I think that makes it desirable that any such regulations imposed should not impose undue hardships on the law-abiding citizens and that they should not obstruct him in the right of self-defense, but that they should be directed exclusively, so far as possible, to suppressing the criminal use, or punishing the criminal use of weapons.

The CHAIRMAN. You spoke of your experience, which we realize is valuable and extensive, in dealing with this matter. This bill contemplates the suppression of crime and the protection of law-abiding citizens. Do you consider that your experience and your knowledge of this subject is superior to that of the Department of Justice? Do you consider that your experience puts you in a better position to say what is necessary to accomplish the suppression of crime than the Department of Justice?

Mr. FREDERICK. I hesitate to set myself up in any comparative sense, because I recognize the prestige of the Department of Justice.

The CHAIRMAN. You recognize also their experience in dealing with this subject?

Mr. FREDERICK. Their experience, I think, has been comparatively recent. I think I may truthfully say this, and I think Mr. Keenan would agree with me, that I have given much more study to the problem of firearms regulations, extending over a longer period of time and going into far greater detail, than any man or all of the men in the Department of Justice.

The CHAIRMAN. Has your experience been with the sole purpose of dealing with crime?

Mr. FREDERICK. I have never been a prosecuting attorney.

The CHAIRMAN. One of the purposes of the Department of Justice is to deal with crime.

Mr. FREDERICK. I have approached it as a citizen interested in the public welfare, and the subject of crime has been a matter I have been deeply interested in ever since my college days, 30 years ago.

Mr. HILL. You expressed the opinion that perhaps any legislation would not be effective to keep firearms out of the hands of the criminal element.

Mr. FREDERICK. I am quite sure we cannot do that.

Mr. HILL. Assuming that is correct, and I am sure a great many might agree with you, if the firearms are found in the possession of the criminal element, and they cannot, under the provisions of this act, or of some similar legislation, show that they are in lawful possession of those firearms, would that not be a weapon in the hands of the Department of Justice in enabling them to hold those criminals until further investigation might be made of the crime?

Mr. FREDERICK. I think so, and I made this suggestion to Mr. Keenan 2½ months ago, that whenever a weapon, a firearm of any kind, and I would not limit it to pistols—I would say rifles or shotguns—is found in the hands of any person who has been convicted of a crime of violence, because there are many crimes which have nothing to do with the use of firearms and that is why I make the distinction; and I think he suggested that we add to that any person who is a fugitive from justice—that mere possession of such a weapon should be prima facie evidence of its transportation in interstate commerce, and that transportation in interstate commerce of weapons by those people be made a crime.

Mr. HILL. What do you do with a man who has never been convicted of a crime although he may be a criminal?

Mr. FREDERICK. I do not know of any way in which you can catch all the dirt in the stream no matter what kind of a skimmer you may use.

Mr. HILL. It is conceivable that some of the most desperate gangsters may never have been convicted because we have been unable to get the evidence.

Mr. FREDERICK. That will sometimes happen.

Mr. HILL. It might frequently happen.

Mr. FREDERICK. I suppose so, because there is a first time for every criminal. I do not know how you can get at that; if he is found carrying a gun, and it is in violation of the State law, that is a State matter; I do not see how it is practical, without doing an injustice to the much greater body of law-abiding citizens to form a statute—and I have not yet been able to think of any way—which would be effective in such a case as you put.

Mr. HILL. I take it that your objection to this character of legislation is that the restrictions which it would impose upon the law-abiding citizen in the matter of firearms outweigh the advantages which might be gained in the hunting down and catching of the criminal.

Mr. FREDERICK. In general, I think it is best for the public interest,

Mr. FREAR. This suggestion has been made: Do you appear here representing any private manufacturing companies or anyone interested in the manufacture of firearms?

Mr. FREDERICK. You mean in the commercial sense?

Mr. FREAR. Yes, in a commercial sense.

Mr. FREDERICK. None whatever, nor have I ever been.

Mr. FREAR. And no compensation is being paid you?

Mr. FREDERICK. No, sir.

Mr. FREAR. I am glad to hear that, and I think you are entitled to have that in the record at this time.

Mr. FREDERICK. I have never, directly or indirectly, been interested commercially in firearms. I am engaged in the private practice of law. I have not anyone, among my clients, nor have I ever had anyone engaged in such enterprises. My expenses here and back and such incidental expenses as I incur are borne by the National Rifle Association of which I am president. Prior to 2 years ago, when they paid some expenses that I incurred in this connection, I bore all of my expenses out of my personal pocket, and no one has ever paid me anything for my services. I am entirely voluntary and this and other service has been a service pro bono publico. I might refer, if I may, to one more point.

Mr. McCORMACK. Who comprises the National Rifle Association?

Mr. FREDERICK. The National Rifle Association is an incorporated body organized, I think, in 1871. It comprises amateur rifle shooting in the United States and it is organized for the purpose of promoting small-arms practice; it works with the War Department, and, in conjunction with the War Department, until the depression, it conducted national matches for which the National Congress appropriated $500,000. It is composed of individual members and of affiliate groups, that is, shooting clubs, etc. Our membership runs into the hundreds of thousands all over the country.

Mr. DICKINSON. I have a telegram, not from my own section, that indicates that it is sent by members of some hunting association.

Mr. FREDERICK. I may say that I am also interested in the subject of conservation of forests and wild life. I know the sportsmen of the country feel as I do.

Mr. McCORMACK. How did they know you were appearing before the committee today?

Mr. FREDERICK. How did those organizations with which I am connected know it?

Mr. McCORMACK. I am not criticizing; I am glad to have you appear before the committee, as I like to hear from those who are shooting at the bill. I value your contribution, whether I agree with you wholly or not at all. I am curious to know how these people knew that you were appearing here today.

Mr. FREDERICK. I have no idea. There is a bill in the Senate which was proposed by the so-called "racketeering committee." I think it was proposed quite a long time ago. There has been a good deal of general excitement with respect to that bill. I do not know whether that is in any way responsible.

Mr. HILL. I have a telegram from the Pacific coast, received this morning, signed by a number of persons, which says:

We urge you to give all possible consideration to recommendations proposed by National Rifle Association in connect on with H.R. 9066 at committee meeting Wednesday morning.

Evidently they know that this hearing is taking place this morning.

General RECKORD. I am responsible for that information going out. Two days ago, when the chairman advised me of this hearing, I advised a number of people by wire that a hearing would be held on this bill.

Mr. McCORMACK. Did these people know that he was coming here?

General RECKORD. I do not know.

Mr. HILL. It is propaganda, then?

General RECKORD. No.

Mr. McCORMACK. Do intelligent people in this country send telegrams on a subject they know nothing about?

General RECKORD. I think you will find they know a great deal about it. They do not know anything about the particular bill, because the bill has been printed less than a week. We never saw the bill ourselves, until 2 or 3 days ago.

Mr. CROWTHER. For 2 months or more I have been receiving some telegrams, and a great many letters from rifle associations and gun clubs. One comes from a large association connected with the General Electric Co. They all relate to this general subject and refer to the McLeod bill, the Copeland bill, the Hartley bill, and so forth, and comment on them. So, it would appear that it is not a new matter before the gun clubs, because I know for at least 2 months I have been receiving letters and telegrams, and some lengthy letters, in which they have given the matter great thought and consideration, and they express the hope that this legislation designed to reach the criminal might not take such form as to place an undue burden on rifle clubs.

Mr. DICKINSON. It looks like the telegram which I received from Branson is from the South, where they do hunting; it is signed by 15 or 20 individuals; it must have been some rifle organization.

Mr. McCORMACK. Have you had hearings on similar legislation before the Judiciary Committee?

General RECKORD. There was a hearing, but we were not advised nor did we attend. I think the Attorney General appeared in person and Mr. Keenan also. Answering the gentleman's question, there was a Copeland bill which was introduced possibly 2 months ago.

Mr. CROWTHER. And a McLeod bill and a Hartley bill.

The CHAIRMAN. That does not account for this stream of telegrams in the last day or two.

General RECKORD. The only person who could possibly be responsible would be myself and after you told me you were giving us a hearing today——

Mr. McCORMACK (interposing). You have contacted such as you could and wired the members of the association?

General RECKORD. In each State, or practically every State, we have a State rifle association, and we advised a number of those people that the hearing would be held today. Nothing was said about Mr. Frederick or any particular individual being present.

Mr. McCORMACK. Did you ask them to wire in here?

General RECKORD. I do not recall the exact language of the telegram; I would say yes, probably we did, or intimated that a wire to Mr. Lewis—I wrote Mr. Lewis myself, because he is from the Sixth District and I particularly requested him to be present.

Case 1:22-cv-02579-CKK   Document 10-1   Filed 10/28/22   Page 66 of 168

Mr. McCORMACK. Did you wire the people telling them what the recommendations were going to be to the committee?

General RECKORD. No, except that the legislation is bad.

Mr. McCORMACK. And they blindly followed it?

General RECKORD. I would not say blindly.

Mr. McCORMACK. They certainly had no information as to what the recommendations were to be.

General RECKORD. They could not possibly have the information.

Mr. McCORMACK. They did not know when they sent the wires in what the association was going to recommend?

General RECKORD. Except that we were going to recommend legislation.

Mr. McGORMACK. Nobody interrupted you. I am going to conclude, not as a result of my friend's staetment, but because I have finished.

The CHAIRMAN. The Chair would like to make an observation. We have been in session 2 hours which is as long as the Department of Justice had the other day. It is requested that they have time for one witness to make a brief statement before this session adjourns today. If you are not going to conclude, we will have to come back.

Mr. FREDERICK. I shall be glad to conclude with one more observation.

The CHAIRMAN. We are very pressed for time, as we have other matters to consider.

Mr. FREDERICK. It seems to me that any provision regarding a permit such as that contained in section 10, page 7, to transport a weapon in interstate commerce should call for a permit good indefinitely, because it is in the nature of a restriction and I take it that is about the only purpose of it. If I should go to Camp Perry or Seagirt, or any other place where the pistol matches are held, it would be a veritable nuisance for me to get a permit to get there, and once there, to get home; it would be a nuisance to go to the country and be required to get a permit, and then be required to get another when you come back at the end of the summer. It seems to me that once a man has registered his weapon, and it is known that he has lawfully obtained a permit to transport it, that it should be good indefinitely, so far as he is concerned, and so far as the particular gun is concerned. I thank you for the privilege of appearing before you.

Mr. LEWIS. Mr. Keenan has stated that he would like to be heard for a few minutes.

The CHAIRMAN. We cannot stay in session more than 15 minutes.

## STATEMENT OF JOSEPH B. KEENAN, ASSISTANT ATTORNEY GENERAL

Mr. KEENAN. I will take less than 5 minutes. So that there will be no misunderstanding and that the record will be clear, the Department of Justice was not aware of any agreement, implied or otherwise, to hear further from Mr. Frederick or General Reckord, inasmuch as approximately 4 hours were devoted to hearing the analysis of the uniform bill which was advocated by them and their views as to what would or would not constitute unreasonable and unduly burdensome restrictions upon the obtaining of firearms. The view of the Depart-

ment, briefly, was this: That the Department represented all of the people of the country, in response to demands that came in for a long period of time requesting that some effort be made to form some type of Federal legislation to curb the sale of firearms. At the beginning it was recognized that no criminal would go to the expense of taking the steps necessary to comply with the regulations.

We cannot over-emphasize our views that we hope to get some good from this bill in its present form or some modified form. As Mr. Frederick stated to me in my office, and as it appears in the record, he spent 15 years of his life in the study of firearms legislation, and he said in the record that none of this legislation had ever reached or touched the criminal, and we approached it from that standpoint. We are fully alive to the grave possibility that we will not keep the criminal from getting firearms, but we do hope to make it a simple matter, when we do apprehend the criminals with firearms, that they will not be able to put up vague alibis and the usual ruses, but that it will be a simple method to put them behind the bars when they violate these regulations.

One word more. We discussed pretty generally the basic principles behind this legislation more than 2½ months ago with General Reckord and Mr. Frederick, on the 20th day of February there were introduced two bills in the Senate, by Senator Ashurst, Senate Nos. 2844 and 2840, and I think General Reckord will admit that he had knowledge of the introduction of these bills shortly after they were introduced.

General RECKORD. Of those two.

Mr. KEENAN. And both of those bills are combined in this one bill, and there are no changes, excepting combining them in one bill, at the request of Senator Ashurst. So, if there is any suggestion that the Department of Justice has been unfair, and that these matters have not been known to those representing the rifle association, I say an examination of the Senate bills, and the present bill will show the present bill to be a composite unit of those two bills, with their basic principles.

Further, with no disrespect intended, we feel in the Department of Justice that we represent the people of the country who demand that some effort be made to reach the firearms evil. We have a tremendous amount of data and correspondence coming into our office. We have had meetings with the International Chiefs of Police Association of America, that represents the chiefs of police of practically every city in the United States of any size, and they have approved of this legislation. They have asked us for it. We have conferred with an executive committee that came from all parts of the United States to call upon the Attorney General and discuss it. Approximately 2 or 3 weeks ago General Reckord came into the Department and I was occupied, and Mr. Smith, my assistant, discussed with him the firearms legislation. At that time, it is my understanding, that General Reckord said that he would work with us if pistols and revolvers were excluded and that Mr. Frederick would work with us if we eliminated the registration feature. We did not see the problem eye to eye. We think every possible opportunity has been given to them. We think that those who have spent their lives in collecting a tremendous amount of data, and Mr. Frederick, who is the best shot in America, and the Olympic champion of America, might have

a view off to the left or to the right, whereas we who are more or less in the center, and who are not experts and have not given the same amount of study would be in a better position to say what is the fair thing to do to eliminate the evil that unquestionably exists with the least burdensome provisions to effect some legislation that would mean something. We had no more meetings with Mr. Frederick and we thought we should draw the bill and submit it to this honorable committee and to the Congress.

We have requested and we have received some figures on the homicides in this country as compared with Great Britain and other countries, which we shall ask leave to submit for the record.

In closing, we cannot overemphasize o т position that we believe that an earnest effort should be made by some governmental body to reach the crook and to try to disarm him. We have a witness here, and we are going to try to save all the time possible. I think this gentleman can throw some light on what might be expected from this legislation, particularly with reference to machine guns.

Mr. SHALLENBERGER. Did I understand you to say that you would give the committee data on crime in Great Britain as compared with this country?

Mr. KEENAN. That is true.

Mr. SHALLENBERGER. I would like to have that for the record.

Mr. COOPER. Let us hear the other witness to whom he has referred.

## STATEMENT OF W. B. RYAN, PRESIDENT OF THE AUTO ORDNANCE CO.

The CHAIRMAN. Do you appear as representing the Department of Justice?

Mr. RYAN. I am president of the Auto Ordnance Co., which own the patent rights to the Thompson submachine guns.

We have studied the bill fairly carefully and we believe that the provisions of it will materially aid in the disarming of the criminal. The policies of the company itself have been exactly those as embodied in the pending bill for a number of years, and we feel that the restrictions in the sale and the taxes to be imposed will eventually result in the disarming, as far as submachine guns are concerned, certainly of all criminals who now have them.

Mr. COOPER. I understood you to say, Mr. Ryan, that your company owns the patents for the Thompson submachine gun.

Mr. RYAN. Yes, sir.

Mr. COOPER. And you are engaged in the manufacture of these weapons?

Mr. RYAN. No, sir; we do not manufacture.

Mr. COOPER. You own the patent rights?

Mr. RYAN. We own the patents.

Mr. COOPER. How many companies in the United States manufacture machine guns used by the gangsters or criminals today?

Mr. RYAN. As far as I know, there is only one company which actually manufactures the small type machine guns, the Colts Firearms Co., who manufacture for us, and they also manufacture a small gun called the "Monitor", a gun of their own.

Mr. COOPER. It is the small type machine gun referred to by you that the criminal element or so-called "gangster" uses?

Mr. RYAN. Yes.

Mr. COOPER. And the Colts Co. manufactures that type of weapon and you own the patent rights on it?

Mr. RYAN. That is right, sir.

Mr. COOPER. Do you believe that this bill will aid in keeping machine guns out of the hands of gangsters and the criminal element?

Mr. RYAN. I do; yes, sir.

Mr. COOPER. Is there any possibility of such guns as these being imported into this country?

Mr. RYAN. There are two types of guns made in Europe which are being imported, I am told, in some quantities into South America and I have heard that they are being brought in here. That I cannot substantiate.

Mr. COOPER. Is it your opinion that this type of legislation would prevent that?

Mr. RYAN. It is; yes, sir.

Mr. COOPER. Are there any small-arms manufacturers that are covered by such arms as are contemplated under this bill, that would be seriously affected by the manufacturers' tax, in your opinion?

Mr. RYAN. Not so far as I know. I know of nobody else making them. I cannot answer for the other types of firearms.

Mr. COOPER. Then, is it your opinion, as one familiar with and interested in the manufacture of this type of weapon, that this pending bill would be desirable and beneficial in attempting to meet the problem that we recognize exists in this country?

Mr. RYAN. It is.

Mr. SHALLENBERGER. Is there any country that arms its soldiers with this type of gun?

Mr. RYAN. Yes, sir; the United States Army.

Mr. SHALLENBERGER. And the peace officers of this country are armed with that gun?

Mr. RYAN. A great many are.

Mr. SHALLENBERGER. Do you know if Great Britain arms police officers with machine guns?

Mr. RYAN. Not this gun.

Mr. SHALLENBERGER. With any kind of machine guns?

Mr. RYAN. I do not know that, sir.

The CHAIRMAN. Are you through with your statement?

Mr. RYAN. Yes, sir.

The CHAIRMAN. We thank you very much.

## STATEMENT OF CHARLES V. IMLAY, MEMBER OF THE NATIONAL CONFERENCE OF COMMISSIONERS ON UNIFORM LAWS, 1416 F STREET, WASHINGTON, D.C.

The CHAIRMAN. Please give your name and address.

Mr. IMLAY. Charles V. Imlay. I am a member of the National Conference of Commissioners on Uniform State Laws, and my address is Washington, D.C.

My connection, Mr. Chairman, and members of the committee, with the National Conference of Commissioners on Uniform State Laws is as a representative on that body of the District of Columbia.

The body has been for some 43 or 44 years meeting annually, drafting and proposing to the States for adoption so-called uniform State laws, being represented generally by two or three commissioners from each of the States.

Some 11 years ago, as one of the members of that body, I was designated chairman of a committee on a uniform firearms act and that work was completed in 1930 with the drafting of the so-called uniform firearms act. You will understand that while a member of that conference, I am not here with any resolution from the conference; I am speaking as a private person from experience gained in that work over a period of about 11 years on firearms legislation. I afterward acted as a member of the committee on the so-called uniform machine gun act, which was completed and promulgated by the conference in its 1933 session.

Very briefly, my own personal objection to the form of legislation in this proposed bill is that it proceeds by a plan of requiring a license to purchase which we saw fit to abandon in the uniform act after a comparison of legislation during the entire history of this country in the various States of the Union we approached the subject, as one must always approach the subject of any uniform State statute, on the assumption that you must take what is the traditional form of legislation that has stood the test of experience and proceed on that. As to the course of that work and the course of observations I made in connection with it, I think I would like to file with the committee as an extension of my remarks, so to speak, the official draft of the uniform firearms act, upon which was modeled that act that has been referred to as the act for the District of Columbia. I should like to file also some observations I made in connection with the District of Columbia act in the summer of 1932 when it was before this Congress, in the Federal Bar Association Journal at page 22.

The CHAIRMAN. How many pages does that cover?

Mr. IMLAY. There are several pages.

The CHAIRMAN. Have you several copies which you could file with the committee?

Mr. IMLAY. I have the one copy. At the time of the reaffirmation of the uniform firearms act in the summer of 1930, I prepared for the American Bar Association Journal an article in which I summarized all of the State legislation upon the subject, and which is contained in the American Association Journal of December 1930, on pages 799 to 801, and those pages I will also separate and leave with the committee as part of the record.

The CHAIRMAN. Without objection that may go in the record.

Mr. IMLAY. If the time comes, Mr. Chairman, when more opportunity is afforded to discuss these matters, then I should like at that time an opportunity to discuss them from the standpoint, as I see it, of this act following the history of firearms legislation in this country and being unworkable on that account.

(The documents referred to are as follows:)

### UNIFORM FIREARMS ACT

Drafted by the National Conference of Commissioners on Uniform State Laws, and by it approved and recommended for enactment in all the States at its Fortieth Annual Conference at Chicago, Ill., August 11 to 16, 1930, with explanatory statement. Approved by the American Bar Association at its meeting at Chicago, Ill., August 20–23, 1930.

NATIONAL FIREARMS ACT

**69**

The committee which acted for the National Conference of Commissioners on Uniform State Laws in preparing the uniform firearms act was as follows: Joseph F. O'Connell, Boston, Mass., chairman; James F. Ailshie, Cœur d'Alene, Idaho, chairman, uniform torts and criminal law acts section; Jesse A. Miller, Des Moines, Iowa, president, ex-officio; Charles V. Imlay, Washington, D.C.; Charles E. Lane, Cheyenne, Wyo.; George B. Martin, Catlettsburg, Ky.; A. L. Scott, Pioche, Nev.; and Julian O. Seth, Santa Fe, N.Mex.

Copies of all uniform acts and other printed matter issued by the conference may be obtained from John H. Voorhees, secretary, 1140 North Dearborn Street, Chicago, Ill.

AN ACT REGULATING THE SALE, TRANSFER, AND POSSESSION OF CERTAIN FIRE-ARMS, PRESCRIBING PENALTIES AND RULES OF EVIDENCE, AND TO MAKE UNI-FORM THE LAW WITH REFERENCE THERETO

SECTION 1. *Definitions.*—"Pistol," as used in this act, means any firearm with barrel less than 12 inches in length.

"Crime of Violence," as used in this act, means any of the following crimes or an attempt to commit any of the same, namely, murder, manslaughter, rape, mayhem, assault to do great bodily harm, robbery, burglary [housebreaking, breaking and entering, kidnapping and larceny].[1]

"Person," as used in this act, includes firm, partnership, association, or corporation.

SEC. 2. *Committing crime when armed.*—If any person shall commit or attempt to commit a crime of violence when armed with a pistol, he may in addition to the punishment provided for the crime, be punished also as provided by this act.

SEC. 3. *Being armed prima facie evidence of intent.*—In the trial of a person for committing or attempting to commit a crime of violence, the fact that he was armed with a pistol and had no license to carry the same shall be *prima facie* evidence of his intention to commit said crime of violence.

SEC. 4. *Certain persons forbidden to possess arms.*—No person who has been convicted in this State or elsewhere of a crime of violence, shall own a pistol or have one in his possession or under his control.

SEC. 5. *Carrying pistol.*—No person shall carry a pistol in any vehicle or concealed on or about his person, except in his place of abode or fixed place of business, without a license therefor as hereinafter provided.

SEC. 6. *Exception.*—The provisions of the preceding section shall not apply to marshals, sheriffs, prison or jail wardens or their deputies, policemen or other law-enforcement officers, or to members of the Army, Navy, or Marine Corps of the United States or of the National Guard or Organized Reserves when on duty, or to the regularly enrolled members of any organization duly authorized to purchase or receive such weapons from the United States or from this State, provided such members are at or are going to or from their places of assembly or target practice, or to officers or employees of the United States duly authorized to carry a concealed pistol, or to any person engaged in the business of manufacturing, repairing, or dealing in firearms or the agent or representative of any such person having in his possession, using, or carrying a pistol in the usual or ordinary course of such business, or to any person while carrying a pistol unloaded and in a secure wrapper from the place of purchase to his home or place of business or to a place of repair or back to his home or place of business or in moving from one place of abode or business to another.

SEC. 7. *Issue of licenses to carry.*—The judge of a court of record, the chief of police of a municipality, the sheriff of a county, may upon the application of any person issue a license to such person to carry a pistol in a vehicle or concealed on or about his person within this State for not more than 1 year from date of issue, if it appears that the applicant has good reason to fear an injury to his person or property, or has any other proper reason for carrying a pistol, and that he is a suitable person to be so licensed. The license shall be in triplicate, in form to be prescribed by the secretary of State, and shall bear the name, address, description, and signature of the licensee and the reason given for desiring a license. The original thereof shall be delivered to the licensee, the duplicate shall within [7 days] be sent by registered mail to the [secretary of State] and the triplicate shall be preserved for 6 years, by the authority issuing said license. The fee for issuing such license shall be $—— which fee shall be paid into the [—————— treasury].

[1] Crimes here enumerated to be modified to suit local definitions.

SEC. 8. *Delivery to minors and others forbidden.*—No person shall deliver a pistol to any person under the age of 18 or to one, who he has reasonable cause to believe has been convicted of a crime of violence, or is a drug addict, an habitual drunkard, or of unsound mind.

SEC. 9. *Sales regulated.*—No seller shall deliver a pistol to the purchaser thereof until 48 hours shall have elapsed from the time of the application for the purchase thereof, and, when delivered, said pistol shall be securely wrapped and shall be unloaded.   At the time of applying for the purchase of a pistol the purchaser shall sign in triplicate and deliver to the seller a statement containing his full name, address, occupation, color, place of birth, the date and hour of application, the caliber, make, model, and manufacturer's number of the pistol to be purchased and a statement that he has never been convicted in this State or elsewhere of a crime of violence.   The seller shall within 6 hours after such application, sign and attach his address and forward by registered mail one copy of such statement to the chief of police of the municipality or the sheriff of the county of which the seller is a resident; the duplicate duly signed by the seller shall within 7 days be sent by him with his address to the [secretary of State]; the triplicate he shall retain for 6 years.   This section shall not .apply to sales at wholesale.

SEC. 19. *Dealers to be licensed.*—No retail dealer shall sell or otherwise transfer, or expose for sale or transfer, or have in his possession with intent to sell, or otherwise transfer, any pistol without being licensed as hereinafter provided.

SEC. 11. *Dealers' licenses, by whom granted and conditions thereof.*—The duly constituted licensing authorities of any city, town, or political subdivision of this State may grant licenses in forms prescribed by the [secretary of State] effective for not more than 1 year from date of issue, permitting the licensee to sell pistols at retail within this State subject to the following conditions in addition to those specified in section 9 hereof, for breach of any of which the license shall be forfeited and the licensee subject to punishment as provided in this act.

1. The business shall be carried on only in the building designated in the license.

2. The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can easily be read.

3. No pistol shall be sold (*a*) in violation of any provision of this act, nor (*b*) shall a pistol be sold under any circumstances unless the purchaser is personally known to the seller or shall present clear evidence of his identity.

4. A true record in triplicate shall be made of every pistol sold, in a book kept for the purpose, the form of which may be prescribed by the [secretary of State] and shall be personally signed by the purchaser and by the person effecting the sale, each in the presence of the other, and shall contain the date of sale, the caliber, make, model and manufacturers' number of the weapon, the name, address, occupation, color, and place of birth of the purchaser, and a statement signed by the purchaser that he has never been convicted in this State or elsewhere of a crime of violence.   One copy shall within 6 hours be sent by registered mail to the chief of police of the municipality or the sheriff of the county of which the dealer is a resident; the duplicate the dealer shall within 7 days send to the [secretary of State]; the triplicate the dealer shall retain for 6 years.

5. No pistol or imitation thereof or placard advertising the sale thereof shall be displayed in any part of any premises where it can readily be seen from the outside.

The fee for issuing said license shall be $_____ which fee shall be paid into the [_____ treasury].

SEC. 12. *Certain transfers forbidden.*—No person shall make any loan secured by a mortgage, deposit, or pledge of a pistol; nor shall any person lend or give a pistol to another or otherwise deliver a pistol contrary to the provisions of this act.

SEC. 13. *False information forbidden.*—No person shall, in purchasing or otherwise securing delivery of a pistol or in appyling for a license to carry the same, give false information or offer false evidence of his identity.

SEC. 14. *Alteration of identifying marks prohibited.*—No person shall change, alter, remove, or obliterate the name of the maker, model, manufacturer's number, or other mark of identification on any pistol.   Possession of any pistol upon which any such mark shall have been changed, altered, removed, or obliterated, shall be prima facie evidence that the possessor has changed, altered, removed or obliterated the same.

SEC. 15. *Existing licenses revoked.*—All licenses heretofore issued within this state permitting the carrying of pistols concealed upon the person shall expire at midnight of the _____ day of _____, 19___

SEC. 16. *Exceptions.*—This act shall not apply to antique pistols unsuitable for use as firearms and possessed as curiosities or ornaments.

SEC. 17. *Penalties.*—Any violation of any provision of this act constitutes an offense punishable by [a fine of not more than [$_____] or imprisonment for not more than [_____] or both, or by imprisonment in the penitentiary for not less than [_____], nor more than [_____]].

· SEC. 18. *Constitutionality.*—[If any part of this act is for any reason declared void, such invalidity shall not affect the validity of the remaining portions of this act.]

SEC. 19. *Short title.*—This act may be cited as the "Uniform Firearms Act."

SEC. 20. *Uniform interpretation.*—This act shall be so interpreted and construed as to effectuate its general purpose to make uniform the law of those states which enact it.

SEC. 21. *Effective date.*—This act shall take effect on the _____ day of _____, 19____.

SEC. 22. *Certain acts repealed.*—All laws or parts of laws inconsistent herewith are hereby repealed.

### EXPLANATORY STATEMENT REGARDING UNIFORM FIREARMS ACT

The National Conference of Commissioners on Uniform State Laws is composed of commissioners appointed by legislative or executive authority from the States, the District of Columbia, the Territory of Alaska, the Territory of Hawaii, and the insular possessions of the United States. The organization meeting was held at Saratoga, N.Y., in August 1892; and annual meetings have been regularly held since that time, immediately preceding the meetings of the American Bar Association. The purpose of the organization, as its name imports, is to promote uniformity of legislation on subjects of common interest throughout the United States. Proposed acts are carefully drawn by special committees of trained lawyers, assisted by experts in many instances, and are printed, distributed, and discussed in the conference at more than one annual session. When finally approved by the conference, the uniform acts are submitted to the American Bar Association and recommended for general adoption throughout the jurisdiction of the United States. Each uniform act is thus the fruit of one or more tentative drafts submitted to the criticism of the Commissioners in annual conference and of the American Bar Association, and represents the experience and judgment of a select body of lawyers chosen from every part of the United States.

### RELATION OF ACT TO PAST AND RECENT FIREARMS LEGISLATION

The conference at its fortieth annual meeting held at Chicago, August 11–16, 1930, approved the Uniform Firearms Act and voted that it be recommended to the States for adoption. On August 21 the American Bar Association, meeting at the same place, approved the act. This was in effect a second approval of the subject-matter by both bodies, inasmuch as the conference and bar association had at a previous meeting held at Denver, Colo., in July 1926, approved an act in substantially the same form. The matter was, however, after the Denver meeting taken under reconsideration by both bodies and for that reason temporarily withdrawn from State legislatures. After 4 additional years of reconsideration the principles of the former draft have been reaffirmed in the new draft and that new draft with only a few changes from the former draft is now recommended to the States for adoption.

When the subject-matter of the act was first brought to the attention of the National Conference at Minneapolis in August 1923, much had already been accomplished in the direction of uniform firearms legislation by the United States Revolver Association, a disinterested noncommercial organization of marksmen. Its legislative committee had drafted a uniform law which had already been adopted with some few changes by North Dakota, and New Hampshire. California had also adopted it with some qualifications and additions. The law was thereafter adopted in Indiana in 1925, and much of its subject-matter was enacted in the Oregon, West Virginia, and Michigan acts of the same year. The extent to which the revolver association act had thus already gained ground as well as the intrinsic merits of that act induced the committee of the conference to select it as the model of the draft of the uniform act approved by the conference in 1926. During these 4 years in which the subject-matter has been under reconsideration and prior to the final approval by the conference and the bar association in 1930, the substance and form of the act has gained additional recognition. · Much of its text has been incorporated in recent acts in Massachusetts, Michigan, New Jer-

sey, and Rhode Island, and to a very great extent in a 1927 act of Hawaii. The act with some minor changes was adopted by the United States House of Representatives in 1929, too late, however, to reach the Senate. With some changes it again passed the House early in 1930, and at the end of that year is still pending in the Senate.

It is believed that the favor tnus already shown to the principles of the act is due to recognition by the various State legislatures of the necessity of uniform legislation on the subject of small firearms, and the soundness of the principles of regulation embodied in the act. These principles are believed to be consonant with legislative precedent and practical experience, and superior to minority views reflected in some past legislation and in a few recent enactments. For example, the uniform act adopts the principle of a strict regulation of the sale and purchase of pistols at the same time that it rejects the comparatively rare provision of a license to purchase, on the theory that the securing of a pistol by a householder as a legitimate means of defense should not be made difficult. The principle of license to purchase was for a long time limited to New York where it was first adopted in 1888. It has in recent years received recognition in Massachusetts, Michigan, New Jersey, and Hawaii, and has been approached in West Virginia and perhaps one or two other places. But beyond that the theory of license to purchase has not been recognized. The uniform act also rejects such extreme theories of regulation as that embodied in the Arkansas law of 1923, requiring a State-wide registration of pistols, which principle, though repealed subsequently in Arkansas, has more recently found some recognition in the Michigan act of 1927, and is approached by the Virginia act of 1926.

It will be noted that the act deals with pistols and revolvers only. The conference after careful consideration decided to confine the act to small arms of this nature as a subject by itself, leaving the matter of other dangerous weapons of not legitimate use to be regulated in separate acts.

### GENERAL PRINCIPLES OF ACT

The general principles embodied in the act may be summarized as follows:

1. Without making it difficult for a law-abiding citizen to secure arms for the protection of his home, as by the inconvenient requirements of a license to purchase, the act seeks by strict regulation of dealers, identification of purchasers, and strict licensing of those who carry concealed firearms, to keep such weapons out of the hand of criminals and other prohibited classes.

2. A heavier penalty is provided for a crime of violence by one who is armed, whether legally or not, and the possession of a pistol by a criminal is made prima facie evidence of intent.

3. The universal principle is adopted as in all State statutes forbidding the carrying of concealed weapons with a complete enumeration of classes of excepted persons and without sufficient exceptions to suit special circumstances. It prohibits carrying pistols in a vehicle whether concealed or not.

4. The act forbids the possession under any circumstances of pistols by persons who have committed crimes of violence as defined by the act.

5. The general principle of forbidding the transfer of pistols to minors is included.

6. A detailed method of identification is provided in the case of sales by private persons and transfers by dealers, requiring licenses of dealers.

7. A complete system is set up for granting licenses to carry concealed weapons in cases where the character of the applicants and emergencies justify the same.

8. The provisions of the act are made effective by prohibitions against the giving of false information by purchasers and applicants for licenses, and the alteration of identification marks on weapons.

9. Pawning pistols or trading in them by way of mortgage is forbidden.

10. A general penalty provision is contained in the act with terms of imprisonment and amounts of fines left blank so as to suit the needs of the particular State enacting the law.

In general, it is submitted that the proposed uniform act embodies sound forms of regulation which have stood the test of experience in this country and that it embodies such new ideas as have been presented from time to time by individuals and organizations working in the same subject matter. Thus at the same time that it preserves the traditional methods of firearms' regulation it takes advantage of enlightened experience of recent years. It comes as near, it is believed, as it is possible to come in meeting the two divergent views of a too drastic regulation on the one hand and a too liberal lack of regulation on the other.

Case 1:22-cv-02579-CKK   Document 10-1   Filed 10/28/22   Page 75 of 168

## COMMENTS ON INDIVIDUAL SECTIONS

Section 1. A "pistol" is defined as a firearm with barrel less than 12 inches in length, in accordance with definitions already prevailing in State statutes. It thus includes a revolver or any small firearm capable of being concealed on the person. Other kinds of dangerous weapons are not included. "Crime of violence", which is used in numerous places in the act, is defined to cover such crimes as are ordinarily committed with the aid of firearms.

Section 2. An additional penalty is provided for persons committing crimes of violence when armed. This provision is found, not only in recent enactments following the revolver association act, but in other States, some of long standing.

Section 3. The fact that a criminal is armed with a pistol without license is deemed prima facie evidence of his intention to commit the crime of violence with which he is charged. This provision is also found not only in those States which have followed the revolver association act, but in a number of other States.

Section 4. One convicted of a crime of violence is absolutely forbidden to own or possess a pistol or revolver. This provision also has numerous precedents in existing State legislation and is useful in keeping firearms out of the hands of criminals.

Section 5. This sections forbids the carrying of concealed weapons and is similar to provisions prevailing in practically every jurisdiction in this country. It adopts the modern theory of making the prohibition extend not only to weapons concealed on the person but also weapons carried in vehicles whether concealed or not. It is intended thus to remove the easy method by which a criminal on being pursued may transfer a weapon from his pocket to a concealed place in a vehicle.

Section 6. This section enumerates all the classes of persons who, it seems, should be excepted from the provisions of section 5, the list being adopted after a comparison of persons named in existing State statutes. The exception of a concealed weapon in a dwelling house or place of business is contained in the preceding section: This section extends the exceptions to cases where the weapon may be in process of being carried for mere purposes of legitimate transfer or for repair.

Section 7. This section defines the method for application and issuance of licenses to carry concealed weapons and for the preservation of the record of the same. It is in line with existing provisions. No bond provision has been added because it is believed that, if a proper showing is made on the part of the applicant as to character and necessity, the bond provision should not be introduced to make the obtaining of the license difficult and burdensome.

Section 8. The provisions of this section forbidding the delivery of a weapon to a minor, a criminal, or incompetent, are similar to those now generally prevailing. The age of 18 years named in the section has been deemed more desirable than the younger age named in a number of statutes and the higher age named in some. It is believed that in ordinary instances youths will be of sufficient maturity at 18, and that the naming of a higher age might make it impossible to deliver weapons to mature youths who might need them.

Section 9. The provision of this section forbidding a seller to transfer on the day of purchase is intended to avoid the sale of a firearm to a person in a fit of passion. The section further requires identification of purchaser and weapon and the preservation of this identification.

Section 10. This section requires a license of dealers and is in line with existing statutes.

Section 11. This section constitutes the conditions under which licenses will be granted to dealers and for the breach of which such licenses will be forfeited. These conditions are in line with all modern legislation on the subject and constitute the chief safeguard against firearms coming into the possession of undesirables.

Section 12. This section in prohibiting a loan of a pistol secured by any of the methods mentioned is intended primarily to prohibit dealing in pistols by pawnbrokers.

Section 13. This section prohibits the giving of false information in purchasing a firearm or in applying for a license to carry the same. The principles of the section have been adopted not only by those States adopting the revolver association act, but by a number of other States.

Section 14. This section, also designed to preserve the identification of weapons in connection with transfers, forbids the changing of identifying marks and provides that the possession of pistols from which such identifying marks have

## 74                    NATIONAL FIREARMS ACT

been obliterated shall be prima facie evidence that the possessor has changed the same. It has been adopted by all States which have enacted the revolver association act.

Section 15. This section revokes all existing licenses on a date to be inserted by the enacting State.

Section 16. This section is designed to remove from the operation of the act firearms that are kept merely as curiosities. It has been adopted already in those States which have passed the revolver association act.

Section 17. This is the general-section which provides penalties for violations of the various provisions of the act. The amounts of fines and the lengths of imprisonment are left blank so that these may be fixed according to the needs and usages of the particular State. This section is so framed as to be applicable to different State definitions of misdemeanors and felonies. A general penalty section has been thought more scientific than the naming of penalties in connection with specific sections.

Section 18. This section is intended to avoid the invalidity of the entire act by a judicial holding that a particular part is unconstitutional. It has been included by the conference as one of its model sections contained in most uniform acts.

Section 19. This section, in accordance with the practice of the conference, provides for a short designation of the act to avoid the longer definition at the beginning. In the selection of the words "Uniform Firearms Act", the definite article "the" has been omitted in order to reduce the short title to its smallest terms.

Section 20. This section is the usual section in uniform acts embodying the legislative intent that the act shall be so interpreted as to make uniform the laws of the States.

Section 21. This section is the usual section found in uniform acts providing for an effective date.

Section 22. This section is the usual section in uniform acts and contained in the revolver association act, repealing existing laws inconsistent with the uniform act.

---

### THE CAPPER FIREARMS BILL—ITS RELATION TO THE UNIFORM FIREARMS ACT.

[By Charles V. Imlay, Vice president National Conference of Commissioners on Uniform State Laws in the Federal Bar Association Journal, March 1932]

The bill recently introduced by Senator Capper in the United States Senate to control the possession and transfer of firearms and other dangerous weapons in the District of Columbia [1] is intended to replace the very inadequate laws upon that subject now prevailing and to supply for the District for the first time a thorough and sane system of regulating traffic in firearms, in particular small arms capable of being concealed on the person, with which the bill is chiefly concerned. The bill has the endorsement of the Commissioners of the District of Columbia and of a number of influential organizations which have studied its provisions. It is very similar to a bill which passed the House of Representatives in 1929 but which failed to get consideration by the Senate that year because of the short time remaining in the legislative session.[2]

The present Senate bill and the former House bill are with some additions and minor changes the Uniform Firearms Act promulgated by the National Conference of Commissioners on Uniform State Laws, first in 1926 and upon reconsideration again in 1930, upon each occasion receiving the approval of the American Bar Association.

#### EXISTING DISTRICT LAWS

The present laws of the District of Columbia [3] are as follows:

One is forbidden under a penalty of a fine of $50 or imprisonment for not more than a year or both, to carry a weapon "concealed about his person" (no mention being made of a vehicle), or openly with intent unlawfully to use the same; with exceptions in case of necessary arms for the Army, Navy, police, and some others. Exceptions are also made of carrying weapons concealed in a dwelling house and to and from a place of purchase or repair. A license to carry concealed weapons

---

[1] S. 2751, 72d Cong., 1st sess., Jan. 7, 1932, a bill to control the possession, sale, transfer, and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties, or prescribe rules of evidence and for other purposes.
[2] H. R. 13211, 70th Cong., 2d sess.
[3] D.C. Code 1929, title 6, ch. 4, ss. 114.116.

may be granted for cause by judges of the police court upon the furnishing of a bond by the applicant. Weapons taken from persons convicted under the provisions of law may be confiscated by the judge. Selling dangerous weapons to minors is prohibited (no mention being made of incompetents, criminals or drug addicts). A dealer in weapons must obtain a license and furnish a bond. He must keep a written register, open to inspection by the police, of purchasers and weapons.

### SUMMARY OF CAPPER BILL

The proposed law as regards pistols provides in the main as follows:

The carrying in a vehicle or concealed on the person (except in the home or place of business) of a pistol (defined as any firearm with barrel less than 12 inches in length) is forbidden to all except law officers and certain others and those specially licensed under rigorous safeguards, and except under certain conditions as going to and from a place of repair. A crime of violence committed by one armed with a pistol carries a further penalty in addition to that prescribed for the crime, graduated from the first to the fourth or subsequent offense from maxima of 5 to 30 years. The fact that one charged with such crime is armed without a license is prima facie evidence of intention to commit the crime.

Possession of pistols by those convicted of crimes of violence is forbidden and delivery of pistols is forbidden to such convicts, drug addicts and incompetents, as well as to minors under the age of 18.

Delivery under sales may be made only after 48 hours from application to the seller, during which interval a complete record of the intending purchaser and the weapon is sent to the police. Dealers are subject to rigorous requirements as conditions for licenses to sell. Among other things the purchaser must be personally known to the seller or furnish clear evidence of his identity. No sales may be made to the prohibited classes mentioned above.

Penalties are provided for giving false information in connection with a purchase of a pistol and altering the identifying marks thereof. Provision is made for licenses to be issued by the superintendent of police for carrying pistols concealed, for cause.

In addition to the regulations mentioned above with reference to pistols, as to which a legitimate use is recognized, certain other dangerous weapons are, with a few exceptions, entirely proscribed. These are the machine gun, tear-gas gun, or tear-gas bomb, or any instrument or weapon of the kind commonly known as a black jack, sling shot, billy, sand club, sandbag, metal knuckles, or a firearms silencer. The exceptions are made in the case of machine guns and several other of the contraband weapons named in favor of the Army and Navy, the police, and certain other individuals and organizations.

### UNIFORM FIREARMS ACT

The National Conference of Commissioners on Uniform State Laws began its work in 1923 upon a request made of it to frame a uniform law which might be adopted by all the States for the purpose primarily of eliminating the evil of the purchase of firearms in States where regulation was lax with the consequent nullification of the stricter laws of other States. A study was made of statutes on the subject prevailing in this country and the history of the matter of firearms regulation. It was found that all State constitutions as well as the Federal Constitution [4] guarantee the right to have and bear arms. It was found that practically without exception all jurisdictions interdict the carrying of concealed weapons.

Thus it might be said that all jurisdictions recognize a legitimate and illegitimate use of arms. This is a proposition that firearms reformers sometimes lose sight of. Colonel Goddard [5] has referred to the "time when the rifle hung over every mantel, and the pistol held an honorable place as a secondary weapon of defense and offense." An attempt then to control the illegitimate use of the firearm must not overlook its legitimate use.

The legitimate uses of the pistol and other firearms have been summarized by Mr. Frederick,[6] one of the legal and technical advisers to the conference, as follows:

"1. By the police, secret service, and other law-enforcement officers.

"2. By the Army, Navy, Marine Corps, National Guard, and Organized Reserves.

[4] Amendment II.
[5] This Pistol Bogey, Calvin Goddard, Am. Jour. Police Science, vol. 1, no. 2, March-April 1930.
[6] Karl T. Frederick, Pistol Regulation—Its Principles and History, reprinted from The American Rifleman, Issues of December 1930 to July 1931.

"3. By bank guards and bank employees, express and mail agents, watchmen, messengers, and others similarly employed.

"4. By target-shooters and marksmen.

"5. By householders for the protection of the home, a use which now as in the past is large and important."

### UNSOUND METHODS OF REGULATION

The conference found existing in the State of New York the Sullivan law which for many years had required as it does now a purchaser to secure a license to purchase, under somewhat burdensome requirements, e.g., the filing of a photograph by the purchaser and his submission to finger-printing. That law, however, has not prevented the increase in New York of crimes of violence committed with firearms, as Mr. Frederick conclusively shows.[7] While similar laws have recently been passed in Massachusetts, West Virginia, New Jersey, Michigan, and in Hawaii, this method of regulation has not found extensive adoption. It was believed by the conference that such a regulation is unworkable and leads to a system of pistol bootlegging. It puts a burden on the legitimate purchaser and does not keep the pistol out of the hands of the criminal. It was for that reason not embodied in the Uniform Firearms Act and is not therefore a part of the Capper bill.

### MEAN BETWEEN TOO LOOSE AND TOO DRASTIC REGULATION

Through rejecting what was believed to be the unsound system of regulation in the Sullivan law and laws modeled thereon the draftsmen of the Uniform Act sought to incorporate therein the sound principles of rigid regulation that were finding their way into the statute law of the States. Much of this had been brought into the proposed Uniform Act drafted by the United States Revolver Association, which act had already been passed in 1923 in New Hampshire and North Dakota and formed the basis of the California law of the same year. Thus, at the same time that the draftsmen of the Uniform Act preserved the traditional methods of firearms regulation which had stood the test of time in this country, they took advantage of enlightened experience of recent years. The Capper bill may therefore be said, as may be said of the Uniform Act upon which it is based, to come as near as possible in meeting the two divergent views of a too drastic regulation on the one hand, and a too liberal lack of regulation on the other. Like the Uniform Act it makes for uniformity of legislation by incorporating within its terms provisions that will receive acceptance generally. And it is obvious that uniformity cannot be secured in State legislation unless there is a basic agreement among the States on the principles underlying a proposed uniform law.

### PRINCIPLES OF CAPPER BILL ALREADY EXTENSIVELY ADOPTED

Attention has already been called to the fact that the proposed new legislation was already in effect in California, New Hampshire, and North Dakota, when the conference began its work in 1923. It was thereafter enacted in Indiana in 1925. After the first approval by the conference in 1926 the Uniform Act, except for the license to purchase feature, was adopted by Hawaii in 1927. Since the second approval in 1930 the Uniform Act has been adopted in Pennsylvania.[8] Many of its provisions have been enacted into the statute law of other States. It may therefore be said that the provisions of the Capper bill have already received extensive acceptance elsewhere. It is believed that the favor already won for this type of legislation will increase and that the enactment of the Capper bill by Congress as a local law for the District of Columbia will place the District in the class of progressive jurisdictions on this subject.

---

### UNIFORM FIREARMS ACT REAFFIRMED

[By Charles V. Imlay, member of Committee on Uniform Firearms Act of Commissioners on Uniform State Laws in the American Bar Association Journal]

The Uniform Firearms Act, one of several acts adopted by the National Conference of Commissioners on Uniform State Laws at its sessions in Chicago,

---

[7] Pistol Regulation, supra, p. 34;

August 11–16 and approved by the American Bar Association in its session there August 21, is in substance and in form almost identical with a former draft adopted by the conference and approved by the bar association at their respective sessions at Denver in July 1926. The intervening 4 years have been employed in a full reconsideration by the conference of certain controversial features (to which reference will be made) which had prompted the bar association likewise to reconsider its approval of the former drafts.

The final draft with only a few departures from the former, which has been reviewed before in this Journal,[1] may be summarized in its important provisions as follows:

"The carrying in a vehicle or concealed on the person of a pistol (defined as any firearm with barrel less than 12 inches in length) is forbidden to all except law officers and certain others and those specially licensed under rigorous safeguards. A crime of violence committed by one armed with a pistol carries a further penalty in addition to that prescribed for the crime. The fact that one charged with such crime is armed without a license is prima facie evidence of intention to commit the crime.

"Delivery of pistols is forbidden to convicts, drug addicts, habitual drunkards, and incompetents, as well as to minors under the age of 18. The first class are forbidden to possess pistols.

"Sales may be made only after 48 hours from application to the seller, during which interval a complete record of the intending purchaser is sent to the police. Dealers are subject to rigorous requirements as conditions for licenses to sell. Among other things the purchaser must be personally known to the seller. No sales may be made to the prohibited classes mentioned above.

"Pawning pistols is forbidden. So also are giving false information in connection with a purchase of a pistol and altering the identifying marks thereof. A general penalty section provides punishments for violations of these provisions as well as for the violation of other provisions of the act."

### OBJECTIONS TO 1926 DRAFT

The subject matter of a Firearms Act was first brought to the attention of the conference at its Minneapolis meeting in 1923 in the form of a model law drafted by the United States Revolver Association, the substance of which had already been enacted in the California, North Dakota, and New Hampshire acts of that year. (It was thereafter enacted in the Indiana Act of 1925.) It was because of the favor with which the model law had already been received that the conference adhered so closely to it in the Denver draft of 1926 and has done so also in the new draft. But notwithstanding the momentum already gained for the uniform act by the previous adoption of the model law and the endorsement of the conference and bar association, the act immediately upon its promulgation late in 1926 was severely criticized in some quarters as not being sufficiently drastic. These criticisms were in the main from law-enforcement officers, notably Mr. G. V. McLaughlin, the police commissioner of New York City. The criticisms were presented in full to the conference by its committee at the Buffalo meeting in 1927.[2] The objections thus made prompted the conference and in turn the bar association to withdraw the act temporarily for reconsideration.[3] Another reason for reconsideration was the fact that the matter of firearms legislation was being considered by the National Crime Commission which early in 1927 produced an act which incorporated most of the uniform act but departed therefrom in some important particulars, notably in the requirement of a license to purchase. (It also introduced the new matter of machine guns.)

During the 4 years intervening between the two drafts there have been frequent conferences between committees of the National Crime Commission and the conference. The criticisms of the act and the suggestions made by the Crime Commission have been carefully considered and have in some instances influenced the redraft in substance and form. In this reconsideration all recent statutes and judicial decisions have been compiled and printed in elaborate annotations in the committee report to the Chicago conference.

One criticism was that the definition of pistol should not be confined to "any firearm with a barrel less than 12 inches in length." But this is the definition prevailing in a great many States, indicating that the legislation refers to small firearms. The definition has therefore been retained. It was said that the

---

[1] American Bar Association Journal, vol. XII, pp. 767–769.
[2] Handbook Nat. Conf. Commissioners on Uniform State Laws, 1927, pp. 866–877.
[3] *Ibid.* p. 866; A.B.A. Reports, vol. 52, 1927, p. 223.

additional penalty for crimes committed while one is armed should not be confined to "crimes of violence" like murder, manslaughter, etc., as defined in the act, but extended to cover crimes of other kinds. It was thought, however, that the provision should be made applicable to those crimes mentioned in the act because they are those in which the pistol specifically figures. For the same reason the Conference has seen fit to interdict the sale of the pistol only to convicts of that class, as against the contention that it should be interdicted to all who have committed any crime. This is on the theory that the pistol has a legitimate use to a householder and should not be prohibited to him without sufficient cause.

The objection of Commissioner McLaughlin that the Denver draft fell short of the requirements in merely forbidding so far as a vehicle is concerned the carrying of a pistol "concealed" was admitted to be sound. And the committee of the conference was more persuaded to admit this objection because the crime commission had in its draft forbidden the carrying by any person of a pistol "in any vehicle" without a license, that is, whether concealed or unconcealed. The final draft of the Uniform Act therefore contains a similar provision. This prevents the possibility, as Commissioner McLaughlin points out, of criminals placing pistols on the floor of automobiles and contending that they are not concealed.

The objection raised by others that the act did not proceed on the theory of prohibiting manufacture and sale of pistols, which seems at one time to have received at least the tacit assent of the bar association,[4] could not be admitted because it is opposed in principle to all theories of regulation heretofore prevailing. There never has been any serious effort made to enact legislation prohibiting the manufacture and sale of pistols. The nearest approach to this was a bill commonly known as the Shields bill introduced in the United States Senate on April 25, 1921,[5] which was intended to restrict the manufacture of firearms to weapons of standard Army and Navy makes. The bill failed of passage. This legislation has of course frequently been directed against contraband weapons that have no legitimate use in the hands of private citizens, e.g., recent statutes against the manufacture and possession of machine guns.[6]

### LICENSE TO CARRY—NOT LICENSE TO PURCHASE

The objection most strongly urged against the Uniform Firearms Act has come from those who have favored the theory of the license to purchase which has been rejected by the conference in both drafts. It was pointed out in the review in this Journal of the former act that New York had long stood virtually alone in favoring the form of regulation by license to purchase under the so-called "Sullivan law," first enacted in 1888, and now existing there with certain amendments. It was also pointed out that Massachusetts had recently enacted a law along the same line,[7] and that a statute of West Virginia of 1925 seemed to approach the principle.[8]  Since that review the States of Michigan [9] and New Jersey have enacted legislation requiring a license to purchase.[10]  Such a provision is also contained in the act of the Hawaii Legislature hereafter mentioned. Beyond that, so far as the committee is advised, the principle has not prevailed; the rank and file of the States in this country are opposed to it. (An Oregon law of 1913 requiring a license to purchase has been superseded by a law modeled closely on the Uniform Act.[11])  It was on this principle that the committee of the conference was unable to reach an agreement with the committee of the Crime Commission which in its draft incorporated the theory of a license to purchase.

In rejecting the theory of the license to purchase the conference has not only adhered to what has always been the prevailing form of legislation in this country, but to what this committee has considered to be the common sense of pistol regulation. The requirement of a license to purchase with its consequent inconvenience and notoriety of such things as photographs and thumb prints, in accordance with the method prevailing under the Sullivan law in New York, subjects the law-abiding citizen to hardship and inconvenience, and thus renders

[4] Reports A.B.A., vol. XLVII, 1922, pp. 424–432, 430.
[5] 67th Cong., 1st sess. S. 1184.
[6] Gen. Laws Cal. 1927, ch. 552; acts, etc. Mass. 1927, ch. 326; Mich. Pub. acts 1927, no. 372; N.J. Pub. L. 1927, ch.95, p. 180.
[7] Mass. Gen. L., ch. 395, act May 29, 1926.
[8] W.Va. laws 1925, ch. 95, act Apr. 23, 1925, amending S. 7, ch. 148, Code W.Va.
[9] Mich. Pub. Acts 1927, no. 374, s. 2; Comp. Laws Mich., ss. 7164 (70), 7164 (74).
[10] N.J. laws 1927, ch. 321, s. 6.
[11] Oregon laws, 1921–27 Supp., ch. 3, s. 9.

more difficult his obtaining a pistol for the legitimate purpose of the defense of the home and at the same time does not keep the pistol out of the hands of the criminal.    For he will not obey the law, but will obtain his pistol under any circumstance.    He does not stop at purchasing, like the respectable citizen, but will resort to thefts of pistols, pistol bootlegging, and for lack of anything else resort to the sawed-off shotgun.

Several drafts of the revised Uniform Act during these 4 years of reconsideration, e.g., the draft presented at Seattle in 1928 [12] and that at Memphis in 1929,[13] had embodied additional material with reference to machine guns, as had been done in the crime commission bill.    An act adhering closely to the 1928–29 drafts and embodying provisions with reference to machine guns intended as a local law for the District of Columbia had passed the United States House of Representatives [14] in the spring of 1929 but failed of passage in the Senate.    It was considered, however, by the committee best to confine the Uniform Act, as the Denver draft of 1926 had been confined, to pistols, inasmuch as the regulation of small firearms constituted a subject in itself.    The matter of the regulation of the possession and sale of machine guns and other highly dangerous weapons of that nature has been committed by the conference to its committee on firearms for the purpose of a report at the session which will be held in Atlantic City in September 1931.    In this intervening year this subject will therefore receive the careful attention of the committee.

## MEAN BETWEEN TOO LOOSE AND TOO DRASTIC REGULATION

The attention of the committee was directed to legislation of the kind known as the "Esmond Wales bill" or "Baumes bill",[15] the text of which was presented by the committee to the conference in one of its reports.    This proposed law and others of the same type have been before the New York legislature a number of times but have never been passed.    They go so far as to require a license to possess a pistol and to effectuate that purpose would require a State-wide registration.    An Arkansas act of March 16, 1923, so providing, was repealed 2 years later as unworkable.[16]    Such a provision in a Michigan act of May 26, 1925, was however included in the most recent Michigan act of 1927 mentioned above.[17]    (The requirements of the Virginia Code Supplement of 1926, S. 2324a, imposing an annual tax on pistols approaches the registration provisions.)    No record has been found of similar legislative attempts elsewhere.    Such proposals are entirely out of line with recognized precedents and could not receive general adoption by State legislatures.

It will be noted that most of the adverse criticism to which reference has been made proceeds upon the theory that the law in its provisions is too mild.    On the other hand almost at the same time that the criticisms mentioned above were forthcoming from the chief of police of New York City the Uniform Act of 1926, having passed both legislatures of the State of Arizona, was vetoed by Gov. George W. P. Hunt in a veto message of March 4, 1927, in which he discusses the act as a serious invasion of personal liberties.[18]    He classes it with the New York legislation on the subject, and argues that it is entirely too drastic.    This is in line with numerous arguments advanced from time to time in presentations of the matter before the National Conference, many members taking the point of view that the law was too drastic.    (This was the point of a venerable member of the conference in casting the vote of his state against the law in the recent Chicago conference.)    This illustrates very well the fact that ideas upon the subject of firearms legislation take many different turns, varying from the extreme view put forward sometimes by law enforcement officers that firearms in the possession of ordinary citizens are useless, to the other extreme view sometimes advocated that persons should be permitted to arm *ad libitum*.    Between these two sharply contrasting extremes the committee of the conference has sought to

12 Handbook 1928, pp. 422–429.
13 Handbook 1929, pp. 350–355.
14 70th Cong., 2d sess., H.R. 13211.
15 Handbook 1927, pp. 907–913.
16 Arkansas acts 1925, Act No. 351, p. 1047.
17 v. Note 9.
12 Handbook 1928, pp. 422–429.
13 Handbook 1929, pp. 350–355.
14 70th Cong., 2d sess., H.R. 13211.
15 Handbook 1927, pp. 907–913.
16 Arkansas acts 1925, Act No. 351, p. 1047.
17 v. Note 9.
18 Handbook 1927, p. 867; Veto Messages, State House, Phoenix, Ariz., Mar. 19, 1927, pp. 11–16.

find and a middle ground that will be consistent with traditional forms of regulation in use in this country.

It is the belief of the committee that the proposed Uniform Act embodies sound forms of regulation which have stood the test of experience in this country, and that it embodies such new ideas as have been presented from time to time including those advanced by Commissioner McLaughlin, the National Crime Commission, and other organizations working along this line. Thus, at the same time that it preserves the traditional methods of firearms regulation it takes advantage of enlightened experience of recent years. It comes as near, in the opinion of the committee, as it is possible to come in meeting the two divergent views of a too drastic regulation on the one hand, and a too liberal lack of regulation on the other.

It is interesting to note that in the recent legislation mentioned in Massachusetts and Michigan, the language of a number of sections of the Uniform Act has been adopted. A Rhode Island act of 1927 has incorporated a number of sections verbatim.[19] The legislature of Hawaii in 1927 adopted most of the sections of the act verbatim.[20] Thus the principles and the form of the act, already well advanced in the legislatures prior to the beginning of the undertaking by the conference in 1923, have gained appreciably in State enactments during the four years that the matter has been under reconsideration. It is believed that this favor already won will continue and that the act, with its recent reaffimation by conference and the bar association, will have a favorable reception throughout the country as a whole.

## STATEMENT OF JOHN THOMAS TAYLOR, REPRESENTING THE AMERICAN LEGION

Mr. TAYLOR. My name is John Thomas Taylor and I represent the American Legion. I should like to present a resolution which the National Convention of the American Legion at Chicago adopted in considering this subject. I would like to read the resolution, if I may [reading]:

*Be it resolved,* That the American Legion recommends that the Congress of the United States and the legislatures of the several States pass legislation toward the end that the sale of machine guns, submachine guns, and lethal weapons be regulated and controlled, and that the owners and holders and purchasers of such weapons be regulated and controlled, and that the owners and holders and purchasers of such weapons and their respective transfer be registered with the proper public authorities, and that the possession of machine guns, submachine guns, and lethal weapons be restricted to the organized military forces and law enforcement authorities of the United States and of the several States.

Mr. Chairman, and members of the committee, you will note that this refers to machine guns, submachine guns, and lethal weapons. We are in full accord with the Department of Justice on this matter and we will lend every aid we can in carrying it out. However, we are in this position: So far as the small weapons are concerned, the pistol or revolver, we do not want legislation to be enacted which will in fact not reach the criminal, against whom the legislation is directed, but will reach the great mass of law-abiding citizens who are interested in having revolvers and pistols of their own as a protection. That is our interest. It is evident that everybody is in accord for the necessity of legislation of this character, and we hope that when it is drafted it will reach the man it is after—the criminal—himself, and not the great body of law-abiding citizens. We hope there will not be another Volstead Act, with the smuggling of the small arms, because the criminal is going to get his unless you go after him. I know you gentlemen will bring out that type of legislation.

[19] R.I. ch. 1052, Laws 1927.
[20] Hawaii, Laws 1927, act 206.

Case 1:22-cv-02579-CKK   Document 10-1   Filed 10/28/22   Page 83 of 168

The CHAIRMAN. The Chair would like to suggest that in view of the statements made, that you confer with the Department of Justice. You are all going to the same destination.

Mr. TAYLOR. We certainly are.

## STATEMENT OF SETH GORDON, PRESIDENT AMERICAN GAME ASSOCIATION, INVESTMENT BUILDING, WASHINGTON, D.C.

Mr. GORDON. My name is Seth Gordon; I am president of the American Game Association with offices in Washington. I will take about a minute. The 6,000,000 sportsmen in the United States are quite perturbed about the possible effect of this piece of legislation. I am sure that I voice their sentiment when I say that every one of those 6,000,000 would like to see legislation that will control and absolutely regulate the possession of the machine gun and submachine gun, but when you go beyond that you are going to infringe upon the traditional rights of the sportsmen of America who have stood behind this country in time of need. Every time we have had trouble they have come to front more quickly than any other class of people. I think you do not need to pass any legislation so drastic as this bill is in its present form but that it should be restricted to machine guns.

Mr. SHALLENBERGER. How about sawed-off shotguns?

Mr. GORDON. If you can find a way to regulate them, I am in favor of it. When you go into pistols and sidearms that sportsmen carry on their hunting trips and require them every time they cross a State line to get a permit in order to do it, there will be 6,000,000 sportsmen opposed to it.

The CHAIRMAN. What excuse or what justification is there for anyone having a sawed-off shotgun?

Mr. GORDON. None. If you will permit one observation, there is some question about how far you ought to go when you say sawed-off shotgun. When you speak about a gun shorter than 18 inches or 20 or 22 inches, that is one thing. If you include a gun which happens to have the end of the barrel blown off because someone got snow or mud in it, and the barrels are cut off and they continue to use it, as they do in the country, it is another thing. You have to be careful when you say sawed-off shotgun so that you do not include a gun which is still useful——

General RECKORD. We believe that the machine gun, submachine gun, sawed-off shotgun, and dangerous and deadly weapons could all be included in any kind of a bill, and no matter how drastic, we will support it. If you will give us an opportunity to sit down and discuss this matter, we believe we can present two or three bills that will cover this situation nearly as well, because it is a hard problem, and it will be aimed at the crook, the man we all want, but it will not hamstring and injure or interfere with the rights or the prerogatives of the honest citizen. We are sincere; we will work with your subcommittee, or with the Attorney General, if given an opportunity, and we ask the opportunity. We believe this is bad legislation and that it is unnecessarily burdensome on honest citizens and that it will no more reach the crook than any legislation heretofore. If we only have the opportunity to present our views——

Mr. COOPER. The Assistant Attorney General stated that you had several hours with him.

General RECKORD. Yes, sir.

Mr. COOPER. You have had something like an hour today; how much longer is it going to take to be prepared to offer your definite and specific suggestions in meeting the problems?

General RECKORD. I might present specific recommendations by Monday of the coming week.

The CHAIRMAN. The Chair would like to make this observation: In view of the statement just made by the adjutant general of the State of Maryland, who has expressed an interest in going as far as the Government can go by legislation to accomplish the purposes which are intended to be accomplished, I suggest that an effort be made with the Department of Justice to see if he can work out something this week along the line of an agreement whereby the committee can have the benefit of your judgment.

General RECKORD. I will be glad to do that.

Mr. KEENAN. General Reckord, Mr. Smith tells me, stated that he could not hope to reach an agreement with us as long as we wanted to regulate pistols. I would like to know if that is still your position?

General RECKORD. No; that never has been.

Mr. KEENAN. There was evidently a misunderstanding.

General RECKORD. I went to Mr. Smith because I could not see Mr. Keenan, and Mr. Smith can correct me if I am wrong; Mr. Smith, when I suggested some legislation that we would propose if given an opportunity, Mr. Smith told me the Attorney General and Mr. Keenan had made up their minds and would not accept the suggestion.

The CHAIRMAN. We will now adjourn.

(Thereupon, at 12:30 p.m., the committee adjourned.)

# NATIONAL FIREARMS ACT

## MONDAY, MAY 14, 1934

HOUSE OF REPRESENTATIVES,
COMMITTEE ON WAYS AND MEANS,
*Washington, D.C.*

The committee met at 10 a.m., Hon. Robert L. Doughton (chairman) presiding.

The CHAIRMAN. I suggest that Mr. Keenan proceed with his explanation of this draft, as he did in connection with the original bill.

Mr. VINSON. It occurs to me that it might be well to insert in the record this amended draft.

The CHAIRMAN. Without objection, it will be inserted.

Mr. VINSON. I think the heading, H.R. 9066, should be stricken out and that it should be shown that this draft is being considered as a substitute measure.

(The committee had under consideration the following draft bill:)

A BILL To provide for the taxation of manufacturers, importers, and dealers in small firearms and machine guns, to tax the sale or other disposal of such weapons, and to restrict importation and regulate interstate transportation thereof

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That for the purposes of this act the term "firearm" means a pistol or revolver of more than .22 caliber rim fire, a shotgun or rifle having a barrel less than 18 inches in length, or any other firearm capable of being concealed on the person, a firearm muffler or firearm silencer, or a machine gun.

The term "machine gun" means any weapon which shoots, or is designed to shoot, automatically or semiautomatically, more than one shot, without manual reloading, by a single function of the trigger.

The term "person" includes a partnership, company, association, or corporation, as well as a natural person.

The term "continental United States" means the States of the United States and the District of Columbia.

The term "importer" means any person who imports or brings firearms into the continental United States, for sale.

The term "manufacturer" means any person who is engaged within the continental United States in the manufacture of firearms, or who otherwise produces therein any firearm for sale or disposition.

The term "dealer" means any person not a manufacturer or importer engaged within the continental United States in the business of selling firearms. The term "dealer" shall include wholesalers, pawnbrokers, and dealers in used firearms.

The term "interstate commerce" means transportation from any State or Territory or District, or any insular possession of the United States (including the Philippine Islands), to any other State or to the District of Columbia.

The term "Commissioner" means the Commissioner of Internal Revenue.

The term "Secretary" means the Secretary of the Treasury.

The term "to transfer" or "transferred" shall include to sell, assign, pledge, lease, loan, give away, or otherwise dispose of.

SEC. 2. (a) Within fifteen days after the effective date of this Act, or upon first engaging in business, and thereafter on or before the 1st day of July of each year, every importer, manufacturer, and dealer in firearms shall register

with the collector of internal revenue for each district in which such business is to be carried on, his name or style, principal place of business, and places of business in such district, and pay a special tax at the following rates: Importers or manufacturers, $1,000 a year; dealers, other than pawnbrokers, $200 a year; pawnbrokers, $300 a year. Where the tax is payable on the 1st day of July in any year it shall be computed for one year; where the tax is payable on any other day it shall be computed proportionately from the 1st day of the month in which the liability to the tax accrued to the 1st day of July following.

(b) It shall be unlawful for any person required to register under the provisions of this section to import, manufacture, or deal in firearms without having registered and paid the tax imposed by this section.

SEC. 3. (a) There shall be levied, collected, and paid upon firearms transferred in the continental United States a tax at the rate of $200 per machine gun and $1 per other firearm, such tax to be paid by the person so disposing thereof, and to be represented by appropriate stamps to be provided by the Commissioner, with the approval of the Secretary; and the stamps herein provided shall be affixed to the order for such firearm, hereinafter provided for. The tax imposed by this section shall be in addition to any import duty imposed on such firearm.

(b) All provisions of law (including those relating to special taxes, to the assessments, collection, remission, and refund of internal-revenue taxes, to the engraving, issuance, sale, accountability, cancelation, and distributinn of tax-paid stamps provided for in the internal revenue laws, and to penalties) applicable with respect to the taxes imposed by section 1 of the Act of December 17, 1914, as amended (U.S.C., Supp. VII, title 26, secs. 1040 and 1383), and all other provisions of the internal revenue laws shall, insofar as not inconsistent with the provisions of this Act be applicable with respect to the taxes imposed by this Act.

SEC. 4. (a) It shall be unlawful for any person to transfer a firearm except in pursuance of a written order from the person seeking to obtain such article, on an application form issued in blank in duplicate for that purpose by the Commissioner. Such order shall identify the applicant by such means of identification as may be prescribed by regulations under this Act: *Provided*, That, if the applicant is an individual, such identification shall include fingerprints thereof.

(b) The Commissioner, with the approval of the Secretary, shall cause suitable forms to be prepared for the purposes above mentioned, and shall cause the same to be distributed to collectors of internal revenue, to post offices, and to such associations, designated by the Commissioner, as, in good faith, are organized for the purpose of, and are engaged in, target shooting or hunging.

(c) Every person so transferring a firearm shall set forth in each copy of such order the manufacturer's number or other mark identifying such firearm, and shall forward a copy of such order to the Commissioner. The original thereof with stamps affixed, shall be returned to the applicant.

(d) No person shall transfer a firearm which has previously been transferred on or after the effective date of this Act, unless such person, in addition to complying with subsection (b), transfers therewith the stamp-affixed order provided for in this section for each such prior disposal, in compliance with such regulations as may be prescribed under this Act for proof of payment of all taxes on such firearms.

(e) If the transfer of a firearm is exempted from the provisions of this Act as provided in section 13 hereof, the person transferring such firearm shall notify the Commissioner of the name and address of the applicant, the number or other mark identifying such firearm, and the date of its disposal, and shall file with the Commissioner such documents in proof thereof as the Commissioner may by regulations prescribe.

(f) Importers, manufacturers, and dealers who have registered and paid the tax as provided for in section 2 (a) of this Act shall not be required to conform to the provisions of this section with respect to transactions in firearms with dealers, but shall keep such records and make such reports regarding such transactions as may be prescribed by regulations under this Act.

SEC. 5. (a) Within four months after the effective date of this Act every person possessing a firearm shall register, with the collector of the district in which he resides, the number or other mark identifying such firearm, together with his name, address, place where such weapon is usually kept, and place of business or employment, and, if such person is other than a natural person, the name and home address of an executive officer thereof: *Provided*, That no person shall be required to register under this section with respect to any firearm acquired after the effective date of, and in conformity with the provisions of, this Act.

(b) Whenever on trial for a violation of section 6 hereof the defendant is shown to have or to have had possession of such firearm at any time after such period of four months without having registered as required by this section, such possession shall create a presumption that such firearm came into the possession of the defendant subsequent to the effective date of this Act, but this presumption shall not be conclusive.

Sec. 6.. t shall be unlawful for any person to receive or possess any firearm which has at any time been transferred in violation of sections 3 and 4 of this Act.

Sec. 7. Any firearm which has at any time been transferred in violation of the provisions of this Act shall be subject to seizure and forfeiture, and all the provisions of internal-revenue laws relating to searches, seizures, and forfeiture of unstamped articles are extended to and made to apply to the articles taxed under this Act, and the persons to whom this Act applies.

Sec. 8 (a) Each manufacturer and importer of a firearm shall identify it with a number or other identification mark approved by the Commissioner, such number or mark to be stamped or otherwise placed thereon in a manner approved by the Commissioner.

(b) It shall be unlawful for anyone to obliterate, remove, change, or alter such number or other identification mark. Whenever on trial for a violation of this subsection the defendant is shown to have or to have had possession of such firearm upon which such number or mark shall have been obliterated, removed, changed or altered, such possession shall be deemed sufficient evidence to authorize conviction, unless the defendant explains such possession to the satisfaction of the jury.

Sec. 9. Importers, manufacturers, and dealers shall keep such books and records and render such returns in relation to the transactions in firearms specified in this Act as the Commissioner, with the approval of the Secretary, may by regulations require.

Sec. 10. (a) No firearms shall be imported or brought into the United States or any Territory under its control or jurisdiction (including the Philippine Islands), except that, under regulations prescribed by the Secretary, any arearm may be so imported or brought in when (1) the purpose thereof is shown to be lawful and (2) such firearm is unique or of a type which cannot be obtained within the United States or such Territory.

(b) It shall be unlawful (1) fraudulently or knowingly to import or bring any firearm into the United States or any Terriroty under its control or jurisdiction, in violation of the provisions of this Act; or (2) knowingly to assist in so doing; or (3) to receive, conceal, buy, sell, or in any manner facilitate the transportation, concealment, or sale of any such firearm after being imported or brought in, knowing the same to have been imported contrary to law. Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of such imported firearm, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains such possession to the satisfaction of the jury.

Sec. 11. It shall be unlawful for any person who is required to register as provided in section 5 hereof and who shall not have so registered, or any other person who has not in his possession a stamp-affixed order as provided in section 4 hereof, to ship, carry, or deliver any firearm in interstate commerce: *Provided*, That a person may ship, carry, or deliver a firearm in interstate commerce if such person had such firearm in his possession prior to the effective date of this Act and notifies the Commissioner thereof by affidavit within two days prior to such shipment, carriage, or delivery, setting forth in such affidavit his address, the number or other mark identifying such weapon, and the place to which it is to be transported.

Sec. 12. The Commissioner, with the approval of the Secretary, shall make all needful rules and regulations for carrying the provisions of this Act into effect.

Sec. 13. This Act shall not apply to the transfer of firearms (1) to the United States Government, any State, Territory, or possession of the United States, or to any political subdivision thereof, or to the District of Columbia; (2) to any peace officer or any Federal officer designated by regulations of the Commissioner; (3) to the transfer of any firearm which is unserviceable and which is transferred as a curiosity or ornament.

Sec. 14. Any person who violates or fails to comply with any of the requirements of this Act, except section 5, shall, upon conviction, be fined not more than $2,000 or be imprisoned for not more than 5 years, or both, in the discretion of the court.

Sec. 15. The taxes imposed by paragraph (a) of section 600 of the Revenue Act of 1926 (U.S.C., Supp. VII, title 26, sec. 1120) and by section 610 of the Revenue Act of 1932 (47 Stat. 169, 264), shall not apply to any firearm on which the tax provided by section 3 of this Act has been paid.

Sec. 16. If any provision of this Act, or the application thereof to any person or circumstance, is held invalid, the remainder of the Act, and the application of such provision to other persons or circumstances, shall not be affected thereby.

Sec. 17. This Act shall take effect on the sixtieth day after the date of its enactment.

Sec. 18. This Act may be cited as the "National Firearms Act."

## STATEMENT OF JOSEPH B. KEENAN, ASSISTANT ATTORNEY GENERAL

The CHAIRMAN. Mr. Keenan, you may proceed with your statement.

Mr. KEENAN. The bill has been read, and I desire to proceed to point out the changes made in this substitute measure.

The CHAIRMAN. Do you prefer to answer questions as you go along, or do you wish to complete your statement and then answer questions?

Mr. KEENAN. I am willing to answer the questions as I go along.

Mr. TREADWAY. As a matter of record, will you please tell the stenographer your official position.

Mr. KEENAN. Joseph B. Keenan, Assistant Attorney General, in charge of the Criminal Division, appearing on behalf of the Department of Justice.

Mr. TREADWAY. There is one other suggestion, before the gentleman begins; why offer any comparison with the original draft? Evidently that is superseded, and what interest is there in the original draft? We do not care how much you compromised with somebody. We can tell by the bill what you are aiming at.

Mr. HILL. We have had an explanation of the bill which was introduced, and we would like to know what the modifications are.

Mr. KEENAN. I think perhaps I would be overstating it in saying that it is an entirely new bill. I think it follows the old bill with a few certain changes that I believe to be important. Before going into the details of the changes of the bill, I would like to make a statement of what I consider to be the essential changes. As you will recall, the bill as originally drafted exercised two powers, one under the taxation clause and the other under the commerce clause. Under the bill as now submitted, it follows the theory of taxation all the way through, and it contains this one affirmative change of extreme importance in that it calls for a registration of all firearms within a prescribed period. This new provision does not, however, require fingerprinting, which has been considered to be the objectionable feature of identification.

Mr. FULLER. It does.

Mr. KEENAN. It does not include fingerprinting of the arms now in existence.

Mr. FULLER. I had the other impression.

Mr. KEENAN. Let me make this clear: In the old act we had no provision for registration of existing possessed firearms. In this act we have, but it only requires the name, address, and the occupation of the possessor. It does not require identification by fingerprinting or photographing.

Mr. TREADWAY. In connection with that, I would like to call attention to the proviso under section 4 (a), "Provided, that, if the applicant is an individual, such identification shall include fingerprints thereof."

Mr. KEENAN. That has to do only with those firearms specified herein, that are acquired after the effective date of this act.

Mr. TREADWAY. All you eliminate is fingerprinting of owners of old firearms?

Mr. KEENAN. That is correct.

Mr. TREADWAY. If I went into a store today and showed that I was a responsible person for the ownership of a pistol, then I would be fingerprinted as owning that pistol?

Mr. KEENAN. That is correct.

Mr. VINSON. The gentleman from Massachusetts speaks of eliminating fingerprints. It is not a question of eliminating fingerprints, because under the original draft, H.R. 9066, you were not required to register firearms owned by private persons.

Mr. KEENAN. That is true.

Mr. VINSON. It is not a question of eliminating fingerprinting and photographs; that was not required under the old bill.

Mr. KEENAN. That is right.

Mr. VINSON. As to those weapons now owned, is it not the taxation power which provides the basis for requiring the registration of the firearms now owned and possessed?

Mr. KEENAN. Yes. In executing or administering the taxation provision it is important to be able to identify arms to see which possessors have paid taxes and which firearms have been taxed and which have not.

Mr. VINSON. What is the penalty for violating section 5?

Mr. KEENAN. There is no penalty at all.

Mr. KNUTSON. In order to expedite matters, will you tell us just what sort of arms this legislation is aimed at, and what arms are exempt from the provisions of this act, or will you come to that later?

Mr. KEENAN. I will do that now. This act affects all firearms with the exception of .22 caliber rim fire pistols, and rifles and shotguns having a barrel longer than 16 inches.

Mr. KNUTSON. Sixteen or eighteen inches?

Mr. KEENAN. Eighteen inches.

Mr. KNUTSON. It exempts those?

Mr. KEENAN. Yes, it exempts those.

The CHAIRMAN. If a dealer only dealt in the firearms not included in this act, would he be subject to this tax? If he only dealt in shotguns and rifles having a barrel more than 18 inches in length and .22 caliber rim fire revolvers, would he be subject to this tax?

Mr. KEENAN. Are you talking about a manufacturer or dealer or both?

The CHAIRMAN. Both.

Mr. KEENAN. The term "manufacturer" means any person who is engaged within the continental United States in the manufacture of firearms or who otherwise produces therein any firearm for sale or disposition, but firearm, as defined, exempts the classes I have mentioned before. I think the answer would be "no."

Mr. WOODRUFF. According to your definitions, would a hardware merchant who dealt in shotguns and rifles, the barrels of which were

18 inches long or longer, and who did not deal in machine guns or rifles or shotguns with barrels shorter than 18 inches, have to pay the $200 tax?

Mr. KEENAN. I think not.

Mr. WOODRUFF. What is your definition of a dealer?

Mr. KEENAN. On page 2 the bill states, "The term 'dealer' means any person not a manufacturer or importer engaged within the continental United States in the business of selling firearms."

Mr. WOODRUFF. Would the term "firearms" include all those that had barrels 18 inches long or longer?

Mr. KEENAN. For the purposes of this act the definition of the term "firearm" is a pistol or revolver of more than .22 caliber rim fire, a shotgun or rifle having a barrel less than 18 inches in length, or any other firearm capable of being concealed on the person.

Mr. WOODRUFF. Where are you reading?

Mr. KEENAN. The first paragraph of the first page of the act. "Or any other firearm capable of being concealed on the person, a firearm muffler or firearm silencer, or a machine gun." Therefore, shotguns or rifles with barrels over 18 inches in length are not included.

Answering the question, I would say quite clearly that such dealers would not be required to pay the tax.

Mr. WOODRUFF. And any dealer dealing in revolvers of more than .22 caliber or automatic pistols of greater caliber would come under the provisions of the act?

Mr. KEENAN. Precisely, yes.

Mr. KNUTSON. Suppose a dealer, at the time this act is passed, has 3 or 4 shotguns or 3 or 4 rifles which he has carried over from last season. Would it be all right to allow him to declare that fact with the collector? He could not turn them in as the manufacturer would not take them back.

Mr. KEENAN. In the instance you cite, it is assumed that the barrels on these rifles and shotguns will be over 18 inches in length.

Mr. KNUTSON. He has in his possession when this act goes into effect those shotguns and rifles. In order to sell those two or three, he would have to take out a license?

Mr. KEENAN. Assuming the shotguns and rifles have barrels 18 inches or more in length, and are not sawed off, they are not covered by this act.

Mr. WOODRUFF. The sawed-off shotguns are those on which the barrels have been sawed off after leaving the manufacturer and after leaving the dealer.

Mr. McCLINTIC. In the first paragraph you say a pistol or revolver of more than 22 caliber rim-fire; is there any probability of the two words "rim fire" causing confusion, taking into consideration that pistols of greater caliber are all cap fire or center fire? Is the term "rim fire" necessary? Would not 22 caliber be sufficient?

Mr. KEENAN. We adopted that provision at the suggestion of the National Rifle Association, as being the definition that would exclude from the provisions of this act the typical target gun that had no real value as a gangster weapon. I think perhaps General Reckord will be better able to answer that than I can.

Mr. McCLINTIC. A center-fire cartridge might be excluded if you specifically refer to rim fire 22 caliber.

Mr. KEENAN. It would be excluded, I am informed.

Mr. McCLINTIC. If they are excluded, then you would exclude a lot of pistols that you want to include.

Mr. KEENAN. We would want to, but we feel if we get more than the 22 calibers under the provisions of the act we would be accomplishing a great deal.

Mr. HILL. Would you understand that pistols or revolvers of not more than 22 caliber, whether center fire or rim fire are exempt from this definition?

Mr. KEENAN. I would think not.

Mr. McCLINTIC. It seems to me that the two words "rim fire" ought to come out, because you would be liable to exclude center fire.

Mr. KEENAN. I am not particularly interested in that. That was adopted from a provision requested by the National Rifle Association. If the Congressman would permit, I would rather those questions be addressed to the proponents of that provision.

Mr. HILL. Under this definition, if a dealer sells a revolver that fires a center fire cartridge of any caliber, he would come under the provisions of paragraph 1 of the act as a dealer in firearms.

Mr. KEENAN. If the revolver is more than 22 caliber rim fire, I think the answer would be yes.

Mr. McCLINTIC. Suppose it is more than 22 and center fire?

Mr. KEENAN. I think it would plainly come within the provisions of the act.

Mr. COOPER. I have one question on that. Is this determined by the character of the cartridge fired or the type of gun that fires the cartridge? What I am getting at is this: Will not a 22 rifle fire a rim-fire or center-fire cartridge just the same?

Mr. KEENAN. We are referring to pistols or revolvers only.

Mr. COOPER. What I am getting at is this: Is the gun itself so made and designed that it will only fire rim-fire cartridges, or will it also fire center-fire cartridges?

Mr. KEENAN. I would prefer to have that question answered by the experts who have requested us to include this language.

Mr. WOODRUFF. I will say that a rifle designed for rim-fire cartridges will fire rim-fire cartridges and no others. A rifle designed to fire center-fire cartridges, I am not sure whether it will fire rim-fire cartridges or not, but I do not believe it will.

Mr. COOPER. Is it the type of cartridge fired that controls, or is it the gun?

Mr. KEENAN. I understand it is the gun; General Reckord tells me it is the gun.

Mr. McCLINTIC. The thought comes to me that if we leave those two words in, "rim-fire", manufacturers might change the firing pin or change the cartridge and make that particular rifle in the future so that it will fire center-fire cartridges. If you take those two words out, it will refer to revolvers of more than 22 caliber.

Mr. KEENAN. I do not think we would have any objection to that.

Mr. WOODRUFF. There are some high-powered 22-caliber rifles, not of a type for target practice.

Mr. VINSON. This provision only refers to pistols and revolvers.

Mr. LEWIS. What is the reason for excepting pistols of 22 caliber? What kind of a pistol is that?

Mr. KEENAN. It is the 22-caliber rim fire, used for target practice.

Mr. LEWIS. As pistols are they deadly?

Mr. KEENAN. They are deadly, but they are not so formidable as the heavier caliber, and this is a concession, if it may be so termed, to those who have a hobby of target shooting, following the suggestions that we attempt to get together on a bill.

Mr. LEWIS. Would a 22-caliber pistol be used for target practice? It is readily concealed on the person and is deadly. Could it be used for target practice?

Mr. KEENAN. The rim fire; yes. This is the message that comes to us from the representatives of the sportsmen and those who have a hobby of using pistols as well as rifles for target practice. It has been represented that while this weapon is technically a deadly weapon, it is not a formidable one, compared to the other arms found on the gangster today.

Mr. LEWIS. Is it required to be registered under the new provision?

Mr. KEENAN. It would not be required to be registered.

Mr. TREADWAY. May I ask a question? I want to get at two things; first, what present regulation or law is there applicable to the ownership of deadly weapons such as we have described here? I would like to know what the present regulation is in connection with those weapons. I would like also to know, when you speak of getting together with somebody, whether that included any business enterprises, manufacturers, etc., who have up to now been allowed to manufacture these goods under certain restrictions. Have they been consulted at all?

Mr. KEENAN. Yes.

Mr. TREADWAY. I mean the folks you are endeavoring to put out of business. There are two separate questions; I would like to have you handle them separately.

Mr. KEENAN. I assume the Congressman has reference to Federal laws.

Mr. TREADWAY. I assume that is all we can discuss.

Mr. KEENAN. I know of no regulations except the present ad valorem tax of 10 percent on sales. Other than through the matter of taxation, I do not believe that there is any regulation I know of by the Federal law.

Mr. TREADWAY. You are laying emphasis on the Federal law. As a side matter, there are State regulations?

Mr. KEENAN. Oh, yes. Of course, it is a very broad subject, if we go into the details of different forms of firearms regulation. We have the Sullivan law in New York, typical of the law with teeth. We have the so-called "uniform pistol law" adopted by 14 or 15 States. That has been presented to the committee, without an opportunity being given to all the members for adequate examination. Answering the second part of the question, I have had a conference with the representative of the Colt Co., which is the largest domestic manufacturer. I think the Colt Co., the Remington Arms Co., Smith & Wesson, and Iver Johnson are the only manufacturers of pistols. When you talk to the Colt Co., I think you are talking to the company that manufactures and sells the great bulk of firearms, the greater proportion of pistols in this country. The machine-gun people were represented here at the last session of this committee. I am not representing to this committee that this bill as drafted and submitted received the approval of the Colt Co. I do say that an earnest effort was made to get together. The representative of the Colt Co. is here

now, and he seemed to be interested in lowering the tax upon manufacturers. We have suggested cutting the manufacturers' tax from $5,000 to $1,000. The manufacture of pistols and revolvers is not a profitable part of the firearms industry. It is in red ink, as far as the manufacture and sale of small firearms are concerned.

Mr. KNUTSON. Do you not think $200 tax on a small dealer is too much?

Mr KEENAN The question asked is whether a tax of $200 on the small dealer is not excessive. I am inclined to take this position, as far as the Department of Justice is concerned: Whatever amount of money meets the approval of this committee in the taxing of the dealer meets our approval.

Mr. WOODRUFF. As a matter of fact, the purpose of taxing is for control only. That is the primary purpose; that is the medium through which we hope, constitutionally, to take charge of this situation, is it not?

Mr. KEENAN. Also the desirability of getting control of firearms away from pawnbrokers.

Mr. WOODRUFF. I understand. I say again that the primary purpose of putting the tax item in this bill is constitutionally to take charge of this situation?

Mr. KEENAN. If that question is asked——

Mr. WOODRUFF (continuing). Whether applied to pawnbrokers or anybody else?

Mr. KEENAN. That question is asked directly, and I have to answer frankly; yes.

Mr. WOODRUFF. The amount of tax is not important?

Mr. KEENAN. The amount of tax is not important except from this standpoint; it would be desirable to have the sale of guns in the hands of as few people as possible as a matter of efficiency to keep track of these weapons and see whether they are sold to the wrong people.

Mr. WOODRUFF. That is a debatable question, and I say that because I come from a district rather sparsely settled, and the merchants doing business in the various small towns in my district, who handle these firearms as described by this bill, who have a desire to supply peaceable law-abiding citizens with a means to defend themselves could not possibly pay that $200 a year.

Mr. KEENAN. Our position is that we would like to see as high a tax as is now suggested. We recede from that; for practical purposes we are willing to fix the tax at any amount the committee sees fit. That is one of the points that we agreed with the Colt Co. on; they were the representatives of the general manufacturers and were also interested in their dealers, since they have no sales organization of their own.

Mr. WOODRUFF. My point is this: So far as the Constitution of the United States is concerned, the Department of Justice is just as safe with a tax of $10 as it would be with a tax of $200?

Mr. KEENAN. I think there is no question about that.

Mr. McCLINTIC. If I read this bill right, the manufacturer who only makes shotguns is not subject to the tax.

Mr. KEENAN That is right.

Mr. McCLINTIC. And neither would be the dealer, unless he sells pistols and these short rifles and shotguns. It would leave shotguns and rifles with barrels greater than 18 inches out of the picture.

Mr. KEENAN. They are out from beginning to end and never were in it.

Mr. TREADWAY. Do you feel that this finger printing, as a matter of identification, is essential?

Mr. KEENAN. I think it is of great importance. What is, and what is not essential——

Mr. TREADWAY (interposing). You provide for registration, his name, and all that sort of thing, from the purchaser, and on top of that you want to fingerprint him.

Mr. KEENAN. Our position is this: The firearm today is causing a great deal of destruction and death in our land. We think anyone who wants to procure a firearm of the nature described in this legislation ought to be willing to go to that trouble to make his contribution to the safety of the other people. We have not had any telegrams sent to this committee; we have not attempted to generate any propaganda. We have received literally thousands of letters from women's organizations and other public-spirited organizations asking that something be done about the firearms evil, and we submit, that even though it is a little trouble to have fingerprints taken, we believe it is not too great a donation to make to the general safety of the public.

The CHAIRMAN. Do you believe that the criminal classes will comply with that provision?

Mr. KEENAN. We do not.

The CHAIRMAN. Those who obey the law will, of course, comply, but the criminal classes will not do so.

Mr. KEENAN. We have recognized that from the beginning. We do not believe that this bill will disarm the hardened gangster, nor do we believe that it will prevent him from obtaining firearms. We do believe that it will permit effective and adequate prosecution, and take that man out of circulation when he does not comply. We think it will be much more difficult to do that if we do not have this means of identification. We are cognizant of the fact that those who oppose this type of legislation all make the argument that this is going to stop the good citizens from getting firearms, but that the crook is going to get them. We do not agree to the first premise. We are inclined to agree as far as the hardened criminal is concerned, but we think those who make the assertion fail to take into consideration that the hardened criminal was not always a hardened criminal. He was once a youngster, and he bought or got a gun, and he learned to use the gun at the time when he was not a hardened criminal. Probably the young boy who is now faced with no penalty for possessing a firearm, if there is a penalty, might think once or twice before he runs afoul of the Federal laws.

Mr. FULLER. I have a very high-class gentleman who is in my home. At one time he was recognized as the expert pistol shot of the world. He has a pistol of every make in the world, and he owns over 10,000 pistols now. For instance, if some notorious gangster had a pistol he would go and buy it. He has that collection of pistols, and he has exhibited it at world fairs and State fairs. Under this bill, as I see it, he would be required to stamp and register each one and pay a dollar for each.

Mr. KEENAN. He registers them, but he pays no tax on them.

Mr. FULLER. For each firearm he pays a dollar.

Mr. KEENAN. The Congressman is asking about that feature of the registration law?

Mr. FULLER. I want to know how it affects that man. He will have to register each and every one, and he will have to have each and every one stamped, and then he will have to pay a dollar each for the registration.

Mr. KEENAN. I do not think that is unreasonable, because some enterprising gangster might learn about those pistols and might go and equip himself. We would like to know who owns those. He would pay no tax on them.

Mr. FULLER. Section 3 states that there shall be levied, collected, and paid upon firearms transferred a tax of $1.

Mr. KEENAN. He just registers them. The registration feature is confined to giving information, such as the name, address, and occupation of the possessor of such firearms as are enumerated in this act. There is no penalty for its violation. There is no cost for registration. That gentleman who owns 10,000 firearms might be put to considerable trouble, but he would be able to hire a clerk to do that for him, in all probability.

Mr. WOODRUFF. There is something said about the difficulties of fingerprinting. Having been fingerprinted a number of times in my life, for a very worthy purpose, I am prepared to say that the proposition of fingerprinting is a very simple one. Any dealer in firearms could have a fingerprinting outfit, and when you buy firearms all you have to do is to put your hand on a flat stone with a little ink on it and transfer it to a piece of paper. There is no difficulty of any kind whatsoever in connection with that phase, and there will be none, if this act becomes law.

Mr. KEENAN. Every postmaster today has that equipment in connection with the Postal Savings System and we have not heard any complaint.

Mr. WOODRUFF. Every dealer should have that equipment; it is inexpensive and of no trouble.

Mr. VINSON. The photographing of the applicant has been stricken out.

Mr. KEENAN. That is right.

Mr. VINSON. Mr. Keenan, when Mr. Cummings, the Attorney General, was testifying on the original bill the question was raised as to paragraph (d), subsection 6 of section 10, which dealt with the presumption of residence. As I understand, that presumption is out of the bill?

Mr. KEENAN. That presumption is out; yes.

Mr. VINSON. In fact, the entire interstate commerce basis is withdrawn from the bill?

Mr. KEENAN. The permit, as such. Of course, I have not come to that part yet, but it is made unlawful for anyone to transport any firearm described in this act in interstate commerce unless he has registered, as provided under the registration clause, the existing firearms, or unless he has complied with the provisions, that is, the fingerprinting, and so forth, relative to acquiring firearms after the passage of the act.

Mr. VINSON. I think you stated originally that H.R. 9066, as introduced on April 11 of this year, had as its foundation taxation and interstate commerce, but that the interstate commerce feature had

58278—34——7

been withdrawn and that it was presented purely with the taxation feature.

Mr. KEENAN. I meant by that statement, that now you are not required to get a permit to bring a firearm from one State to another. You are required to register all existing arms, and you are required to observe all the formalities for the purchase of arms described in the act, after its passage.

Mr. VINSON. Now you are requiring that all existing firearms be registered?

Mr. KEENAN. Under that act.

Mr. VINSON. Under that act.   Under section 5 of the substitute, it is provided that all firearms now possessed shall be registered; that is correct, is it not?

Mr. KEENAN. Yes.

Mr. VINSON. But, as you have stated, there is no penalty attached for failure to register such firearms?

Mr. KEENAN. Yes.

Mr. VINSON. Is the main purpose which actuated you in providing for registration of existing firearms to provide the basis for the presumption that appears in paragraph (b) of section 5?

Mr. KEENAN. I would rather say this, Congressman, that the purpose of section 5 is to aid those charged with the administration of this act in determining whether or not taxes had been paid on firearms that should be taxed.

Mr. VINSON. When you fail to have a penalty for nonregistration of firearms, I am in thorough accord with that thought in the bill.

Mr. KENNAN. I would assume so.

Mr. VINSON. It seems to me that the only purpose that you could have in providing for registrations of firearms now owned and possessed would be to permit this presumption in paragraph (b) of section 5, that whenever a defendant "is shown to have or to have had possession of such firearm at any time after such period of 4 months without having registered as required by this section, such possession shall create a presumption that such firearm came into the possession of the defendant subsequent to the effective date of this Act, but this presumption shall not be conclusive."

Mr. KEENAN. The purpose is to determine whether or not a gun in a certain instance was purchased before or after the passage of this act, to determine whether or not the tax has been properly paid upon it. We also propose to attempt to determine who possesses firearms and where the firearms are, so we can make a start on this proposition. In my opinion, it will take a long time to control this traffic adequately.

Mr. VINSON. Do you think that there will be any affirmative benefit to the Department of Justice in knowing the names and addresses of citizens of this country who report and register a pistol or revolver, that they now legally own?

Mr. KEENAN. Not directly; no.

Mr. VINSON. The crook or gangster will not register that weapon?

Mr. KEENAN. We believe not.

Mr. VINSON. The law-abiding citizen will, if he knows about this provision; if it is called to his attention, he will so register that firearm, but it seems to me that the only purpose here in requiring this registration is to use the registration as the basis for this presumption which will certainly be of benefit to you in the trial of a man accused of having

in his possession a firearm that is not registered. Is there no other purpose behind the requirement that all firearms now owned shall be registered?

Mr. KEENAN. There is this additional purpose, Mr. Vinson. I think it is not sufficiently emphasized that a good many of these pistols of the classifications described are stolen, not alone from armories and commercial dealers, but also those who possess firearms as individuals. We think it will help us to have such matters reported. It will help to have a record of the owners.

Mr. VINSON. "To have such matters reported"; what do you mean by that?

Mr. KEENAN. When reports are made of a gun being stolen, we will have that fact brought to the attention of the police. People will be more careful of the use of firearms. They will realize that it means something to them to have a gun, if they have to account for it. We think, too, that it is a good thing to make this start. It may take many, many years before we make real headway in the control of firearms.

Mr. VINSON. As I understand paragraph (b), section 5, after the expiration of the 4-month period, after the time this would become a law, if a person were caught with a firearm, coming within the purview of the act, without that firearm having been registered, there is a legal presumption set up that such firearm came into his possession more than 4 months after the enactment of this law.

Mr. KEENAN. That is correct.

Mr. VINSON. That presumption may be rebutted?

Mr. KEENAN. That may be rebutted, yes.

Mr. VINSON. It is not a conclusive presumption; it is prima facie?

Mr. KEENAN. Yes.

Mr. McCLINTIC. What would be the maximum penalty that could apply for carrying that firearm from one State to another?

Mr. KEENAN. The penalty is that within the discretion of the court. Conceivably, a tremendous injustice might be done to a man carrying a gun across State lines who had in his possession a gun which had not been registered as required; he would be subject to the full penalty provided in the act.

Mr. HILL. You have defined "firearm" in the first paragraph of the new draft of the bill. When the word "firearm" is used in this bill, does it refer back to that definition, and is it confined to the terms of that definition?

Mr. KEENAN. We take it that all the way through, for the purposes of this act, the term "firearm" means what the definition states. We have used the term "firearm" and we have not used any other language, confining its meaning to that which it would have under the definition as set forth in the first paragraph. I have assumed there is no question that having defined the term "firearm," wherever it is used thereafter in the act, it would be restricted to the limitations of that definition.

Mr. HILL. A shotgun with a barrel of 18 inches or more would not be a firearm?

Mr. KEENAN. It would not.

Mr. HILL. A rifle of 18 inches or more would not be a firearm under this definition?

Mr. KEENAN. It would not.

Mr. HILL. It is hard to use the word "firearm" without referring to the definition to know what are the firearms not included in the definition. As to such firearms, used in the generally accepted sense of the term, that do not come within the definition of firearm, as defined in the act, no registration is required, and no restriction is imposed on carrying such a weapon from one State to another?

Mr. KEENAN. You mean as long as they are over 18 inches?

Mr. HILL. As long as they do not come within the definition of "firearm" in the act.

Mr. KEENAN. That is right; yes, sir.

Mr. HILL. There is perfect freedom, the same as now exists, as to the possession and use of guns, under this bill, so long as they do not come within the definition of "firearm," as set forth in the bill?

Mr. WOODRUFF. There is no limitation whatsoever as to the use of sporting arms.

Mr. KEENAN. None at all, unless you call a Colt .45 a sporting arm.

Mr. REED. What I see in this bill is, and it is brought out quite clearly by Mr. Vinson's questions, that when you require the registration and fingerprinting, it enables you as a prosecutor to take the man who has not complied with the law and raise the presumption against him in the prosecution.

Mr. KEENAN. That is true. I forgot to state, and I think I should have, that if by chance a person who possessed firearms does not register them within the prescribed period of 4 months and desires to carry them into another State, he may have them registered after the 4-month period, and if he does register them within that time, then he carries them as though they were registered prior thereto.

Mr. LEWIS. Is it not true that nearly all of the States have passed laws against all kinds of concealed weapons?

Mr. KEENAN. I believe that to be true.

Mr. LEWIS. That evinces a purpose on the part of the State to require notice to the public, publicity with regard to the carrying and the possession of small weapons?

Mr. KEENAN. That is right.

Mr. LEWIS. The suggestion occurs to me that in requiring them to register, we are only effecting the purposes of these laws in the States against carrying concealed weapons. Will not they be as completely concealed as if there were no registration.

Mr. KEENAN. I think the bill would be helpful in obtaining auxiliary facts, to aid the States.

Mr. FULLER. As I understand, if any person should sell, assign, pledge, lease, loan, or give away a pistol, that he would be liable to a fine not exceeding $2,000, or imprisonment not exceeding 5 years, or both.

Mr. KEENAN. Unless the provisions have been complied with with respect to that firearm, yes. If you are going to regulat the transfer at all, it seems to me it must be——

Mr. FULLER (interposing). If he had failed to obtain a permit and pay a dollar for the loan or gift or pledge or assignment, he would be guilty of that penalty?

Mr. KEENAN. He would invoke that penalty, yes. Otherwise, the effects of the bill would be emasculated. If you exempt gifts, and

you try the gangster for having the gun, he will interpose with great facility, as the past has shown, the same kind of an alibi that he has always been able to cook up.   You will find somebody who has made a gift to him.

Mr. FULLER. Do you think under the terms of this bill it would prohibit an administrator or executor from transferring any of these weapons?

Mr. KEENAN. I think so but, Mr. Fuller, we expect to find some element and some degree of common sense in the Federal judges and in the prosecutors.

Mr. McCLINTIC. Referring back to section 1, on the subject of pistols, if you transposed the language, it would say " a rim-fire pistol greater than a .22 caliber." That would exclude the center fire pistols of larger caliber. It seems to me that some attention ought to be paid to that language so as to clarify it in such way as to eliminate the element of doubt.

Mr. KEENAN. I would be glad to take a note of that.

Mr. McCLINTIC. You are referring to the particular kind of pistols.

Mr. KEENAN. I am frank to say, with reference to that particular provision, we have followed the language suggested by our good friends, the National Rifle Association, and those representing sporting men, General Record, and Mr. Frederick, and the others who have followed this legislation for some fifteen-odd years, and we have taken their definition and their language as to the .22-caliber rim fire, just as we adopted the language as to the machine gun. We do not want to exclude from the provisions of this act any other pistol over the .22 caliber.

Mr. McCLINTIC. If you leave the language as it is written, I am afraid you do that.

Mr. HILL. One question relative to the definition of machine guns. There is a distinction between an auto-loading and automatic gun, I take it?

Mr. KEENAN. I think so.

Mr. HILL. An automatic gun is one that fires without pulling the trigger more than once.   An auto-loading might not be an automatic. An auto-loading gun might not be an automatic gun; for instance, you have these small rifles, the .22-caliber rifles which are are auto-loading, but you have to pull the trigger each time to fire them. That is not a machine gun.

Mr. KEENAN. A machine gun is one that shoots more than one shot without manual reloading, by a single function of the trigger. If it comes within the provision of that, it would be a machine gun.

Mr. HILL. If you have to have more than one function of the trigger, it is not automatic.

Mr. KEENAN. That is right.

Mr. HILL. I know in these small rifles, when you fire by pulling the trigger they reload automatically, but they do not automatically fire again unless you pull the trigger.

Mr. KEENAN. I appreciate the distinction.

Mr. HILL. That is not a machine gun under this definition.

Mr. KEENAN. No.

Mr. VINSON. I am still thinking about the firearm that is now owned and possessed legally, and referring to the supplemental statement that you made while Mr. Reed of New York was interrogating

you, that such a weapon could be transported in interstate commerce without being a violation of law, I find, on looking into that section, which is section 11 of the substitute bill, that before that man may transfer the firearm which he now owns and possesses legally in interstate commerce, he has to take the matter up with the commissioner, notify him by affidavit, within 2 days prior to such shipment, carriage or delivery, setting forth in such affidavit his address, the number or other mark identifying such weapon, and the place to which it is to be transported. In other words, this citizen has not violated the law in the purchase or the possession of this firearm, but if he transports it, he does. He may possess it legally by registering it.

Mr. KEENAN. May I ask a question there? You are referring to a class of those who possess guns not registered as required by this act?

Mr. VINSON. Yes. That gentleman gets a penalty for such possession of the weapon and he will be guilty of a violation of the law if he transports that weapon in interstate commerce.

Mr. KEENAN. Yes.

Mr. VINSON. If he lives on one bank of a river and was within the law in the possession of this firearm and failed to register it, there is no penalty attached, but if he moves to the other side of the river, then he has violated the law in that he has transported the weapon in interstate commerce, unless he makes an affidavit and sends it to the commissioner and tells him all about it.

Mr. KEENAN. That is right.

Mr. VINSON. What is the penalty for that violation? A fine of not more than $2,000 or imprisonment of not more than 5 years, or both, in the discretion of the court?

Mr. KEENAN. Those are the maximum penalties provided generally, and he comes within that provision. We have been hoping that the Federal judge or the prosecutor would look into those matters and exercise common sense.

Mr. VINSON. I understand the common-sense theory, but you would not rely upon the whims of Federal judges in the 48 States, nor prosecutors.

Mr. KEENAN. It must be admitted that that would permit, under some circumstances, a very severe penalty for what was at least not intended to be a violation of the law. It is a stringent provision, I think you will admit.

Mr. VINSON. Assuming that section 11 were stricken out, would that be vital to the purpose of the Department of Justice? We have paragraph (b) in section 5 with reference to the presumption.

Mr. KEENAN. Will the Congressman please put that question again?

Mr. VINSON. I am asking whether the abolition of that language, the elimination of it, which sets up and makes illegal what ordinarily would be a lawful act, the transportation of something which he has in his possession legally, from one State to another. Would that vitally affect the purposes behind the bill?

Mr. KEENAN. I think so, for this reason: If you take that out, you might as well take out the registration provision entirely.

Mr. VINSON. Not the registration provision.

Mr. KEENAN. I will withdraw that statement. It would still leave the presumption of those found with the firearm, without affecting the registration, if the weapon was procured before the act went into

effect. I am inclined to think we could afford to give way on that; there is a good deal to what the Congressman says with reference to eliminating that provision. I do not think it would vitally affect the act, answering the question categorically.

Mr. HILL. I suggest that Mr. Keenan started out to give the main differences in the bill.

The CHAIRMAN. He may proceed.

Mr. KEENAN. I think we have, in the course of the questioning, touched upon every important element of this act, as we have gone along. I think I can briefly state that we have changed the preceding act by a definition of machine gun, which already has been brought up for some detailed discussion.

Mr. HILL. In that connection, there was a suggestion made here in the previous session of the committee that you might consider the matter of requiring the registration of clips for machine guns. You have not done anything about that?

Mr. KEENAN. There has been nothing done on that.

Mr. HILL. You also referred to metal vests.

Mr. KEENAN. That might go in another bill.

Mr. HILL. You do not think machine-gun clips belong in this bill?

Mr. KEENAN. I think it could be included. We had thought of handling machine-gun clips and metal vests in a commerce clause in another bill.

Mr. HILL. Do you think machine-gun clips should come in here?

Mr. KEENAN. I think they should.

Mr. HILL. Where would they come?

Mr. KEENAN. I suppose it would have to come in the definition, in the first clause, as part of the firearms. We would have to change the act considerably to include as firearms machine-gun clips.

Mr. HILL. Do you think them of sufficient importance to be included here?

Mr. KEENAN. I do not think so. I think if we had control of the arms themselves for the purpose we want, that it will not be of any tremendous assistance in following the ammunition.

Mr. HILL. A gangster might be in lawful possession of a machine gun, and yet he must have ammunition for that gun. You might trace the ammunition to him and thereby contribute toward his identification as the operator of the machine gun.

Mr. KEENAN. You can readily tell if the ammunition was of such a nature as to be designed for machine guns. We have been working to get a bill otherwise acceptable to the various groups of the community interested therein, and we had not considered that seriously up to this time.

Mr. FREAR. In the substitute bill, you have left in revolvers, pistols, and all that?

Mr. KEENAN. Yes.

Mr. FREAR. The protests were directed toward those, largely.

Mr. KEENAN. We will have a few words from General Allen about the matter of protests. We dislike to get into that subject about the protests, because we find that communications have been sent out from Washington by the National Rifle Association, in effect asking the members to bombard this committee with objections and showing a rather definite knowledge of the terms of the act as originally drawn, and making some representations which, we regret to say, we

think are not in accordance with the facts of the case. We will have those to show the committee, if it is interested. I imagine the Congressman has not been here before today.

Mr. FREAR. I was here at the previous session, but have not been here today.

Mr. KEENAN. We have discussed the matter of pistols. They are left in, excepting the .22-caliber rim fire pistol. The suggestion was made that they ought to be excluded, not being a deadly weapon as compared with the other calibered pistols and weapons included.

Mr. TREADWAY. You are dealing with the small firearms exactly under the same conditions as you are the machine guns, are you not? There is no different treatment, according to the danger of the article involved?

Mr. KEENAN. That is true; they will both kill.

Mr. TREADWAY. Isn't a machine gun a very much more dangerous weapon to have in the hands of a gangster? You can do a lot more work with a machine gun than with an ordinary revolver?

Mr. KEENAN. There is no doubt that it is more dangerous.

Mr. TREADWAY. What benefit is there in allowing machine guns to be legally recognized at all? Why not exclude them from manufacture?

Mr. KEENAN. We have not the power to do that under the Constitution of the United States. Can the Congressman suggest under what theory we could prohibit the manufacture of machine guns?

Mr. TREADWAY. You could prohibit anybody from owning them.

Mr. KEENAN. I do not think we can prohibit anybody from owning them. I do not think that power resides in Congress.

Mr. TREADWAY. It would be like the control of a deadly poison, I suppose.

Mr. KEENAN. That is controlled.

Mr. TREADWAY. Yes; that is controlled.

Mr. KEENAN. We have tried meticulously to follow the Harrison Act, passed by the Congress, and the decisions under that act. We have this strong analogy to poison, but the poison only kills the person who takes it, while the gun is designed to kill others.

Mr. TREADWAY. That would afford a basis of argument. Could you not make a relative difference between the dangerous types, according to how dangerous they are?

Mr. KEENAN. In the penalty for their transportation?

Mr. TREADWAY. Or in the control of them.

Mr. KEENAN. I suppose that could be done. The idea would be to increase the penalty for carrying machine guns, or decrease it for carrying guns not so deadly as machine guns?

Mr. TREADWAY. Whenever we hear of these terrible raids, the machine guns are the ones which do the most damage, are they not?

Mr. KEENAN. Yes; we usually find the machine gun, but we always find a half dozen or 8 or 10 Colt automatics or some easily concealable firearm.

Mr. TREADWAY. That is a matter of convenience, is it not?

Mr. KEENAN. It is a matter of convenience. If the Congressman would permit me to suggest, in addition to the machine gun, the modern gangster is not technically well equipped if he does not have several concealable small arms for use instantly.

Mr. TREADWAY. How large is a machine gun? How conspicuous must it be for a person to carry it around?

Mr. KEENAN. I have seen a lot of them.

Mr. TREADWAY. It would be about how long?

Mr. KEENAN. About 2 or 2½ feet in length.

Mr. TREADWAY. How large are they? What would they weigh?

Mr. KEENAN. It has a bulky stock; I would say it is 4 or 5 or 6 inches across and it has a drum.

Mr. TREADWAY. What would it weigh?

Mr. KEENAN. I cannot answer that.

Mr. TREADWAY. It is very inconvenient for a man to conceal?

Mr. KEENAN. They have concealed them in golf bags recently. You may remember reading that Dillinger recently went to be treated for a gunshot wound by Dr. Mortenson, head of the Minnesota State Welfare Department. At that time Dillinger's companion had a machine gun sticking out from his coat, which, many people thought, should have indicated that he was dealing with a gangster. It was difficult to conceal the gun.

Mr. TREADWAY. You do not feel that there is any way in which a more severe penalty could be imposed against the machine gun, either its purchase, sale, or possession, than any other kind of a dangerous weapon?

Mr. KEENAN. I think that is an excellent suggestion. I think it might be regulated in the penalty.

Mr. HILL. Sections 3 (a) of the substitute bill provides that there shall be levied, collected, and paid upon firearms transferred in the continental United States a tax at the rate of $200 per machine gun and $1 per other firearm. There is a discrimination there in the size of the tax.

Mr. KEENAN. There is. I still think there is a great deal to what the Congressman says about the penalty for carrying a machine gun. I do not think life imprisonment would be too much.

Mr. TREADWAY. I cannot see what a machine gun would be for unless it was for breaking the law. It is not an article for protection. For instance, if you or I had a permit to have a revolver in our home, that is for our defense. I cannot see where a machine gun can be used in a legitimate way.

Mr. KEENAN. The revolver and pistol are designed to kill some being and so is the machine gun. It is a matter of which kills the more effectively. That is why we are asking the committee to consider what may seem to be drastic regulation of all firearms. I have stated about all of the important points with the exception of matters such as antiques.

The CHAIRMAN. The wooden pistol seems to have been used with great effect.

Mr. KEENAN. The wooden pistol might have great effect with people with wooden heads.

Mr. FULLER. What would you think of a law which prohibits the manufacture or sale of pistols to any person except the Government or an officer of the law?

Mr. KEENAN. I think that would be an excellent provision if the Congress had power to enact such legislation. We think it would be a good thing. The way that can be attacked, naturally, is by some action of the State assemblies.

Mr. FULLER. We could enact a law declaring it a felony to sell them.

Mr. KEENAN. I do not think that power resides in the Congress. The Federal Government has no police powers.

Mr. FULLER. It could require them to be registered and pay them full value and then destroy the weapons.

Mr. KEENAN. I do not think that power resides in Congress.

Mr. VINSON. It is because of that lack of power that you appear in support of the bill to do something indirectly through the taxing power which you cannot do directly under the police power?

Mr. KEENAN. I would rather answer that we are following the Harrison Act, and the opinions of the Supreme Court.

Mr. VINSON. In other words, you are advocating the creation of a new felony in the failure to register a firearm acquired subsequent to the enactment of the law, with a fine of not more than $2,000 or imprisonment of not more than 5 years or both.

Mr. KEENAN. That is right.

Mr. VINSON. Under the taxing power of the Constitution.

Mr. KEENAN. Yes, following the Harrison Narcotic Act; that is right.

## STATEMENT OF J. WESTON ALLEN, CHAIRMAN NATIONAL CRIME COMMISSION, NEWTON, MASS.

The CHAIRMAN. Please give your name and whom you represent.

Mr. ALLEN. My name is J. Weston Allen, and my residence is Newton, Mass. I am a practicing lawyer in Boston. I was Attorney General of Massachusetts when Calvin Coolidge was Governor, and I am appearing here as chairman of the National Crime Commission, under the aegis of the Department of Justice, because the National Crime Commission has, during a period extending back to 1896, been directly interested in the problem of the adequate control of firearms, both under Federal and State legislation.

The National Crime Commission was established as a voluntary association on the initiative of Judge Gary at the time that the problem of crime was disturbing the country, and in 1927 the National Crime Commission appointed a special committee to draft a firearms bill which might be submitted to the States. At that time, there had been a uniform firearms bill recommended by the Commissioners on uniform laws, which organization has been going forward for a quarter of a century, and that bill has been approved by the American Bar Association and has been submitted to the States. It aroused so much opposition; protests came from so many States to the National Crime Commission, that the adoption of that bill by the States would be a reactionary measure that would take the teeth out of existing law in so many of the States, that the National Crime Commission asked me if I would organize a committee which would study the question with a view of making suggestions as to a uniform law to be submitted to the States which would have more efficient power to control the situation.

The personnel of that committee which carried on the study and made the draft of the bill was carefully selected to represent all the interests which were concerned. When the Commission accepted the responsibility of forming such a committee, it named three repre-

sentatives: August Vollmer, chief of police of Berkeley, Calif., who was a recognized authority on police problems; Philip S. Van Dise, former colonel of the United States Army during the World War and who achieved a reputation as a prosecuting attorney of the city and county of Denver; and myself. Later, the Honorable Ogden L. Mills, who was in Congress, consented to act in an advisory capacity on Federal legislation. Hon. George M. Napier, attorney general of Georgia and president of the Association of States Attorneys General named as representatives of his association, at the request of the Commission, the Honorable Jay R. Benton, attorney general of Massachusetts; the Honorable H. L. Eckern, attorney general of Wisconsin, and O. S. Spillman, attorney general of Nebraska.

At our request, the Secretary of War designated Brig. Gen. Colden L. Ruggles, chief of the Ordnance Department, Washington, D.C., to serve on the committee in an advisory capacity. The American Bankers' Association, which is deeply concerned, designated James B. Baum, deputy manager, to represent that body.

The National Rifle Association and the United States Revolver Association selected Mr. Charles T. Frederick to serve on the committee for both associations. Mr. Frederick, I understand, has been before your committee, and he has stated, and correctly stated, that he was largely the author of the bill which has been approved by the commissioners on uniform laws.

The Remington-Arms Co., Inc., Iver Johnson Arms & Cycle Works the Harrington & Richardson Arms Co., Smith & Wesson, Inc., and Colt's Patent Firearms Co., which comprise the leading manufacturers of firearms in this country, agreed on Mr. S. M. Stone, president of Colt's Patent Firearms Co., as their official representative on the committee.    That committee met in New York City; we had sessions in which the question was fully taken up, and from that time on, the National Crime Commission has followed legislation, both Federal and State with respect to this subject.

Concerning the bill in question, during the few minutes which are assigned to me, I wish to speak on the question of fingerprinting and the importance of having section 5 in the bill, which provides for registration, and if I have time, to refer to the arguments that this legislation will take the protection away from the home and will not prevent the gangster from getting guns, which is one of the arguments, and the other argument that it interfers with honest sport in rifle ranges and in hunting.

With regard to section 5, gentlemen, there will never be efficient control of firearms in this country until State and Federal legislation succeed in securing, in some form, registration of firearms which are possessed by the people in the United States. That is, until we can have that information the police and all those who believe in the adequate control of firearms are at a disadvantage. This bill provides in a most admirable way for this registration. It provides for no penalty; it simply in effect says to the citizen, "you should and must register your firearms so that we can know with regard to where the firearms are in this country." Of course, all firearms that are not effective for use are eliminated. All shotguns and rifles are eliminated. The only thing that the citizen is asked to register are firearms that fall within those classes.  Why?  One reason is that when you get a

criminal and he has a firearm, it is important to find out where he got
that firearm, and when, as time goes on, we are able to get a reason-
able degree of registration, the important question which comes
up first, in getting information with regard to criminal activitiy is,
where did he get the firearm, will be capable of more prompt solution.
It does not handicap anyone at all to merely register the fact that they
have these firearms, provided they are serviceable firearms.  The
effect will be in a small nnumber of years, and as time goes on, all
modern firearms, such as criminals must have, will be registered.  As
for the purpose of this law, which provides for the registration of all
firearms sold hereafter, as you supplement it by the registration of
firearms now in existence, you will soon have something we have never
had before, an efficient means of locating firearms.

Mr. HILL. How are you going to enforce the requirement for
registration?

Mr. ALLEN. You are not going to enforce it by penalty.  If a man
has firearms and does not register them until he wants to transport
them, you do not know.  With every year, you are going to get more
registrations.  It is because this bill seeks to be reasonable that it does
not put a penalty on a person who does not register.

With regard to fingerprinting; when we prepared a uniform law
which was submitted to the States, the only objection that was made
finally by Mr. Frederick, representing the associations, and by Mr.
Stone, representing the manufacturers, was the fingerprinting; they
did not want fingerprinting.  The War Department at that time said
that they did not want to impose any requirement which would
seriously handicap manufacturers.  The vote was something like
nine to three in favor of fingerprinting at that time, but in order to
meet the wishes of the manufacturers and the associations, I tele-
graphed all members of the committee, after the meeting, and got
their permission to omit fingerprinting from that bill.  In spite of
that, they went in and opposed the bill in every State I know of, where
it was introduced.  I went to Maine to be heard on the bill.  Some-
body spoke against it and objected to fingerprinting and talked about
rifle ranges.  I asked what his business was and he said a salesman.  I
asked what he sold and he objected.  He finally stated that he repre-
sented the Remington Arms Co.  With respect to fingerprinting,
the time is coming, and I think most of us will live to see it, when
fingerprinting will be recognized as essential for every citizen.  They
are fingerprinting babies in hospitals, in all the leading hospitals.
In Argentina, where fingerprinting is required, the percentage of per-
sons who die and are buried in unknown graves, is nil, where in this
country they are not able to identify a great many people, and there
are large numbers of people buried, because of that, without being
known.

In Massachusetts, we have had fingerprinting, as a requirement in
the registration of firearms since before 1907, when this bill was
passed.  New York has it in the Sullivan Act, and New Jersey has
recently adopted it.  Commissioner McLachlin of New York, and
Mr. Wilson of Massachusetts, and practically every police commis-
sioner in this country will state that they believe fingerprinting is
essential.  Recently in Massachusetts we have called for fingerprint-
ing of all taxi drivers.  None one can drive a taxi without being finger-
printed, and there is no difficulty.  The sentimental idea back of the

objection to fingerprinting is that they think it is like being photographed for the rogues gallery, and that is passing so rapidly that there is no longer any reason to prevent the only efficient means of identification.   I know of no one who does not represent the manufacturers or associations who, today, object to fingerprinting as the only means of identification.

With respect to the statement that is everywhere heard whenever these matters come before the legislature, that you are going to take the pistol away from the innocent man, you are going to deprive him from protecting his home, but you are never going to get the guns away from the criminal element, they are unreasonable and foolish enough to say that we are not going to keep the gun from the criminal; but, gentlemen, this country has not yet come to realize how much can be done to make the possession of a gun by a criminal a very serious thing for him, and the provisions in this bill, supplemented by provisions in State legislation, are going to make it a means of putting the criminal behind the bars where he cannot be a gunman any more, provided you will pass such regulations in this bill to make possession of the firearms by the man who has not complied with the law a criminal offense.  Of course, the gunman is not going to register.   That is the reason why the registration is useful; the gunman could not register, because he is known in the underworld, but even if you cannot prove he has committed an act of violence, if he owns a gun you can put him away for 5 years, and unless he has a wooden pistol, he will not make trouble for 5 years.

A pistol will be found in an automobile and there will be three gunmen there who will say that they do not own it.  We have provided in Massachusetts that a pistol found in an automobile is in constructive possession of the man driving that automobile, and we stopped that loophole.

If you will register guns, and the gunmen cannot register, and if you will make these provisions in the Federal law which will fortify our State legislation with respect to the control of firearms, you will go a long way to make it hot for the criminal to be caught with a gun.   You are not going to keep the criminal from having a gun, but when he has it, you will catch him and then you will send him away.   You cannot do it now.  In my opinion, the most valuable service this bill will render will be in putting teeth into every State law which we have in all 48 States, which are endeavoring to meet the problem of the criminal being in possession of a gun.

With respect to protecting a man in his home.  Gentlemen, if you want to protect your wife and children aren't you going to be willing to register your gun?  If you want this kind of a gun included here, if you are not willing to do this, you do not appreciate the tremendous importance of having those lawfully in possession of guns known to be lawfully in possession of guns, in order to get at those who are not lawfully in possession of guns.

The late William McAdoo, of New York, who was an authority during his lifetime on this problem, in a letter written to Mr. Wickersham stated that he had argued and would continue to argue that if all the law-abiding people of the city of New York were crack shots and were armed with two revolvers apiece, that it would not stop armed robbery and murder with firearms.  The fact that the police in England do not carry firearms, and the fact that the chiefs of

police of cities like Mr. Mulready think it would be better if the police were not armed with pistols or revolvers shows how little there is to the argument that the private citizen is going to be protected by revolvers.

Sometime ago we had a bank robbery on Beacon Street in Boston in broad daylight, and the policeman outside went into the bank with his gun. They took his gun away from him and they then had one more gun than they had before. Someone has said that he would rather be a live coward than a dead hero. There are some men who would. The whole recent discussion of bank robberies is due to the fact that there is no way of beating the gunmen who plan such a robbery, when they are armed with machine guns, by shooting them down, because they have the jump; they have selected the time, etc. The theory is a policeman should not go in where there is a bank robbery going on; he should stay outside and shoot them down as they come out. You are not going to prevent the tremendous criminal wave of robberies, hold-ups, and so forth, by arming our policemen with guns.

The CHAIRMAN. Assuming that it is true, and I believe it is true, that there is a comparatively small percentage of homes ever entered by burglars, if the occupant feels more comfortable and safer by having a gun; if it relieves him to some extent and gives him a sense of security, why should not he be permitted to have it, for the mental relief it affords?

Mr. ALLEN. If he feels safer, he should be willing to register it. There may come a time when I will want a gun in my home. I am perfectly willing to register it.

The CHAIRMAN. Have you about concluded your statement?

Mr. ALLEN. There is more I had expected to say.

The CHAIRMAN. You can extend your remarks in the record, or if you have further thoughts to present you may continue for a few minutes in the morning at 10 o'clock.

Mr. ALLEN. If I stay over, may I have 5 minutes more in the morning?

The CHAIRMAN. Yes. We will now adjourn until tomorrow at 10 o'clock.

(Thereupon, at 12:20, the committee adjourned until tomorrow, May 15, 1934, at 10 a.m.)

# NATIONAL FIREARMS ACT

### TUESDAY, MAY 15, 1934

HOUSE OF REPRESENTATIVES,
COMMITTEE ON WAYS AND MEANS,
*Washington, D.C.*

The committee met at 10 a.m., Hon. Robert L. Doughton (chairman) presiding.

The CHAIRMAN. The committee will please be in order.

When we recessed yesterday General Allen, of Massachusetts, was testifying but had not completed his statement. If he is present and ready to resume, we should be pleased to hear him at this time.

Mr. KEENAN. Mr. Chairman, General Allen is not here. I would suggest, if there is anybody from the Rifle Association present, the committee might hear him in the interest of saving time.

The CHAIRMAN. Very well. We will hear General Reckord.

## STATEMENT OF MAJ. GEN. MILTON A. RECKORD

General RECKORD. Mr. Chairman and gentlemen, with your permission I should like to make a statement which will take only a few moments and then answer any questions, if that is satisfactory.

The CHAIRMAN. That will be satisfactory, General.

General RECKORD. Thank you, sir. We understand and have understood from the beginning the difficulties with which the office of the Attorney General is confronted in reaching the crooks and the gangsters. We are sincere when we say that we want to assist in every reasonable way.

The Attorney General himself at the committee hearing on April 16, said:

The development of late years of the predatory criminal who passes rapidly from State to State has created a situation which is giving concern to all who are interested in law and order. * * * There lies the heart of our problem. The roaming groups of predatory criminals who know * * * that they are safer if they pass quickly across the State line, leaving the scene of the crime in a high-powered car or by other means of quick transportation.

Later in his testimony the Attorney General said:

Now we are dealing with armed people, criminals who have hide-outs in various spots. They will stay in one place a little while and in another place a little while and then move about, always with arms.

At another place in his testimony, in response to a question by Mr. Frear, General Cummings said:

With regard to reaching a man like Dillinger, there is nothing specific in this act that deals with that situation. There is pending, however, before the Judiciary Committee of the House a bill making it a Federal offense to flee across the state line to escape prosecution for a felony, and if that bill should be enacted we

would be able to reach criminals who are passing rapidly from one State to another.

I have made these references to the Attorney General's testimony because they have very immediate bearing on the question of this bill we are now considering—H.R. 9066. It has been the thought of our Association that effective legislation must be aimed directly at the criminal. It is the desire of all of us to apply the maximum pressure on people like Dillinger.

The Attorney General made the point very clear, with which we are in hearty accord: That the criminals with whom the Department of Justice may properly concern itself are the roving type, moving constantly across state boundaries.

The bill to which the Attorney General had reference as being in the Judiciary Committee of the House at the time of this statement on April 16 was Senate bill 2253. This bill, if passed, the Attorney General said, would strike directly at Dillinger and others of his kind. The bill was passed by the House last week and was I believe reported in agreement to the Senate by the Senate conferees on Friday or Saturday of last week.

S. 2253 makes it unlawful for any person to flee from one State into another with intent to avoid prosecution for murder, kidnaping, burglary, robbery, assault with a dangerous weapon and certain other crimes of a felonious type, and provides a penalty of not more than $5,000 or imprisonment for not longer than 5 years or both, for violations. This bill is a direct attack and an easily enforcible attack on the criminal use of firearms because in a very large proportion of the cases in which the Department of Justice needs to be called in, the criminals move continuously across State boundaries.

S. 2080 provides that anyone killing any United States marshal or deputy agent of the Department of Justice, Post Office inspector, Secret Service operative, officer, or enlisted man of the Coast Guard, or any employee of any United States penal or correctional institution, or who shall forcibly resist, intimidate, or interfere with any such employee of the United States while engaged in the performance of his official duties, shall be fined not more than $5,000 or imprisoned not more than 3 years. This bill is also a direct attack, and a proper Federal attack on the criminal use of firearms.

S. 2573 provides that any person who conveys or causes to be conveyed into any Federal penal or correctional institution or who aids or assists in such conveyance, or who conspires with any other person or persons to so convey any firearm, weapon, or explosive into the prison shall be punished by imprisonment for a period of not more than 10 years. This is another direct attack at the criminal use of firearms which through the provisions concerning connivance will give the Federal officers wide powers of arrest and conviction.

S. 2841 provides that anyone who by force and violence or by putting in fear feloniously takes or attempts to take any property or money or any other thing of value which is in the custody, control, management or possession of any member bank of the Federal Reserve System, or any banking institution organized under the laws of the United States, shall be fined not more than $5,000 or imprisoned not more than than 20 years and further provides that if a dangerous weapon is used he shall be fined from $1,000 to $10,000 or imprisoned 5 to 25 years. The act further provides that anyone

who has committed the offense as defined in the act and in avoiding or attempting to avoid apprehension or in freeing himself or attempting to free himself of confinement for such offense, kills or kidnaps any person, he shall be punished by imprisonment for not less than 10 years, or by death if the verdict of the jury shall so direct. This is certainly a direct, concrete, enforcible law, striking directly at the criminal use of firearms in an extremely broad manner, because practically all criminals depend on bank robberies of the type defined in the act to maintain themselves in funds. The penalties provided are more severe than those provided in the proposed H.R. 9066 and the act has the additional advantage of including all dangerous weapons.

The National Rifle Association considers the above bills as sane, reasonable and effective approaches to the problem of the use of firearms by criminals. When these bills are considered in conjunction with S. 2249, prohibiting the interstate communication of extortion messages, S. 2252, forbidding the interstate transportation of kidnaped persons, S. 2460, concerning the extension of the Statute of Limitations in certain cases, S. 2845, extending the provisions of the national motor vehicle theft act to other stolen property, and H.R. 9476 empowering agents of the Justice Department to make arrests without warrants for felonies, we believe that the major portion of the criminal element, armed and otherwise, in this country, who may be properly considered as coming within the jurisdiction of the Federal police, will be completely covered.

We feel that if H.R. 9066 is amended so as to be applicable in all of its provisions to machine guns only and is further amended as suggested by our association to bring within the Federal jurisdiction the interstate transportation of firearms of any type by previously convicted felons and to prohibit the interstate transportation and pawning of stolen firearms of any type, no further Federal legislation concerning firearms will be necessary.

We can pledge the whole-hearted support and coöperation of the sportsmen in this country with the agents of the Government in the apprehension and conviction of criminals under the laws above mentioned and under H.R. 9066 if amended as we request. We do not believe that the general inconvenience, the resentment in many cases, against unnecessary Federal supervision which would be caused by the registration requirement of H.R. 9066 will add anything worth while to the Federal police jurisdiction insofar as the actual suppression of crime is concerned.

The Attorney General in a syndicated newspaper article under date as late as April 29 indicated that H.R. 9066 was intended to cover machine guns. The Attorney General was quoted as saying that the intention of the Department of Justice and the needs of the Department were "expressed by a series of bills now before Congress, with the endorsement of this Department. The first in order may not be so important in the long run as some of the others, but we need it in order to meet an immediate emergency. It is the one having to do with machine guns." The Attorney General described the provisions of this bill to considerable length, mentioning the tax provisions and the licensing provisions for manufacturers, dealers and consumers. He then briefly described the provisions of the other bills which have already been placed before the Senate and the—

House. But at no point did General Cummings refer to the ordinary pistol and revolvers. It would appear from this nationally broadcast statement that the Attorney General himself did not consider the pistol and revolver provisions of this act as being of any great importance.

It may be of interest to the members of the committee to know that only a week ago, at the request of Mr. Hoover's bureau in the Department of Justice, our association furnished that Bureau with a list of men, all sportsmen and members of the National Rifle Association and all trained rifle and pistol shots, offering them as volunteers to work with Mr. Hoover's special agents, instructing them in the proper use of the pistols and revolvers issued them by the Department. The local police could not in most cases train the agents of the Department who are charged with the duty of shooting it out with John Dillinger and others of his kind, because the police in most cases do not themselves know very much about marksmanship. In this emergency, as in 1918, the Government of the United States has turned to the civilian shooters organized under the National Rifle Association to furnish instructors and teach marksmanship in the case of a National emergency. I mention this as an indication of the value of arming and training our average reputable citizens instead of discouraging and restricting their armament and proper training. I also mention it as additional proof, if the committee needs any additional proof of the earnest desire of our association to cooperate in every practicable way in the suppression of armed criminal activities in this country.

The amendments which we now propose to H.R. 9066 are accordingly to eliminate pistols and revolvers entirely from the bill, confining it to machine guns, sawed-off shot guns and mufflers or silencers and not otherwise changing the bill except to strike out section 10, the interstate transportation section, substituting therefor the following language:

SEC. 10 (a). Whoever shall transport or cause to be transported in interstate or foreign commerce any firearm theretofore stolen or taken feloniously by fraud or with intent to steal or purloin, knowing the same to have been so stolen or taken or whoever not being a common carrier, shall so send or transport, or attempt to send or transport, or cause to be sent or transported any such firearm, under such circumstances as should put him upon inquiry whether the same had been so stolen or taken, without making reasonable inquiry in good faith to ascertain the fact, shall be punished by a fine of not more than $10,000 or by imprisonment of not more than 10 years or both.

Mr. COOPER. Mr. Chairman, if I may interrupt for just a moment; it is proposed to strike out section 10 (a)?

General RECKORD. Yes, sir.

Mr. COOPER. I understood you to say that that related to the interstate transportation of firearms. It strikes me that section 10 (a) of the new draft relates to importation.

General RECKORD. I am speaking of the old draft.

Mr. COOPER. I understood you to refer to the new draft.

General RECKORD. I am referring to the old draft, H.R. 9066. The new draft as presented yesterday had no number.

Mr. COOPER. The new draft has a number, the same number as the old bill, H.R. 9066.

Mr. TREADWAY. The new draft, of course, has not yet been introduced, so it does not have a number.

Mr. COOPER. I am making no criticism, but I wanted to keep the record clear.

General RECKORD. I want it to be clear, too. I was speaking of the printed bill.

Mr. COOPER. What you are suggesting there, then, is in relation to the interstate transportation and not to importation?

General RECKORD. That is right.

Mr. FULLER. Your redraft touches the transportation of sawed-off shotguns, silencers, and machine guns——

General RECKORD. Yes, sir.

Mr. FULLER. Only?

General RECKORD. Yes, sir.

Mr. FULLER. Why do you insert the language "knowing the same to have been so stolen"? Why do you not make it altogether prohibitive?

General RECKORD. We are willing to make it so broad that this section would refer to all firearms, all guns. We are perfectly willing, if a gun is stolen, that that be used against the man who steals it.

Mr. FULLER. You are covering the only section that seeks to reach the man who transports a machine gun, are you not?

General RECKORD. No. My language, Mr. Congressman, says all firearms.

Mr. FULLER. All firearms?

General RECKORD. Yes, sir.

Mr. FULLER. I think the operation of the law should be more severe on the man who carries the sawed-off shotgun or machine gun than on the man who carries merely a pistol.

General RECKORD. We are willing to go as far as the committee wishes to go on that.

Mr. FULLER. If a man is carrying that type of weapon, if he is not an officer, he ought to be taken into custody anyway, because we know that he is carrying it for an unlawful purpose; I am referring to such a weapon as a sawed-off shotgun or machine gun, or a silencer.

General RECKORD. We agree with that.

Mr. FULLER. We cannot compare those with a pistol.

General RECKORD. Whatever the committee desires on that, we will be in accord with the judgment of the committee.

Mr. FULLER. You would have no objection to putting those in different categories?

General RECKORD. No, sir. I think the language that I use here was prepared by the office of the Attorney General after we had had one of our conferences, and we accepted that language.

The CHAIRMAN. Have you completed your main statement, General Reckord?

General RECKORD. Not quite.

The CHAIRMAN. May I say to the members of the committee that the witness has requested that he be allowed to complete his statement before being asked questions.

Mr. FULLER. I beg the gentleman's pardon. I was not here when he started.

General RECKORD. In section 10 (b) we suggest a paragraph that would cover the pawning of stolen firearms. We suggest the following:

(b) Whoever shall receive, conceal, store, barter, sell, dispose of, or pledge or accept as security for a loan any firearm moving in or which is a part of interstate

or foreign commerce and which, while so moving or constituting such part, had been stolen or taken feloniously by fraud or with intent to steal or purloin, knowing the same to have been so stolen or taken; or whoever shall receive, conceal, store, barter, sell, dispose of, or pledge or accept as security for a loan, any such firearm, under such circumstances as should put him upon inquiry whether the same had been so stolen or taken, without reasonable inquiry in good faith to ascertain the fact, shall be punished by a fine of not more than $10,000 or by imprisonment of not more than 10 years or both.

(c) 1. It shall be unlawful for any person who has been convicted of a crime of violence in a court of competent jurisdiction of the United States or of any State, Territory, or the District of Columbia, or of any insular possession of the United States (including the Philippine Islands) to send, ship, carry, or deliver any firearm in interstate commerce.

(c) 2. Any such person found in possession of a firearm shall be presumed to have transported such firearm in interstate commerce contrary to the provisions hereof, unless such person has been a bona fide resident for a period of not less than 60 days of the State wherein he is found in possession of such firearm, or has in his possession a stamp-affixed order therefor indicating that it has been purchased in such State.

This language that we have suggested here is language that was prepared in the office of the Attorney General as substitute language, but later was not used.

Mr. VINSON. And that the Attorney General's office has stated that they have not submitted it to go into the bill.

General RECKORD. They did not submit it yesterday.

Mr. VINSON. In other words, referring to the memorandum that they submitted at the former hearing, after they thought about the constitutional rights of citizens and the laws of presumption, they could not find anything that squinted at such a presumption as was contained in that language, and so they were willing to leave it out.

General RECKORD. They did leave it out, Mr. Congressman.

Mr. VINSON. And you want to put it back in?

General RECKORD. We are suggesting that H.R. 9066 as printed——

Mr. VINSON. I am asking if you want that language, that presumption in regard to residence, in?

General RECKORD. I think this would be much better than the language of the bill as presented yesterday.

Mr. VINSON. Are you a lawyer?

General RECKORD. No, sir.

This language will, like the bills already passed, strike directly at the criminal without the round-about method of trying to get the criminal through the honest citizen.

I would like to say that during our initial conference with Mr. Keenan this amendment to section 10 was tentatively agreed upon, but subsequent developments, I believe, in the Treasury Department caused the Department of Justice to withdraw its tentative approval of the above language, substituting the requirement discussed yesterday that all citizens now owning pistols and revolvers be required to register them or to file an affidavit with the Commissioner of Internal Revenue before shipping or carrying the gun into another State.

I would also like to say that immediately following our hearing before this committee on April 18, we did confer with Mr. Keenan and reached what appeared to be a substantial accord in several directions concerning the registration and identification methods provided in the original draft of the bill. Subsequently, however, several changes were suggested, I believe, by the Treasury Depart-

Case 1:22-cv-02579-CKK   Document 10-1   Filed 10/28/22   Page 115 of 168

ment which required a rather extensive redrafting of the measure in
the form as presented to the committee yesterday by Mr. Keenan.
Mr. Smith, of Mr. Keenan's office, made a conscientious effort to
keep us advised of these numerous changes and corrections, and we did
our best to keep up with them.   But it was not until yesterday, when
the revised draft was presented by Mr. Keenan, that we had a clear
picture of the changes that were to be proposed.   I do not say this
in any criticism of Mr. Smith or Mr. Keenan, but merely to indicate
to the committee something of the difficulty which we have had in
trying to keep abreast of what we were supposed to discuss at this
committee hearing.   We do feel, however, that the recent action of
the House in approving the Senate bills above referred to has so
completely changed the picture and has so materially broadened
the power of the Department of Justice to take jurisdiction over
practically the entire armed criminal class in this country that
attempts to reach a compromise on the pistol and revolver provisions
of H.R. 9066 are no longer necessary.

We feel that if this bill is limited to machine guns and sawed off
shotguns, except for the interstate transportation by criminals
clause, the Congress will have done all that can be done to assist the
States in the suppression of felonies.

In closing, I would like to say for the purposes of the record that
Mr. Keenan yesterday stated that the Department of Justice was in
receipt of numerous requests, notably from women's organizations,
requesting antifirearms legislation.   At the same time, he seemed to
feel that the receipt by Members of Congress of communications
from members of men's organizations opposing this same type of
legislation constituted propaganda.   We have endeavored to keep
the members of our association advised as to the progress of the vari-
ous bills proposed which would affect the use and carrying of firearms.
We believe that this is both our privilege and our duty to our members.
We do not consider that it is unethical nor that such action con-
stitutes insidious propaganda.

We want the record to be perfectly clear on this point—that we
feel it is quite as proper for members of men's organizations to
honestly and openly oppose antifirearms legislation of this character
as it is for women's organizations to propose such legislation.

In Judge Allen's statement he raised some question as to the value
of a pistol or revolver in the hands of the private citizen in case of a
hold-up.   The committee may be interested to know that in the
city of Chicago in 1932, 63 hold-up men and burglars were killed by
gunfire.   Of that number, 26, or approximately 40 percent, were
killed by armed citizens.   In 1933, 71 thugs were killed in Chicago,
of which number 33, or pretty nearly 50 percent, were killed by
armed citizens.   These figures, of course, have no reference to gang
killings, but to the killing of bandits during attempted hold-ups or
burglaries.   In the past 3 years there have been reported to us,
through the medium of newspaper clippings and personal letters,
several hundred cases in which attempted burglaries and hold-ups
have been frustrated by the fact that the citizen against whom the
felony was attempted, or a passer-by, was armed.

We do not favor promiscuous gun-toting, but it is a fact which
cannot be refuted that a pistol or revolver in the hands of a man or

woman who knows how to use it is one thing which makes the smallest man or the weakest woman the equal of the burliest thug.

That is the position of the association which I represent and that is the reason we are here opposing the proposal with respect to pistols and revolvers. We believe, if your committee will weigh carefully the bills that have already been passed—at least I understand that the conferees have agreed on them and they will shortly be signed—if you will take all those bills that I have enumerated, you will find that you have covered the hoodlum, the racketeer and the crook.

We think in every way that the Attorney General's office has stated that they wish to cover that particular element, you will find it covered by the language of those bills.

. In addition, if you will add machine guns, we think you need and they need nothing more.

.. That is our position. I shall be glad, if I can, to answer any question with respect to the details of the bill.

Mr. HILL. I understand you have given the numbers of these bills in your statement?

General RECKORD. Yes, sir; I did.

The CHAIRMAN. You speak of a law to prevent criminals from fleeing after the crime, and that such legislation is pending before Congress, or has been reported in a bill out of the Senate. You say that has your approval. Is that correct?

General RECKORD. Yes, sir.

The CHAIRMAN. As I understand, one of the chief purposes of this bill as proposed by the Department of Justice is to prevent the commission of the crime; instead of dealing with a criminal fleeing from the scene of the crime, which you seem to accentuate, the Department is trying through the control of the use of firearms and the restriction of the use of firearms, to prevent the commission of the crime. There is a great difference between dealing with a man who has committed a crime and drafting a law to make more difficult the commission of the crime.

General RECKORD. I do not see how that would be reached by this proposal, Mr. Chairman. The Attorney General has never made a statement like that to me.

The CHAIRMAN. I may be in error, but——

General RECKORD. If I may refresh your mind——

The CHAIRMAN. It was my impression that——

General RECKORD. Only yesterday Mr. Keenan made the statement right here that this new proposal they knew would not get the crook. The crook would not obey the law, but the honest citizen would obey the law. Therefore they could come in—I probably did not use just the correct language there—but what I understood Mr. Keenan to say was this: That they realize that when you pass this bill the honest citizen would obey it and therefore when they caught the crook they would be able to take care of him under the provisions of this bill, because he had not complied with its requirements.

. Now, we say, and I honestly believe, if you gentlemen will study the two principal bills among those which I named, you will find that they have the power now under the new legislation to do just what they are attempting to do here. We are in accord with that. We do not believe, Mr. Chairman and gentlemen, that there is any justification for discommoding hundreds of thousands—and there

are that many—honest citizens and sportsmen who honestly possess and rightfully possess a pistol and a revolver.

Mr. VINSON. General, I do not understand that in those bills that were reported out of the Judiciary Committee, the anticrime bills, a felony is created when a law-abiding citizen has a revolver in his possession.

General RECKORD. No, sir; not in any of those. We are in accord with those bills.

Mr. VINSON. You say that the same thing is done here?

General RECKORD. No, sir; not the same thing.

Mr. VINSON. That is, attempted to be done here?

General RECKORD. No, sir; I do not mean to say that. I say the Department of Justice through those bills reaches the men that they say they are trying to reach under this bill. Therefore, this bill is not necessary.

Mr. VINSON. So far as Federal legislation is concerned, this bill is probably the first ever presented making it a felony for a citizen to have in his possession a pistol.

General RECKORD. Yes, sir. But you did not understand my point.

Mr. VINSON. I think I understood you.

General RECKORD. This bill, we believe, is unnecessary because of the fact that they already have under the new legislation all the law they will need in order to reach the crook.

Mr. FULLER. There is nothing in the new law about buying, carrying, or possessing machine guns and sawed-off shotguns?

General RECKORD. That is true. But we are willing that you amend it. We do not care how severe you make H.R. 9066—and it is a very severe bill now. We do not care how severe you make it, if you will strike three words out of the bill.

Mr. COOPER. Why do you say that this bill is not necessary if you agree that that ought to be done?

General RECKORD. We say this bill is not necessary in its present language. At the same moment we also say that we are glad to go along with them on machine guns, dangerous weapons, sawed-off shotguns, as far as they want to go, whether it is necessary or not.

Mr. FULLER. But eliminating pistols?

General RECKORD. Pistols and revolvers.

Now, if you want to amend the printed bill in the first section by striking out three words, "pistols and revolvers" we will go along with it, even though we do not believe it is necessary.

Mr. FULLER. Have you a copy of your suggested amendments to section 10?

General RECKORD. I may be able to find some copies. I am sure they can be gotten for you.

Mr. TREADWAY. I understood you to say—and you now seem to be confirming it—that you support this bill, H.R. 9066, insofar as it applies to machine guns?

General RECKORD. Yes, sir.

Mr. TREADWAY. And you say that if we strike out three words, so far as you are concerned, the bill is satisfactory. I assume that those three words are——

General RECKORD. Pistols and revolvers.

Mr. TREADWAY. Let us locate them.  They are in line 4; "pistol, revolver, shotgun"—are those the three words?  It seems to me you should strike out more than three words.

General RECKORD. No, sir; Mr. Treadway.

Mr. TREADWAY. Just what do you want to strike out?

General RECKORD. Just let me answer it in an intelligent way, Mr. Treadway.  Following that you have the language "shotgun having a barrel less than 18 inches in length."  We would leave that in the bill.  That is a dangerous weapon.

Mr. TREADWAY. What is the third word in addition to "pistol" and "revolver?"

General RECKORD. We would take out the words "a pistol, revolver."

Mr. TREADWAY. Then you are not striking out three words.

General RECKORD. I said three words.  I thought when I was referring to the bill that the language read "pistol and revolver."

Mr. TREADWAY. Then the language as you would have it would be that "For the purposes of this act the term 'firearm' means a shotgun having a barrel less than 18 inches in length or any other firearm capable of being concealed on the person, a muffler or silencer therefor, or a machine gun."

General RECKORD. Yes, sir; that is correct.

Mr. TREADWAY. So that the words to which you are really referring are, as I have said, "pistol" and "revolver"?

General RECKORD. That is correct.

Mr. VINSON. In that connection you could not leave in there "or any other firearm capable of being concealed on the person" because that would include pistol or revolver, if it is your intention to strike out pistol or revolver.

General RECKORD. I think that point is well taken.  The language there would have to be changed.

Mr. TREADWAY. You have covered in general your objection to H.R. 9066?

General RECKORD. Yes, sir.

Mr. TREADWAY. And any suggested changes and amendments would, of course, be left to our drafting force anyway?

General RECKORD. Yes, sir.

Mr. TREADWAY. You would approve the general purposes of H.R. 9066, provided those two words were stricken out and whatever else might be necessary to harmonize the rest of the bill; is that correct?

General RECKORD. Yes, sir; that is correct.

Mr. TREADWAY. That being the case, and inasmuch as you say that the nine judiciary bills, so called, cover all of the requirements sought to be covered by this bill, except that touching machine guns, if those bills are not already law, why not insert "machine guns" in some one of those bills and not go to all the bother of trying to pass such a long bill as this, that has objectionable features to people other than yourselves?

General RECKORD. That would be very acceptable to us.  We are not offering this bill.  That would be, we think, a most satisfactory way of covering the situation.

Mr. TREADWAY. Have you not tried to conform with the views of the Department of Justice?  You testified here some time ago, I

remember, as to efforts that had been made to harmonize the various conflicting interests here.

General RECKORD. Yes, sir, we have tried. We have found it rather difficult, though, and I do not mean that in a spirit of criticism at all. But we have found this, that whenever we go over to the Department of Justice—and we have always been ready and willing to go at any time—we find that Mr. Keenan who is handling this matter is very busy. And he is a busy man, we realize that.

Mr. TREADWAY. I do not doubt that at all, because they must all be very busy to keep up with this alphabetical procession that is under way.

General RECKORD. I agree with you, but——

Mr. TREADWAY. They cannot help but be busy.

General RECKORD. We have found him busy, and then we deal with Mr. Smith.

Mr. TREADWAY. Right at that point, Mr. Keenan has been here for 2 days. You say you cannot reach Mr. Keenan on account of his being so busy with other matters. He is right here now. Let me ask Mr. Keenan, Mr. Chairman, what there is in H.R. 9066 that his Department is asking Congress to pass, other than the reference to machine guns, that is not contained in the other bills that have been referred to.

Let me put it a little differently, and ask this question: Do you agree with the present witness that the nine judiciary bills, so-called, take care of the situation so far as the authority of your Department to reach gangsters the best you can by legislation, if included in those bills were a direct reference to machine guns?

Mr. KEENAN. We do not.

Mr. TREADWAY. Why?

Mr. KEENAN. Because we find in every case where we get a gangster he has not alone a machine gun, but he has the latest and finest developed pistols and revolvers with which they can kill as well as they can with a machine gun. It would be very helpful, of course—tremendously so—to get rid of machine guns. But we do not believe that the job can be done unless we make it expensive for the gangster to have the highly improved, dangerous weapon, either the pistol or the revolver.

Mr. TREADWAY. Mr. Keenan, as to the matter of expense, I do not think I can go along with you on your argument at all. The gangster is going to raid a bank and he might kill somebody trying to get to the money in the bank, but he is trying to get thousands and thousands of dollars. You could not make a pistol expensive enough so that he could not afford to get it. The matter of dollars and cents would not be important to him. If he is a high-grade gangster, such as seems to be operating around these days, he is not going to be deterred by the price of the pistol.

Mr. KEENAN. We do not want our position misstated in this record by any of the witnesses who appear before the committee. We admit frankly from our experience that we do not believe this or any other bill can deter at the present time the hardened criminal and the gangster from procuring any type of weapon, including machine guns. But we do believe that over a period of time—and we believe it will be a long hard row—we can start at the beginning and take an inven-

tory and find out who have these pistols, and in the meantime make it very expensive to be found in possession of a pistol.

For example, if I may tell this committee very briefly our experience in trying probably the worst mob in this country. They had at least one man with just as bad a record as Dillinger. That was Schaeffer of the Touhy mob which included Banghard and Kator, recently convicted in Chicago, in Cook County, and sentenced to 99 years in prison. They were found on the highway, four of them, in an automobile. They had rifles, they had rope, they had all of the kidnaping paraphernalia, the tape, all ready for the job. They had five or six automatics, but no machine guns.

At the time that we found them they had no machine guns with them, but undoubtedly in a cache some place they did have machine guns that they could get. But it was shocking to the people in that court room when those pistols were brought out and laid on the table and a bag of ammunition that was so heavy it would be difficult to carry in your arms, that there was no Federal law under which they could be prosecuted for transporting those pistols, those deadly weapons, this moving arsenal, literally.

I heard a great many people, including Federal Court judges and some of the prominent writers of the country who happened to be at that trial, express themselves that way.

There was no way they could be effectively prosecuted. It might be interesting to know that one of the men was not connected with this crime in Chicago, the Factor kidnaping, and the only thing they could do with him was to send him back to Wisconsin to be tried on a charge involving a maximum sentence of 1 year, because he was found in that State in the possession of some firearms.

Mr. TREADWAY. What I am trying to do is to help you parties to get together.

Mr. KEENAN. Since you have asked the question, I would like to make this statement for the record. I have listened patiently and earnestly to General Reckord, and I say most respectfully, so far as the Attorney General of the United States and his position in connection with this legislation is concerned, it is not necessary for Mr. Reckord by deduction or otherwise to interpret what the position of the Attorney General of the United States is in reference to this bill. It is already stated in the record before the committee. I am here as his representative, duly authorized by him to say that he considers this bill a very important part of the program of the Department of Justice to do its full part. Perhaps we are wrong, but this is the result of our study.

Mr. TREADWAY. Just one more question in connection with some matters that you brought up in illustration.

With these nine judiciary bills which have been referred to, will you then have covered the cases that you have cited as illustrating the need of this legislation?

Mr. KEENAN. Not one of them.

Mr. TREADWAY. You would not have covered them?

Mr. KEENAN. In not one of them, particularly the glaring instance that I speak of, in which the Touhy mob was concerned, who were found in the automobile. They were obviously bent upon crime, they were not hunting, they were not shooting.

Mr. TREADWAY. It seems to me we are getting somewhere now. That is contrary to the statement made by the present witness that the nine judiciary bills will cover what you want covered.

Mr. KEENAN. With all due respect to the witness, we think we are able to interpret our own position a little better than he is.

Mr. TREADWAY. I was just trying to see whether the conflicting elements could be harmonized. Apparently they do not agree.

General RECKORD. No; we do not, Mr. Treadway.

Mr. VINSON. For the purpose of the record, there is nothing now to prevent the State of Illinois, where these men were found with these rifles and revolvers, from making it a penalty punishable with death to carry a revolver, is there?

Mr. KEENAN. I suppose that is within their police power; that is, there would be no restriction on a sovereignty to pass a law with respect to anything that affected the public welfare of that sovereignty.

Mr. VINSON. Even to the extent of inflicting the death penalty?

Mr. KEENAN. I do not think there would be anything unlawful there. It is interesting to know, Mr. Vinson, that in reading the report of the Crime Commission, meetings of which were held in Washington—and of which General Allen was chairman; and some of the most distinguished men of the country attended—one of the first things that I remember reading was that at that time the State of Illinois through its legislature had refused to pass an act making it unlawful to possess machine guns without a permit. Even though they have the power, they do not do those things always.

Mr. McCLINTIC. I would like to ask the witness a question. If I understand your position correctly, you are interested in pistol clubs; and I take it you are interested in the subject of pistol marksmanship?

General RECKORD. That is correct; yes, sir.

Mr. McCLINTIC. If that is true, could there not be found some way whereby a duly organized pistol club could have exemptions to the extent that this legislation would not necessarily apply to them?

General RECKORD. Mr. McClintic, I shall be delighted to answer that question. The fact is that in conference with Mr. Keenan's office we thought we had reached a conclusion, and although we did not want it, because we did not want members of our association to be exempted as such over and above any other honest citizen—we really did not want it—we agreed to accept it and we thought they were going to bring that down as one of the new provisions yesterday. We were surprised when it was not in there.

Mr. McCLINTIC. In other words, your organization does not desire to take the position that the rights of all the public should be subjugated in some such manner that you would have a special privilege that they would not have?

General RECKORD. That is correct. That is our honest position. We do not want any privileges for the members of our association that are not given to all other honest citizens. But yet when I told Mr. Keenan that, he got angry and said we were not willing to accept any responsibility.

Mr. McCLINTIC. If we were to place a provision in this bill which would allow duly recognized and properly organized pistol clubs to carry on those functions in which you are particularly interested, and

then exclude all others—thus making the law applicable only to those having these weapons with criminal intent——

Mr. VINSON. Will the gentleman yield there?

Mr. McCLINTIC. I yield.

Mr. VINSON. What status has a duly organized pistol club over that of a law abiding citizen?

Mr. McCLINTIC. The point I had in mind——

Mr. VINSON. In regard to possession of that which now it is legal to possess, such as a pistol or a revolver?

Mr. McCLINTIC. The point I had in mind is this. It seems to me the public interest is so much greater, when it comes to protecting life, that some regulation ought to be put into effect concerning pistols and the carrying of pistols and the registration of pistols.

Mr. VINSON. If that were stricken from the bill, it would take care of what the General has in mind.

Mr. McCLINTIC. I do not think you can properly put into effect a law against crime unless you deal with pistols, because a thousand criminals will use pistols where one will use a machine gun.

Mr. VINSON. Mr. McClintic, listening to this argument in regard to making it a felony to have a pistol, my mind reverts back to felonies that were set up in Russia at the time when the Czar was the ruler of Russia. I imagine that the Czar and his department of justice had the most splendid purpose in mind when they picked up a Russian citizen and tried that Russian citizen on some trivial offense and then transported him to Siberia when, as a matter of fact, what they were trying to get at was a conspiracy against the Czar. They justified the punishment and that method of dealing it out by saying that the end justified the means.

Mr. McCLINTIC. I do not think that is comparable to the situation that exists in this country.

Mr. VINSON. I rather imagine that that describes the mental processes of the people over there when they sent their citizens to Siberia for the commission of a criminal offense of one kind when they could not get the evidence to convict them for the offense which they were really trying to reach.

Mr. McCLINTIC. It is my thought that inasmuch as the gentleman is interested in pistol organizations and the perfection of marksmanship, and so forth, it ought to be possible to agree upon some provision whereby those organizations would not be penalized by the proposed legislation.

General RECKORD. Mr. McClintic, answering your question, we are willing to accept some such provision, although it is our best judgment not to have it. We did agree to do that in an effort to get together. We did agree to accept that amendment. Then the Attorney General, for some reason, did not include it in the bill.

Mr. McCLINTIC. This committee has the jurisdiction and we can work out something of that kind to deal with the subject of pistols in that way.

General RECKORD. Please have it in the record that we are not asking any such privilege for the members of our association.

Mr. McCLINTIC. But I think your association ought to have some kind of privilege in regard to the use of pistols for purposes of marksmanship. But I do not think the word "pistol" should be eliminated from this proposed legislation.

Mr. Cooper. Let us see if we can get to something tangible as to where you stand on this matter. A considerable part of your statement has been more or less general in nature. I have no criticism nor have I disposition to discredit you at all. Let us see if we can get down to something that we can take hold of in dealing with this subject. What is your understanding as to the provisions of this new bill with reference to owners of pistols and revolvers?

General Reckord. We think it is very bad in that respect.

Mr. Cooper. I did not ask for your opinion about the bill. I asked for you to please tell me what your conception of the application of this bill was to pistols and revolvers.

General Reckord. My conception? I hardly know how to answer you.

Mr. Cooper. What do you understand the bill does, in so far as a man owning a pistol or revolver is concerned?

General Reckord. It makes the man do things that any honest citizen is not going to be able to do. One of the provisions provides that if a pistol is sold a dozen times, every time it is sold—and I am speaking of the new draft—a bill of sale, a stamped bill of sale must go along with it, and the last man who buys it, every time you find him with the pistol on him, he has to have nine bills of sale in his pocket. It is a silly provision.

Mr. Cooper. Does not the bill provide that the owner of a revolver or pistol shall register it?

General Reckord. Yes, sir.

Mr. Cooper. If he does that, isn't that all he has to do?

General Reckord. The owner of a revolver prior to the enactment of this law, within 4 months thereafter must register.

Mr. Cooper. That is what I am talking about.

General Reckord. When he sells that pistol, then he comes within the other provisions of the act. He could not give it away. Under this bill, if I lived next door to a good friend of mine, and I had unexpectedly a large amount of money in my house and no revolver, I could not walk next door and borrow his pistol for the night. If I did I would be subject to a fine of $2,000 or imprisonment for 5 years or both. We say that is too severe and we should not hamstring honest citizens that way.

Mr. Cooper. What other criticisms do you have?

General Reckord. We severely criticize the registration provision. If you will permit, I will refer to the first hearing on H.R. 9066, which, I think, was in executive session and the Attorney General was before you himself, and Mr. McClintic asked this question.

I would like to ask just one question. I am very much interested in this subject and what in your opinion, would be the constitutionality of a provision added to this bill which would require registration on the part of those who now own the class or type of weapons that are included in this bill?

Mr. Cummings. We were afraid of that, sir.

Mr. McClintic. Afraid it would conflict with State laws?

Mr. Cummings. I am afraid it would be unconstitutional.

Mr. Keenan. What page is that?

General Reckord. That is page 13, the top of the page. I am not a lawyer, but there is the Attorney General speaking.

Mr. VINSON. It seems to me that when they failed to put a penalty in this substitute bill for the failure to register, that is another way of making it harder to test the constitutionality of it.

General RECKORD. There is no question about it.

Mr. VINSON. Then, not having the penalty, and not being able to test the constitutionality, they get a presumption under paragraph (b) of section 5 in the substitute bill, as I recall it, in regard to the time when the man became possessed of it.

Mr. HILL. I asked yesterday how you would enforce the requirement for registration with no penalty. What would happen to an owner of a pistol or revolver for failure to register under the provisions of this act?

General RECKORD. This would happen, as I read the bill; if I am incorrect I want to be corrected. As I read the bill, if a man failed to register; assume he lived in Baltimore and he was hurriedly called to Washington and wanted to bring a pistol with him which he had not registered. He could not bring that pistol into Washington on a trip, no matter how much he needed it.

Mr. VINSON. Unless he violated the law.

General RECKORD. Unless he violated the law and became amenable to the fine and imprisonment.

Mr. HILL. So long as he did not cross the State line he would not violate the law.

General RECKORD. That is a smooth way they are trying to get that in in connection with transportation; they are trying to get that in which the Attorney General himself said he believed was unconstitutional. They put that in; they say within 4 months you must register, but there is no penalty if you fail to register, and they then go on, if you cross the State border and have not registered, then you may register within 48 hours prior to crossing the State border. Suppose you do not have time; 48 hours is 2 days; suppose you have to cross in a hurry, then you are a lawbreaker. I am just as sincere about this as I can be.

Mr. HILL. So long as you do not go out of the State, you will not be violating any law by not registering.

General RECKORD. That is true. You will violate a provision which they say is unconstitutional. If you sell the pistol, then you must come within the purview of the other section.

Mr. HILL. Of the taxing section?

General RECKORD. Yes. This bill is a subterfuge. They are trying to get crooks in a round-about way. They started out by building the bill on the Narcotic Act. No honest citizen should have narcotics. Basically, a pistol or revolver is not dangerous; it is only dangerous in the hands of the crook; it is not dangerous in the hands of the honest citizen.

Mr. DICKINSON. You say that the Attorney General concluded that that provision was unconstitutional. Did he not say he feared it was unconstitutional, and has not the Department of Justice now concluded that it is not unconstitutional?

General RECKORD. I have not heard them say that, but this is the language.

Mr. KEENAN. The Attorney General said, "I am afraid it would be unconstitutional."

Mr. DICKINSON. He did not say positively that it was unconstitutional. Having included it in the substitute bill, has not the Department of Justice concluded that it is not in violation of the Constitution?

General RECKORD. I cannot answer for them; they are here.

Mr. DICKINSON. I was calling attention to the fact that the Attorney General did not state that it was unconstitutional, but that he feared it was unconstitutional. Upon further investigation, and having included it in this bill, would not you say that they have reached the conclusion that it is not unconstitutional?

General RECKORD. No, sir.

Mr. HILL. The real effect of this registration requirement is to make it unlawful, without registration, to transport a pistol or revolver or other firearm across State lines?

General RECKORD. I think the real reason is to attempt to get the registration. As I understand it, they would like to have every firearm in the United States registered.

Mr. HILL. Of course, if you registered voluntarily, that would be fine from the standpoint of the Department of Justice. If you do not do it, there is no way they can force you to do it.

General RECKORD. No, sir.

Mr. HILL. If you fail to register and then transport the firearm across the State line, you are violating the law.

General RECKORD. Yes; you are violating the law. I will tell you, gentlemen, if you pass this legislation, I will come back in 5 years and I know you will agree with me that it is going to be another Volstead Act. The honest citizens are not going to be bothered with such restrictions. They won't obey the law and you are going to legislate 15 million sportsmen into criminals; you are going to make criminals of them with the stroke of the President's pen.

Mr. HILL. It is not a very onerous operation to register a pistol.

General RECKORD. You must remember that when they started out with this bill, it was a much worse bill than it is now, and they have whittled it away and whittled it away because of the objections, and if we have time enough, not in this session, but if we have time enough and carry the bill over until next January, and if they will allow us to work honestly and earnestly to reach a conclusion, we will do it.

Mr. HILL. It is a difference of opinion as to whether that might not emasculate the bill, so far as its utility is concerned.

General RECKORD. Yes, but the committee has that responsibility; that is for the committee.

The CHAIRMAN. It is no great hardship for any honest citizen to register a pistol if he needs it for a legitimate purpose. And, so far as I can see, that is the only weapon. He does not want to trade it; he does not want it as a matter of barter and sale; he wants it as a matter of protection. If he is a sportsman, he wants it for whatever use he may have for it along that line. In view of the present very serious condition with regard to the criminal situation, the racketeers, bank robbers, kidnapers, and so forth, isn't it incumbent upon the law-abiding citizens for them to be willing to surrender some minor privilege, something that does not impose any considerable hardship upon them, for the general good? I cannot understand, if the Department of Justice thinks it is necessary for the protection of society to put a

limitation upon the ownership of a weapon such as is proposed here, why I should stand up and say that that is too much trouble, notwithstanding it is an attempt to protect someone's life, notwithstanding it may protect someone from being kidnaped, and notwithstanding it may prevent some bank robberies. Yet it is argued that on the great broad principle of personal liberty, I am not going to register the pistol. I think you misconceive the spirit of cooperation of the American people. If this is the answer, and I do not know whether it will answer the purpose or not, but I cannot believe that the law-abiding citizens and the true sportsmen would hesitate going to that inconvenience if it would accomplish the desired results. I think that point has been much overdrawn.

General RECKORD. That was never presented until yesterday; the registration of the pistol now in existence was never presented until yesterday. Along with it is this provision that every time a pistol is sold a bill of sale must go along; no matter how many times it is sold, all of those bills of sale must accompany it.

Mr. LEWIS. Would not that be true of an automobile?

General RECKORD. No, sir; the last one is all they carry. The last is all they need to carry here. Then they come along with fingerprinting.

The CHAIRMAN. If that requirement were eliminated, would you object to the bill?

General RECKORD. That would help.

The CHAIRMAN. I understand you object to anything relating to pistols?

General RECKORD. The bill is bad, in our judgment. We do not believe it will help to get the criminal.

Mr. SHALLENBERGER. As I recall your statement, you do not object to its including machine guns and sawed-off shotguns?

General RECKORD. Yes, we will go along on machine guns and sawed-off shotguns.

Mr. SHALLENBERGER. I want to know why you object to including automatic pistols. After all, this little machine gun is only an improvement on the automatic pistol; it shoots more times, but it has the same ability and kills in the same way. I ran a bank for 20 years, and I would as soon be shot by a machine gun as an automatic pistol. If you abolish the machine gun and leave the gangster to get the automatic pistol and give him two, he is just as dangerous as if he had the automatic machine gun, which is more or less of an intimidating weapon. I cannot understand why you object to the automatic pistol.

General RECKORD. We believe that it is covered by one or two other bills already passed.

Mr. SHALLENBERGER. The Department of Justice would like to have every firearm in the United States registered.

General RECKORD. Yes.

Mr. SHALLENBERGER. Isn't this the way toward which we are working in many cases? Nobody can fish in my State without getting a license. No one can hunt, even with a shotgun or a rifle, unless he has it registered. I have observed that when we begin this idea of getting control of certain things by registration that those who are affected by it at first object. The fisherman did and the hunters did, when we began to require licenses of them. I ask if

you do not think it would be really a fine thing for every firearm which could be used to take human life and in committing robberies. and other crimes, to be registered so we would know where they are in the United States?

General RECKORD. I do not think it would do a bit of good. The reason you have not had objection with respect to fishing licenses is because that money is taken and used to raise fish which are thrown into the streams about that long [indicating] so that fishermen get something for their money.

Mr. SHALLENBERGER. It is to prevent the violation of certain rules of law and this is for the same purpose. I just wanted to ask you that question to satisfy myself. In my judgment, it would be the best thing that could happen, so far as the regulation of firearms, and their use by criminals, to have the ownership and the location of those firearms found out. I will say this: The Government of the United States, when we had control in the Philippine Islands, introduced a policy of trying to promote order there, and we had the Philippine Constabulary for that purpose. The captain of one of those organizations was from my home town and he told me that the best regulation which they had, in order to stop sniping and the shooting of Americans by the Insurectos and those who were engaged in that business, which is something like our present day robbers and bandits, was when they installed—I do not presume they passed any law—but by declaration or edict they installed the practice of requiring every person with an implement of death to have it recorded, so they knew where those things were.

General RECKORD. I am in accord with that.

Mr. SHALLENBERGER. That was a very essential thing in controlling the killing of Americans in the Philippines. That is the purpose, as I view it, of this act. Its purpose is to find out, as soon as we can, where these implements of death are located. As the Chairman has said, it seems to me that the good American citizen will be willing to go through the formality of having his gun recorded, and that he will not object to doing so. In connection with this idea of recording the registration of transfers, you can go through many lines of business where it was not required before, so this principle which it is now proposed to incorporate in this bill is along the line of a good many other requirements in connection with the business of this country. A record is required of every transfer made of anything which it is essential to have recorded.

General RECKORD. I do not think you will find anything as severe as this.

Mr. SHALLENBERGER. This makes it a crime not to record a transfer; it is a little different.

Mr. VINSON. Governor Shallenberger refers to the fact that we have fishing licenses. That is under a State law. We have no Federal law requiring licenses to be taken out to permit a person to fish. We have comparable laws in regard to the regulation of weapons in various States, penal statutes concerning weapons, but we have, as yet, no Federal law with reference to a pistol or a revolver. Now, I think the question answers itself. Is there a man on this committee, however fine it might be, who would support a bill that would make it a crime to fish without a Federal license? It is the Federal control feature.

Mr. HILL. How about the duck stamp law?

Mr. VINSON. What is the duck stamp law?

Mr. SHALLENBERGER. We have some analogous Federal laws.

Mr. VINSON. I remember, in the 10 years that the migratory bird legislation has come before the Congress of the United States, every effort made to place a tax or to require the folks who live out in the districts, and who happen to vote—and that is something quite important—to pay a tax or to secure a license in order to kill migratory birds that are under the control and supervision and subject to regulation by Congress, those efforts have died ignominous deaths. There is no law on the books requiring a Federal permit before you can hunt.

Mr. McCLINTIC. The gentleman has laid great stress upon the necessity for registering a pistol every time it is sold. I have lived in a section of the country where a pistol was a part of every man's equipment, for a great many years, and I venture to assert that I never heard of 5 pistols, in 30 years, ever being sold. Does the gentleman have in mind any instances where individuals sold pistols to others?

General RECKORD. Answering the Congressman's question, my association publishes a magazine, and I venture to say that there are three pages of advertisements, little squibs, about rifles and pistols in that magazine every month, where one man wants to sell and another wants to buy.

Mr. McCLINTIC. There might be a few instances where they would want to sell rifles, but the different individuals do not sell pistols.

General RECKORD. Out in your country a man would buy a pistol and keep it all his life.

Mr. McCLINTIC. That is a mountain made out of a mole hill.

General RECKORD. Let me point out this: When the Attorney General came here with the bill in the first place, it provided that every time a man in your country wanted to buy a pistol, he had to throw his leg over his horse and go a hundred miles or so to the office of the collector of internal revenue to get a stamp; ride a hundred miles to get a dollar stamp to put on that pistol.

Mr. McCLINTIC. You mean that was in the original draft?

General RECKORD. I say to you, that if it had not been for our opposition to the ridiculous features of this bill—I won't say ridiculous—I will correct that—if it were not for opposition to the very severe features of this bill, as applied to the honest citizen, these changes would not have been made.

Mr. COOPER. I do not know that that statement is justified.

General RECKORD. That they would not have been made?

Mr. COOPER. You realize that the members of the committee were all present, and we may have done some of the things which you have pointed out as being objectionable.

General RECKORD. I agree.

Mr. McCLINTIC. If your pistol organizations, which are organized for the purpose of promoting marksmanship, are excluded, you do not have a leg to stand on. There is nothing to the argument about selling pistols.

Mr. DICKINSON. Would there not be rules and regulations adopted by which a deputy could be named so the citizens desiring to register their weapons would not have to go anywhere, except possibly to the courthouse?

General RECKORD. Those amendments have been made. They were not in the original.

Mr. LEWIS. This question is addressed generally to those helping the committee. Does anyone know the statistics of homicides in the United States and other countries? I have a vague recollection of figures like 20,000, which were due probably not only to acts of the gangsters, but to acts of people who have pistols in their pockets and who use them when they are drunk and so on, and those homicides would not have resulted if some kind of restraint had been applied in connection with the possession of pistols, such as the restraint which is applied in the most disciplinary way to the driver of the automobile.

Mr. KEENAN. I have a memorandum which was submitted to the clerk. We got the statistics gathered from the latest sources available and I think the clerk has a memorandum of them. The memorandum was handed in.

General RECKORD. I will be glad to answer such other questions as the committee may desire to ask. I would like for Mr. Imlay to be heard. If he can be heard now, I will appreciate it.

Mr. TREADWAY. General Allen is here and he has not completed his statement.

Mr. COOPER. When we adjourned yesterday, we promised General Allen 5 minutes more.

General RECKORD. I do not want to take that from him.

The CHAIRMAN. We will let him conclude his statement. We thank you for your appearance and the testimony you have given the committee.

General RECKORD. Before the general makes his statement, may I say that in his testimony of yesterday, I think he made a mistake in connection with one matter as to fingerprinting in Massachusetts. I wired for information and I have a telegram reading as follows: "Present Massachusetts law does not require fingerprints for purchase of revolvers or pistols." I thought he would probably want to correct the record to that extent.

## STATEMENT OF J.-WESTON ALLEN (Continued)

Mr. ALLEN. Mr. Chairman and gentlemen of the committee, the discussion which has just intervened with respect to registration hits at one of the fundamentals in this bill, which makes it serviceable in reaching the gangster. It has been said that I was chairman of the conference here in Washington where this matter was covered. At that time, Mr. Newton D. Baker was chairman. He was chairman at the time of drafting this bill. I would like to have your committee know the membership of the executive committee of the National Crime Commission, which was composed of Hon. Newton D. Baker, Richard Washburn Child, F. Trubee Davidson, E. A. Alderman, of the University of Virginia; Mrs. Richard Derby, a daughter of the late former President Roosevelt; Gen. James A. Breen, Hugh Franey, representing labor; Herbert S. Hadley, Charles E. Hughes, Samuel Lewisohn, Frank O. Lowden, Samuel McRoberts, and the assistant to the chairman was Colonel Howe, who is secretary to the President. Colonel Howe was assistant to the chairman from the time it was organized until recently, when his duties made

it necessary for him to give up that work. It was with Colonel Howe that we organized this committee which drafted the law that I referred to yesterday.

The nub of the whole situation with respect to registration has been met by what has been said by the chairman and by you, Governor, and by Mr. Hill, at the previous hearing, when Mr. Frederick was on the stand. I want to read a question that was asked by Mr. Hill of Mr. Frederick. Mr. Hill said:

> You expressed the opinion that perhaps any legislation would not be effective to keep firearms out of the hands of the criminal element.
>
> Mr. FREDERICK. I am quite sure we cannot do that.
>
> Mr. HILL. Assuming that is correct, and I am sure a great many might agree with you, if the firearms are found in the possession of the criminal element, and they cannot, under the provisions of this act, or of some similar legislation, show that they are in lawful possession of those firearms, would that not be a weapon in the hands of the Department of Justice in enabling them to hold those criminals until further investigation might be made of the crime?
>
> Mr. FREDERICK. I think so, and I made this suggestion to Mr. Keenan two and a half months ago, that whenever a weapon, a firearm of any kind, and I would not limit it to pistols—I would say rifles or shotguns—is found in the hands of any person who has been convicted of a crime of violence, because there are many crimes which have nothing to do with the use of firearms, and that is why I make the distinction; and I think he suggested that we add to that any person who is a fugitive from justice—that mere possession of such a weapon should be prima facie evidence of its transportation in interstate commerce, and that transportation in interstate commerce of weapons by those people be made a crime.

Mr. VINSON. Have you any such limit as that in either the original bill or the substitute?

Mr. ALLEN. The bill before you now?

Mr. VINSON. Yes, either in the original bill or the substitute; is that thought in either one of the bills?

Mr. ALLEN. That it must be a person who has been convicted?

Mr. VINSON. Yes.

Mr. ALLEN. No, sir. I am coming to that point. Gentlemen, this is just the trouble, when you limit it to a person who has been convicted of a crime, because a very large number of these gunmen in my State, and in every State, have not got a record at the present time. As Mr. Treadway is well aware, we have a murder trial going on now, of the Millens, who committed a brutal bank robbery and theater robbery in Massachusetts. Where were those men taken? In New York, and they were armed, and they had no criminal record, and they did not have machine guns on their persons. They were armed with these automatics.

Mr. TREADWAY. Would it not be well to add that there were two dress suitcases filled with arms and ammunition, which were found at the Union Station in Washington?

Mr. ALLEN. Yes; after they were taken, there was a regular arsenal of firearms found in the Union Station in Washington. Not one of them had a criminal record.

Mr. VINSON. Are they on trial now?

Mr. ALLEN. Yes.

Mr. VINSON. For what?

Mr. ALLEN. For murder.

Mr. VINSON. What is the penalty for murder in Massachusetts?

Mr. ALLEN. We give the death penalty.

Mr. VINSON. That is quite a severe penalty, and if they are guilty of that crime, society will not be menaced with them any longer. This law would not affect their condition any.

Mr. KEENAN. Suppose they are acquitted?

Mr. ALLEN. We were fortunate in getting confessions from them. It is admitted that that whole series of robberies was so cleverly brought about that without their admissions, it would be a very difficult thing to convict them. What we want to get, when we find a firearm in the hands of a man who is a gunman or criminal, we do not want to wait until he has been convicted before you can reach him for carrying these weapons.

The CHAIRMAN. Right there, you would have something to hold him on, until you made a further investigation, if you found him with firearms, contrary to law?

Mr. ALLEN. Yes, sir; but if we can have the right to register guns, so that a man who has unregistered guns is thereby guilty of a felony, you are going to put, in my opinion, more gunmen and gansters in jail than by anything that this committee can do. I have read the other bills by the Department of Justice, and I agree with the Attorney General, in his opinion, that this situation is not met by the other bills.

Many letters have been received by Congressman; they have spoken to me since I came to Washington. Many letters have been received from men who have written as sportsmen, and articles have appeared in the newspapers with respect to hunting being imperiled just because Dillinger bags a few sheriffs. I want to call the attention of the committee to the fact that letters were sent out by the National Rifle Association of America, in which it was stated that the officers in Washington will do all they can, but that—

A personal letter or telegram of yourself and every sportsman in America objecting to the bill is necessary if we are to wage a successful fight. With your help we killed the Copeland bill, but the committee thinks this one, H. R. 9066 is going to be harder to kill.

Then, in another résumé of this bill, it was said that all of the restrictions which are proposed in House bill 9066, aimed at the pistol and revolver are almost worthless, as far as providing any real Federal control of firearms is concerned, that all guns, shotguns, and rifles, as well as pistols and revolvers, must be included in the Federal statute if it is to serve any useful purpose. "If not included, House bill 9066 is not worth the paper it is printed on, as a crime preventive measure. If they are included, the honest sportsmen in this country will rise up in arms as they did over the Copeland bill." It is also said that the bill is undoubtedly presented in its present form, because there are fewer owners of pistols and revolvers than there are of shotguns and it is hoped in that way to get the law passed, and that once on the books the Attorney General can go to the next Congress and say that the firearms bill needs a slight amendment so it can be made to include any firearm and that—

Few Congressmen will have time to notice it and within a year after the passage of House bill 9066 every rifle and shotgun owner in the country will find himself paying a special tax and having himself fingerprinted and photographed for the Federal rogues gallery every time he buys or sells a gun of any description.

Mr. HILL. Who is that from?

Mr. ALLEN. The author of the letter is here, and it was signed by the National Rifle Association of America, home office Barr Building, Washington, D.C.

Mr. COOPER. Who signed the letter?

Mr. ALLEN. It is signed "Fraternally, National Rifle Association, C. B. Lister, Secretary-Treasurer."

Gentlemen, for 15 years I have followed, on behalf of the National Crime Commission, the legislation in which we sought to obtain reasonable regulation of firearms, and I wish to say to this committee that in all that 15 years I have never known the American Bar Association, the Commission on Uniform Laws, the National Crime Commission, or the Attorney General's Office to ever suggest that they were going to do just what it is said here the Attorney General will slip over, and that is, reach rifles and shotguns. It is not necessary; the rifle and shotgun are not concealed weapons. I can say that I believe that the good faith of the Attorney General's Office is involved when it is said that this merely a stepping stone to interfere with the sportsman's honest and proper use of shotguns and firearms.

The press release was sent out by the National Rifle Association which caused news articles to be published over the country, under date of April 30. That press release was sent out by the National Rifle Association and it said, among other things:

But the Attorney General  *  *  *  has had introduced a bill which  *  *  * proposes to give almost dictatorial control to an official of the Government in Washington whose training has nothing whatever to do with this phase of governmental activity.

Gentlemen, as a matter of fact, power to enforce this act is given to the Secretary of the Treasury and his under-official, the Commissioner of Internal Revenue.

Mr. HILL. Are you reading from the release?

Mr. ALLEN. This is my statement. Their statement was that it was giving dictatorial control to an official of the Government whose training has nothing whatever to do with this phase of governmental activity. I am saying to the committee that the Treasury Department is more capable and better experienced in carrying out the provisions of this act than is any other department of the Government. All internal revenue laws are enforced by revenue agents of the Treasury Department. All customs laws are enforced by officials of the Treasury Department. The regulation of narcotic drugs is in this Department, and so is the Secret Service. The means and methods of registration of dealers and individuals in connection with occupational taxes and sales taxes is properly and peculiarly within the knowledge of this Department of the Government.

The next statement in this press release is:

Under the provisions of the Sumners bill, present owners of the types of guns to which the bill applies would have to obtain the permission of the revenue collector to ship or sell a gun and register their fingerprints and photographs and pay a tax.

This is a plain misstatement. Permission of the revenue collectors is not necessary either to ship, sell, or buy a firearm. If a gun upon which the transfer tax has not been paid is shipped in interstate commerce, it would be necessary to obtain a permit from any of the persons designated by the Commissioner of Internal Revenue to issue permits, but such permit must be granted to everyone if the proposed

transportation is lawful. Moreover, persons who sell or otherwise dispose of a gun are not required to register their fingerprints and photographs.

Mr. VINSON. You say that under H.R. 9066, you would not be required to make an application to the Commissioner of Internal Revenue before you could sell, assign, transfer, give away or otherwise dispose of a firearm, except on application form issued in blank for that purpose by the Commissioner of Internal Revenue, and in such application it would be necessary for you to be identified by name, address, fingerprints, photograph, and such other means of identification as may be prescribed.

Mr. ALLEN. You make application to the Commissioner of Internal Revenue.

Mr. VINSON. I understood you to say that the statement in the press release was inaccurate in regard to the photograph and fingerprinting. I am reading from the bill, which in section 4; page 4, which requires you to make this application and to be identified by fingerprints and photographs, so certainly the gentleman is in error when he says that statement in the press release was inaccurate.

Mr. ALLEN. The statement said that permission must be obtained.

Mr. VINSON. That is what this says; it says it cannot be done—

except in pursuance of a written order from the person seeking to obtain such article, on an application form issued in blank for that purpose by the Commissioner of Internal Revenue.

Mr. ALLEN. The permission runs to the Commissioner. That is true of most of the regulations, where you make application; you do not make application to the local man.

Then the press release said, "Under the bill, there is no right of appeal from the decision of the Commissioner of Internal Revenue should the permit be refused." Those of us who are lawyers know that there is, of course, a right of appeal from the decision of the Commissioner in this case, just as there is in any other case where the Commissioner is delegated with a discretionary power.

Then the release said, "A citizen owning a gun before the act went into effect would be subject to arrest, his gun would be confiscated, and he would have to accept the notoriety, pay the costs of legal counsel, and lose the time from his business to prove to the satisfaction of a jury in Federal Court that he had not obtained the gun illegally."

The only instance where a citizen owning a gun before the act went into effect would be subject to arrest, and so forth, would be under the interstate transportation provision if he should be arrested for having transported the weapon in interstate commerce and if it should be proved that he had not been a resident of the State for 60 days. Moreover, this presumption would not apply if he had lawfully purchased the gun after the act went into effect. Even this provision concerning interstate transportation without a permit has been removed from the bill. Then it says:

Mr. Lister points to the rank injustice the Sumners bill would impose upon farmers, ranchers, and homesteaders not living within a reasonable distance of an internal revenue bureau office. The bill provides that all purchasers of the firearms mentioned in the act be required to get an order from internal-revenue agents allowing a purchase to be made.

The act merely provides that before a gun can be purchased a form must be filled out and presented to the person who sells the weapon. These forms, as well as the revenue stamps, will be available at any post office or at any internal-revenue office, and quantities may be obtained by any shooting association or sporting-goods dealer by merely making the request.

It further says, "Fingerprinting, photographing, and the expense of a revenue-tax stamp are included in the provisions of the bill."

Although a revenue-tax stamp is required, this press release fails to state that the present tax on the sale of firearms is repealed.

Mr. LEWIS. I have here the figures with respect to homicides in the United States as compared with other countries. For the year 1928 there were 10,050 homicides in the United States; in France, 520; in Germany, with half of our population, 1,264; in Great Britain, with one third of our population, 284; in Italy, with about one third of our population, 988. The method of treatment in Great Britain of this small-arms subject is of interest to me and may be to others who read the record. In England every person, with certain exceptions, must have a firearms certificate to purchase, possess, use, or carry a firearm or ammunition. The term "firearms", includes any lethal firearm, or other weapon of any description from which any shot, bullet, or other missile can be discharged, or any part thereof. It does not include antiques or firearms possessed as trophies of any war, although no ammunition may be purchased therefor. Ammunition is defined to be ammunition for such firearms, and it also includes grenades, bombs, and similar missiles; the firearm certificate is granted by the chief of police in the district in which the applicant resides, if the police officer is satisfied that the applicant has good reason for acquiring the certificate, and that he can be permitted to have the firearm without danger to the public safety, and upon payment of a prescribed fee, which is 5 pounds for the first period of 3 years, and it is renewable every 3 years for 2 pounds 6 shillings. There is much more to the statute, but that is sufficient to set up the comparison I have in view as to homicides in our country and in other countries and as to the character of legislation Great Britain has found it desirable to enact in an endeavor to control this homicide tendency.

Mr. ALLEN. In that connection, there are two things that will very greatly reduce the enormous number of homicides in this country. I believe one of them is the registration of firearms. In England, as you see, the provisions are very severe, compared with what the Attorney General is suggesting in this bill. In England, it is nearly $25 for the first 3 years. The other matter is a matter for the States. When you can get a provision that requires 48 hours or any greater time between the time when the person purchases the gun and the time when it is delivered, and that is the law in numerous States now, you thereby prevent a very large number of suicides, voluntary homicides, because in many, many suicides, where people go and buy a gun, if there is a delay of 48 hours before delivery, the insurance companies say that it will greatly lessen the number of suicides.

The CHAIRMAN. We thank you, General, for your appearance and the testimony you have given the committee. General Keenan, how much more time would you require?

Mr. KEENAN. I will not require very much more time.

The CHAIRMAN. We will have another session tomorrow, if that is agreeable.

General RECKORD. In view of the reading into the minutes of certain data which came from our office by General Allen, may I be permitted to extend my remarks by reading into the minutes certain other data?

The CHAIRMAN. Without objection, you may do so. The Chair desires to state that we will have another session tomorrow, and it is our purpose to close the hearings tomorrow.

General RECKORD. We shall not need over an hour, unless the committee takes up our time in asking questions.

Mr. KEENAN. I have a brief statement I would like to make at this time, and that is, we have no desire to enter into a controversial subject. Each and every provision that has been submitted to this committee has received study from the Department of Justice and the approval of the Attorney General. In appearing before this committee, at the very beginning, the Attorney General stated that we were, to some extent, feeling our way about in attempting to grapple with a tremendously important problem. We had suggestions from one of the members of this committee with reference to the advisability, if practical, of a registration feature. It was following his suggestion that we had a conference with the other branches of the Government. I would not have the committee under the impression that the Department of Justice submitted a bill for this committee's consideration without investigating, within the time permitted, the matters of law involved therein. For example, with reference to the matter of registration of firearms; recourse was had to the practice followed under the Harrison Act which we have attempted to follow generally, in the taxation features. There we find that although the provision with reference to existing drugs was not specified in the act itself, regulations were promulgated by the Treasury Department which required certain memoranda to be inscribed as a record upon the article sold, on the boxes and containers, which the Treasury Department felt was a reasonable regulation looking toward the collection of the tax upon the article.

We have no decisions of the Supreme Court that we are able to find to guide us, but we believe the sound principle of law to be that a provision for registration of all firearms would be constitutional if it be attempted and considered to be a reasonable regulation, and a reasonable protective step taken by the law enforcement agency to collect the tax provided in the main body of the act. I may say, from such inquiry as we have made, we have been unable to find that that regulation has been attacked in any court of this country up to this time, which afforded us some reason to believe that a similar regulation with reference to the registration of firearms, might receive and probably will receive official sanction as the exercise of constitutional power, and with the provision, if you please, that our act provides that if any portion thereof is found to be unconstitutional, it will not invalidate the entire act.

Mr. VINSON. There is quite a difference in the application of the law, as I see it, to a firearm now owned and possessed legally, with reference to registration, and the power to cause registration of firearms acquired subsequent to the effective date of the act, which

compels the payment of the tax; under your bill, you do not require payment of the tax on the firearm now possessed?

Mr. KEENAN. That is right. I do not think we would have such power.

Mr. VINSON. Your power under the taxing statute would apply to those weapons, but I cannot see by any stretch of imagination how you go back and apply the taxing power as a basis for registration, when there is no tax applied on those weapons that are now possessed and are required to be registered.

Mr. KEENAN. Of course, all such firearms referred to in this act are taxable upon transfer.

Mr. VINSON. I understand that.

Mr. KEENAN. It might be that it would be held to be constitutional, as a proper provision to determine the identity and ownership of the firearm, so that when they were transferred a proper check-up could be made.

Mr. VINSON. It might be you could require the tax on the transfer. What I am speaking of is, under the taxing power, when you have to pay a dollar for the transfer, that you require registration, and then I cannot see how you use the taxing power to require registration when no tax is involved.

Mr. KEENAN. There is no tax involved then, but there would be in the future.

Mr. VINSON. If the registration applied as of the time when the tax accrued, there might be some argument for it, but for the life of me, seriously, I cannot see how you are going to use the taxing power to require registration of an article that does not require the payment of the tax.

Mr. HILL. Would it not be used in determining whether or not the particular firearm was subject to the tax?

Mr. KEENAN. That is the precise point.

Mr. VINSON. That does not determine it; that is a fact; whether the firearm is taxable or not is a fact. When you establish that fact, if you do establish the fact that the man owned it before the effective date of the act, then there is no tax.

Mr. KEENAN. Mr. Vinson, using the same analogy in connection with the drugs, the Federal Government had absolutely no control over the drugs that existed at the time the Harrison Act became law.

Mr. VINSON. Of course, I think there is quite a difference.

Mr. KEENAN. Respectfully, I do not see the difference in the analogy. They require certain things to be done under penalty, but you do not have the matter subject to taxation. Referring again to the British law, they have no difficulty; they do not have the same constitutional limitations and constitutional questions that we have. I said that I would only take a minute, and I do not want to impose upon the committee, but the point I am trying to make is we are struggling with a difficult problem, with limited powers of the Federal Government. It is what we believe to be a growing need for some Federal legislation, and the inspiration for which we received, not from bureaucratic members of a centralized government, if such there be, but from the international police chiefs of this country, the largest organization of its kind, which includes in its membership practically every police chief in the country.

Mr. VINSON. They did not ask for the registration of weapons?

Mr. KEENAN. They asked for it at the beginning. The Attorney General was inclined to believe that the same thing could be arrived at through using the taxing power, under the sales tax provision and under the commerce and transportation clauses, and it was due to the suggestion of registration made in this committee that we attempted to work out something which we respectfully still believe would have a good chance to pass the test. If it would not, it would not invalidate the act in its entirety.

Mr. VINSON. How would you make that test? Under the language of the bill, how would you make the test?

Mr. KEENAN. I suppose the test would arrive, in case a man possessed a firearm described in the act, and prior to the effective date of the act, he attempted to transfer it in interstate commerce; that would be one way.

Mr. VINSON. I thought you agreed yesterday that section 11 could very well come out.

Mr. KEENAN. It could come out, because, as I interpret the act, any man who is found in possession of a firearm after the 4 months period, there would be a presumption that he acquired it after the effective date of the act. Then, if we attempt to apply the act, we have found the man in possession of the firearm; it was not identified; he did not have the stamp on it; then he would be subject to arrest and indictment and when he came before the court you could, I suppose, test the sufficiency of the indictment.

Mr. VINSON. You have two propositions; you have a line drawn as to when he acquired it, whether he acquired it before or after the effective date of the act. It may be constitutional; I have not, of course, investigated it exhaustively. It may be constitutional under the taxing power, to make it an offense for him to fail to register the weapon after the effective date of the act. It becomes a fact for the jury to determine, when he procured it. If they say he is guilty, the court can say that it was on the basis that he acquired it after the effective date of the act. I cannot see how you are going to test the constitutionality as it affects the registration of the weapon prior to the effective date of the act.

Mr. HILL. Is there any general penal provision in the statute that would apply to a failure to register a weapon, under the provisions of this proposed act?

Mr. KEENAN. There is no general penal provision.

Mr. HILL. Is there any general penal provision?

Mr. KEENAN. Under the act, it is not a violation of the act; there is no penalty provided, and it is not a violation.

Mr. HILL. In some cases, where you require a man to do a certain thing, he may be covered under some general penal provision if he does not do it.

Mr. KEENAN. It is not in this act, as I interpret it.

Mr. HILL. It is either true that the Federal Government has the power to require it or it does not have the power.

Mr. KEENAN. That is correct.

Mr. HILL. Why do you not put something in there to enforce that legislation?

Mr. KEENAN. Really, what we are after is the crook who has not registered, and we do not believe he is going to register.

Mr. HILL. The law-abiding citizen probably might not register; what are you going to do if he does not register?

Mr. KEENAN. If the law-abiding citizen does not register, and does not get into any kind of difficulty that would cause him to come to the notice of the police, and there are not going to be snooping squads going around from house to house to see who does and who does not possess arms; this is a practical piece of legislation.

Mr. VINSON. You get the benefit under section 5, paragraph (b), in regard to the presumption.

Mr. KEENAN. The presumption is applied to the gangster.

Mr. VINSON. That presumption is there, but that does not touch the question of whether it is a good thing or a bad thing; that does not touch the constitutional power.

Mr. KEENAN. It all comes to this point; I am almost tempted to say, even at the eleventh hour, that it is quite evident there is a good deal of difference of opinion in the committee as to whether there should be fingerprinting, or anything that might be considered a burdensome regulation. I hope, if we are going to do anything this session, it might be considered whether or not it will be practical to eliminate fingerprints, and whether or not general registration would receive more sympathetic hearing from some members of the committee than attempting to obtain fingerprinting legislation. We feel there is an urgent need to do something. Our practical experience causes us to believe that you are not going to solve the problem of the roving gangster and apprehend him and put him away before he kills people if you strike at the machine gun only, the crook is clever; he is enterprising and he is going back to his very effective Colt and other .45 automatics, if he is restricted.

The CHAIRMAN. We will adjourn until 10 o'clock tomorrow morning.

(Thereupon, at 12:20 p.m. an adjournment was taken until tomorrow, May 16, 1934, at 10 a.m.)

# NATIONAL FIREARMS ACT

## WEDNESDAY, MAY 16, 1934

HOUSE OF REPRESENTATIVES,
COMMITTEE ON WAYS AND MEANS,
*Washington, D.C.*

The committee met at 10 a.m., Hon. Samuel B. Hill presiding.

Mr. HILL. General Record, you may proceed with your witnesses, either yourself or anyone else you may designate.

General RECKORD. Congressman Hill, we would like this morning to have the committee hear Mr. Imlay, who is an attorney with offices in the District of Columbia, and who has had long experience with the matter of firearms legislation as a member of the American Bar Association. His experience is such that we believe he can bring out some points in connection with this proposed legislation which have not been brought out up to this time.

Mr. HILL. The committee will be very glad to hear Mr. Imlay.

## STATEMENT OF CHARLES V. IMLAY, WASHINGTON, D.C.

Mr. IMLAY. I appreciate the privilege of making a statement this morning, but please let me ask your indulgence, however, because of a cold that has somewhat interfered with my hearing passages, and if you will bear with me and let me make my statement, I shall be glad to answer any questions then.

Mr. HILL. Please give your name, address, and the capacity in which you appear.

Mr. IMLAY. My name is Charles V. Imlay; my profession is attorney at law, and my study of firearms legislation has been in connection with my membership in the National Conference of Commissioners on Uniform State Laws. That conference is composed of two or more representatives from each of the various States, which meets annually under the name of the National Conference of Commissioners on Uniform State Laws, and it has been engaged for some 45 years in preparing and recommending to the States for adoption, various uniform State laws. It is affiliated with the American Bar Association, although distinct from it, and the American Bar Association functions through it, receiving from it, in the first instance, before it acts upon them, any proposed uniform State laws.

My membership in that conference was the occasion for my giving a study, which has now lasted for some 11 or 12 years, on this subject of firearms legislation. When we began that study some 11 years ago we were told that it was impossible; that there could be no such thing as a uniform firearms law; that we would fail just as the

137

conference had failed in a uniform divorce law. Its conspicuous success with the commercial acts is known to everybody; but when we approached the matter we sought first to find just what the existing laws in the various States are on firearms legislation, and we found that it is a matter in which State control has progressed to completeness in practically all of the States, and we found that it has always been assumed that it was a matter of State regulation, as distinguished from Federal regulation.

The traditional form of firearms legislation has been to recognize the legitimacy of the possession of certain weapons, to forbid the carrying of concealed weapons, and in those States in which progress had been made in the way of regulation, the effort had been made to follow closely the identity of weapons and the identity of purchasers, and taking those as the bases, this uniform firearms act which has been referred to a good many times, and which I introduced in the record when I first spoke here 2 weeks ago, was passed to embody those features.

Now, Mr. Allen, who spoke at considerable length yesterday and the day before, brought to your attention the work that was done by the National Crime Commission, and he told you how the National Crime Commission took up this work, but I am not sure that Mr. Allen emphasized the fact that the National Crime Commission in its work proceeded on the theory of a State law and State control and State regulation. We never heard from the Crime Commission in the direction of a Federal law. We worked with the Crime Commission, and when this uniform act that is spoken of was first passed by the National Conference, approved by the bar association in Denver, in 1926, when it was recalled from the legislature, it was not, as Mr. Allen says, because it received universal opposition; it was because the new president of the American bar association requested that it be withdrawn for further consideration. The fact of the matter was that the only opposition that came from it was the opposite of the opposition that Mr. Allen pointed out. The Governor of Arizona thought it was too drastic, and that is the peculiarly controversial nature of all firearms regulation. One man will tell you it is too drastic and one will tell you it is too liberal.

What the National Crime Commission sought to do in their draft of a proposed uniform act was to take the uniform act that had come out of the National Conference and the Bar Association; take its provisions almost 95 percent in toto, and then incorporate in it the New York theory of the Sullivan Law, which, so far as I know, has met acceptance in only three or four States of the Union—New Jersey, Massachusetts, and probably one or two others. They proposed a State law, and this is the first time, in the presentation of this bill before this committee, that anyone has ever sought to say that this very difficult matter could be handled by Federal law, and with all deference to the Attorney General and his able assistant, and to Mr. Allen, and to all others who have advocated this proposed Federal law, I wish to say that my experience of 11 years in the study of this subject makes me think that it is impossible to regulate it by Federal law.

First of all, Mr. Keenan says that he has the analogy of the Harrison Act, and that that analogy is very close. I was looking over the Harrison Act again last night, to verify some of my study of that sub-

ject. The Harrison Act attempts to set up a system of licensing dealers, and then a system by which purchases from dealers are made by means of an order which establishes identification, but when we have found that as the analogy, then the analogy stops, because when you get by the dealer who purchases from the manufacturer; we will say, as you get down to the patient, the patient does not get the drug on an order, but he gets the drug because his physician prescribes it for him, and you have, therefore, an entirely different subject matter.

If you were to try to find exact analogy between the Harrison Act and its system of regulation and apply it to firearms regulation, you would have to introduce a second story in this structure, and you would have to find a place where a particular potentate, like a doctor of medicine, says, "Now, having satisfied the law in the purchase of a firearm, I am the dispenser; I am going to dispense the firearm to A and B and C and D", and so forth, so that the normal necessity for the possession of the pistol can be satisfied by somebody that administers the law according to his superior knowledge.

Taking the regulation in the Harrison Act, as far as it goes, it started out in 1914 under conditions where there was no fully developed State regulation in existence in this country, and the experience from 1914 to date, over the period of 20 years, has demonstrated the fact that it does not succeed by itself and that it cannot succeed by itself, and that was demonstrated so fully some 5 or 6 years ago to the officials of the Bureau of Narcotics in the Treasury Department. that they found it necessary to formulate and propose a so-called "uniform narcotic drug act" for the States, and that so-called "narcotic drug act" formulated by them for the States, was brought before the National Conference of Commissioners on Uniform State Laws, by them promulgated, approved by the Bar Association at its meeting in this city 2 years ago, in 1932, recommended to the States, and thus far has been adopted by eight States in the short period from 1932 to date, and is on the point of being adopted by one or two others; and I venture to predict that within 2 more years it will be the law of practically every jurisdiction in the United States, which means, I submit, that the Harrison Narcotic Act, a Federal act, by itself cannot succeed but must depend upon a rigid, careful, and conscientious enforcement of a State law on the subject.

The reason why you can administer a State law, and this proposed narcotic act does in fact duplicate the provisions of the Harrison Act, is that your method of enforcement is immediate and in the hands of citizens that are right there to do it, and supported by the public sentiment of all the people in the community.

Some mention was made yesterday and the day before about fishermen's licenses. The fisherman's license has been enforced so well against nonresidents because the nonresident is a bright and shining mark when he comes to fish in the stream or lake of a community. I went 2 years ago into the extreme southwestern county of your State, Mr. Chairman, and there in that beautiful Lake Santeelah I fished, and when I got my license to fish, because I tried to obey the law of the State, expensive as it was, I had to pay $5 to fish for one day, and I did not catch any fish. It is now 25 cents.

The CHAIRMAN. You will have to go back some time and get your $5 worth.

Mr. IMLAY. What I did was to go to the country store and there the keeper of the store gave me a receipt for my $5 and the additional 40 cents which the United States charges me, and he gave me a receipt in the name of the game warden.

Let us imagine that you would attempt here to erect a national fishing-license system, and you would get that same storekeeper to administer it for you. You would have an exact duplicate of what you are trying to do here, in saying that alongside of the system of regulations in the States that now exists, with reference to firearms, a system of regulation which has gained ground under the influence of the uniform act which requires an application that fully identifies the applicant and that furnishes to the police the information as to who it is that is applying for the pistol and requires the lapse of 48 hours before the pistol can be got. Now, let us suppose that we erect an entirely different and distinct system of regulation by the United States. According to sections 3 and 4 here, in which we have the dealer license, in which we provide for the order and for the stamps, are we going to ask the States to withdraw?

When the Volstead Act began to be unpopular and irksome, some of the States withdrew State control, and I believe said somewhat hypocritically that they were withdrawing State control because Federal control was sufficient. Now, I venture to say that if you were to erect an elaborate system of United States or Federal control like this, either you are going to have a troublesome duplication of State and national control or you are going to ask the State to withdraw. Now, if you get a picture of this form of regulation, you can see just what it means. Section 4 of the act——

Mr. HILL. Of the original act or the redraft?

Mr. IMLAY. I am speaking of the revised draft. Section 4 of the revised draft says that it shall be unlawful for any person to transfer a firearm except in pursuance of a written order from the person seeking to obtain such article, on an application form issued in blank, in duplicate, for that purpose by the commissioner. In one of these remote counties of which we were speaking a moment ago, let us imagine two householders situated close by; let us imagine one of them coming to the other and asking for a perfectly legitimate purpose the loan of a rifle or a shotgun. Those are not affected by this act, but let us suppose that he asks for the loan of a pistol, which, I believe, is recognized as perfectly legitimate when it is kept by a householder in his house. The owner will naturally loan it to him, and if he takes it in his hand he is violating the Federal law because he has not the order and the stamps, and the pistol has been transferred, because, if you look back at the definition of the word "transfer" you will find that it means to sell, to lease, to loan, and you have a man committing a crime by a perfectly natural, normal act of borrowing a pistol from his neighbor.

Mr. TREADWAY. Would you mind an interruption?

Mr. IMLAY. No.

Mr. TREADWAY. The reason I want to interrupt there was to see whether you are starting with a good premise in that you say that if this neighbor went to an adjoining house it would be natural that the owner of the pistol should loan it to him. As a neighborly act, that is true, but have you not overlooked the fact that if the neighbor has that pistol in his possession, if this bill should become law, he must,

Case 1:22-cv-02579-CKK   Document 10-1   Filed 10/28/22   Page 143 of 168

under the conditions under which he has it, have it registered.  In other words, this fact of registration would be absolute knowledge to him whereby he should see that he should get in line with respect to that pistol.  Do I make myself clear?

Mr. IMLAY. Yes, your statement is clear.

Mr. TREADWAY. What is your reaction to that viewpoint?

Mr. IMLAY. Your statement is clear, but yet if we assume that it was registered or was not registered, whether it is registered or not, the loan of it under those circumstances is a violation of the law.

Mr. TREADWAY. Absolutely.

Mr. IMLAY. And you have precisely the same unhappy condition that you had under the Volstead Act., where liquors were contraband, and where any transfer of the liquor necessitates either a violation of the law or a very elaborate system of espionage and control.

I had occasion about 2 years ago to sell a drug store in this District at public auction, and we had a few quarts of gin and a few quarts of whisky in that drug store.  Three or four inspectors from the Prohibition Unit were there, and they were as tender about that gin and whisky as a mother would be about a 2-week-old infant.  They stood around for hours, and they finally relieved us of embarrassment by taking it to the storage rooms of the Prohibition Unit.  You have set up a system of Federal espionage, Federal visitation, and you have made a criminal of a man who borrows a pistol of his neighbor, unless he goes through this system.  Even under the most rigid system of licensing automobiles or titling automobiles, there is no difficulty in borrowing an automobile.  If the analogy of the automobile-title system is sound, then this system of registration ought to be pliable enough to get away from the necessity of violating the law if you hand a man a pistol to examine and give his opinion on.

Mr. McCORMACK. From a practical angle, do you place pistols and automobiles in the same category?  Let us get at this from a practical point of view.  Looking at it from a practical standpoint. do you put a gun and an automobile in the same category, and do you put a gun and liquor in the same category?

Mr. IMLAY. No; I do not.  I think the gun is a dangerous instrument.

Mr. McCORMACK. It is inherently dangerous, is it not?  A gun is dangerous from the beginning, is it not?

Mr. IMLAY. A gun is dangerous; a pistol is dangerous.  I do not want to give the committee the impression that I am rabid on this subject in either direction.

Mr. McCORMACK. I am not conveying my state of mind.  My state of mind is open; I want to listen to all the evidence and I would like to get your state of mind as to whether or not you want me, as a member of this committee, to seriously consider the argument that guns and automobiles are in the same category, so far as borrowing is concerned, from a practical angle.  We will eliminate the theoretical side.

Mr. IMLAY. Practically, borrowing a pistol is more dangerous than borrowing an automobile.

Mr. McCORMACK. Suppose you and I are close, intimate friends

a gun; would you loan it to me with the same state of mind that you would loan an automobile?

Mr. IMLAY. If I knew you.

Mr. McCORMACK. You are a remarkable man. I would not loan a gun to my best friend without an explanation from him as to what he wanted it for.

Mr. IMLAY. I will add that qualification; I will go along with you on that qualification, that I would want to know what he wanted it for.

Mr. McCORMACK. And there would be a lot of other mental strings attached to the loan of the gun.

Mr. IMLAY. Yes.

Mr. McCORMACK. We are human beings, and I think we are practical men. Taking the angle of prohibition which you spoke about. You talked about the public state of mind. You addressed that argument to the committee to indicate the public state of mind with reference to prohibition and the fact that theoretically, under this bill, the same conditions might exist. That is the purpose of your argument?

Mr. IMLAY. Yes; that is it.

Mr. McCORMACK. It all rests upon what the public state of mind was and might be?

Mr. IMLAY. Yes.

Mr. McCORMACK. Do you think the public state of mind would be the same with reference to regulating the sale, or eliminating the sale or transfer for a consideration for commercial purposes of firearms, as that which revolted against what I on many occasions termed the impractical inequities of prohibition?

Mr. IMLAY. I do. I think the public state of mind will be the same.

Mr. McCORMACK. You think that I, as an average citizen, when I read in the paper of somebody borrowing a gun from "John Jones", of his being arrested because he had not complied with the law, that I am going to have that same feeling of revolt that I had when the prohibition law was on the statute books?

Mr. IMLAY. I am not sure that you individually will have.

Mr. McCORMACK. I am talking about the average man.

Mr. IMLAY. I am sure the average man will.

Mr. McCORMACK. That is all I consider myself, the average man.

Mr. IMLAY. I think when you get into that remote county of North Carolina, or you get into a remote county of any other State, you are going to find that feeling.

Mr. McCORMACK. Prohibition never bothered North Carolina or any other of those States. They had their liquor all during prohibition, although it bothered certain other sections of the country. Those things have a practical way of adjusting themselves.

Mr. IMLAY. When you get into the remote sections of any one of our States, you are going to find a great aversion to the Government's coming in there and controlling them on those things.

Mr. McCORMACK. Again, to get your state of mind, are you opposed to any kind of Federal regulation of firearms?

Mr. IMLAY. I am opposed to Federal regulation of firearms, other than a form of regulation that stops where the Mann Act stops.

Mr. McCORMACK. I am not arguing with you. Do not think because I ask questions, that I am arguing with you. I want to get your state of mind to the extent that it will enable me to obtain evidence so that I may form an opinion. You are not opposing a regulation of some kind?

Mr. IMLAY. I am not opposed to a form of Federal regulation that stops where the Mann Act stops, confining itself to interstate commerce, or which goes as far as some of the acts passed in the State prohibition history, which were in aid of the State, an act which would make it unlawful to transport weapons that would be in violation of State laws on the subject.

May I refer for a moment to the matter of registration, because I do not want to take too much time. I have set forth some of these views in the record, in those articles which I had printed there.

Section 5 provides for a registration of these types of weapons, including revolvers. Now, if we were to assume that everybody in the United States would come forward and register his weapon, I would say go to it, and I would be with this legislation heart and soul. I am not affiliated with the National Rifle Association and I am not affiliated with the arms manufacturers. I have never had a retainer from any of them. I am not affiliated with any organization on this subject. On the other hand, I am connected with this organization which, in a disinterested way, has sought to learn what the State law on the subject is, and to look at it impartially from a disinterested standpoint of formulating and recommending to the States a uniform law on the subject, and we looked at this matter of firearms registration, and we considered it very carefully.

Another one of the things that surprised me in Mr. Allen's statement is that he advocated this registration provision, because the draft of a proposed law formulated by the National Crime Commission did not contain any registration feature, and I looked at the draft of the act last night again to verify that fact. The first time I ever heard Mr. Allen, and I have heard him for a good many years, say anything about registration was when he stood here and talked to you gentlemen about registration and talked of it as something which, in the words of St. Paul, was a thing to be hoped for. In other words, everybody is not going to come forward and register his gun. We hope that some of them will, so we incorporate section no. 5 without any penalty attached to it, and we hope that more and more of them will come forward and register their guns, so that as each year rolls by we will have more and more registered guns.

Mr. VINSON. What is the purpose of the registration of the guns now owned?

Mr. IMLAY. The purpose of registration is, in their minds, frankly, a police measure.

Mr. VINSON. What would it effectuate? The registration is for the purpose of determining ownership, and the time when the party owns it. In other words, their claim is with regard to registering revolvers and pistols now owned, that if they catch a man with a pistol and it is not registered, it is hard for them to determine whether it was acquired subsequent to the effective date of the act or prior thereto. Do not all revolvers and pistols have factory numbers that determine when they came from the factory or when they were manufactured?

Mr. IMLAY. Yes.

Mr. VINSON. Would not that show whether the gun had been acquired subsequent to the effective date of the act?

Mr. IMLAY. Yes; and to that extent it operates.  To the extent that they find somebody with a contraband weapon, not registered, the act succeeds.

Mr. VINSON. Could not they find that without requiring this anticonstitutional measure to be inserted in the bill?

Mr. IMLAY. It can be accomplished under a State law better than under a national law.

Mr. VINSON. I know, but even under this law could not the district attorney, without much trouble, ascertain from the factory when that gun was manufactured?

Mr. IMLAY. Absolutely.

Mr. VINSON. Certainly a person could not have had it before it was manufactured.

Mr. IMLAY. The system of identification from the factory, or identification in connection with purchase, is fully effective.

Mr. VINSON. I am speaking about the pistols and revolvers that are now owned, before the effective date of the act.  I think I can see a line between pistols and guns now owned and those acquired subsequent to the effective date of the act.

Mr. IMLAY. Yes; it can be ascertained, Mr. Congressman.  It can be ascertained by that process, that does not have the effect of creating a great body of law-breakers, who do not take the time or the trouble to register their pistols.

Mr. VINSON. And it can be ascertained without Congress enacting what might be an anticonstitutional provision?

Mr. IMLAY. Yes.  The registration feature has been tried and has failed, and I should invite your attention particularly, Mr. Vinson, to page 79 of volume 2 of the record, where I have pointed out that the Arkansas law passed in 1923 requiring a State-wide registration was abolished the following year as being unworkable, and there on page 79 of volume no. 2 of the record I have cited the act of 1923 in Arkansas, and I have cited the act of 1924 in which the registration feature was abolished.  Frankly the registration feature was intended to affect a certain class of lawless persons whose pistols they wanted to have registered, but those people did not come forward. It did not reach those people, and then, on the other side, there were a great many people who, from indifference, stubbornness, or obstinacy, which was the same attitude manifested toward the Volstead Act, refused to register their guns, and 2 years later I happened to be in Detroit, where the National Conference was meeting, and we were discussing these things, and this registration feature, and one of the leading citizens of that State which had passed the registration feature that year, in the spring of 1925, said: "Today is the day when we are supposed to register our pistols.  I am not going to register mine."  Michigan still has that registration feature.  I have not followed it closely since 1925.  It was reenacted in the act of 1927, but I venture to say that you can go to Detroit or to any other city or town in Michigan and you can find countless weapons which are not registered.

The CHAIRMAN. Are you opposed to the principle of registration, either by the State or the Federal Government?

Mr. IMLAY. I am opposed to the form of registration, either by the State or Federal Government, that consists in requiring everybody to come forward and register a pistol. It is unworkable; it did not work in Arkansas, and they repealed it in Arkansas.

Mr. DICKINSON. What reason did he give for not registering?

Mr. IMLAY. He is a bad citizen; he is a good lawyer and a man of means, and I do not justify him. It is bad citizenship; it is bad citizenship whether it is a violation of the Volstead Act or a violation of the Firearms Registration Act.

Mr. COOPER. How many States of the Union now have the State registration requirement?

Mr. IMLAY. None, except Michigan, and, I believe, Wisconsin.

Mr. COOPER. You say the act in Michigan was repealed about a year after it was enacted?

Mr. IMLAY. Yes.

Mr. COOPER. You cite the instance of one citizen who, you say, is not a good citizen, from the State of Michigan who declined to register his pistol?

Mr. IMLAY. Yes.

Mr. COOPER. Does the conversation which you had with one man control your conclusions or your views on this proposed legislation?

Mr. IMLAY. I did not understand.

Mr. COOPER. Does that conversation which you had with one man control and influence your views on this whole subject matter?

Mr. IMLAY. No. I was told that was the general attitude of rebellion.

Mr. COOPER. Have you been to the State of Arkansas?

Mr. IMLAY. I have been there since, but I rely, not so much upon being there, but upon talking with men familiar with this subject.

Mr. COOPER. Have you made any considerable investigation of the sentiment down there on that matter?

Mr. IMLAY. I am relying upon what was told me by my fellow commissioners from the State of Arkansas, upon their knowledge, what they knew.

Mr. COOPER. Is this man with whom you had the conversation, whom you spoke of, one of the commissioners?

Mr. IMLAY. Yes.

Mr. COOPER. And you say he is a bad citizen?

Mr. IMLAY. Yes.

Mr. COOPER. I have been interested in your observation relative to the Mann Act, with reference to the interstate question involved here. Would you object to a reasonable restriction on the interstate transportation of pistols?

Mr. IMLAY. Formulated in this way; yes.

Mr. COOPER. And you would object to any reasonable restriction on the interstate transportation of pistols?

Mr. IMLAY. I would not, Mr. Cooper. I would be willing to see an act passed that would declare that when the pistol in the original package has crossed the State line it becomes local intrastate commerce and is subject to local regulation.

Mr. COOPER. Do you think your rather theoretical views of the treatment of the subject would work out very satisfactorily?

Mr. IMLAY. Mr. Cooper, I am just bold enough to say I think my views are not theoretical but practical, for this reason: That I believe I am talking about a system of regulation that is traditional in this country, and has existed for 150 years. It is only within recent years that there has been any attempt to make any exact identification of the purchases, and many States, following the theory of the uniform act, or, in some few States, following the theory of the Sullivan Act, have proceeded by that system of regulation. Now, if an Act of Congress were to declare that when the pistol crosses the State boundary it then ceases to be in the jurisdiction of Congress, but is in the jurisdiction of the State, then the State of New York could apply the Sullivan Act, or the State of Maryland could apply their system of regulation, or the State of Pennsylvania could apply the uniform act, or the District of Columbia could apply the uniform act. I think you were here when I spoke of the Harrison Act.

Mr. COOPER. Yes.

Mr. IMLAY. You would have what they have today in the Harrison Act; you would have the State and the Nation working together on the thing.

Mr. COOPER. Do you contemplate that the State authorities and the Federal authorities will not work together under this proposal?

Mr. IMLAY. Not if there is duplication.

Mr. COOPER. Did I understand you to say that although the Federal Government passed the Harrison Narcotic Act, that then the various States of the Union had to pass a similar or identical act to that?

Mr. IMLAY. Yes.

Mr. COOPER. Is not that the type of cooperation and working together that might be reasonably expected under legislation of this type?

Mr. IMLAY. In those local narcotic acts, the State law will ultimately supersede the national act.

Mr. COOPER. I respectfully submit that you are in error on that.

Mr. IMLAY. Perhaps I am.

Mr. COOPER. From my experience and observation, that is not the result at all.

Mr. IMLAY. I will not contend with you on that.

Mr. COOPER. It is my experience in the courts, although my State has an antinarcotic act, as I recall, patterned after the Harrison Act, still offenders are constantly arraigned before the Federal court. If your knowledge of this subject matter is gained from your experience under that act, I am afraid you are not making the contribution here that you would like to make and that we would like to have you make.

Mr. IMLAY. It will rest with your judgment and the judgment of your colleagues as to whether I have or have not made a contribution. I am wrong in using the word "supersede." Let me qualify that; let me qualify the entire statement by saying the Uniform State Law is only 2 years old, so my answer is rather a prediction than the statement of a fact. What I anticipate is that the conviction on the part of the officers in the Narcotics Bureau that they needed the help of a State law, which caused them to draft it, and has brought about the enactment of a State law, will mean that they will rely very heavily upon State control. Now what I anticipate, and I may be wrong,

and I say it with deference to your experience, what I anticipate is that the bulk of the responsibility will rest upon the State in the enforcement of those rules.

Mr. COOPER. There is no disposition on my part to argue with you. I am trying to get at something tangible, something we can take hold of, to see if there is some way to control this matter which we all want, you and I, and I am sure the other members of the committee too. My experience has not at all been along the line of that indicated by you with reference to the Narcotic Act. It so happens that I have had some limited experience with cases coming under that act. It has occurred that an offender might be indicted under the Federal act and under the State act at the same time, and in practice the State courts, in my part of the country, will wait for the Federal court to act and yield jurisdiction of the matter to the Federal court. It has also been my observation that in my part of the country there are perhaps 10 of these narcotic cases prosecuted in the Federal court where there would be one in the State court, although the offense would be a violation of both Federal and State law. When you make the statement that legislation of this type is going to require State legislation that will supersede the Federal legislation, and you base that upon the experience of the Narcotic Act, my experience prevents me from following in that conclusion.

Mr. IMLAY. I submit that to your judgment.

Mr. McCORMACK. What State do you come from?

Mr. IMLAY. I am from the District of Columbia.

Mr. McCORMACK. I appreciate what Mr. Cooper says, but I think that in our State our conditions are a little different. In my section there are a lot of prosecutions in the State courts. I suppose, if we were discussing the question as a question of experience, I would not want the gentleman to be placed in the position of making an argument which, at least, does not support some of the conditions which exist in some sections of the country. There is a tremendous number of prosecutions in the State courts in Massachusetts, the minor cases. The Federal courts take up the serious ones, but the police of Boston catch some with dope in their possession. They bring them in or catch them selling dope and the Federal court may later take jurisdiction, but there is a considerable number of prosecutions in the State courts. My only reason for that is not to contradict my friend from Tennessee but in order that if I were in this gentleman's position, and if I entertained the same thoughts, I would make the same argument he did, based on experience, assuming I agree with the gentleman.

Mr. IMLAY. Mr. Chairman, may I conclude in just about 2 minutes?

The CHAIRMAN. I hope you will be able to conclude soon. We desire to finish the hearing this morning.

Mr. IMLAY. I am willing to agree, in response to the suggestions just made, from a police standpoint, from the standpoint of prosecution, like Mr. Allen, that there are certain things that might be done that will make the law tight and will aid the police and aid the prosecutors, but you are legislating for citizens and when you take the history of firearms and their legitimate use in the history of this country, what do you find? You find that law and order has always been enforced by the citizen body and you can go now into some of our rural sections and you can find it is still true, as it was in the

early part of the Republic, that when the sheriff goes after a gangster, he can go from house to house and he can be sure there is a householder there with a weapon. It was once a shotgun or a rifle, but it is now a pistol, and the weapon is as much a part of the equipment of that household as the Bible on the mantle, but when you go into the city, and much of this legislation has come out of the city, you find a different situation. I ask you, before attempting a system of regulation like this, that you consider somebody other than the attorneys general, somebody other than the police, and consider the citizen, the one that is primarily affected. I thank you.

Mr. HILL. I want to ask 2 or 3 questions. Using the term "firearm" as it is defined in this proposed legislation, do you think that there is sufficient law now to properly and adequately regulate the use of them?

Mr. IMLAY. To regulate what?

Mr. HILL. The use of such firearms.

Mr. IMLAY. Yes.

Mr. HILL. That is, for the protection of society and having in view particularly the development of certain classes of criminals that have grown up in this country within recent times.

Mr. IMLAY. Yes.

Mr. HILL. In other words, you do not feel there is any need of any further regulation of firearms?

Mr. IMLAY. Not of Federal regulation.

Mr. HILL. You said it was impossible to regulate by Federal laws?

Mr. IMLAY. I think so, yes.

Mr. HILL. Did you mean it was impossible, or is it from your viewpoint undesirable?

Mr. IMLAY. I think both. Mr. Hill, I think when Mr. Keenan frankly confessed that he got by the Constitution by making the control measure a taxing measure that it is repugnant to me. It is repugnant for the Attorney General to tell you he gets by the Constitution by calling an act in the preamble a taxing measure and ending by saying that it may be cited as the National Firearms Act.

Mr. HILL. If it is lawful to do it, it is not a case of getting by the Constitution.

Mr. IMLAY. It is side-stepping the Constitution.

Mr. HILL. If you can do it lawfully under the taxing power, it is perfectly legitimate legislation, is it not?

Mr. IMLAY. It is legitimate when you take the letter of the law, but not the spirit.

Mr. HILL. You are opposed to any Federal regulation; that is your attitude?

Mr. IMLAY. Except in a limited sense.

Mr. HILL. And you say you have been working on the proposal of a uniform firearms regulation under State laws?

Mr. IMLAY. That is right.

Mr. HILL. You have not succeeded in obtaining uniformity in that respect?

Mr. IMLAY. We have made very good progress. Some 10 or 12 States have passed the uniform act.

Mr. HILL. But it has not in a material way contributed toward the suppression of kidnaping and bank robbery and general gangster

operations that cross State lines and are not within the jurisdiction of the State courts, in their full and comprehensive scope?

Mr. IMLAY. Not noticeably, and I do not know that any firearm law does, noticeably.

Mr. HILL. If you have Federal regulation such as is proposed here, whereby the Department of Justice and the Federal Secret Service force can take jurisdiction of the matter, do you not think that it would contribute largely toward the stamping out of this kind of crime, toward which the legislation is directed?

Mr. IMLAY. I think not. If it would, I would be for it.

Mr. TREADWAY. I would like to follow you a moment and plead ignorance. You referred to the possibility of side-stepping the Constitution. The one feature of this bill that appeals to me is getting rid of machine guns. If the Constitution is side-stepped to bring in a taxing measure in order to secure regulation of this nature, why could not we side-step it once more and prevent, by some kind of Federal statute, the manufacture of machine guns? Where, in the Constitution, are we so terribly tied down that we cannot prevent the manufacture of instruments of such a serious destructive nature as these are to human life?

Mr. IMLAY. If the courts are willing to say that a machine gun is so far contraband, or such a dangerous thing; that was the theory of some of the earlier prohibition acts. If the courts are willing to say that a machine gun is a nuisance, and insofar as Congress can legislate it legislates them out of existence, or for example, if they say they shall not ship any machine gun across the border at all, if the courts will go that far, I am perfectly willing to see some regulation of machine guns that will confine their manufacture and their use entirely to the police. We have, Mr. Treadway, a uniform machine-gun act. I have not mentioned that before, but this uniform machine-gun act has been approved by the American Bar Association, as well as the national conference, which approved it in its 1933 meeting, and this law is designed to accomplish in the States in legislation against machine guns the same thing that the uniform act is with reference to pistols.

Mr. TREADWAY. That is a recommendation you are making to the States?

Mr. IMLAY. Yes.

Mr. TREADWAY. It has nothing to do with the Federal Government?

Mr. IMLAY. I think perhaps a better answer to your question is that there is now pending before the Committee on Interstate and Foreign Commerce of the House H.R. 9399, which is a bill to prevent the shipment of machine guns, submachine guns, sawed-off shotguns and bullet-proof vests in interstate commerce. I believe that if Congress were to pass that act, assuming that the courts would construe it as I think they would, as sufficiently dangerous to prevent their shipment altogether, I believe that is accomplished by that bill.

Mr. TREADWAY. That would not go as far as the Federal prohibition against manufacture, if we could get by with that.

Mr. IMLAY. It does not.

Case 1:22-cv-02579-CKK   Document 10-1   Filed 10/28/22   Page 152 of 168

Mr. TREADWAY. You spoke about whether the courts would support such a proposition. I am not a lawyer, as probably you will see from my line of questioning, but what defense is there of the possession or manufacture of machine guns outside of the country itself using them in case of war, or in connection with very dangerous police needs? What other good purpose can be served by the manufacture of any such article?

Mr. IMLAY. There is no good purpose except police, bank guards, Government guards in buildings, et cetera; they are the only ones that ought to have them.

Mr. TREADWAY. As a matter of interest, in your judgment how many machine guns could be used for legitimate purposes such as you are naming now?

Mr. IMLAY. I should say, in the District of Columbia, perhaps 100 ought to be enough. There are some wagons that go about the streets, from the Treasury Department to the Bureau of Engraving and Printing equipped with them.

Mr. TREADWAY. This has just come to my attention this morning, in a very unofficial way, but I understand that there is in this city today an automobile equipped with machine guns that was captured in Chicago by the Department of Justice agents that has the most complete mechanical devices conceivable against human life. I cannot see why some form of legislation cannot be enacted within the provisions of the Constitution that will absolutely overcome the possibility, not of transporting it in interstate commerce—that I feel confident we could regulate—but why permit their manufacture? As a result of permitting their manufacture, even though they may be transported contrary to interstate commerce regulations they can be used in this terribly destructive way on an automobile, and they are set off, as I understand, by an electrical connection.

Mr. IMLAY. I am in favor of State laws that forbid the manufacture of machine guns except for those few uses.

Mr. TREADWAY. You cannot go as far as to say that we can sidestep the Constitution sufficiently to prevent their manufacture?

Mr. IMLAY. I think not. I think you can pass a bill which says you cannot ship machine guns across State lines. That is as far as the Mann Act goes.

Mr. TREADWAY. Mr. Evans mentions an interesting analogy of opium. A Federal statute prevents that being manufactured, does it not?

Mr. IMLAY. I am not familiar with that. I do not know whether there is a separate opium act or not.

Mr. REED. I want to ask the witness a question. Do you know of any power other than the taxing power and the power to regulate interstate commerce by which we could prevent the manufacture of firearms?

Mr. IMLAY. I know of no other power. Mr. Chairman, I think I have taken enough time.

Mr. KEENAN. I wonder if I might be permitted to ask the witness one question?

The CHAIRMAN. It is rather an unusual request.

Mr. KEENAN. Or, if I may have the question asked of the witness.

The CHAIRMAN. Without objection, you may ask a question.

Mr. KEENAN. Reference has been to the action of a member of a committee with which the witness served, and I got here a little late, and I do not know what the committee was, but a member of that committee made the open statement that he did not intend to comply with the State law which required registration of firearms. I only want to know what that committee was; was that a committee of the American Bar Association on Uniform State Laws, or how was the committee chosen?

The CHAIRMAN. Can you answer the question?

Mr. KEENAN. You told about a man who said he would not comply with a State law with respect to the registration of a pistol, a comember of a committee with you.

Mr. IMLAY. He was not on the committee; he was a citizen of Detroit.

Mr. KEENAN. Was he interested in the uniform State law, or was he connected with it?

Mr. IMLAY. He was talking with us about our act, and our proposed act.

Mr. TREADWAY. This hearing has run along here for several days and has kept going along the same lines. I do not know whether any representatives of the industry, manufacturers of pistols, desire to be heard. There have been gentlemen here continuously representing the industry, and if we are going to complete the hearings this morning, I wish they might be given time, if they want it.

The CHAIRMAN. The Chair will state that Mr. Nichols was in my office, and he said he would like 5 minutes.

## STATEMENT OF FRANK C. NICHOLS, VICE PRESIDENT, COLT PATENT FIREARMS MANUFACTURING CO.

The CHAIRMAN. The Chair will state that we must, if reasonably possible, close the hearings before noon. Mr. Nichols, I told you the other day that if it was agreeable to the committee, we would give you 5 minutes. Please give your name and in what capacity you appear.

Mr. NICHOLS. My name is Frank C. Nichols; I am vice president of Colt Patent Firearms Manufacturing Co. Mr. Chairman and gentlemen, there are two points I want to bring up, one in which I think you will be particularly interested, namely, the reference to machine guns. My company is the only manufacturer of machine guns in the United States, and our largest and principal client is the United States Government. The machine gun is not a weapon that can be used with any degree of convenience or satisfaction to the class of rascals that the Department of Justice is after. We do not make submachine guns.

Mr. TREADWAY. What is the distinction between a machine gun and submachine gun?

Mr. NICHOLS. A submachine gun is a small weapon, as described to you yesterday by Mr. Keenan, which can be carried under the coat. It is automatic, with a drum feed, holding as high as 500 cartridges, which simply spurts fire.

Mr. VINSON. Who manufactures those?

Mr. NICHOLS. We manufactured 15,000 of those in 1921 for the Auto Ordnance Co., New York. The Auto Ordnance Co. are referred

to on page 66 of the hearing of April 18. They do not and never did manufacture a machine gun or a submachine gun. How many they have left, and what their method of merchandising was, I do not know. It was the invention of Col. John Thompson, formerly Chief of Ordnance, and was designed for purely a military weapon, shooting only a pistol cartridge. It was not successful as a military weapon, and, unfortunately, I think we can state correctly, they were a bit careless in their method of merchandising. It got into the hands of the dealers, and some of the dealers were not entirely responsible. I will ask the privilege of filing this catalog with the clerk, illustrating and describing exactly what a machine gun is. It is not sold commercially; it is sold for strictly military purposes to this Government and to foreign governments, if we are lucky enough to get foreign contracts.

Mr. VINSON. Do I understand today that there is no manufacturer in this country making a submachine gun?

Mr. NICHOLS. No, sir; unless he is making it under cover.

The CHAIRMAN. There would be no objection, if it is such a menace to society and there is no demand for it, to a law against its being transported in interstate commerce?

Mr. NICHOLS. None whatever, and frankly, gentlemen, it should not be manufactured.

Mr. HILL. Where did the machine guns come from that are in use in this country now?

Mr. NICHOLS. In my opinion, they have been stolen.

Mr. HILL. Stolen from what source?

Mr. NICHOLS. Stolen from police departments, prisons, and from dealers who got them shortly after the manufacture began, and before they were stopped or agreed to stop.

Mr. HILL. Is there any importation of that kind of gun?

Mr. NICHOLS. Not to my knowledge.

Mr. HILL. Where did the police departments get their supplies?

Mr. NICHOLS. From the Auto Ordnance Co.

Mr. HILL. Those 15,000 which you manufactured were for the Auto Ordnance Co.?

Mr. NICHOLS. Yes, sir.

Mr. HILL. That supply is gradually being exhausted, I take it, as far as the Auto Ordnance Co. is concerned?

Mr. NICHOLS. Yes.

Mr. TREADWAY. Those are submachine guns?

Mr. NICHOLS. Yes.

Mr. REED. Shortly after the war, the Ordnance Department put on sale quite a number of guns, among them some Colt .32 revolvers in a .45 frame, and they were sold to people out over the country for a small sum, I think, around $4. Did they at that time have machine guns for sale, in the same way?

Mr. NICHOLS. No, sir.

Mr. REED. Do you believe that these machine guns are manufactured by the criminals themselves, or through some organization of the criminals?

Mr. NICHOLS. They could be, very easily.

Mr. HILL. Where do they get the ammunition for the submachine gun?

Mr. NICHOLS. They can buy the ammunition at any sporting-goods store.

Mr. VINSON. They shoot an ordinary pistol cartridge?

Mr. NICHOLS. Yes.

The CHAIRMAN. Of what caliber?

Mr. NICHOLS. .45.

The CHAIRMAN. Referring to the question of Mr. Reed as to the possibility of manufacturing machine guns by the unlawful element, it would require quite a set-up in the way of a factory to do that, would it not?

Mr. NICHOLS. No, sir. You are referring to the machine guns; I am referring to the submachine guns.

The CHAIRMAN. I am talking about submachine guns.

Mr. NICHOLS. A clever gunsmith or a clever locksmith could put one of those together but it would be a crude job, although it would shoot.

Mr. HILL. Mr. Treadway referred to a fully equipped automobile.

Mr. Treadway. Yes; it is in the city today.

Mr. HILL. That was not a crude affair, was it?

Mr. NICHOLS. That may have been a Thompson submachine gun. I cannot conceive, if you will study that catalogue, how they could use a machine gun.

Mr. TREADWAY. In an automobile?

Mr. NICHOLS. Yes; in an automobile, or anywhere else. Machine guns are only manufactured by my company in this country, and they are all chambered, for shooting the high-power military cartridge.

The CHAIRMAN. What is the approximate weight of a machine gun?

Mr. NICHOLS. Sixty-five to ninety pounds.

The CHAIRMAN. They are too heavy to be carried.

Mr. NICHOLS. Yes.

Mr. VINSON. You certainly could equip an automobile with a machine gun.

Mr. TREADWAY. That was what I was told.

Mr. VINSON. You undoubtedly could plant a machine gun in an automobile and use it from an automobile.

Mr. NICHOLS. It would be a very inconvenient thing to do and I doubt very much if any criminal or crook or racketeer would resort to that type of weapon.

Mr. EVANS. You said your market was almost exclusively to the United States Government?

Mr. NICHOLS. Yes; and such foreign governments as we can sell.

Mr. EVANS. Do you have any other demands at all?

Mr. NICHOLS. No, sir.

Mr. EVANS. If you should have, would you sell one?

Mr. NICHOLS. No, sir.

Mr. EVANS. Are you restricted by law or regulation or otherwise?

Mr. NICHOLS. Not that I know of, exactly.

Mr. TREADWAY. You use your own good judgment as to the customers you ought to deal with?

Mr. NICHOLS. Yes.

Mr. EVANS. Your concern would not, under any conditions, sell anyone but some public functionary or governmental agency?

Mr. NICHOLS. Either the Government or a duly authorized subsidiary thereof.

Mr. EVANS. That is an invariable rule that you have?

Mr. NICHOLS. Absolutely; there is no exception.

Mr. EVANS. Has that always been your rule?

Mr. NICHOLS. Always.

Mr. EVANS. So that any machine gun that may be in the hands of racketeers did not come through your sales department, or otherwise?

Mr. NICHOLS. No, sir; and furthermore, I do not believe there are any machine guns in the hands of racketeers; submachine guns; yes, but we never sold those.

Mr. EVANS. You sold 15,000?

Mr. NICHOLS. Yes; to the Auto Ordnance Co.

Mr. EVANS. Are they restricted in their sale or distribution of those machine guns?

Mr. NICHOLS. I do not believe in the early days they were.

Mr. EVANS. That has not been so long ago.

Mr. NICHOLS. It was in 1921.

Mr. EVANS. That is 13 years ago. Those machine guns could very well be in use yet, could they not?

Mr. NICHOLS. Yes; they are in use.

Mr. EVANS. Do you think those are the ones in the hands of the racketeers?

Mr. NICHOLS. Yes, sir.

Mr. EVANS. That explains where the racketeers are getting machine guns, in part, at least.

Mr. REED. That exactly is the point I was trying to make when I questioned the witness before, that right after the war they sold a great number of implements such as revolvers and things of that kind as surplusage. They had been slightly used but they were apparently in good condition. Does anybody know how many of these machine guns or submachine guns the Ordnance Department sold indiscriminately?

Mr. KEENAN. They did not sell any. He refers to the Auto Ordnance Co., which is a private corporation. Mr. Ryan, the president of that company, has already appeared. As I understand, the Colt Co. manufactured and sold 15,000 submachine guns to the Auto Ordnance Co.

Mr. REED. What did they want them for?

Mr. KEENAN. They owned the patent on the Thompson machine gun and they wanted them to sell at a profit and make some money; it was a pure commercial transaction.

Mr. REED. They sold them to anybody, indiscriminately?

Mr. KEENAN. They sold them to dealers or anybody that wanted them. I think there is no mystery about that; I think Mr. Ryan would admit it.

Mr. EVANS. I want to know if this bill is enacted into law, would it be possible for another batch of submachine guns to get into the market in some way?

Mr. NICHOLS. I do not see how.

Mr. EVANS. What do you say, Mr. Keenan?

Mr. KEENAN. I think in the first place there is not any legitimate manufacturer of machine guns.

Mr. EVANS. But they could still manufacture them.

Mr. KEENAN. I imagine they could, but it would require elaborate equipment.

Mr. VINSON. They can still manufacture, even with the law.

Mr. EVANS. Why not make it strong enough to make that impossible?

Mr. VINSON. You run into the constitutional provisions.

The CHAIRMAN. It would be a question of whether you took the profit out of it.

Mr. EVANS. I am in favor of making it impossible to manufacture instruments of that kind.

Mr. TREADWAY. Isn't this the unfortunate situation? According to Mr. Nichols, a submachine gun, crude though it may be, can be put together by an ordinarily bright mechanic. That is the situation, and if that is going to reach the racketeer, you cannot overcome it.

Mr. EVANS. He would be a bootlegger in the business, and you cannot stop bootlegging.

Mr. TREADWAY. You say that so far as the present supply of these dangerous submachine guns is concerned, you think they are being largely stolen from police headquarters?

Mr. NICHOLS. Those used by the gangsters. The Auto Ordnance Co., as I understand, still have, but I do not know how many, a quantity of the 15,000 that were made in 1921.

Mr. TREADWAY. They are allowed to sell them without any restrictions?

Mr. NICHOLS. I think not.

Mr. KEENAN. There is no Federal law.

Mr. TREADWAY. They are situated in New York; is there a New York State law that prohibits them from being sold in the State of New York?

Mr. KEENAN. I cannot answer that. There are several States which have laws. Illinois has such a law and Texas has also.

Mr. TREADWAY. New York you do not know about?

Mr. KEENAN. I cannot answer that.

Mr. TREADWAY. I assume these are stored in New York?

Mr. KEENAN. We have an agreement, a code agreement, whereby they do not distribute or sell them to anyone without the specific permission of the Department of Justice, and I would like to have the record show that this company has lived up to that agreement and has acted in an honorable fashion.

Mr. TREADWAY. Isn't it a fact that these three men who are on trial for murder in Massachusetts today, in connection with the killing of a policeman and bank officials secured their big supply of these weapons from an exhibition in an armory somewhere in Massachusetts which they broke into?

Mr. NICHOLS. That is my understanding.

Mr. TREADWAY. And that is an illustration that led you to say that the present supply is being stolen, I assume?

Mr. NICHOLS. Yes.

Mr. EVANS. Mr. Chairman, it occurs to me that 13 years ago, when this concern bought these 15,000 submachine guns, it undoubtedly had legal authority to buy and sell them at that time. Is it not very

likely that they have the same legal authority to sell them now that they had then?

Mr. NICHOLS. As far as I know.

Mr. EVANS. You would know about it if New York had passed a law in the meantime?

Mr. NICHOLS. I do not know of any law in New York that covers that point.

Mr. EVANS. I presume they are selling those guns yet.

Mr. VINSON. Mr. Keenan, as I understood him, said that they had signed a code agreement and that this concern did not sell the submachine gun except where such sale was approved by the Department of Justice.

Mr. KEENAN. That is correct. We have no practical problem with reference to machine guns made by legitimate manufacturers or dispensed by legitimate persons. There are, in several parts of our country, bootleg organizations that are manufacturing them, in accordance with reports from special agents.

Mr. VINSON. You are speaking of submachine guns?

Mr. KEENAN. Submachine guns; yes.

Mr. McCLINTIC. What is the name of the company that owns the machine guns in New York at the present time and how were they acquired?

Mr. NICHOLS. They are named the Auto Ordnance Co.   I do not know the address.   We manufactured under a contract in 1921, 15,000 of those submachine guns, not machine guns, but submachine guns, for them.

Mr. McCLINTIC. For whom?

Mr. NICHOLS. For the Auto Ordnance Co., New York City.

Mr. McCLINTIC. They bought them and paid the regular price?

Mr. NICHOLS. They bought them and paid us the contract price. We had nothing to do with the sale or distribution anywhere at any time.

Mr. TREADWAY. Until there was a code agreement reached with the firm, they were able to dispose of them legitimately to such customers as might apply, without restriction, either of a Federal nature or under the New York State law, as far as we can learn.

Mr. McCLINTIC. Do you have any information as to how many they now have on hand?

Mr. NICHOLS. They have never ordered any since the original contract, and I do not believe they will.   If they can get out of that deal whole, I do not think they will go back.

Mr. HILL. What was the other proposition you wanted to submit?

Mr. NICHOLS. It was about the tax in the measure under discussion, and for this reason, for many, many years we have distributed our product through a selected number of jobbers, wholesalers, and retail dealers.   We do not sell to the consumer or the user under any circumstances.   There is no profit in this business, to speak of, to the dealer.   He will not pay this tax; he will go out of business.   You can quite appreciate, I believe, where that leaves us.   We will not sell the user; we refer him now to his nearest dealer, give him the name, if you please, if that will help him any.   I doubt very much, gentlemen, if, under this measure we would be justified in continuing in this small arms business.

Mr. TREADWAY. You mean pistols and revolvers?

Mr. NICHOLS. Yes; speaking solely as to pistols and revolvers.

Mr. TREADWAY. You feel that the inconvenience of this registration and the taxation would practically do away with the demand for a legitimate sale of your goods?

Mr. NICHOLS. Yes, sir.

Mr. HILL. You have reference to the size of the tax; not to the principle, but to the amount of the tax, do you not?

Mr. NICHOLS. Yes, to the amount of the tax; and also I am considering that in many States a law already exists where the dealers pays such a tax to handle small arms.

Mr. HILL. If you take away the tax feature entirely, this bill goes out of the picture.

Mr. NICHOLS. I understand that.

Mr. McCLINTIC. What other articles does your concern manufacture?

Mr. NICHOLS. We manufacture a molded compound material, such as bottle caps, tube caps, and certain lines of electrical equipment. We manufacture dish-washing machines of large types.

Mr. McCLINITC. You do not manufacture shotguns?

Mr. NICHOLS. No, sir.

Mr. McCLINTIC. Nothing of that character?

Mr. NICHOLS. No, sir.

Mr. McCLINTIC. You do have quite an extensive foreign business, do you not?

Mr. NICHOLS. On arms we have had, up to the present depression.

Mr. McCLINTIC. Then the placing of a tax on pistols does not necessarily mean that your concern would go out of business?

Mr. NICHOLS. No.

Mr. McCLINTIC. What you have in mind is that you might stop making pistols?

Mr. NICHOLS. We might stop making and selling pistols. I wonder if you gentlemen want that brought about. We were very valuable to the Government during the war. We cannot maintain a plant to assist the Government in case of war, unless we can stay in the business. We have been in business nearly 100 years, an honorable business and a legitimate business. We have used the utmost care in the distribution and sale of our product.

Mr. VINSON. What is the average State tax upon dealers for the sale of pistols and revolvers?

Mr. NICHOLS. I am very sorry, but I cannot give that.

Mr. VINSON. Can you give the maximum?

Mr. NICHOLS. $5 to $10.

Mr. VINSON. This substitute bill, as I see it, calls upon the dealer to pay $200 a year. That is quite some difference.

Mr. McCLINTIC. What would be the effect of the legislation if a new provision were added which would exempt duly organized rifle clubs or pistol clubs, organized under some Federal supervision? Would not that allow those that are interested in marksmanship and pistol shooting to carry on in a satisfactory manner?

Mr. NICHOLS. To a certain extent.

Mr. McCLINTIC. I think that such a provision along that line can be added to the legislation.

Mr. NICHOLS. The presentation along that line by General Reckord yesterday, I think, covers it very fully. I am not a lawyer; I am a

plain, ordinary business man, and sometimes I think not a very good one. The other point I wanted to touch upon is this: That the rascals that the Department of Justice wants to get hold of is a difficult matter. The first thing the racketeer and the bad man does when he gets hold of a gun, and they won't buy it, is to chisel out every identifying mark on the weapon. We keep a record religiously, and we ask our customers to keep a record of where they are sold.

Mr. HILL. This bill provides against that; it provides for that contingency, where they obliterate the number, as I understand.

Mr. NICHOLS. Would that stop him from doing it?

Mr. HILL. It would not stop him from getting the gun.

Mr. NICHOLS. Would it stop him from taking off the number?

Mr. HILL. No; but it would make it an offense if he did take it off.

Mr. NICHOLS. But you are talking about the registration.

Mr. HILL. It is not expected, as I understand, that he will register.

Mr. NICHOLS. No.

Mr. HILL. He will have the gun in his possession; he may have chiseled the number off, but if you find him with that kind of a gun, not registered, then he has committed an offense.

Mr. NICHOLS. What is not registered?  He does not register in the first place.  I may be thick on this; Mr. Keenan has been the soul of courtesy to me on two occasions, but I cannot get through my head where the matter of registration, the licensing, the fingerprinting, photographing, if you please, are going to get that bad man or help to get him.

Mr. REED. I do not know that I can make it clear to you, but here is my understanding: That if they find the man with the weapon, with the number chiseled off, the then has in his possession something unlawful, and it raises a presumption of guilt against him.

Mr. NICHOLS. Yes, sir.

Mr. REED. And that aids the Department of Justice in the prosecution of the man; that is the theory of it.

Mr. HILL. It enables them to hold him until the case is investigated.

Mr. VINSON. It subjects him to a fine of $2,000 or imprisonment of not more than 5 years.

Mr. NICHOLS. Even so; but where is the advantage of registration?

Mr. EVANS. It seems to me that is the answer.

Mr. VINSON. His point is you could have that offense for that thing without the necessity for registration.  You can trace a revolver from the factory; it has been done hundreds of times; it is more cumbersome, perhaps, than if you simply had to look at a list.  The point the gentleman is making is you could have an offense with regard to the erasure of an identifying mark without the necessity of registration.

Mr. NICHOLS. That is my understanding.

Mr. EVANS. The primary purpose of the registration, as I get it, is to furnish a means whereby one may have legitimate possession of a gun, is it not?

Mr. NICHOLS. I beg your pardon?

Mr. EVANS. The purpose of registration is to legitimatize the possession of firearms.

Mr. NICHOLS. For pistols and revolvers.

Mr. EVANS. I have a pistol which was given me 25 years ago. I have not seen it for 10 years, but if this law passes I will have to have that pistol registered. That means I am in lawful possession of that pistol and nobody can question it, but if my neighbor has a pistol, not registered, as Mr. Reed points out, there is some presumption that he has that illegitimately. Is it not a good thing to have the registration, then?

Mr. NICHOLS. I am afraid on certain of your questions my reply would be prejudiced because I am in the business.

Mr. McCLINTIC. I have before me a statement of your company which shows that in 1932 you had a profit of $20,795 and in 1933 it had increased to $675,132. I was just wondering whether the increase of law violation, gangster operation, and so forth, had brought about any increase in the sale of articles which you manufacture?

Mr. NICHOLS. No, sir.

Mr. McCLINTIC. How do you account for this enormous increase in profit?

Mr. NICHOLS. That increase in profit as you have read it was in connection with a contract I closed with the Argentine Government in 1926, and for one reason or another, we were unable to find out, we completed this contract but they did not pay it until 1933, and that is reflected in the increase. That was for machine guns.

Mr. McCLINTIC. That is anticipated profit?

Mr. NICHOLS. They paid it in 1933.

Mr. McCLINTIC. Then the impression is left by you with the committee that your company deals extensively with many foreign nations?

Mr. NICHOLS. Yes, sir; we did prior to the depression.

Mr. McCLINTIC. The fact that we would put in a limitation on pistols would not in any way cause you to go out of business, would it? It might reduce your pistol sales to a small extent, but it is liable to be made up by some situation in foreign countries which bring about an increase in business.

Mr. NICHOLS. No, sir; not in small arms.

Mr. REED. The thing I have in mind, I cannot see the point in taxing all these small dealers. I will take my own home town, which is typical of many towns in my district. There are several hardware stores. One man will be selling arms because he handles them in connection with sporting goods. I do not know how many such stores there are in my town; I suppose in this little town of 17,000 there might be a dozen or more handling firearms. If you put a tax of $200 on them, I can see where 9 out of 10 would go out of business rather than pay any such tax. The profit is too small.

Mr. NICHOLS. And you would put that tax on revolvers and pistols, where he may sell 8 or 10 a year.

Mr. REED. I think the tax is too large; I do not think it accomplishes any great purpose. You may require them to keep records, but when it comes to a tax of that size, I think it is too large.

Mr. McCLINTIC. Does the gentleman have in mind the thought that he pays no tax on the kind of firearms that are most in demand, shotguns and rifles, which are the two kinds of weapons bought by the sportsmen?

Mr. REED. A lot of people have hobbies. I have quite a number of revolvers; I like to shoot at targets. I have a .22 Colt and I have the Colt .32 in .45 frames, which I take down to the farm and

shoot at targets with. It is a hobby. After you use one so long, you like to try something new. I can see where the small dealer will sell a number of such weapons.

Mr. McCLINTIC. We are bound to admit that it would reduce the number of dealers.

Mr. REED. It seems we might accomplish the purpose without destroying the dealer, without taxing him out of business.

Mr. McCLINTIC. I have thought that if the present situation exists throughout the Nation, with respect to kidnaping, we require something pretty strong.

Mr. REED. I will do anything that stops kidnaping. The question is, whether you are going to do it without putting on the heavy tax.

Mr. HILL. I think this is a matter for executive session.

Mr. EVANS. How many States in the Union have laws against carrying concealed weapons on the person?

Mr. KEENAN. I should say approximately three fourths.

Mr. EVANS. Some have no prohibition along that line?

Mr. KEENAN. No; some have none.

Mr. HILL. Who is the next witness?

General RECKORD. This gentleman was not our witness. He and Mr. Harrington were mentioned by the chairman.

Mr. HILL. Does Mr. Harrington wish to make a statement?

General RECKORD. All we would like to say in closing is what we have stated repeatedly, that we are willing to withdraw any objection that we have interposed if this bill is made to apply to machine guns, submachine guns, and sawed-off shotguns. We will go along with such a bill as that. We will take either bill that has been proposed if they will eliminate pistols and revolvers, and we suggest they do it for a year or two and try it out. If in a year or two, with all the other bills that have been passed, and the columns of newspapers stated last night that the Senate and House were in agreement on those bills, and with this as a machine-gun bill solely, we believe the Department of Justice will get the men they are after. If they find they cannot do it, then we will come along and try to work out the matter of pistols and revolvers.

Mr. McCLINTIC. What would you say along the line of a compromise by adding to the legislation a section which would allow pistol clubs and certain organizations to be exempt from the provisions of this legislation, in order to take care of those who are conscientious in the thought of promoting marksmanship and things of that kind?

General RECKORD. Mr. Cooper asked me practically that same question. I told him that we had agreed, in an effort to get together with the Department of Justice, to accept such an amendment, although we are not favorable to it, because it will look like it is an effort on our part to force people to join our organization.

Mr. VINSON. There will be more folks affected who are not members of pistol clubs.

General RECKORD. Millions will be affected. If this bill is basically right, you do not need to except our members, and we are not asking you to except them. We ask you to eliminate pistols and revolvers and make it a machine-gun bill and let us try it.

Mr. McCLINTIC. We can take care of the membership business; we can write an amendment so as to fix it so that an organization that

had no membership fee could have the privilege of participating in matches of this kind.

General RECKORD. I would like, for the benefit of the record, if Mr. Seth Gordon might be permitted to read a resolution. He has handed me a resolution which his organization has passed.

## STATEMENT OF SETH GORDON, WASHINGTON, D.C.

Mr. GORDON. This is a resolution of the Izaak Walton League of America. The Izaak Walton League of America, at its convention in April, recommended that there be no legislation of this kind at this time and passed this resolution.

Mr. HILL. It may be included in the record.

(The resolution referred to is as follows:)

RESOLUTION ADOPTED BY THE TWELFTH ANNUAL CONVENTION OF THE IZAAK WALTON LEAGUE OF AMERICA, CHICAGO, ILL., JANUARY 20, 1934

Whereas some 13 million citizens in this Nation, both men and women, take part in the sport of hunting, both with rifle and shotgun, rifle and pistol target shooting, and the sport of shooting clay birds; and

Whereas it is most desirable that the youth of this land, both boys and girls, should be taught the proper use of firearms while young and thus, in a great measure, prevent the occasional accident generally born of ignorance of the proper handling of firearms; and

Whereas, during the past few years, this country has been experiencing a disgraceful wave of crime and domination of gangs and racketeers in many of our leading and most prosperous cities; and

Whereas a certain element of our citizens propose, as a control to this disgraceful crime wave, the control and restriction of the sale of all firearms of whatsoever nature, and to prevent by law the training of the youth of this land in the use of firearms; and

Whereas at the present time there are certain bills before the National Congress designed to restrict the use and sale of firearms in this country; and

Whereas such laws will merely disarm the law-abiding citizens and will in no way prevent the crook, the robber, and the gangster from getting firearms, and it is self-evident to any thinking person that the real remedy to our crime situation is not in disarming the law-abiding citizens but, on the other hand, the diligent enforcement of such laws as we now have; Therefore be it

Resolved, That the Twelfth Annual Convention of the Izaak Walton League of America, in its annual convention assembled, this 20th day of April 1934 go on record as being opposed to any and all antifirearms legislation that will in any way affect the right of our citizens to own and bear arms freely.

## STATEMENT OF JOSEPH B. KEENAN, ASSISTANT ATTORNEY GENERAL

Mr. HILL. Mr. Keenan, do you have anything further?

Mr. KEENAN. I do; but I would as soon put it in the record. It is very brief; I will not burden the committee; it is merely this: For the purpose of the record, and so there will be no misunderstanding, a common impression has been created that the legitimate firearms-manufacturing companies of this country have opposed salutary regulations of firearms from a selfish viewpoint. I want to say that I have been in communication with the largest manufacturers, and I have found that their attitude was an extremely decent and fair one. They have attempted to work with the Department of Justice and in some way to preserve the legitimate business interests, and to work out the best proposal available.

Mr. TREADWAY. Isn't your statement borne out by the testimony of Mr. Nichols? He was emphatic in his statement that his company

wants to abide by the proper regulations of the Government in controlling the illegitimate sale of these weapons.

Mr. KEENAN. That is correct. I cannot overemphasize that. There has been a real effort made along that line, and we feel that the opposition to rules and regulations that would not be burdensome come from those whom we term hobbyists; but the legitimate enterprises, reflecting an investment of capital and the jobs of the employees, have shown a splendid spirit of cooperation with the Department of Justice. I do not want this occasion to go by with some contrary notion prevailing. It does appear—and I think it would be agreed to by Mr. Nichols—that today such companies as he represents are not making money in the manufacture and sale of small firearms to individuals. On the contrary, they are losing money; they are in red ink. Mr. Nichols says that is correct. If we do eventually curtail the distribution of firearms, we will not be destroying the profits of legitimate industry. The fact is, they are not operating at a profit in the manufacture and distribution of small firearms. We will let that speak for whatever it means. So many times reference has been made by members of the committee to this unconstitutional legislation. Before this hearing closes I would like respectfully to call attention to the case of *Nigro* v. *The United States*, found in volume 276, United States 332, which is a decision by Chief Justice Taft, decided April 9, 1928, in interpretation of the Harrison Narcotic Act.

Mr. TREADWAY. Has that a direct bearing on our problem?

Mr. KEENAN. It has on the constitutionality of the provisions set forth.

Mr. TREADWAY. I suggest that Mr. Keenan furnish a synopsis of it.

Mr. HILL. How long a decision is it?

Mr. KEENAN. It is quite long and involved. I think it might be epitomized.

Mr. TREADWAY. Will you make a synopsis of it?

Mr. KEENAN. Yes.

Mr. VINSON. What is the constitutional point involved?

Mr. KEENAN. The point involved is where a tax is required to be paid by certain persons under the Harrison Narcotic Act, and whether other persons than those required to pay the tax can be required to perform acts to comply with the law, which the Congressmen will see is getting dangerously close in analogy to the precise matter involved here, as far as the constitutionality is concerned.

Mr. HILL. You are referring to the registration feature?

Mr. KEENAN. Yes. I think we ought to answer one question, particularly, asked by the Congressman from California, as to what good registration will do. I think the point has escaped some members of the committee that have not attended all of the sessions. Without registration, there is no way to get at the control of firearms now possessed, before the effective date of the act. It would be helpful in the prosecution of cases where firearms were in possession of those gangsters roaming the lands, which were acquired previous to the enactment of the act.

Mr. VINSON. Why did you not provide for registration in the original bill?

Mr. KEENAN. My answer to that is we had not given it sufficient thought to exhaust all the possibilities of Federal control.

Mr. VINSON. You had given it thought enough to cause the Attorney General to say that he was afraid it was not constitutional.

Mr. KEENAN. I think I ought to answer that the matter of registration, following the provisions of the narcotic act, not the terms of the act but the regulations promulgated, had not been taken up with the Attorney General at the time he made the statement.

Mr. VINSON. He expressed his view at that time.

Mr. KEENAN. I think the Attorney General expressed no definite opinion of its unconstitutionality, but he had some doubt.

Mr. VINSON. He said he was afraid it was unconstitutional.

Mr. KEENAN. He said he was afraid it was unconstitutional, and we got the suggestion while discussing it with the committee, and from further consultation with another branch of the Government, other than the Department of Justice.

Mr. REED. With regard to the registration, what we are seeking to do is when a criminal comes into court to prevent him from escaping prosecution by his saying that he purchased the weapon prior to the enactment of the statute.

Mr. KEENAN. Exactly.

Mr. VINSON. Criminal or law-abiding citizen, if he did have it prior to the effective date of the act, under the law there is no penalty.

Mr. KEENAN. There is a penalty if he transports it in interstate commerce.

Mr. VINSON. But I thought you indicated yesterday, or the day before, or some other time, that because there was no crime in the possession of it that there was some consideration to be given to the idea that you ought not to make it a crime to transport it across State lines.

Mr. KEENAN. I did not intend to convey that idea.

Mr. VINSON. You conveyed it to me.

Mr. KEENAN. I did not intend to say other than this: No penalty was provided for the failure to register, although the Treasury Department has suggested that such a penalty be provided in the act, but it was left out, because we wanted to get a bill, from a practical standpoint, that might receive the favorable consideration of the committee, realizing that there would be great opposition, as has developed, from those opposing the measure, even to the point of one man saying, "I am not going to the trouble of registering and giving my name and address."

(Mr. Keenan subsequently submitted the following estimate of the annual revenue to be derived from the proposed firearms tax measure and an amendment to section 4 of the proposed act upon the suggestion of Mr. McClintic:)

| | |
|---|---|
| Sales of new firearms, 60,000 a year | $60,000 |
| Sales and transfers of used firearms, 40,000 a year | 40,000 |
| Revenue from tax on dealers and pawnbrokers: | |
| 200 wholesalers and 2,000 retailers at $100 each | 220,000 |
| 100 pawnbrokers at $300 each | 30,000 |
| Revenue from tax on machine-gun manufacturers: | |
| 20 sales at $200 each | 4,000 |
| 4 manufacturers at $500 each | 2,000 |
| Total | 356,000 |

The estimated number of new and used weapons has been made from figures showing the present revenue derived from the taxation of pistols and revolvers, from the number of machine guns sold annually, from the number of pistols and revolvers manufactured in this country, which has fluctuated from approximately 165,000 in 1929 to 60,000 in 1933, and from the number of licenses obtained in New York City in 1933 to purchase pistols and revolvers.

SEC. 4. (a) It shall be unlawful for any person to transfer a firearm, except in pursuance of a written order from the person seeking to obtain such article, on an application form issued in blank in duplicate by the Commissioner. If the applicant is a member of any association, designated by the Commissioner, which, in good faith, is organized for the purpose of, and is engaged in, target shooting or hunting, such order shall identify the applicant as a member of such association. In all other cases such order shall identify the applicant by such means of identification as may be prescribed by regulations under this act: *Provided*, That if the applicant is an individual such identification shall include fingerprints thereof.

Mr. HILL. This closes the hearings on the bill, as far as I am advised.

General RECKORD. I desire to extend my remarks if it is agreeable to the committee.

Mr. HILL. Without objection you may file any additional statement you desire.

(The statement referred to is as follows:)

The circular relative to H.R. 9066, referred to by Mr. Allen, was not broadcast, because by the time it had been delivered to us by the printer and the necessary copy of the bill to accompany the circular had been obtained and printed, conferences were already under way with the Attorney General's Office, and indications were at that time that several important changes would be made in the original draft of the bill. Having no desire to spread misinformation, the mailing of this letter was withheld, and it was finally destroyed about a week ago. A considerable number of individual copies of the letter and the accompanying bill were mailed, principally in response to inquiries from sportsmen, but in each case a personal letter accompanying the printed circular pointed out that many of the comments would probably not apply to the redrafting of the bill on which we were working with the Attorney General's Office.

The attempt which was made by Mr. Allen to leave the impression in the minds of the committee that this circular was broadcast throughout the United States was therefore entirely unwarranted. In view of the fact that the representatives of the Department of Justice at the committee hearing on Monday the 14th had been personally advised that this letter was never broadcast, the effort on the part of Mr. Allen to leave this impression with the committee can scarcelybe credited as anything more than a deliberate attempt to discredit the National Rifle Association in the eyes of the committee members.

The statements made in the circular were the result of careful examination of the provisions of the bill as originally drafted. Much of the fault that Mr. Allen found with this letter appeared to be based on the fact that the letter did not apply to the bill in its present form. The letter as written had nothing to do with the bill in its present form but referred to the original draft. Many of the comments do, however, still apply to the redraft as submitted on the 14th by Mr. Keenan. Every statement concerning the probable effectiveness of the bill is substantiated by what would appear to be ample evidence to warrant the expression of such opinion.

The history of the so-called "Sullivan law" in New York State is an excellent example. This law was originally enacted to take the place of the conventional prohibition against the carrying of concealed weapons more than 20 years ago. Additional efforts to add teeth to the law have been an almost annual occurrence and have finally reached the point of complete prohibition of the use of rifles in some sections of the State.

In Massachusetts, the history of the firearms law has been the same. Originally a law prohibiting the carrying of concealed weapons, the Massachusetts law, was amended so as to require that a permit be obtained from the police before a pistol or revolver might be purchased. The law also required that a permit be obtained to possess a pistol or revolver in the home or place of business, as well as a special form of permit to carry concealed. As in the case of the Sullivan law,

the Massachusetts law has had the practical effect of disarming honest citizens without disarming the criminal. Accordingly, this year in Massachusetts the conventional step was taken of introducing a bill which would require a permit from the police in order to purchase any firearm, rifle, or shotgun as well as pistol or revolver and the registration of such arms already possessed.

In Michigan the history of firearms legislation parallels that of New York and Massachusetts. Starting from the fundamental concealed-weapons law, the law has been expanded and made more severe until today the regulations cover rifles and shotguns as well as pistols and revolvers. This law has already been in effect in Michigan for 3 or 4 years, but fortunately it is being sanely administered by a superintendent of State police who is favorable to civilian small-arms practice. What will happen when a change in administrative officers becomes necessary cannot be foretold.

In Pennsylvania the same history of firearms regulation has applied. First, the concealed-weapons law, then a bill based on the uniform-firearms act, and now attempts on the part of the same reform groups to put more teeth into the uniform act by requiring a police permit for the purchase of rifles and shotguns and ammunition, of all types.

The history of the situation in West Virginia has been the same. The reason that the uniform-firearms bill has not been adopted in Illinois up to this time has been because of the efforts of the reform element to add to the uniform act provisions requiring a permit to purchase, provision for the fingerprinting of bullets, so-called, and various other theoretical plans for disarming the criminal.

In California the story has been the same. From the basis of the concealed-weapons law, California went to a very excellent form of revolver, pistol, and machine-gun regulation based on the provisions of the uniform act. The women's organizations in California, particularly in one section of the State, have been particularly active in demanding that this law be made still more strict. And I suspect that some of the petitions mentioned by Mr. Keenan as having come from women's organizations favoring strict Federal firearms legislation have come from these particular groups in California, as we know that they have forwarded similar petitions to their Representatives and Senators in Congress from time to time.

There is no reason to believe, on the face of the evidence supplied from all parts of the country over a long period of time, that Federal firearms legislation would not follow the usual trend: First, the adoption of some kind of a Federal firearms bill; second, the effort to strengthen its provisions and to put more teeth into it; and finally, the effort to completely disarm the average citizen on the theory that by so doing we would be able to better arrest the armed criminal and save many people from suicide.

There is another reason for believing that this Federal legislation would take the turn indicated. The proponents of this bill, including the representatives of the Department of Justice, have repeatedly stated that they know this bill is not ideal but that they want to make a start. The logical question is "A start toward what?"

Furthermore, Mr. Keenan has said very frankly that the ideal solution of this problem would probably be to have the manufacture of all types of firearms entirely in the hands of the Government arsenals, because the Government could then refuse to sell arms to anyone it might choose to refuse.

When the importance of training our able-bodied citizens in the use of small arms as a measure of national defense was suggested to Mr. Keenan, he expressed the opinion that that was of relatively small importance, because the next war would not be won by small arms, and that in his opinion both the individual soldier, the small arms, and the ships of the fleet would be of no tangible value.

It was on the evidence presented by the Nation-wide history of firearms legislation in this country, plus the frankly expressed opinions of the Assistant Attorney General himself, that we pointed out in our letter the future possibilities of amendments to H.R. 9066.

The reference to possible dictatorial control by one or two men under the provisions of this bill which make it possible for the Secretary of the Treasury or the Commissioner of Internal Revenue to do many things by regulation which are not specifically mentioned in the bill was also based on numerous conversations with Mr. Keenan and Mr. Smith of the Department of Justice. They made it evident that many of the effective provisions under which the Narcotics Act is being administered were not included in the original law at all but had merely been added on as regulations.

It has seemed to us that while provisions written into a bill may easily be tested in the courts for constitutionality, it would probably be a much more difficult, long-drawn-out, and expensive proceeding to prove that a regulation was unconstitutional.  As a matter of fact, we wonder if a regulation, not being a law, could be declared unconstitutional.

This is the evidence and these are the reasons lying behind the statements contained in our discussion of H.R. 9066.

(Thereupon, at 12:20 p.m., the hearings were concluded.)

