**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ROBERT M. MILLER,** ) | |
| ) | **Civil Action No. 1:22-cv-02579-CKK** |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **MERRICK GARLAND, Attorney General of** ) | |
| **the United States, in his official capacity** *et al.***,** ) | |
| ) | |
| **Defendants.** ) | |
| _____ ) | |

**REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION
<u>TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT</u>**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ..................................................................................................................... 2

I.      Plaintiff Lacks Standing to Challenge the Rule. ................................................... 2

        A.      The Rule Imposes No Obligations or Harm on Plaintiff as a Prospective
                Owner of a PMF ......................................................................................... 2

        B.      Plaintiff's Allegations Regarding His Voluntary Destruction of a "Solvent
                Trap" Do Not Confer Standing to Challenge the Rule. ................................ 6

II.     The Court Lacks Subject Matter Jurisdiction Over Plaintiff's Challenges to the
        NFA ..................................................................................................................... 10

        A.      Plaintiff Lacks Standing to Challenge Aspects of the NFA Other Than the
                Taxation Provisions. ................................................................................... 10

        B.      The Anti-Injunction Act Bars Plaintiff's Challenge to the Collection of a
                Tax for His Conversion of a Handgun to a Weapon Regulated by the NFA
                as "Any Other Weapon." ............................................................................. 12

        C.      Plaintiff's Challenge to the NFA's Taxation Provisions Must Be Dismissed
                Pursuant to the Anti-Injunction Act's Jurisdiction-Stripping Provision and
                for Failure to Exhaust Administrative Remedies. ....................................... 14

CONCLUSION ............................................................................................................... 17

# TABLE OF AUTHORITIES

**Cases**

*Angelo v. Dist. of Columbia*,
No. 22-1878, 2022 WL 17974434 (D.D.C. Dec. 28, 2022) .................................................... 11

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................................................. 3

*Bennett v. Spear*,
520 U.S. 154 (1997) ............................................................................................................ 17

*Cherry v. FCC*,
641 F.3d 494 (D.C. Cir. 2011) ........................................................................................... 16

*CIC Servs., LLC v. IRS*,
141 S. Ct. 1582 (2021) ........................................................................................................ 13

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .................................................................................................. 6, 7, 10

*Coleman v. Toyota Motor Credit Corp.*,
109 F. Supp. 3d 4 (D.D.C. 2015) ......................................................................................... 2

*Davis v. United States*,
No. 05-CV-2474, 2006 WL 2687018 (D.D.C. Sept. 19, 2006) .............................................. 15

*Ellis v. Commissioner of Internal Revenue Service*,
67 F. Supp. 3d 325 (D.D.C. 2014) ....................................................................................... 6

*Emerald Int'l Corp. v. United States*,
54 Fed. Cl. 674 (2002),
*appeal dismissed*, 60 F. App'x 808 (Fed. Cir. 2003) .............................................................. 17

*Enochs v. Williams Packing & Nav. Co.*,
370 U.S. 1 (1962) ................................................................................................................ 14

*Fla. Audubon Soc'y v. Bentsen*,
94 F.3d 658 (D.C. Cir. 1996) ................................................................................................ 5

*Fogle v. Walton-Pratt*,
318 F. Supp. 3d 114 (D.D.C. 2018) ...................................................................................... 2

*French v. Hester*,
585 F. Supp. 3d 974 (E.D. Ky. 2022) ................................................................................... 3

*Gulf Coast Mar. Supply, Inc. v. United States*,
    867 F.3d 123 (D.C. Cir. 2017) ............................................................. 15

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ..................................................................... 6, 10

*Martens v. United States*,
    No. 05-1805, 2007 WL 2007580 (D.D.C. July 6, 2007)......................... 15

*Microwave Acquisition Corp. v. FCC*,
    145 F.3d 1410 (D.C. Cir. 1998) ............................................................. 5

*Middlesex Sav. Bank v. Johnson*,
    777 F. Supp. 1024 (D. Mass. 1991) ...................................................... 17

*Minneapolis St. Louis Ry. Co. v. Gardner*,
    177 U.S. 332 (1900) ............................................................................. 5

*Montrois v. United States*,
    916 F.3d 1056 (D.C. Cir. 2019) ........................................................... 16

*Navegar, Inc. v. United States*,
    103 F.3d 994 (D.C. Cir. 1997) ............................................................. 11

*NO Gas Pipeline v. FERC*,
    756 F.3d 764 (D.C. Cir. 2014) ............................................................... 5

*Ontario Power Generation, Inc. v. United States*,
    54 Fed. Cl. 630 (2002) ......................................................................... 17

*Ord v. District of Columbia*,
    587 F.3d 1136 (D.C. Cir. 2009) ......................................................... 7, 11

*Parker v. Dist. of Columbia*,
    478 F.3d 370 (D.C. Cir. 2007) ............................................................. 11

*Ross v. United States*,
    460 F. Supp. 2d 139 (D.D.C. 2006) ..................................................... 15

*Sargeant v. Dixon*,
    130 F.3d 1067 (D.C. Cir. 1997) ............................................................. 5

*Seegars v. Gonzales*,
    396 F.3d 1248 (D.C. Cir. 2005) ........................................................... 11

*Sossamon v. Texas*,
    563 U.S. 277 (2011) ........................................................................... 16

*South Carolina v. Regan*,
   465 U.S. 367 (1984) ................................................................................ 14, 15

*Spencer v. Brady*,
   700 F. Supp. 601 (D.D.C. 1988) .............................................................. 14, 15

*Starr Int'l Co., Inc. v. United States*,
   302 F. Supp. 3d 411 (D.D.C. 2018) .............................................................. 16

*United States v. Black*,
   739 F.3d 931 (6th Cir. 2014) ......................................................................... 12

*United States v. Dalm*,
   494 U.S. 596 (1990) ...................................................................................... 16

*United States v. Lax*,
   596 F. Supp. 3d 421 (E.D.N.Y. 2022) ........................................................... 17

**Statutes**

18 U.S.C. § 921 ...................................................................................................... 9

18 U.S.C. § 921(a)(3)(C) ........................................................................................ 7

18 U.S.C. § 921(a)(30) ......................................................................................... 12

26 U.S.C. § 5811(b) .............................................................................................. 17

26 U.S.C. § 5845(e) .............................................................................................. 12

26 U.S.C. § 6511 ................................................................................................... 16

26 U.S.C. § 6532(a)(1) .......................................................................................... 16

26 U.S.C. § 7422(a) .............................................................................................. 16

26 U.S.C. § 5845(a)(7) ........................................................................................... 9

28 U.S.C. § 1346(a)(1) .......................................................................................... 15

**Regulations**

87 Fed. Reg. 24,652 (Apr. 26, 2022) .............................................................. 1, 3, 8

**Other Authorities**

ATF, Form 1 - Application to Make and Register a Firearm (ATF Form 5320.1) ....................... 9

ATF, Form 4 - Application for Tax Paid Transfer and Registration of Firearm (ATF Form 5320.4).................................................................................................................... 17

THE FEDERALIST No. 81 (Alexander Hamilton) (Benjamin F. Wright ed., 1961)........................ 16

ATF, Adding a Vertical Fore Grip to a Handgun (May 4, 2006) ................................................... 13

## INTRODUCTION

Plaintiff's Opposition to Defendants' Motion to Dismiss confirms that he has not established a basis for the Court's subject matter jurisdiction over any of his claims.

*First*, Plaintiff lacks standing to challenge the Rule, 87 Fed. Reg. 24,652 (Apr. 26, 2022), promulgated by the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") defining "firearm," "frame," and "receiver."  The Rule's provisions concerning privately made firearms ("PMFs") do not injure Plaintiff, as an owner of PMFs, because the Rule does not prohibit the making or possession of PMFs or impose any obligations on owners of PMFs.  Plaintiff's suggestion that he may take his PMFs to a specific federal firearms licensee ("FFL") who may take his PMFs into inventory and charge him for serialization do not establish standing.  Any harm from such events would result from the decisions of Plaintiff and the FFL and would not be fairly traceable to the Rule.  Plaintiff's allegation that he destroyed a solvent trap establish only non-cognizable, self-inflicted harm.

*Second*, the Court lacks subject matter jurisdiction over Plaintiff's challenges to the National Firearms Act ("NFA").  Plaintiff's concession that he does not intend imminently to acquire any weapons classified as firearms under the NFA confirms that he lacks standing to challenge the NFA's administrative requirements concerning firearms registration.  Plaintiff's generalized fear of future criminal prosecution does not satisfy the stringent requirements for pre-enforcement standing.  The Anti-Injunction Act strips this Court of jurisdiction over Plaintiff's prospective challenge to the collection of the NFA's taxation provisions and any administrative requirements incidental to collection of that tax.  Finally, Plaintiff has failed to establish that he exhausted his administrative remedies—a jurisdictional prerequisite to sue for a refund of taxes already paid.  The Court should thus dismiss this case for lack of subject matter jurisdiction.

**ARGUMENT**

**I.      Plaintiff Lacks Standing to Challenge the Rule.**

Plaintiff lacks standing to challenge the Rule because he has failed to meet his burden[1] of alleging that the Rule is currently causing him, or will imminently cause him, any concrete injury. While Plaintiff's Opposition contains a plethora of alleged harms and grievances regarding the Rule, nowhere in the Opposition does he, or can he, identify a single instance of either (a) any product that he owns or intends to buy that he is prevented from possessing or buying under the Rule, or (b) any lawful use of any firearm or component he currently owns that is restricted or prohibited by the Rule.

**A.      The Rule Imposes No Obligations or Harm on Plaintiff as a Prospective Owner of a PMF.**

Plaintiff repeatedly invokes the Rule's definition of PMF as the basis for Article III injury. *See, e.g.*, Opp. at 6.  Plaintiff even asserts that it is "indisputable Plaintiff was the object of the Rule, since it was directly intended to affect his unmarked privately made firearms ('PMF'), including rifles, pistols, and silencers."  *Id*.  However, far from being "indisputable," Plaintiff's statement is flatly incorrect, as the Rule does not impose any restrictions or regulations whatsoever

---

[1]  In his Opposition, Plaintiff attempts to invoke the "less stringent standards" customarily applied to *pro se* litigants.  *See* Mem. in Opp. to Defs.' Mot. to Dismiss ("Opp."), ECF No. 19, at 2 (citing *Fogle v. Walton-Pratt*, 318 F. Supp. 3d 114, 118 (D.D.C. 2018)).  However, as set forth in greater detail in Defendants' Motion to Dismiss, while the pleadings of *pro se* litigants are held to a more relaxed standard generally, this less stringent standard does not apply where a *pro se* litigant is unlike the typical, unsophisticated *pro se* litigant, even if he or she lacks formal legal training. Mem. in Supp. of Defs.' Mot. to Dismiss Pl.'s Second Am. Compl. 14 n.5, ECF No. 11-1 ("MTD") (citing authorities).  Here, Plaintiff is an experienced, highly prolific *pro se* litigant.  *See id*. Therefore, the Court should not apply the relaxed standard to which unsophisticated, inexperienced *pro se* litigants are generally entitled.  Even if the relaxed standard did apply, the result would be the same.  For inexperienced *pro se* litigants, "although the Court is required to construe the *pro se* complaint liberally, [*p*]*ro se* plaintiffs are not freed from the requirement to plead an adequate jurisdictional basis for their claims."  *Coleman v. Toyota Motor Credit Corp.*, 109 F. Supp. 3d 4, 6 (D.D.C. 2015) (cleaned up).  For the reasons discussed in this memorandum and in Defendants' Motion to Dismiss, Plaintiff has not done so.

on owners of PMFs such as Plaintiff. *See, e.g.*, *French v. Hester*, 585 F. Supp. 3d 974, 985 (E.D. Ky. 2022) ("[W]hile the Court must accept Plaintiff's version of facts as true, the Court is not required to accept as true legal conclusions contradicted by [the basis for the legal claim]."); *cf. Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

The Rule clarifies that, consistent with the plain text of the Gun Control Act ("GCA"), the GCA's definition of "firearm" includes a "privately made firearm." 87 Fed. Reg. at 24,735. A "privately made firearm" is a firearm (including a frame or receiver) that is assembled or otherwise produced by a person other than a licensed manufacturer, and that does not contain a serial number placed by a licensed manufacturer at the time of production. *Id.* The Rule does *not* restrict the private making of firearms by non-licensees who are not otherwise prohibited by law from possessing them, and requires only that such firearms that are taken into inventory[2] by licensees be serialized and recorded by the licensees so that they may be traced by law enforcement if they are later involved in crime. *Id.* at 24,653, 24,742, 24,744.

The Rule's definition of "privately made firearm" does *not* prohibit an individual from making a firearm for personal use and imposes *no* obligations upon owners of PMFs. As the Rule expressly states, "[t]here are also no recordkeeping requirements imposed by the GCA or the proposed or final rule upon unlicensed persons who make their own firearms, but only upon [federal firearms licensees] who choose to take PMFs into inventory in the manner prescribed."

---

[2] Plaintiff's assertion that the Rule requires FFLs to mark PMFs with a serial number "at intake," *see, e.g.*, Opp. at 7, is incorrect and flatly contradicted by the Rule. As the Rule states, FFLs only have to mark PMFs with a serial number at all if the FFL decides to take the PMF into inventory, and in that event, the Rule provides that the FFL must apply a serial number to the PMF "not later than the seventh day following the date of receipt or other acquisition, or before the date of disposition." 87 Fed. Reg. at 24,742.

*Id*. at 24,670.  Therefore, owners of PMFs like Plaintiff may continue to own and use their PMFs exactly as they could prior to the enactment of the Rule.  Contrary to Plaintiff's contention, the Rule clearly and expressly does not make owners of PMFs like Plaintiff the "object" of the Rule.

Plaintiff next contends that he has suffered an Article III injury because one particular FFL, Sterling Arsenal, may have to keep one or more of Plaintiff's PMFs in its inventory for longer than a day to provide some of the upgrades Plaintiff would like to make to his PMFs, in which case the FFL would be required by the Rule to apply a serial number to the PMF.  *Id*. at 24,635.  In that case, the FFL has represented that it would decide to charge Plaintiff an additional $65 to $85 as a result of applying the serial number.  *See* Decl. of Luis Rose ¶ 26, ECF No. 19-1.

However, to the extent Plaintiff is relying upon this theoretical future $65-85 charge as the Article III injury that purportedly gives him standing to challenge the Rule, any such future harm would not be imposed upon Plaintiff by Defendants, and would be instead the result of a chain of a number of independent decisions made by Plaintiff and the FFL.  With regard to at least many of the processes, such as cerakoting, Plaintiff does not establish—nor could he—that this process is actually necessary for the operation of any of his PMFs, only that it is something he would like to have done to his PMFs.  Plaintiff essentially admits that these processes and upgrades are things that he wants to do, and something that certain other owners of PMFs have done.  *See, e.g.*, Opp. at 7 ("Plaintiff's bare aluminum receiver has a mirror-like finish *he does not want*, and no one to his knowledge has ever left a firearm in bare aluminum.") (emphasis added).  It is therefore clear that many of these gunsmithing services and upgrades are things that Plaintiff subjectively wishes to do and intends to seek at some indefinite point in the future.  Moreover, Plaintiff has not shown that these services will necessarily require his PMF to be taken into inventory, but only that one particular FFL, in accordance with its business practices, would generally take a PMF into

inventory to perform such services.  However, Plaintiff has made no showing that other FFLs could not perform the services and upgrades he desires to obtain for his PMFs, without taking his PMFs into inventory.  Finally, Plaintiff does not, and cannot, show that the Rule itself imposes any financial penalty on FFLs, so a particular FFL's decision to charge Plaintiff $65-85 for serialization is a decision made by that FFL, and not by the Rule.

In order to satisfy the requirements for Article III standing, a plaintiff must demonstrate a concrete injury that is "fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court."  *NO Gas Pipeline v. FERC*, 756 F.3d 764, 768 (D.C. Cir. 2014).  In making this determination, the court "examines whether it is substantially probable that the challenged acts of the defendant, not of some absent third party, will cause the particularized injury of the plaintiff."  *Microwave Acquisition Corp. v. FCC*, 145 F.3d 1410, 1412 (D.C. Cir. 1998) (quoting *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (en banc)).  Here, the $65-85 charge proposed by one FFL is an "independent action" of a "third party not before the court," not something that is required by the Rule, and therefore cannot be the basis of Plaintiff's Article III standing claim.

Finally, to the extent Plaintiff predicates his standing argument on the violation of some "liberty interest," he still fails to identify any actual liberty interest.  Plaintiff simply repeats his conclusory assertion that he "has both protected property and liberty interests in keeping his PMFs unmarked."  Opp. at 6.  The case he cites in support of his argument is a case from over 120 years ago that does not address standing but merely states the true but irrelevant point that natural persons can take actions not forbidden by law.  *Id.* (quoting *Minneapolis St. Louis Ry. Co. v. Gardner*, 177 U.S. 332, 343 (1900)).  As the Supreme Court has held, an injury in fact required for Article III standing as an "invasion of a concrete, imminent, and legally cognizable interest."  *Sargeant v.*

*Dixon*, 130 F.3d 1067, 1069 (D.C. Cir. 1997) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61, 573 n.8 (1992)). Here, even to the extent Plaintiff's interest in continuing to own and lawfully use his PMFs is a protectable interest, it is one that is not infringed or restricted by the Rule. Plaintiff does not, and cannot, demonstrate that his PMFs have been seized or rendered illegal, and he may continue to legally possess and own them just as he could prior to the issuance of the Rule.

### B. Plaintiff's Allegations Regarding His Voluntary Destruction of a "Solvent Trap" Do Not Confer Standing to Challenge the Rule.

As Defendants' Motion to Dismiss explained, Plaintiff does not have standing to challenge the Rule based on his contention that he voluntarily chose to destroy a so-called "solvent trap"— a device intended for use in fabricating firearm silencers. MTD at 8-9. Initially, Plaintiff cannot premise standing on any alleged harm resulting from his voluntary decision to destroy his own personal property because any such alleged harm is purely self-inflicted. *See id.* at 8.[3] Plaintiff responds by attempting to reframe his injury as a fear of future criminal prosecution, contending that if he had not voluntarily chosen to destroy his solvent trap, he "face[d] substantial risk of felony violation of the GCA." Opp. at 11. But litigants "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). Therefore, Plaintiff's "contention that [he has] standing because [he] incurred certain costs as a reasonable reaction to a risk of harm is unavailing" because the alleged harm he sought to avoid "is not certainly

---

[3] In support of the legal proposition that "it is well-settled in this jurisdiction that self-inflicted injuries—injuries that are substantially caused by the plaintiff's own conduct—sever the causal nexus needed to establish standing," Defendants cited *Ellis v. Commissioner of Internal Revenue Service*, 67 F. Supp. 3d 325, 336 (D.D.C. 2014). *See* MTD at 8. Plaintiff responds by attempting to distinguish the factual circumstances in this case from those in *Ellis*. Defendants did not cite *Ellis* for its facts, but instead for the legal proposition that self-inflicted injuries do not confer standing, which Plaintiff fails to refute.

impending." *Id*.; *see also id*. ("[A]llowing respondents to bring this action based on costs they incurred in response to a speculative threat would be tantamount to accepting a repackaged version of respondents' first failed theory of standing."). Nor may Plaintiff evade the strictures of the D.C. Circuit's high threshold to establish pre-enforcement standing for criminal prosecution simply by voluntarily choosing to destroy an allegedly proscribed or regulated item. If that were all that was required to establish pre-enforcement standing, then it would not have been necessary for the plaintiff in *Ord v. District of Columbia*, 587 F.3d 1136 (D.C. Cir. 2009), to rely on a warrant for his arrest for violating the District's firearm laws and a concession by the District that his prosecution was "a special priority" in order to establish standing to challenge those laws. *See* 587 F.3d at 1138-42. Instead, it would have sufficed for the plaintiff to "inflict[] harm on [himself]" by destroying or disposing of his firearm. *Clapper*, 568 U.S. at 416. But Article III's requirements are not evaded so easily. Such self-inflicted harm does not establish standing, either in general or for pre-enforcement standing in particular.

Additionally, as Defendants have explained, Plaintiff cannot contend that his voluntary choice to destroy his solvent trap was due to fear of incurring criminal liability under the Rule because nothing in the Rule changes the legal status of solvent traps under preexisting law. MTD at 8-9. More specifically, the Rule does not alter the status of solvent traps under either the NFA or GCA. *Id*. As Defendants have explained, the GCA's definition of "firearm" includes a "firearm silencer." 18 U.S.C. § 921(a)(3)(C). In turn, a "firearm silencer" includes "any part intended only for use in" "assembling or fabricating a firearm silencer or firearm muffler." *Id*. § 921(a)(25). Devices marketed as "solvent traps" that have been indexed by a seller for the purpose of allowing the buyer to drill a hole for the passage of a projectile, in order to diminish the report of a portable firearm, are intended only for use in assembling a firearm silencer, despite being labeled as a

"solvent trap."  87 Fed. Reg. at 24,699-700.  Thus, under the GCA, a solvent trap is a "firearm silencer" and a "firearm," and the Rule does not alter this status.  Plaintiff therefore lacks standing to challenge the Rule based on his contention that he voluntarily chose to destroy a solvent trap.

Plaintiff fails to demonstrate otherwise.  Opp. at 9-11.  Indeed, Plaintiff concedes that "[l]ong before finalizing the Rule," the federal government treated solvent traps as a firearm silencer "regulated by the GCA."  *Id*. at 9.  And Plaintiff fails to show that the Rule altered the status of solvent traps under the GCA.  Plaintiff contends that a solvent trap is not "intended only for use in" assembling or fabricating a firearm silencer or firearm muffler because it could also be used for collecting cleaning agents from a rifle barrel's end.  *Id*. at 10.  This contention is not persuasive because a solvent trap that has been indexed by a seller for the purpose of allowing the buyer to drill a hole for the passage of a projectile, in order to diminish the report of a portable firearm, is intended only for use in assembling a firearm silencer, and not as an innocuous cleaning tool.  In any event, Plaintiff concedes that he planned to use his solvent trap in assembling a firearm silencer.  Second Am. Compl. ¶ 197, ECF No. 10.

Nor, contrary to Plaintiff's representation, did Defendants "contradict[] [themselves] by saying possessing solvent traps with intent to make a silencer is illegal, but it is still permissible under the Rule to make a silencer from a solvent trap."  Opp. at 10.  Defendants did not represent that it is permissible under the Rule to make a silencer from a solvent trap, but instead made clear that the Rule does not change the *legal status* of solvent traps under either the NFA or the GCA.  MTD at 8-9.  As explained above, the GCA regulates solvent traps as both "firearm silencers" and "firearms."  *See id*.  The GCA does not generally prohibit the possession of firearms or firearm silencers, and the Rule does not change the GCA's treatment of firearms or firearm silencers.  The NFA does prohibit the possession of an unregistered "silencer," and because the NFA incorporates

8

the GCA's definition of "silencer," it follows that the NFA prohibits the possession of solvent traps.  *See* 26 U.S.C. §§ 5845(a)(7) (defining "firearm" to include "any silencer (as defined in section 921 of title 18, United States Code)"), 5861(d) (prohibited possession of unregistered "firearms").  However, an individual may file an ATF Form 1 to request permission to transform into a silencer a bona fide solvent trap that has not yet been so transformed (*i.e.*, has not yet been indexed for drilling) or is not a solvent trap kit (*i.e.*, is not a kit that contains all the parts of a silencer and thus under the GCA's definition, a silencer); upon receipt of such permission, the individual may lawfully transform the solvent trap into a silencer.[4]  This remains true under the Rule, which does not alter the legal status of "silencers" under the NFA.

Additionally, Defendants' motion explained that under the GCA, a solvent trap is, by definition, a "firearm silencer" without regard for the Rule's definition of the term "readily" or the application of the Rule's term "may readily be converted."  MTD at 9.  Plaintiff mischaracterizes this explanation as "trying to use the term 'readily' from different paragraphs of 18 U.S.C. § 921 to apply to the specific coverage of silencer parts in § 921(a)(25), which does not contain that word."  Opp. at 10.  But Defendants' explanation did no such thing.  Instead, Defendants plainly stated that the GCA treats a solvent trap as a "firearm silencer" regardless of the Rule's definition of the word "readily."  Plaintiff's contrary representation is thus founded on a basic misunderstanding of Defendants' explanation.

---

[4] *See* ATF, Form 1 - Application to Make and Register a Firearm (ATF Form 5320.1), *available at* https://www.atf.gov/file/11281/download (last visited Feb. 16, 2023).

II.     **The Court Lacks Subject Matter Jurisdiction Over Plaintiff's Challenges to the NFA.**

A.      **Plaintiff Lacks Standing to Challenge Aspects of the NFA Other Than the Taxation Provisions.**

As explained in Defendants' opening brief, Plaintiff has failed to demonstrate standing to challenge any portion of the NFA other than its taxation provisions.  MTD at 10-12.  Plaintiff has conceded that he cannot presently afford to purchase additional firearms regulated under the NFA. *See* Decl. of Robert M. Miller ¶¶ 8-9, ECF No. 19-2 ("Miller Decl.") (stating that Plaintiff's "collection of NFA-regulated firearms has scarcely grown since August 2020 only because [he] lost his income from whistleblower retaliation by [his] employer" and that he "intend[s] to add to [his] NFA firearm collection as soon as [he] can a*fford to do so*") (emphasis added).  Consequently, Plaintiff does not face any imminent injury associated with filing an application under the NFA with respect to the future purchase of an NFA-regulated firearm, including any registration, fingerprinting, or other administrative requirements associated with any such purchase.  *Contra* Opp. at 15-16.  Because Plaintiff's alleged harm associated with any such future purchases is not "*certainly impending*," it does not "constitute injury in fact" but is instead merely an "[a]llegation[] of *possible* future injury."  *Clapper*, 568 U.S. at 409 (citations omitted).  An injury is not sufficiently imminent for Article III purposes "when, as here, the plaintiff alleges only an injury at some indefinite future time, and the acts necessary to make the injury happen are at least partly in the plaintiff's own control."  *Lujan*, 504 U.S. at 564 n.2.  Consequently, to the extent that Plaintiff contends that he will suffer injury associated with filing an NFA application, he fails to allege an imminent injury, and lacks Article III standing.

Nor, as explained previously, does Plaintiff satisfy the standing requirements for pre-enforcement review of the challenged laws.  *See* MTD at 11.  As the D.C. Circuit has held, for a plaintiff to establish standing to challenge a law with potential criminal applications that does not

burden expressive rights, the plaintiff must "demonstrate that their prosecution results from a special law enforcement priority, namely that they have been 'singled out or uniquely targeted by the . . . government for prosecution.'" *Ord*, 584 F.3d at 1140-41 (quoting *Parker v. Dist. of Columbia*, 478 F.3d 370, 375 (D.C. Cir. 2007)); *accord Angelo v. Dist. of Columbia*, No. 22-1878, 2022 WL 17974434, at *4-11 (D.D.C. Dec. 28, 2022). However, as Defendants have shown, Plaintiff has neither demonstrated any concrete intention to engage in specific conduct that could potentially expose him to criminal liability under the NFA nor shown that he has been "singled out or uniquely targeted by the . . . government for prosecution." *Ord*, 584 F.3d at 1141. At most, then, Plaintiff only faces a threat of prosecution that is "merely abstract or speculative," rather than one which is "credible and immediate." *Navegar, Inc. v. United States*, 103 F.3d 994, 998 (D.C. Cir. 1997).

In response, Plaintiff attempts to distinguish D.C. Circuit precedent regarding pre-enforcement standing from this case on the grounds that in addition to alleging pre-enforcement standing, Plaintiff is also alleging constitutional harm. Opp. at 17. But that was true in *Ord* as well. *See Ord*, 587 F.3d at 1139 (noting that the plaintiff had alleged a violation of his Fourth Amendment rights). And it was the case in *Angelo*, where the plaintiffs (including Plaintiff here) alleged constitutional harm premised on a Second Amendment violation. *See Angelo*, 2022 WL 17974434, at *4; *id.* at *2 (explaining that Robert M. Miller was one of the plaintiffs). Nevertheless, the Court held that the plaintiffs in that case had "failed to allege that they satisfy the imminence requirement as articulated by the D.C. Circuit in *Navegar* and *Seegars [v. Gonzales*, 396 F.3d 1248 (D.C. Cir. 2005)]," and denied the plaintiffs' motion for preliminary and permanent

injunctive relief for lack of standing.  *Id.* at *11.  So too here; Plaintiff has failed to demonstrate

an imminent, credible threat of prosecution, and thus lacks pre-enforcement standing.[5]

> **B.**      **The Anti-Injunction Act Bars Plaintiff's Challenge to the Collection of a Tax for His Conversion of a Handgun to a Weapon Regulated by the NFA as "Any Other Weapon."**

To the extent that Plaintiff claims that he refrains from converting a handgun into a

particular type of weapon regulated under the NFA for fear of incurring taxation, the Anti-

Injunction Act bars his claim.  *See* Opp. at 16.  This claim by Plaintiff involves his proposed

conversion of a "handgun" into a weapon that falls under the NFA's catchall phrase "any other

weapon."  Federal law defines a "handgun" to mean "a firearm which has a short stock and is

designed to be held and fired *by the use of a single hand*" or any combination of parts from which

such a firearm can be assembled.  18 U.S.C. § 921(a)(30) (emphasis added).  The NFA defines the

catchall term "any other weapon" ("AOW") as:

> [A]ny weapon or device capable of being concealed on the person from which a shot can be discharged through the energy of an explosive, a pistol or revolver having a barrel with a smooth bore designed or redesigned to fire a fixed shotgun shell, weapons with combination shotgun and rifle barrels 12 inches or more, less than 18 inches in length, from which only a single discharge can be made from either barrel without manual reloading, and shall include any such weapon which may be readily restored to fire.

26 U.S.C. § 5845(e).  ATF has long held that a handgun that is modified by the addition of a

vertical fore grip[6] is no longer designed to be "held and fired by the use of a single hand," and thus

---

[5] For similar reasons, Plaintiff cannot establish pre-enforcement standing based on his decision not to convert firearms that he owns into weapons regulated under the NFA's catchall phrase "any other weapon."  *See also infra* II.B.

[6] A vertical fore grip is "a stabilizing grip that [is] attached to the front of the firearm so that it [may] be fired using two hands to improve accuracy and counter recoil."  *United States v. Black*, 739 F.3d 931, 934 (6th Cir. 2014).

falls within the NFA's definition of "any other weapon."[7]   The NFA requires the payment of a $200 tax by any person who possesses an item that falls within the NFA's definition of "any other weapon."  *See id.*; Miller Decl. ¶ 47 (noting that "Defendants consider putting a vertical forward grip ('VFG') on a handgun or pistol is making an AOW regulated by the NFA and subject to a $200 making tax and failure to pay the tax").

Plaintiff claims that he "owns many" vertical fore grips that he would convert into "NFA-regulated AOWs" but for his "apprehension of the consequences of violating the NFA or GCA." Miller Decl. ¶ 50; *see also id.* ¶ 51 (representing that Plaintiff "bought a Stoeger Coach Gun with the intention of shortening the barrel and stock to make an AOW, but [has] not done so only because of the NFA tax").  As explained above, *see supra* II.A, Plaintiff lacks pre-enforcement standing to the extent that he claims he refrains from converting his weapons into items regulated by the GCA or NFA for fear of criminal prosecution.  And to the extent that Plaintiff claims that he refrains from such conversion because he will incur a $200 tax under the NFA, he seeks prospective relief from a tax requirement, and the Anti-Injunction Act bars that claim.  *See* MTD at 12-13.[8]

---

[7]ATF, Adding a Vertical Fore Grip to a Handgun (May 4, 2006), *available at* http://www.atf.gov/firearms/docs/open-letter/all-ffls-may2006-open-letter-adding-vertical-fore-grip-handgun/download (last visited Feb. 15, 2023)

[8] Moreover, the Supreme Court has long "rejected the view that regulatory tax cases have a special pass from the Anti-Injunction Act."  *CIC Servs., LLC v. IRS*, 141 S. Ct. 1582, 1593 (2021). Therefore, Plaintiff may not evade the Act's strictures by disclaiming his intent to seek injunctive relief preventing the collection of the $200 tax payment and purporting to challenge instead only the provision of the fingerprint card or photograph (or any other regulatory aspect of the NFA).

### C.   Plaintiff's Challenge to the NFA's Taxation Provisions Must Be Dismissed Pursuant to the Anti-Injunction Act's Jurisdiction-Stripping Provision and for Failure to Exhaust Administrative Remedies.

As set forth in Defendants' opening brief, this Court lacks jurisdiction over Plaintiff's challenge to the tax provisions of the NFA to the extent that Plaintiff seeks either prospective or retrospective relief.  *See* MTD at 12-16.  With respect to prospective relief, Plaintiff argues that his "claim satisfies an exception to the Anti-Injunction Act," in that he "has no means of challenging the tax statute other than through an injunctive action."  Opp. at 21 (capitalization altered); *see South Carolina v. Regan*, 465 U.S. 367, 378 (1984) (holding that the Anti-Injunction Act does not "apply to actions brought by aggrieved parties for whom [Congress] has not provided an alternative remedy").[9]   Plaintiff argues that this exception applies because "[i]t is simply impossible for Plaintiff to lawfully obtain, make, or keep NFA regulated firearms without payment of the tax."  MTD at 21.  But under Plaintiff's theory, *South Carolina*'s "extremely narrow . . . exception," *Spencer v. Brady*, 700 F. Supp. 601, 604 (D.D.C. 1988), would swallow the rule, as no taxpayer can lawfully engage in conduct giving rise to tax liability without paying the tax associated with that conduct.  Indeed, "[t]he manifest purpose of § 7421(a) is to permit the United States to assess and collect taxes alleged to be due without judicial intervention, and to require that the legal right to the disputed sums be determined in a suit for refund." *Enochs v. Williams Packing & Nav. Co.*, 370 U.S. 1, 7 (1962).  "In this manner the United States is assured of prompt collection of its lawful revenue."  *Id.*

---

[9] Plaintiff's argument appears to be contingent on the Court granting his motion for jurisdictional discovery.  *See* Opp. at 21 ("Assuming this Court does allow Plaintiff to explore the issue of futility of exhaustion in discovery, Plaintiff argues as follows.").  Because the Court denied that motion, *see* Minute Order of Jan. 13, 2023, the Court need not and should not reach Plaintiff's argument that his claim satisfies an exception to the Anti-Injunction Act.  Nevertheless, Defendants address the argument here out of an abundance of caution.

In any event, *South Carolina* does not apply because Plaintiff has a right to challenge the constitutionality of the NFA's tax provisions—to the extent he is subject to and thus harmed by them, *see infra* pages 16-17—through a refund suit pursuant to 28 U.S.C. § 1346(a)(1).  It is well established that such a refund suit is an adequate alternative remedy so that the *South Carolina* exception does not apply.  *See, e.g.*, *Gulf Coast Mar. Supply, Inc. v. United States*, 867 F.3d 123, 130 n.1 (D.C. Cir. 2017) (holding that "a refund suit . . . *is* an 'alternative remedy'" for purposes of the *South Carolina* rule); *accord Martens v. United States*, No. 05-1805, 2007 WL 2007580, at *5 (D.D.C. July 6, 2007); *Ross v. United States*, 460 F. Supp. 2d 139, 148 (D.D.C. 2006); *Davis v. United States*, No. 05-2474, 2006 WL 2687018, at *5 (D.D.C. Sept. 19, 2006); *Spencer*, 700 F. Supp. at 604; *see also South Carolina*, 465 U.S. at 374-75 (distinguishing earlier cases in which the Anti-Injunction Act precluded relief because the "plaintiff had the option of paying the tax and bringing a suit for a refund").  Thus, because Plaintiff identifies no applicable exception, the Anti-Injunction Act bars his claims for prospective tax relief.

With respect to retrospective tax relief, Plaintiff initially "concede[d]" in his opposition brief that he had failed to exhaust administrative remedies, requiring dismissal of his tax refund claims.  Opp. at 20.  Subsequently, Plaintiff filed a supplemental brief in which he contends that he exhausted his administrative remedies by submitting a refund request to the Alcohol and Tobacco Tax and Trade Bureau (TTB).  *See* Suppl. Opp. to Defs.' Mot. to Dismiss at 3-6, ECF No. 28 ("Suppl.").  But Plaintiff contends that he filed his refund request on December 23, 2022, and that "Defendants [have taken] no action" on the request.  Suppl. at 3, 5.  Pursuant to the Internal Revenue Code, "[n]o suit or proceeding under section 7422(a) for the recovery of any internal revenue tax, penalty, or other sum, shall be begun before the expiration of 6 months from the date of filing the claim required under such section unless the Secretary renders a decision thereon

within that time." 26 U.S.C. § 6532(a)(1); *see also id.* § 7701(11)(B) (defining "Secretary" as "the Secretary of the Treasury or his delegate").  Thus, because TTB has not rendered a final decision on Plaintiff's refund request and because the request has been pending for less than six months, this Court lacks jurisdiction over Plaintiff's claim for refund of taxes that he alleges are unconstitutional.  *See, e.g., Montrois v. United States*, 916 F.3d 1056, 1061-62 (D.C. Cir. 2019) (noting that the exhaustion requirement of Section 7422(a) is jurisdictional); *see also, e.g., Starr Int'l Co., Inc. v. United States*, 302 F. Supp. 3d 411, 416 (D.D.C. 2018) ("If a taxpayer . . . proceeds directly to federal court [on a claim for refund of taxes allegedly "erroneously or illegally assessed or collected," 26 U.S.C. § 7422(a)], the court will lack subject matter jurisdiction and must dismiss the action."), *appeal dismissed*, No. 18-5085, 2018 WL 2338134 (D.C. Cir. Apr. 25, 2018). Additionally, to the extent that Plaintiff seeks any refund of NFA taxes paid more than two years before the filing of a refund claim, his claims are barred under 26 U.S.C. § 6511.  *See United States v. Dalm*, 494 U.S. 596, 602 (1990).[10]

While the Anti-Injunction Act and Plaintiff's failure to exhaust administrative remedies for any tax refund claim suffice to require dismissal of Plaintiff's claims for both prospective and retrospective tax relief, Plaintiff also has not established standing to challenge the transfer tax to the extent that he was the transferee in the relevant taxable transactions.[11]  Plaintiff asserts that he

---

[10] To the extent that Plaintiff challenges the doctrine of sovereign immunity, *see* Opp. at 22-25, his argument is foreclosed under binding precedent, *see, e.g., Sossamon v. Texas*, 563 U.S. 277, 283 (2011) ("It is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent." (emphasis omitted) (quoting THE FEDERALIST No. 81, at 511 (Alexander Hamilton) (Benjamin F. Wright ed., 1961))).

[11] Defendants acknowledge that they did not raise this argument in their opening brief, before Plaintiff clarified the grounds for his "implicit" tax refund claim in his opposition and supplemental briefs. Opp. at 20; *see generally* Suppl. But "Article III standing is a jurisdictional requirement that cannot be waived [or forfeited] by the parties." *Cherry v. FCC*, 641 F.3d 494, 497 (D.C. Cir. 2011).  In any event, the Court can and should dismiss Plaintiff's tax refund claims because of the jurisdictional defects already discussed, which were addressed thoroughly in

"owns 49 NFA regulated firearms for which he paid the $200.00 NFA tax," totaling "$9,400." ECF No. 25-1, at 1. But the schedule attached to his TTB Form shows taxes paid pursuant to both Form 1 and Form 4.[12] Form 4 is used to transfer a NFA firearm to an individual or other entity.[13] The NFA's transfer tax "shall be paid by the transferor," not the transferee. 26 U.S.C. § 5811(b). To the extent that Plaintiff currently "owns" the relevant firearms, ECF No. 25-1, at 1, he fails to explain why he paid the transfer tax (rather than the transferor from which he obtained the firearms) or otherwise was harmed by the tax.[14] Thus, Plaintiff lacks Article III standing to challenge any NFA taxes imposed on transfers of firearms to Plaintiff for which the transferor paid the transfer tax.

## CONCLUSION

For the reasons stated above and in Defendants' opening brief, the Court should dismiss Plaintiffs' Second Amended Complaint for lack of subject matter jurisdiction.

---

Defendants' opening brief, *see* MTD at 12-16, and need not rely on Plaintiff's lack of standing to challenge the transfer tax.

[12] Defendants use the term "Form" herein to refer interchangeably to the relevant traditional Forms and corresponding e-Forms.

[13] *See* ATF, Form 4 - Application for Tax Paid Transfer and Registration of Firearm (ATF Form 5320.4), *available at* https://www.atf.gov/firearms/docs/form/form-4-application-tax-paid-transfer-and-registration-firearm-atf-form-53204/download (last visited February 16, 2023).

[14] Even to the extent that the economic burden of the tax may have been passed on to Plaintiff in the form of higher prices, any such injury would not be fairly traceable to Defendants, "but rather 'the result of the independent action of some third party not before the court,' *to wit*, the decision of the [transferors] to 'pass on' the burden of [the transfer tax] to their customers." *Ontario Power Generation, Inc. v. United States*, 54 Fed. Cl. 630, 632 (2002) (quoting *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997)), *aff'd*, 369 F.3d 1298 (Fed. Cir. 2004); *accord Emerald Int'l Corp. v. United States*, 54 Fed. Cl. 674, 680 (2002), *appeal dismissed*, 60 F. App'x 808 (Fed. Cir. 2003); *see also, e.g.*, *United States v. Lax*, 596 F. Supp. 3d 421, 433 (E.D.N.Y. 2022) ("The fact that a party may bear the ultimate economic burden as a result of payment of a tax does not make that party the taxpayer or establish standing." (quoting *Middlesex Sav. Bank v. Johnson*, 777 F. Supp. 1024, 1029 (D. Mass. 1991) (collecting cases)).

Dated:  February 16, 2023                    Respectfully submitted,


                                             BRIAN M. BOYNTON
                                             Principal Deputy Assistant Attorney General

                                             LESLEY FARBY
                                             Assistant Branch Director


                                               */s/ Daniel Riess*
                                             DANIEL RIESS (Texas Bar No. 24037359)
                                             Trial Attorney
                                             United States Department of Justice
                                             Civil Division, Federal Programs Branch
                                             1100 L Street, N.W.
                                             Washington, D.C.  20005
                                             Tel: (202) 353-3098
                                             Daniel.Riess@usdoj.gov
                                             *Attorneys for Defendants*